**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Class Actions | No. 1:19-cv-06627 |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, ten community pharmacies seeking to represent a putative class, assert that the defendants have conspired to restrain trade and monopolize key services related to the provision of "e-prescriptions." The defendants have moved to dismiss, arguing (among other things) that under the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the plaintiffs are not proper parties to bring this antitrust action for damages. Because the plaintiffs stop short of alleging that they are direct purchasers from the defendants or otherwise permitted by the *Illinois Brick* doctrine to bring these claims, they have failed to push their claim across "the line between possibility and plausibility of entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (cleaned up). Accordingly, the defendants' motions to dismiss are granted. As this is a defect that the plaintiffs may be able to remedy, the dismissal is without prejudice.

**BACKGROUND**

This case involves the market for e-prescription services. E-prescription services include both "routing," the transmission of prescription information from a physician to a pharmacy, and "eligibility," the transmission of a patient's formulary and pharmaceutical benefit information from the patient's health care plan to a prescriber's electronic health record system. Consol. Class Action Compl. ("CAC") ¶ 2. The plaintiffs are ten pharmacies that participate solely in the routing

market. Defendant Surescripts is a health information technology company that provides e-prescription routing and eligibility services. Defendant RelayHealth is a wholesale customer of Surescripts that resells Surescripts' e-prescription routing services. Defendant Allscripts is an electronic health records (EHR) vendor that provides patient chart data electronically for physicians and hospitals.

The market for e-prescription services has expanded dramatically in recent years, encouraged in part by the Medicare Improvements for Patients and Providers Act and the Health Information Technology for Economic and Clinical Health Act. In 2017, 77% of all prescriptions were delivered electronically. *Id.* ¶¶ 42-43. The plaintiffs allege that defendant Surescripts maintains "at least a 95% share, by transaction volume, in both the routing and eligibility markets" and has been able to charge pharmacies supracompetitive prices for nearly ten years. *Id.* ¶ 3. The plaintiffs allege that they and other pharmacies "have been forced to pay considerably more for their routing services than they otherwise would have paid in the presence of lawful competition." *Id.* ¶ 4.

In addition, the plaintiffs allege that some pharmacy technology vendors ("PTVs")—firms that provide software and computer technology services that facilitate pharmacies' connections to Surescripts' routing services—entered into a conspiracy with the defendants. Generally, a PTV serves as a facilitator for routing transactions; the plaintiffs allege, however, that "some PTV entities joined Defendants' scheme as co-conspirators." These PTVs resell Surescripts' e-prescription routing transactions to pharmacies, charging routing prices "in lock-step with Surescripts' prices" that are paid to the PTV rather than to Surescripts. *Id.* ¶ 30. Each plaintiff alleges that during the relevant period, it "paid Surescripts e-prescription routing charges," *id.* ¶¶ 16-25, and the plaintiffs enumerate the amount that they were charged per routing transaction,

*id.* ¶ 58. The plaintiffs do not specify, however, whether they paid Surescripts directly, paid for Surescripts routing services through a reseller like defendant RelayHealth, or purchased those services through a PTV. *Id.* ("Surescripts and RelayHealth (or PTV Co-Conspirators) charge pharmacies an itemized fee for each routing transaction.").

The plaintiffs allege that Surescripts has enacted a pricing regime that requires long-term exclusivity commitments from its customers, threatened retroactive fees that have effectively precluded potential competitors from entering the market, and entered into noncompete agreements with other players in the routing market. Surescripts offers loyalty pricing to customers that route all of their transactions only through the Surescripts network. *Id.* ¶ 72. While loyalty pricing differs from non-loyalty pricing only by a few cents per transaction, the plaintiffs allege that the additional cost adds up over millions of routing transactions. *Id.* ¶ 74. Moreover, if a pharmacy opts to no longer route its transactions exclusively through Surescripts' network, the plaintiffs allege that Surescripts "requires customers to pay the price differential between the loyal and non-loyal price for historical transaction volume *retroactive* over the term of the contract." *Id.* ¶¶ 76, 78-79. The plaintiffs allege that it is nearly impossible for a potential competitor to offer a low enough price to offset Surescripts' loyalty pricing and concomitant penalties for non-exclusivity. *Id.* ¶ 177. Indeed, the plaintiffs aver that Surescripts effectively forced potential competitor Emdeon out of the market through its loyalty pricing and exclusivity contracts, which cover "at least 79% of pharmacy routing transaction volume" and accordingly "foreclose nearly 80% of the pharmacy side of the routing network from potential competition." *Id.* ¶¶ 50, 70, 170.

