## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br>All Class Actions | Civil Action No. 1:19-cv-06627<br><br>Judge John J. Tharp, Jr.<br><br>Magistrate Judge Susan E. Cox |

## ALLSCRIPTS HEALTHCARE SOLUTIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Joel R. Grosberg (*Pro Hac Vice*)
**McDermott Will & Emery LLP**
The McDermott Building
500 North Capitol St NW
Washington, DC, 20001-1531
Telephone: (202) 756-8207
Email: jgrosberg@mwe.com

Katharine M. O'Connor
Joshua W. Eastby
**McDermott Will & Emery LLP**
444 West Lake Street, Suite 4000
Chicago, IL, 60606-0029
Telephone: (312) 984-3627
Email: koconnor@mwe.com
        jeastby@mwe.com

*Attorneys for Defendant Allscripts Healthcare Solutions, Inc.*

# TABLE OF CONTENTS

Introduction..............................................................................................................................1

The Facts Alleged About Allscripts.........................................................................................2

Standard of Review...................................................................................................................5

Argument ..................................................................................................................................6

    I.    Counts IV and VIII Fail Because Plaintiffs Have Not Pled Necessary Elements of a Rule of Reason Claim as to Allscripts. ................................................................7

        A.    Counts IV and VIII Fail Because Allscripts Does Not Have Market Power. ........................................................................................................8

        B.    Counts IV and VIII Fail Because Plaintiffs Cannot Allege Substantial Foreclosure Based on the Allscripts-Surescripts Agreement Alone............9

    II.    The Court Should Dismiss Counts IV and VIII Because Allscripts, as a Surescripts Customer, Is Not a Proper Defendant. .................................................11

    III.    Even if Analyzed under the *Per Se* Rule, Counts IV and Count VIII Fail Because Plaintiffs Have Not Alleged a Plausible Conspiracy Involving Allscripts. ...........11

    IV.    Plaintiffs Cannot Bring any Antitrust Claim Against Allscripts Under *Illinois Brick*.....................................................................................................................13

    V.    Plaintiffs Are Not Proper Parties to Bring Any Claim Against Allscripts under *Associated General Contractors*.........................................................................14

Conclusion ..............................................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................5

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983) ..........................................................................................14, 15

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.,*
784 F.2d 1325 (7th Cir. 1986) ...............................................................................8

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................2, 6, 12, 13

*Car Carriers, Inc. v. Ford Motor Co.,*
745 F.2d 1101 (7th Cir. 1984) ...........................................................................6, 13

*Dickson v. Microsoft Corp.,*
309 F.3d 193 (4th Cir. 2002) .............................................................................8, 9

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.,*
684 F.2d 1346 (7th Cir. 1982) ..........................................................................7, 8, 9

*Genetic Sys. Corp. v. Abbott Labs,*
691 F. Supp. 407 (D.D.C. 1988) ...........................................................................11

*Goodloe v. Nat'l Wholesale Co., Inc.,*
No. 03-cv-7176, 2004 WL 1631728 (N.D. Ill. July 19, 2004) ...............................11

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
392 U.S. 481 (1968) ...............................................................................................13

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ...............................................................................................13

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde,*
466 U.S. 2 (1984) ...................................................................................................10

*Kendall v. Visa U.S.A., Inc.,*
518 F.3d 1042 (9th Cir. 2008) ..........................................................................12, 13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007) ................................................................................................7

ii

*Marion HealthCare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ........................................................................................13, 14

*McGuire v. Columbia Broad. Sys., Inc.*,
  399 F.2d 902 (9th Cir. 1968) ..................................................................................................11

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
  No. 1:13-cv-01054, 2016 WL 5817176 (C.D. Ill. Sept. 30, 2016) ........................................10

*Monsanto v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)................................................................................................................13

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)..............................................................................................................7

*Paper Systems Inc. v. Nippon Paper Indus. Co.*,
  281 F.3d 629 (7th Cir. 2002) ..................................................................................................14

*Rubloff Dev. Grp. v. SuperValu, Inc.*,
  863 F. Supp. 2d 732 (N.D. Ill. 2012) .....................................................................................15

*Sharif Pharmacy, Inc. v. Prime Therapeutics*, LLC
  950 F.3d 911 (7th Cir. 2020) ....................................................................................................8