The plaintiffs further allege that when Surescripts discovered that defendant Allscripts was developing a network that would cut Surescripts out as a middleman and offer lower prices to "route prescriptions to Emdeon's pharmacy customers without using the Surescripts network,"

3

Surescripts signed a long-term exclusivity agreement with Allscripts for both routing and eligibility services and required Allscripts to terminate its relationship with Emdeon. *Id.* ¶¶ 120, 122-23, 126-29. Allscripts and Surescripts renewed their agreement in 2015. *Id.* ¶ 135. Despite this agreement, the plaintiffs allege that Surescripts remained concerned that Allscripts would utilize other platforms, including Emdeon; to ensure that Allscripts remained exclusive, Surescripts allegedly threatened to cut off Allscripts' access to Surescripts' pharmacy directory, medication history, and eligibility information and to impose penalties if Allscripts did not enter into an exclusivity agreement. *Id.* ¶¶ 136-41. In 2018, Surescripts and Allscripts entered into an amended agreement, allegedly after they became aware of an FTC investigation into Surescripts' e-prescribing contracts, that "deleted some of the more restrictive provisions contained in the 2010 Allscripts-Surescripts agreement and the 2015 amendment" but did not fundamentally change Surescripts' exclusivity requirements. *Id.* ¶ 144.

Finally, the plaintiffs allege that out of concern over defendant RelayHealth's ability to compete in the routing market, Surescripts entered into multiple agreements not to compete with RelayHealth, "meaning that while RelayHealth could resell Surescripts' routing services to certain customers, it could not compete with Surescripts by starting its own routing network." *Id.* ¶¶ 92, 104. Surescripts and RelayHealth signed an agreement in 2010 in which RelayHealth agreed not to compete in the routing market for another six years. *Id.* ¶ 107. The 2010 agreement also included plans to co-develop 27 value-added services, none of which have come to fruition. *Id.* ¶¶ 192-93. According to the plaintiffs, Surescripts' own documents acknowledge that "the only real value that we are getting out of the RelayHealth relationship at this point is the exclusivity." *Id.* ¶ 112. Surescripts and RelayHealth signed another contract in 2015 that is still in force that, according to

the plaintiffs, "exchanged the explicit routing non-compete provision for an implicit one, requiring RelayHealth to transition its EHR routing relationships to Surescripts directly." *Id.* ¶ 113.

Plaintiffs seek to represent a prospective class of U.S.-based pharmacies who "paid for e-prescription routing transactions from Surescripts, RelayHealth, or any pharmacy technology vendor with an exclusive Surescripts or RelayHealth routing contract during the period September 21, 2010, through and until the date of trial." *Id.* ¶ 221. Plaintiffs allege that the defendants' fraudulent concealment tolled the statute of limitations, as plaintiffs and members of the prospective class had no knowledge of the alleged conspiracy until the FTC filed a complaint against Surescripts in the United States District Court for the District of Columbia in May 2019. *Id.* ¶¶ 211-14. The plaintiffs filed actions in this District in October and November 2019 and filed the CAC on December 5, 2019, bringing claims for monopolization, conspiracy to monopolize, and conspiracy or combination in restraint of trade in violation of the Sherman Act against Surescripts, RelayHealth, and Allscripts. The plaintiffs reached a settlement in principle with defendant RelayHealth in June 2020, and accordingly RelayHealth's motion to dismiss has been held in abeyance; defendants Surescripts' and Allscripts' motions to dismiss are before the Court. Argument on the motions was heard on June 26, 2020 by telephone conference. Transcript, ECF No. 117.[1]

## DISCUSSION

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to

---

[1] All citations to "Tr." are to the transcript of the oral argument on the defendants' motions to dismiss.

5

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In ruling on a motion to dismiss under Rule 12(b)(6), a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but the court need not accept legal conclusions or conclusory allegations. *Id.* at 680-82.

Only certain parties may assert a federal antitrust cause of action for damages. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977), the Supreme Court held that only an "overcharged direct purchaser, and not others in the chain of manufacture or distribution," may bring such a claim. *See also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) ("*Illinois Brick* established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers."). Alternatively, if manufacturers and distributers have entered into a conspiracy that makes a certain party the "first innocent purchaser," *Illinois Brick* will not bar the claim, as the "first buyer from a conspirator is the right party to sue." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631 (7th Cir. 2002). To state a claim, a plaintiff must plausibly allege that it was a direct purchaser from an alleged monopolist or "plausibly allege that [it was] a direct purchaser from a member of the alleged conspiracy." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 752-53 (N.D. Ill. 2019). *See also Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841, 843 (7th Cir. 2020) (antitrust plaintiffs must establish at the pleading stage that they are proper parties under the *Illinois Brick* doctrine).