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*,
  200 F.3d 307 (5th Cir. 2000) ..................................................................................................13

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
  390 F. Supp. 3d 892 (N.D. Ill. 2019) .....................................................................................12

*Wallach v. Eaton Corp.*,
  814 F. Supp. 2d 428 (D. Del. 2011)........................................................................................11

*Will v. Comprehensive Accounting Corp.*,
  776 F.2d 665 (7th Cir. 1985) ....................................................................................................8

iii

### INTRODUCTION

Plaintiffs' Second Amended Consolidated Class Action Complaint (Complaint) does nothing to cure the defects in their initial pleading as to Allscripts Healthcare Solutions, Inc. (Allscripts). Plaintiffs do not alter their allegations as to Allscripts except to *omit* certain allegations that Allscripts demonstrated during the last round caused Plaintiffs antitrust claim to fail.[1] Even with these omitted facts, Plaintiffs continue to have no claim. As a customer with no market power, Allscripts cannot be liable under the antitrust laws for entering into an alleged exclusive agreement with a monopolist. To make Allscripts defend an antitrust claim based on its agreeing to an exclusive agreement with Surescripts LLC (Surescripts) would fly in the face of basic antitrust law. Plaintiffs cannot survive by calling Allscripts' agreement with Surescripts a "conspiracy" or "collusion." Those are mere labels with no independent meaning. Plaintiffs must allege Allscripts had market power to pursue a claim against Allscripts based on its contract with a supplier (a "vertical" agreement under the antitrust laws). Plaintiffs also must allege that the Allscripts-Surescripts agreement alone substantially foreclosed competition in a relevant market. They plead neither nor do they even attempt to do so.

It is not surprising that Plaintiffs have no claim against Allscripts, one of the dozens of companies that unwillingly entered into "loyalty contracts" with Surescripts. After a multi-year investigation of the same conduct alleged in Plaintiffs' complaint, the Federal Trade Commission (FTC) decided *not* to bring any claims against Allscripts despite Plaintiffs' allegations mimicking

---

[1] Specifically, Plaintiffs deleted the allegations that it is "economically rational" for electronic health records (EHR) vendors like Allscripts to maintain loyalty agreements with Surescripts, that EHRs have "no choice" but to agree to Surescripts' demands, that an EHR customer (Allscripts) "feared that 'Surescripts would have cut us of'" if it did not acquiesce to Surescripts' demands, and that Allscripts "strongly object[ed]" to the agreement. *See* Consolidated Class Action Complaint [Dkt. 52] at ¶¶ 175, 180-81.

1

the FTC's.[2] Plaintiffs' reason for adding Allscripts is simple—to bring the "*in terrorem*" threat of treble damages and extensive litigation against Allscripts in hopes of a quick settlement with attorneys' fees. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Plaintiffs' claims against Allscripts should not be allowed to proceed.

## THE FACTS ALLEGED ABOUT ALLSCRIPTS[3]

This case involves the electronic transfer of prescription and insurance benefits information between healthcare providers, insurance companies, and pharmacies. As an EHR vendor, Allscripts is "customer of Surescripts" because Allscripts' own customers (healthcare providers) "need to connect to pharmacies and Health Plans/PBMs" through a network like Surescripts'. *Id.* ¶¶ 2, 7, 39. Surescripts provides the electronic connections that allow Allscripts' provider customers to send electronic prescriptions to pharmacies (called "routing") and to receive prescription benefit information from insurance companies[4] (called "eligibility"). *Id.* ¶ 2. The difference between Surescripts' agreements with EHR vendors and others is that EHR vendors receive fees for routing its customers' prescription and eligibility transactions, while PBMs, pharmacy technology vendors (PTVs), and pharmacies pay for services. *Id.* ¶¶ 132-34, 232. None of the Plaintiffs in this case purchased anything from Allscripts, either directly or indirectly. *See id.* ¶¶ 15-29.

Plaintiffs allege that Surescripts sought to prevent EHR vendors, like Allscripts, as well as

---

[2] The FTC disagrees with Plaintiffs here that there is a claim against Allscripts. *See* Nov. 19, 2019 Hearing Tr. in *FTC v. Surescripts, LLC* (D.D.C.), Case No. 19-cv-1080, at 84:16-21, attached as Ex. A ("I am not going to speak for the private plaintiffs, but their complaints name RelayHealth and Allscripts as defendants in those cases, and we do not. We don't agree on that issue.").