The plaintiffs maintain, correctly, that the Illinois Brick doctrine is not one of jurisdictional standing:

> Numerous doctrines have arisen to clarify the circumstances under which
> a particular person may recover from an antitrust violator. At times these

> doctrines are rather incautiously lumped together under the umbrella term of "antitrust standing." However, the Supreme Court has generally been careful to limit the actual question of standing to the simple inquiry of whether a plaintiff has suffered a redressable injury in fact, entitling the federal courts to hear such a "case or controversy" under Article III. There is no dispute that the plaintiffs in these cases have been injured . . . their Article III standing is therefore secure. The difficult question is statutory, because the Sherman Act has additional rules for determining "whether the plaintiff is the proper party to bring a private antitrust action."

*Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002) (citations omitted). That *Illinois Brick* presents a merits question is true enough, but that is of no consequence to resolution of the defendants' motions as the defendants do not dispute that the plaintiffs have Article III standing to bring their claims. Resp. MTDs at 9 & n.9, ECF No. 90. The merits question at issue here is whether the plaintiffs have adequately pleaded that they are direct purchasers permitted to sue for antitrust damages under the *Illinois Brick* rule. The Court concludes that they have not. Even taking all facts in the CAC as true and drawing all reasonable inferences in the plaintiffs' favor, the plaintiffs have not plausibly alleged that they were direct purchasers or that they were first innocent purchasers from an identified member of the conspiracy sufficient to make them proper parties in this action.

First, nowhere in the CAC have the plaintiffs alleged that they purchased e-prescription routing services directly from Surescripts. The closest they come is an allegation, repeated verbatim in the paragraphs identifying each plaintiff, which states: "During the relevant period, [each plaintiff] paid Surescripts e-prescription routing charges." CAC ¶¶ 16-25. Plaintiffs maintain that this allegation "should be the end of the inquiry at this stage of the litigation," Resp. MTDs at 11, ECF No. 90, but as the defendants point out, this statement does not state *to whom* the plaintiffs paid those charges. And other allegations in the CAC suggest that the plaintiffs purchased Surescripts routing services not from Surescripts directly but from intermediaries like RelayHealth

or PTVs who were reselling routing services that they had purchased directly from Surescripts. When the CAC alleges that "Plaintiffs and members of the Class paid substantial overcharges on routing transactions directly from Surescripts, RelayHealth, and PTV Co-Conspirators," CAC ¶ 215, we are left to wonder *which* plaintiffs and which class members paid Surescripts directly, which paid RelayHealth, and which paid "PTV Co-Conspirators." Indeed, this allegation does not reveal whether any of the named plaintiffs purchased routing services from Surescripts directly; the statement would not be untrue even if every one of the plaintiffs purchased their routing services directly from a PTV Co-Conspirator. The CAC's allegation that "Surescripts and RelayHealth (or PTV Co-Conspirators) charge pharmacies an itemized fee for each routing transaction" adds no clarity; knowing that pharmacies paid one of the three does not plausibly allege that they paid Surescripts. Nor does knowing what each of the plaintiff pharmacies paid for routing services fill in the gap; knowing that Corner Pharmacy paid 19 cents per transaction while Summers Pharmacy paid 16.5 cents per transaction does not answer, but begs, the question: to whom did they pay those charges?[2]

The plaintiffs surely know the answer to this question. This is not information to which they are not privy or that lies only within the defendants' ken. If the plaintiffs paid Surescripts directly for e-prescription routing services, they need only say so to render the *Illinois Brick* doctrine irrelevant. They have instead engaged in what looks like artful pleading intended (albeit unsuccessfully) to disguise their failure to allege that they are direct purchasers from Surescripts. It is exceedingly difficult, moreover, to imagine why the plaintiffs would not put this issue to rest

---

[2] Allscripts, as an EHR vendor, avers that it is not in the distribution chain for routing services and is not a "seller, reseller, or distributor of anything that pharmacies purchase." Mem. Supp. Allscripts MTD at 6, ECF No. 77. The plaintiffs do not allege that they are direct purchasers from Allscripts, but rather allege that Allscripts is part of the conspiracy.

if they could, in good faith, allege that they purchased e-prescription routing services directly from Surescripts.[3]