[3] For purposes of this motion to dismiss only, Allscripts accepts as true the facts alleged in the Second Amended Consolidated Class Action Complaint.

[4] A patient's pharmacy benefit manager (PBM) also can relay the patient's insurance coverage information for prescriptions. For our purposes here, PBMs and health plans function interchangeably. *Id.* ¶ 30.

2

pharmacies, PTVs, and PBMs from using more than one connectivity provider for e-prescribing services—a practice called "multihoming." *Id.* ¶¶ 49, 108. "Customers want to multihome because it encourages price competition and innovation in e-prescribing." *Id.* ¶ 108.

Surescripts sought to prevent multihoming, and, therefore, competition for its connection services, through a series of agreements containing "loyalty" provisions. Without the assistance of any other market participants, "*Surescripts* established pricing protocols that *required* long-term exclusivity commitments from virtually all of its routing and eligibility customers." *Id.* ¶ 6 (emphasis added). These contract terms "substantially raised nearly all of its customers' costs to multihome." *Id.* ¶ 113. By preventing multihoming, Surescripts was able to protect and solidify its alleged monopoly because other competitors were unable to acquire the volume necessary to build a competing network. *Id.* ¶¶ 109, 225-27, 230-32.

Allscripts was one of Surescripts' customers that multihomed before entering into a contract with "loyalty provisions." *Id.* ¶ 7, 173. Before 2009, Allscripts connected to both Surescripts and Emdeon, an "aspiring" Surescripts competitor. *Id.* ¶ 7. Surescripts viewed Emdeon as "an emerging threat" because it allowed customers to multihome. *Id.* ¶¶ 114. Allscripts preferred to multihome, and, before 2009, "Emdeon paid Allscripts a routing transaction incentive fee that was higher than what Surescripts paid Allscripts." *Id.* ¶¶ 117-18, 173.

Allscripts unwillingly agreed to enter into the alleged exclusive contract with Surescripts because of Surescripts' market power as a "must-have" connectivity provider. Because Allscripts was one of the customers who multihomed with Emdeon, Surescripts wanted to ensure Allscripts signed up for the exclusive contract, *id.* ¶ 172, and "implemented a 'full combat strategy' to 'lock up . . . Allscripts,'" *id.* ¶ 179. "Allscripts lamented that it had to enter into this agreement as Surescripts was a 'must-have' connectivity vendor, and without a contract, Allscripts would be

3

unable to connect to pharmacies and PBMs and thus be unable to e-prescribe." *Id.* ¶ 186. Allscripts, like all EHRs, was "harmed by not having any choice of routing or eligibility provider." *Id.* ¶ 229. But for Surescripts' contracts, "competition for prescribers (via their EHRs) would likely result in higher incentive payments to EHRs, which would in turn provide incentives to EHRs to increase their doctors' utilization of e-prescribing." *Id.* ¶ 255.

Surescripts implemented an even more aggressive strategy to ensure Allscripts signed a renewed contract with loyalty provisions in 2014. During the 2014 renewal process, "Emdeon again attempted to sign Allscripts up as a customer by, for example, offering Allscripts increasingly large up-front payments and profit-sharing arrangements to compensate Allscripts for losing Surescripts's incentive fees." *Id.* ¶ 195. And, therefore, "Surescripts still worried that Allscripts would eventually restart multihoming." *Id.* ¶ 189. So, to prevent Allscripts from connecting to Emdeon, Surescripts substantially threatened Allscripts' business in other areas where Allscripts relied on Surescripts. *Id.* ¶ 192.[5] "Surescripts also sought to impose a penalty on Allscripts by making Allscripts pay millions of dollars if Allscripts did not enter into an exclusive agreement." *Id.* ¶ 193. "Surescripts sent Allscripts a retroactive invoice" that it would have to pay if it "did not agree to the renewed exclusivity" and "also withheld loyalty incentive payments from Allscripts until Allscripts signed the renewed contract." *Id.* Surescripts "admitted [the provisions] were designed to ensure that Allscripts did not leave the exclusive relationship." *Id.* ¶ 194.