At oral argument, moreover, the plaintiffs effectively conceded that they have not alleged that they paid Surescripts directly for e-prescription routing services by asserting that the identity of who they wrote the checks to is irrelevant. The Court asked plaintiffs' counsel where in the CAC the plaintiffs had alleged that they purchased e-prescription routing services directly from Surescripts. Tr. at 42:20-25 ("coy might not be a bad description. We're talking about something very simple and straightforward here . . . . Who did the plaintiffs buy from? And you could parse this complaint very carefully and not get an answer to that question, or tell me where the answer to that question lies in the complaint."). The plaintiffs' response was not to point to an allegation in the CAC that avers that they purchased routing services directly from Surescripts, but to instead acknowledge that the plaintiffs paid PTVs and to argue that PTVs are only "billing aggregators" for Surescripts. *Id.* at 44:10. In other words, PTVs were collecting on behalf of Surescripts, not buying and then reselling e-prescription routing services.

There are at least three problems with that argument. First, there are the allegations, already addressed above, averring that the plaintiffs and other class members bought directly from PTVs. That allegation is plainly inconsistent with the assertion that PTVs are merely billing aggregators.

---

[3] In noting the plaintiffs' artful pleading, the Court is not endorsing the characterization of the plaintiffs' pleadings offered by the defendants in their motion for sanctions. As the Court sees it, the problem with the CAC is not that it falsely alleges that the plaintiffs directly purchased routing services from Surescripts but rather that it fails to provide sufficient information to plausibly suggest that they should be deemed to be direct purchasers. Many complaints fail to include enough facts to plausibly support a claim, but that does not make them sanctionable. Further, although the Court is not persuaded by the plaintiffs' argument that they are direct purchasers from Surescripts because the PTVs they dealt with were not traditional distribution chain intermediaries, the argument cannot fairly be described as frivolous. Accordingly, although granting the motions to dismiss, the Court denies Surescripts' motion for sanctions (ECF No. 113).

9

The plaintiffs explain the inconsistency by asserting that only a small portion of PTVs act as resellers. *Id.* at 42:1-3. But which PTVs act as resellers and to which pharmacies do they sell? The CAC doesn't say. More critically still, although the plaintiffs' counsel asserted that the plaintiffs only dealt with PTV facilitators, not those who were resellers, that is not what the CAC alleges. *See* CAC ¶ 215 ("During the relevant period, Plaintiffs and members of the Class paid substantial overcharges on routing transactions directly from Surescripts, RelayHealth, and PTV Co-Conspirators.").

Second and relatedly, in an effort to invoke the "first innocent purchaser" exception to the *Illinois Brick* direct purchaser rule, the CAC alleges that some PTVs are conspirators with Surescripts, *id.* ¶ 30. *See Paper Sys. Inc.*, 281 F.3d at 631. The plaintiffs name more than 80 PTVs that have been certified by Surescripts to provide pharmacies with access to the Surescripts routing network, CAC ¶ 30, but they never state that any or all of these PTVs have joined the alleged conspiracy. The plaintiffs do not even allege that they conducted business with any of these particular PTVs. The CAC therefore fails to adequately plead the existence of a conspiracy that would bring purchases of routing services from PTVs into the direct purchaser confines of the *Illinois Brick* doctrine.

"A plaintiff is not entitled to resort to frivolous accusations of conspiracy to evade the *Illinois Brick* rule; the allegation must still reach the level of baseline plausibility." *Marion Healthcare*, 952 F.3d at 841. This is not a high bar. It is "enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002); *see also City of Rockford*, 360 F. Supp. 3d at 748 ("This standard is not the same as the 'heightened' pleading standard of Rule 9(b), and accordingly, plaintiffs can allege an antitrust conspiracy by pleading circumstantial evidence of an illegal agreement."). Low

as this pleading bar is, however, the plaintiffs have failed to clear it. They have not indicated the particular PTVs they dealt with much less alleged facts that plausibly suggest that the PTVs were coconspirators.

The plaintiffs state that "not all [of the PTV Co-Conspirators] are currently known or named as defendants in this complaint," CAC ¶ 30, but in fact *none* of the alleged PTV Co-Conspirators are identified by name in the CAC, nor are any of the PTVs named in the CAC alleged to be co-conspirators. In *City of Rockford*, plaintiffs' conspiracy claim was dismissed for conclusory pleading against an identified co-conspirator when the complaint contained "scant mentions of [the co-conspirator] and its role as part of the dealing arrangement alleged in all other respects to be exclusive." 360 F. Supp. 3d at 752-53; *see also Marion Healthcare*, 952 F.3d at 841 ("If the distributors were not part of the alleged conspiracy, then Providers' case falls apart: no conspiracy, no direct purchaser status, no right to recover."). In this case, the plaintiffs have not identified which, if any, of the PTVs are alleged co-conspirators, much less alleged facts regarding the timeframe and scope of their conspiratorial agreement. Accordingly, the plaintiffs have not plausibly alleged that they are first innocent purchasers from a PTV Co-Conspirator sufficient to avoid the *Illinois Brick* bar and state a claim.