Allscripts was not alone as a customer Emdeon sought to lure away from Surescripts. Emdeon approached pharmacies, PTVs, and EHRs to convince them "to become non-loyal to Surescripts." *Id.* ¶ 198. "In many cases, Emdeon approached these potential stakeholders with

---

[5] This included threats to "(1) bar Allscripts from using eligibility information obtained from Surescripts's network" for electronic prior authorization; "(2) cut Allscripts off from Surescripts's pharmacy directory;" and "(3) bar Allscripts's access to a separate service called medication history." *Id.* ¶ 192.

4

lower per-transaction pricing than Surescripts charged, higher per-transaction incentive payments than Surescripts paid, and no loyalty requirements." *Id.* Emdeon "was not successful" because "pharmacies *and EHRs could not afford to entertain offers from a Surescripts competitor* because doing so would trigger [] massive penalty provisions." *Id.* ¶ 199 (emphasis added). "There was no price (or incentive payment) that Emdeon could offer that would offset the penalty." *Id.* ¶ 201.

Allscripts also was not alone as an EHR customer of Surescripts that agreed to the loyalty contracts. "[N]early all EHRs" are connected to the Surescripts network, including large EHRs Cerner, Epic, and eClinicalWorks. *Id.* ¶¶ 122, 132. And, "nearly all EHRs participating in Surescripts' loyalty program agree to exclusivity on both transactions." *Id.* ¶ 133. The only fact that distinguishes Allscripts from other EHRs is that Allscripts' incentive fees allegedly were "substantially more than similarly situated EHRs." *Id.* ¶ 187. Surescripts described these higher fees as a "bribe." *Id.*

Plaintiffs allege that "Surescripts possesses durable monopoly power in each relevant market," but make no claims regarding market or monopoly power as to Allscripts. *Id.* ¶ 213. Plaintiffs allege that "Surescripts's loyalty contracts" as a whole have "foreclosed at least 70-80% of the routing and eligibility markets," *id.* ¶ 229, and that Surescripts' contracts with EHRs "foreclose well over 80% of the EHR sides of the routing and eligibility markets," *id.* ¶ 227. According to Plaintiffs, Allscripts' customers represented 25% of Surescripts' transactions, *id.* ¶ 172, or 20% of the EHR sides of routing and eligibility (80% multiplied by 25%).

## STANDARD OF REVIEW

"To survive a motion to dismiss for failure to state a claim under Federal Rule 12(b)(6), a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.

at 570). Formulaic recitations of the elements of a cause of action do not suffice. *Twombly*, 550 U.S. at 555; *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) ("[I]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss; to the contrary, these conclusory statements must be accompanied by supporting factual allegations.").

## ARGUMENT

Plaintiffs allege two counts (Counts IV and VIII) against Allscripts—a Sherman Act Section 1 conspiracy claim, and various state antitrust laws mirroring Sherman Act Section 1.[6] The conduct Plaintiffs challenge in each claim is the same—that Allscripts' contract with Surescripts is an anticompetitive agreement.

Plaintiffs fail to state a viable claim. As an agreement between a supplier and a customer, the Allscripts-Surescripts agreement is a "vertical" agreement subject to rule of reason review. Allscripts cannot be liable as a matter of law because plaintiffs do not allege Allscripts has market power nor do they allege the Allscripts-Surescripts agreement substantially forecloses competition. Plaintiffs try to get around lack of substantial foreclosure by claiming Emdeon was foreclosed. But the Allscripts agreement represented only 25% of Surescripts' transactions through an EHR, which is not substantial foreclosure by any measure, nor is the number of Surescripts transactions a relevant product market. This result is consistent with the purpose of the antitrust laws, which are meant to protect customers forced into exclusive agreements with monopolists— not to make the customers subject to the antitrust laws themselves.

Even if the Court were to analyze the Allscripts-Surescripts agreement under the *per se* analysis, which it should not, Plaintiffs' allegations fail. Allscripts allegedly "conspired" to harm

---

[6] For purposes of analyzing Plaintiffs' state law claims substantively, this Court can follow federal law interpreting Sherman Act Section 1. *See* Appendix 1.

itself by limiting its own choices and eliminating its own ability to multihome, which is implausible on its face.

Finally, Plaintiffs cannot bring any claim against Allscripts because they fail to allege an overarching conspiracy involving Allscripts, and because they cannot allege Allscripts' actions proximately caused their alleged harm.