Third and finally, the plaintiffs' argument about the "market realities" of the relationship between Surescripts and non-conspirator PTVs is out of sync with *Apple, Inc. v. Pepper*, 139 S. Ct. 1514 (2019), in which the Supreme Court held that consumers were direct purchasers from Apple of smart phone "apps" despite the fact that Apple did not set the prices of the apps. In so holding, the Court squarely rejected the argument that application of the *Illinois Brick* doctrine turns on how the financial relationship between an upstream supplier (read: Surescripts) and a middleman (read: PTVs) is structured. It would exalt form over substance, the Court observed, to

11

permit suit against an intermediary when it bought the product from the supplier and then marked it up but to forbid suit when "instead of buying the product from the supplier, [the intermediary] arrange[d] to sell the product for the supplier without purchasing it from the supplier." *Apple*, 139 S. Ct. at 1523.

That is in essence the distinction the plaintiffs try to draw in arguing that, in billing pharmacies for routing services, the "market reality" is that PTVs are not acting as resellers and "had no part of e-prescriptions, carrying it, paying for it, holding it, taking any risk on it." Tr. 44:16-17. As the defendants point out, the CAC acknowledges that this is not the case for some PTVs, but even accepting this allegation at face value, *Apple v. Pepper* teaches that the arrangements between supplier and intermediary are not the focus of the *Illinois Brick* doctrine. Whether the defendant is a traditional reseller marking up a product purchased from a supplier or merely a broker who provides a service that connects a supplier and consumer and facilitates their transaction does not matter to application of the *Illinois Brick* doctrine; "a distribution system that relies on brokerage is economically indistinguishable from one that relies on purchaser-resellers." *Apple*, 139 S. Ct. at 1523 (quoting 2A Areeda & Hovenkamp ¶ 345, at 183).

Rather, "[t]he relevant inquiry in determining the applicability of *Illinois Brick* focuses on the relationship between the seller and the purchaser." *Marion Healthcare*, 952 F.3d at 840. But, again, despite the fact that they surely have the information, the plaintiffs tell us next to nothing about their relationships with Surescripts and PTVs so we cannot plausibly determine from whom they purchased routing services. Indeed, we don't know who they purchased routing services from even by category (acknowledged reseller, conspirator-PTV, or "facilitator" PTV), much less by firm. The CAC, moreover, offers no averments about the nature of the services provided to them by whatever PTVs they used (if any) in connection with routing e-prescriptions through

Surescripts' network. We know, based on what little the CAC alleges, that some PTVs provide only "pharmacy software and computer technology" that facilitates the use of Surescripts' services, CAC ¶ 29, while others "contract with Surescripts . . . to 'resell' Surescripts' e-prescription routing transactions in return for a cut of the supracompetitive profits," *id.* ¶ 30, but the CAC provides no basis to distinguish a PTV "reseller" in league with Surescripts from a PTV "billing aggregator" who was merely a conduit for payments to Surescripts. In short, the CAC does not allege sufficient facts, taken as true, to plausibly establish that in writing a check to a PTV the plaintiffs were not purchasing routing services from the PTV but really writing a check to Surescripts.

\* \* \* \* \*

Here's the bottom line: The CAC does not tell us whether the plaintiffs purchased e-prescription routing services directly from Surescripts, or from RelayHealth or other resellers, or from PTVs who were conspiring with Surescripts, or from PTVs who weren't conspiring with Surescripts. Without this information, the CAC fails to allege facts that establish that the plaintiff pharmacies are permitted under the *Illinois Brick* doctrine to bring suit in federal court for antitrust damages. That's the plaintiffs' burden. Accordingly, defendants Surescripts' and Allscripts' motions to dismiss are granted. The dismissal, however, is without prejudice; the plaintiffs may replead if they are able. If they prefer to stand on the CAC, however, they may so advise the Court and it will enter judgment for Surescripts and Allscripts to facilitate any appeal the plaintiffs may wish to pursue.

Date: August 19, 2020

John J. Tharp, Jr.
United States District Judge