**I.    Counts IV and VIII Fail Because Plaintiffs Have Not Pled Necessary Elements of a Rule of Reason Claim as to Allscripts.**

There are two ways to allege a Section 1 illegal agreement. The first way is to allege a naked agreement not to compete between direct competitors. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 885–87 (2007). Those agreements are called "horizontal" agreements because they are between horizontally situated competitors. *Id.* Naked agreements not to compete of that kind are so harmful to competition on their face that courts have deemed them illegal *per se*, meaning that there is no procompetitive justification for them, and thus they violate the antitrust laws without further inquiry. *Id.* The other way to plead a Section 1 illegal agreement is through the rule of reason. *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2284 (2018). "Vertical" agreements— for example, between customers and suppliers—are analyzed under the rule of reason. *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352-55 (7th Cir. 1982) (holding that the district court abused its discretion in granting preliminary injunction because plaintiff did not meet its burden of showing a vertical agreement was illegal under the rule of reason).

The Allscripts-Surescripts agreement is a vertical agreement because Allscripts is a "customer" of e-prescription routing and eligibility services. Compl. ¶¶ 7, 172; *see also id.* ¶¶ 29 (EHRs are customers "on the sell side of the e-prescription routing market"), 118, 195. Allscripts relies on the Surescripts connection so that its own customers, who are healthcare providers, can send prescriptions to pharmacies and receive benefit information from PBMs. *Id.* ¶¶ 186, 191.

7

Surescripts is a "must-have" supplier to Allscripts because, without Surescripts, Allscripts would be unable to connect its healthcare provider customers to 95% of pharmacies and PBMs. *Id.* ¶¶ 6, 120-21, 221.

Under the rule of reason, Plaintiffs must plead that *Allscripts* has market power in a relevant market, and that the Allscripts-Surescripts agreement alone substantially foreclosed competition. *Dos Santos*, 684 F.2d at 1352-55 (finding one exclusive agreement between a hospital and an anesthesiology provider was not substantial foreclosure of a relevant market); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207-09, 212-13 (4th Cir. 2002) (affirming dismissal of complaint for failure to plead market power as to the dismissed defendants). Plaintiffs have done neither.

A.     **Counts IV and VIII Fail Because Allscripts Does Not Have Market Power.**

Market power is a "necessary ingredient" in every case challenging a vertical arrangement. *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986). "Under the rule of reason for Section 1 cases, exclusive dealing or refusals to deal could violate Section 1 only if a defendant has monopoly or market power in a relevant market." *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (affirming dismissal of § 1 claim); *Dickson*, 309 F.3d at 208-13 (affirming dismissal of defendants Compaq and Dell for failure to allege either had market power). As such, defendants that "lack market power" are entitled to enter into vertical arrangements "without further scrutiny under the Sherman Act." *Ball Mem'l Hosp., Inc.*, 784 F.2d at 1337; *see also Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671 (7th Cir. 1985) ("We need not sift through the other instructions, however, because plaintiffs' case has a fatal weakness. They did not establish market power. They failed as a matter of law. This failure makes every other element of the anti-trust case irrelevant.").

8

Plaintiffs do not make any allegations that Allscripts has market power—instead they claim that Surescripts has market power. Compl. ¶¶ 209-23. According to Plaintiffs' own complaint, Allscripts has multiple EHR competitors that operate in each of the routing and eligibility markets in the same way that Allscripts does. *Id.* ¶¶ 122, 132-33. Because Allscripts does not have market power, providers can (and do) use other EHRs, and Surescripts easily could run its network without Allscripts.

Plaintiffs affirmatively allege that Allscripts *does not* have market power. Rather, they allege that Surescripts was able to coerce and control Allscripts and force Allscripts into an exclusive contract in which it was worse off. *Id.* ¶¶ 172-73 (Allscripts received higher incentive fee payments by multihoming), 186 ("Allscripts lamented that it had to enter into this agreement as Surescripts was a 'must-have' connectivity vendor."), 192-95, 229. This Court can dismiss Counts IV and VIII on the sole ground that Plaintiffs do not allege Allscripts has market power.

B.    **Counts IV and VIII Fail Because Plaintiffs Cannot Allege Substantial Foreclosure Based on the Allscripts-Surescripts Agreement Alone.**

Where, like here, a complaint alleges parallel anticompetitive vertical agreements, plaintiffs must plead that each vertical agreement alone substantially foreclosed competition. *Dos Santos*, 684 F.2d at 1352 ("In the context of exclusive dealing arrangements, this means that the plaintiff can prevail only by showing that the agreement in question results in a substantial foreclosure of competition . . . in a relevant market."); *Dickson*, 309 F.3d at 209 (dismissing claims of "vertical conspiracy" where plaintiff failed to allege "that either of the two licensing agreements at issue, when considered individually, are likely to foreclose a significant share of the relevant software markets").

Plaintiffs have not pled the Allscripts-Surescripts agreement alone substantially foreclosed competition. Allscripts is only one of several EHRs that has exclusive agreements in routing and

9

eligibility with Surescripts. Compl. ¶¶122, 132-33. Together, all of the EHRs' alleged exclusive agreements with Surescripts represent 80% of all e-prescription transactions though an EHR. *Id.* ¶ 227. Allscripts, however, represents only 25% of Surescripts' transactions through an EHR, which is not a relevant market. Therefore, Allscripts' transactions represent something less than 25% of the total electronic prescription transactions in either "market." *Id.* ¶ 172. This is not substantial foreclosure as a matter of law. *See, e.g., Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 n.51 (1984) (reversed on other grounds) (exclusive dealing contracts are unlawful only if they "foreclose[] so much of the market from penetration by . . . competitors as to unreasonably restrain competition in the affected market"); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 1:13-cv-01054, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) ("Courts typically require a plaintiff to make an initial showing of foreclosure from competing in at least 30 to 40 percent of a market to proceed with a claim.").

Plaintiffs cannot salvage this failure by claiming that Allscripts was a key for Emdeon to be able to form its own network. Allscripts was just one EHR among many that Emdeon needed to contract with in order to achieve its network. Compl. ¶ 199 ("[P]harmacies and EHRs could not afford to entertain offers from [Emdeon] because doing so would trigger the massive penalty provisions in their contracts."); *see also id.* ¶¶ 198-208. Emdeon needed to sign up a number of EHR providers to be competitive, but too many EHRs were in exclusive agreements with Surescripts that imposed penalties on them for multihoming. *Id.* In other words, Surescripts' agreements as a whole allegedly foreclosed Emdeon. The Allscripts-Surescripts agreement is just one part of Emdeon being foreclosed. Plaintiffs do not state a claim against Allscripts.

10

## II. The Court Should Dismiss Counts IV and VIII Because Allscripts, as a Surescripts Customer, Is Not a Proper Defendant.

As a Surescripts customer, Allscripts is not the proper defendant in an exclusive dealing case. Imposing liability against Allscripts for acceding to an exclusivity term with an allegedly monopolistic seller would contradict fundamental principles of antitrust law. That it is because the purpose of Sherman Act Section 1 is to protect parties in the position of Allscripts—parties that rely on contracts with monopolists. *Genetic Sys. Corp. v. Abbott Labs*, 691 F. Supp. 407, 414 (D.D.C. 1988) (finding that "a claim for violation of the Sherman Act Section 1 cannot stand" against "a buyer in an exclusive dealing contract"); *see also McGuire v. Columbia Broad. Sys., Inc.*, 399 F.2d 902, 906 (9th Cir. 1968) (affirming grant of summary judgment for defendant that was not the seller of the at-issue services); *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 443 (D. Del. 2011) (Robinson, J.) (dismissing exclusive dealing claims against buyer-defendants). Put differently, a customer owes no duty to the public—or to other potential sellers—not to pay supra-competitive prices, or not to accept supra-competitive sales terms, for goods or services offered by a seller with market power. This is true even if the customer, like Allscripts, allegedly "knowingly joined" an alleged monopolistic scheme. *Genetic Sys. Corp.*, 691 F. Supp. at 415. The Court should dismiss Allscripts as a customer of a monopolist seller.

## III. Even if Analyzed under the *Per Se* Rule, Counts IV and Count VIII Fail Because Plaintiffs Have Not Alleged a Plausible Conspiracy Involving Allscripts.

Even if the Court were to analyze the Allscripts-Surescripts agreement under the *per se* lens, Plaintiffs clearly fail to allege an unlawful agreement involving Allscripts. Plaintiffs' repeated invocations of terms such as "collude," "conspiracy," "agreement," and "monopoly profits" do not help them. *Goodloe v. Nat'l Wholesale Co., Inc.*, No. 03-cv-7176, 2004 WL 1631728, at *8 (N.D. Ill. July 19, 2004) (dismissing Section 1 claim where "[p]laintiff adorns his

§ 1 claim with antitrust terminology—'contract,' 'combination,' and 'conspiracy,' for example—yet omits factual allegations that would even minimally support a § 1 claim"). In assessing a complaint's allegations, "facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 553-58, 557 n.5) (affirming grant of motion to dismiss where plaintiffs alleged parallel conduct and a bare assertion of conspiracy without factual detail); *see also U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 902-04 (N.D. Ill. 2019) (dismissing antitrust claims for failure to plead a plausible conspiracy where allegations amounted to parallel, legitimate conduct).

Plaintiffs' "conspiracy" claim against Allscripts appears to be based on the allegation that Allscripts received "higher-than-market incentive payments" under the Surescripts agreement. Compl. ¶ 310. This is the only *fact* pled (as opposed to mere antitrust jargon) that distinguishes Allscripts from other EHRs. This allegation is insufficient for three reasons.

First, it is inherently implausible on its face that Allscripts would conspire to eliminate Emdeon for the sole benefit of allegedly incrementally higher incentive payments given the Plaintiffs' numerous allegations that the Surescripts agreement as a whole harmed Allscripts, and Allscripts wanted to get out of the agreement. Compl. ¶¶ 173, 186, 192-95, 229, 238, 255. Allscripts benefitted from being able to route transactions through multiple sources—conspiring to eliminate Emdeon would harm Allscripts. *Id.* ¶ 117-18, 172. The agreement injured Allscripts because it enhanced Surescripts' alleged monopoly, making it harder for Allscripts to multihome as it wanted to, and subjecting Allscripts to penalties and retribution. *Id.* It is "inherently implausible" that Allscripts "would conspire in order to allow [Surescripts] to charge

12

noncompetitive prices," "in essence, that [Allscripts] conspired to injure itself." *Car Carriers*, 745 F.2d at 1109.

Second, receiving payment pursuant to a contract is insufficient standing alone to represent a plausible conspiracy. *Marion HealthCare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842-43 (7th Cir. 2020) (allegations that distributors "buy and sell the devices according to the terms" of negotiated contracts is insufficient to infer a "conspiracy"); *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 313 (5th Cir. 2000) (declining to infer an antitrust conspiracy "based solely upon the existence of contracts").

Third, Plaintiffs' allegations "just as easily suggest rational, legal business behavior" by Allscripts. *Kendall*, 518 F.3d at 1049. Allscripts acted unilaterally and in its own interest in contracting with a "must-have" supplier to connect its customers to pharmacies and health plans/PBMs, because failing to do so would threaten Allscripts' ability to serve its own customers. *Id.* ¶¶ 172, 186. Unilateral action is not a "conspiracy" as a matter of law. *Monsanto v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed."). The Court should dismiss Counts IV and VIII for Plaintiffs' failure to plead a plausible conspiracy. *Twombly*, 550 U.S. at 547.

## IV. Plaintiffs Cannot Bring any Antitrust Claim Against Allscripts Under *Illinois Brick*.[7]

As discussed in the Surescripts Motion to Dismiss,[8] only direct purchasers may bring private antitrust claims for damages. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977); *see also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968). As this Court

---

[7] Appendix 2 lists the state law claims that fail under *Illinois Brick* or a state statute barring indirect purchaser claims.

[8] Allscripts joins Surescripts' Motion to Dismiss and Memorandum of Law in Support, Argument Parts I and V (discussing *Illinois Brick* & state law claim specific arguments).

DM_US 174454019-5.100375.0025

already has noted, "plaintiffs do not allege that they are direct purchasers from Allscripts, but rather allege that Allscripts is part of a conspiracy." Mem. Op. & Order [Dkt. 135] at 8 n.2.

Adding the conclusory labels "collusion" and "conspiracy" to their description of Allscripts' conduct does not give Plaintiffs the ability to sue Allscripts under the so-called "conspiracy exception." *Paper Systems Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629 (7th Cir. 2002), stands for the limited proposition that, where there are allegations of a conspiracy linking all of the alleged participants, each participant may be jointly and severally liable for damages caused by the other alleged participants' acts. *Paper Systems Inc.*, 281 F.3d at 634 (reversing dismissal of alleged manufacturer co-conspirator where plaintiffs claimed passed-on overcharge damages resulted from a price-fixing conspiracy). The Seventh Circuit's recent *Marion HealthCare* opinion makes clear that Plaintiffs cannot assert that exception unless they plead an *overarching conspiracy* involving the party from whom they purchase directly. *Marion HealthCare, LLC*, 952 F.3d at 841-42 (without an overarching conspiracy, the "case falls apart" and plaintiffs have "no right to recover"). One agreement between a supplier and a customer is not an overarching conspiracy. *Id.* at 842 (alleging a series of parallel vertical agreements is insufficient to state a conspiracy claim). Because Plaintiffs are not direct purchasers from Allscripts, and plead no overarching conspiracy involving Allscripts, the "conspiracy exception" does not apply.

## V.    Plaintiffs Are Not Proper Parties to Bring Any Claim Against Allscripts under *Associated General Contractors*.[9]

Every antitrust plaintiff must demonstrate that it is "a proper party to bring a private antitrust action." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459

---

[9] Appendix 3 lists each of the state law claims that fail because the states follow the same analysis of "antitrust standing" as articulated in *AGC*, or otherwise bar antitrust claims for lack of proximate cause.

14

U.S. 519, 535 n.31 (1983) (*AGC*). Under *AGC*, failure to plead the "causal connection" between the antitrust violation and the injury warrants dismissal at the pleading stage. *Id.*; *see also Rubloff Dev. Grp. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 741 (N.D. Ill. 2012) (dismissing for failure to plead a causal connection between the alleged antitrust violation and alleged injury).

Plaintiffs cannot allege proximate cause as to Allscripts because they do not plead that Allscripts even is part of the distribution chain. Even assuming that some prescriptions routed to Plaintiffs' pharmacies originated with Allscripts' healthcare provider customers, the connection to Allscripts remains too remote under *AGC*. Plaintiffs claim that they paid too much for routing through the electronic connection. *Id.* ¶ 186. Allscripts does not sell or resell the connection that transmits the electronic prescription to pharmacies. Allscripts and its customers are *customers* of electronic prescription routing services, just like the alleged victims in Plaintiffs' complaint.

Plaintiffs try to skirt their proximate cause obligation by arguing that the Allscripts-Surescripts agreement excluded Emdeon. Pls.' Mem. in Opp. to Surescripts, RelayHealth and Allscripts Defs.' Mots. to Dismiss (Opp.) [Dkt. 90] at 20. Similar to Plaintiffs' failure to plead substantial foreclosure, Plaintiffs cannot avoid their proximate cause obligation either by simply claiming the agreement excluded Emdeon. Plaintiffs have to connect some Allscripts conduct to their own injury. Allscripts was just one EHR that contracted with Surescripts, and those collective agreements allegedly foreclosed Emdeon. Compl. ¶¶ 198-201. It, therefore, is incorrect to say the "Allscripts-Surescripts agreement excluded Emdeon." Plaintiffs have no other basis for their claim of proximate cause. Plaintiffs' claims should be dismissed.

### CONCLUSION

Allscripts respectfully requests the Court grant this motion to dismiss, and dismiss Counts IV and VIII of Plaintiffs' Second Amended Consolidated Class Action Complaint, with prejudice.

DATED: December 4, 2020.

 /s/Katharine M. O'Connor

Joel R. Grosberg (*Pro Hac Vice*)
**McDermott Will & Emery LLP**
The McDermott Building
500 North Capitol St NW
Washington, DC, 20001-1531
Telephone: (202) 756-8207
Email: jgrosberg@mwe.com

Katharine M. O'Connor
Joshua Eastby
**McDermott Will & Emery LLP**
444 West Lake Street, Suite 4000
Chicago, IL, 60606-0029
Telephone: (312) 984-3627
Email: koconnor@mwe.com
        jeastby@mwe.com

*Attorneys for Defendant Allscripts
Healthcare Solutions, Inc.*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2020, I served **ALLSCRIPTS HEALTHCARE SOLUTIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** on all counsel of record via the CM/ECF electronic filing system.

/s/ Katharine M. O'Connor
 Katharine M. O'Connor
 McDermott Will & Emery LLP

17