**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| IN RE SURESCRIPTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Class Actions | Civil Action No. 1:19-cv-06627 |
|---|---|

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO SURESCRIPTS AND ALLSCRIPTS DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

SUMMARY OF FACTS .......................................................................................................4

STANDARD OF REVIEW ....................................................................................................8

ARGUMENT……………………………………………………………………………………………...8

I.  PLAINTIFFS ARE THE PROPER PARTIES TO BRING THIS PRIVATE
    ANTITRUST ACTION FOR DAMAGES……………………………………………..8

    A.  *Illinois Brick* does not bar Plaintiffs' claims...........................................................9

        1.  The economic reality of the market shows that Plaintiffs—pharmacies—
            pay Surescripts for e-prescription routing………………………………9

        2.  Plaintiffs have federal damages claims as the first innocent purchasers. ..12

    B.  Plaintiffs are the proper parties under *Associated General Contractors*. ..............14

II.  PLAINTIFFS HAVE ADEQUATELY ALLEGED AN ILLEGAL MONOPOLIZATION
     CLAIM AGAINST SURESCRIPTS BASED UPON ITS EXCLUSIONARY CONDUCT
     (COUNTS I AND V)……………………………………………………………………16

    A.  Anticompetitive exclusivity contracts are the predominant mechanism of
        exclusion. ...............................................................................................................17

    B.  Surescripts' claim that the exclusivity contracts and "loyalty programs" were
        "optional" does not negate the fact that they are anticompetitive. ........................20

III. PLAINTIFFS HAVE ADEQUATELY ALLEGED A CONSPIRACY TO
     MONOPOLIZE CLAIM AGAINST SURESCRIPTS AND RELAYHEALTH (COUNTS
     II AND VI)……………………………………………………………………………21

IV.  PLAINTIFFS HAVE ADEQUATELY ALLEGED A RESTRAINT OF TRADE CLAIM
     AGAINST SURESCRIPTS AND RELAYHEALTH (COUNTS III AND VII)………..24

    A.  Plaintiffs have sufficiently pled a naked restraint of trade sufficient for *per se*
        treatment. ...............................................................................................................24

    B.  Alternatively, Plaintiffs have sufficiently pled an anticompetitive restraint of trade
        under the Rule-of-Reason. ......................................................................................27

V.   PLAINTIFFS HAVE ADEQUATELY ALLEGED A RESTRAINT OF TRADE CLAIM
     AGAINST SURESCRIPTS AND ALLSCRIPTS (COUNTS IV AND VIII)…………..29

A.      Plaintiffs adequately plead market power and actual detrimental effects on competition. ..................................................................................................31

B.      Plaintiffs adequately allege substantial foreclosure. ...............................................33

VI.     ALLSCRIPTS, AS A BUYER AND SELLER, IS A PROPER DEFENDANT FOR AN EXCLUSIVE DEALING CLAIM……………………………………………………………34

VII.    PLAINTIFFS HAVE PLED A PLAUSIBLE CONSPIRACY BETWEEN ALLSCRIPTS AND SURESCRIPTS……………………………………………………………………35

VIII.   THE COURT SHOULD MAINTAIN PLAINTIFFS' STATE LAW CLAIMS………...38

A.      Named plaintiffs can assert claims under the laws of states where they did not do business on behalf of putative class members. ......................................................38

B.      Defendants' other arguments for dismissal of Plaintiffs' state law claims are baseless. ..................................................................................................................41

1.      Plaintiffs may assert Illinois and Montana claims on behalf of a Class. ...41

2.      Plaintiffs can assert claims under Utah's antitrust law. .............................42

3.      Plaintiffs may seek damages under Connecticut, Maryland, and Rhode Island antitrust laws. ..................................................................................43

4.      Surescripts monopolized the relevant market through concerted action in violation of California and New York law. ...............................................43

5.      Plaintiffs can recover under the Missouri Merchandise Practices Act. .....44

CONCLUSION........................................................................................................................45

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Albert H. Cayne Equip. Corp. v. Union Asbestos & Rubber Co.*,
   220 F. Supp. 784 (S.D.N.Y. 1963) ........................................................ 38

*Am. Tobacco Co. v. United States*,
   328 U.S. 781 (1945)........................................................................ 22

*Anderson News LLC v. American Media, Inc.*,
   680 F.3d 162 (2d. Cir. 2012) ........................................................ 38

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
   204 Cal. App. 4th 1 (Cal. Ct. App. 2012) .............................. 44

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................ 8

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983).................................................................. passim

*BASF AG v. Great Am. Assur. Co.*,
   522 F.3d 813 (7th Cir. 2008) ........................................................ 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................ 8

*Blackburn v. Sweeney*,
   53 F.3d 825 (7th Cir. 1995) ........................................................ 24, 27

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982).................................................. 9, 10, 11, 12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)........................................................................ 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)........................................................................ 8

*Car Carriers, Inc. v. Ford Motor Co.*,
   745 F.2d 1101 (7th Cir. 1984) ........................................................ 37

*City of Rockford v. Mallinckrodt ARD, Inc.*,
   360 F. Supp. 3d 730 (N.D. Ill. 2019) .............................. passim

*Colby v. J.C. Penney Co., Inc.*,
   811 F.2d 1119 (7th Cir. 1987) ................................................................. 17

*Collins v. Associated Pathologists, Ltd.*,
   884 F.2d 473 (7th Cir. 1988) ................................................................... 20

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) .................................................................................. 27

*Cont'l T.V. v. GTE Sylvania*,
   433 U.S. 36 (1977) .................................................................................... 29

*Contractor Utility Sales Co. v. Certain-Teed Products Corp.*,
   638 F.2d 1061 (7th Cir. 1981) ................................................................. 25

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) .................................................................................. 40

*Dickson v. Microsoft Corp.*,
   309 F.3d. 193 (4th Cir. 2002) ................................................. 29, 32, 33, 34

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*,
   684 F.2d 1346 (7th Cir. 1982) ................................................................. 30

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) .................................................................................. 31

*Fed. Trade Comm'n v. Vyera Pharm., LLC*,
   No. 20-cv-706, 2020 WL 4891311 (S.D.N.Y. Aug. 18, 2020) ................ 36

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
   617 F.2d 478 (7th Cir. 1980) ................................................................... 12

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986) .................................................................................. 32

*FTC v. Mylan Lab., Inc.*,
   62 F. Supp. 2d 25 (D.D.C. 1999) ............................................................ 45

*FTC v. Surescripts, LLC*,
   No. 19-1080, 2020 U.S. Dist. LEXIS 8360 (D.D.C. Jan. 17, 2020) ............... passim

*Gaebler v. New Mexico Potash Corp.*,
   676 N.E.2d 228 (1996) ............................................................................. 42

*General Leaseways, Inc. v. National Truck Leasing Assoc.*,
   744 F.2d 588 (7th Cir. 1984) ................................................................... 24

iv

*Genetic Systems Corp. v. Abbot Labs*,
  691 F. Supp. 407 (D.D.C. 1988) ...................................................................... 34, 35

*Gravity, Inc. v. Microsoft Corp.*,
  127 F. Supp. 2d 728 (D. Md. 2001) ........................................................................ 23

*Hatchett v. Henry Schein, Inc.*,
  No. 3:19-CV-83, 2020 WL 733834 (S.D. Ill. Feb. 13, 2020) ................................... 41

*Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharm., Inc.*,
  353 F. Supp. 3d 678 (M.D. Tenn. 2018) ................................................................ 42

*Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) ................................................................................... 22

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) .................................................................................... passim

*Immanuel Baptist Church v. City of Chicago*,
  344 F. Supp. 3d 978 (N.D. Ill. 2018) ....................................................................... 8

In re Aluminum Warehousing Antitrust Litig.,
  833 F.3d 151 (2d Cir. 2016) ................................................................................... 15

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  123 F.3d 599 (7th Cir. 1997) ................................................................................. 12

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................................... 40, 41, 42

*In re Dairy Farmers of America Inc. Cheese Antitrust Litig.*,
  No. 9 CV 3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ................................. 40

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  360 F. Supp. 3d 788 (N.D. Ill. 2019) ........................................................... 19, 30, 40

*In re Delta Dental Antitrust Litig.*,
  No. 19-cv-6734, 2020 WL 5296996 (N.D. Ill. Sept. 4, 2020) ................................. 24

*In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*,
  No. CIV. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) ..................................... 24

*In re Effexor Antitrust Litig.*,
  357 F. Supp. 3d 363 (D.N.J. 2018) ........................................................................ 44

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018) ............................................................... 43, 44

v

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................ 44

*In re Magnesium Oxide Antitrust Litig.*,
   No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ................................ 25

*In re Microsoft Crop. Antitrust Litigation*,
   127 F. Supp. 2d 702 (D. Md. 2001) ................................................ 10

*In re Opana ER Antitrust Litig.*,
   162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................ 39, 40

*In re Packaged Seafood Prod. Antitrust Litig.*,
   242 F. Supp. 3d 1033 (S.D. Cal. 2017) ................................................ 41

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   No. 09-cv-7666, 2012 WL 39766 (N.D. Ill. Jan. 9, 2012) ................................ 16

*In re Sulfuric Acid Antitrust Litig.*,
   743 F. Supp. 2d 827 (N.D. Ill. 2010) ................................................ 28

*In re Surescripts Antitrust Litig.*,
   19-cv-6627, 2020 U.S. Dist. LEXIS 150584 (N.D. Ill. Aug. 19, 2020) ................................ 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827, 2011 WL 3268649 (N.D. Cal. July 28, 2011) ................................ 44

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   No. 2:18-MD-2836, 2019 WL 1397228 (E.D. Va. Feb. 6, 2019) ................................ 22, 42

*Isaksen v. Vt. Castings, Inc.*,
   825 F.2d 1158 (7th Cir. 1987) ................................................ 37

*Kendall v. Visa USA, Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................ 38

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) ................................................ 25, 29

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ................................................ 25

*Lektro-Vend Corp. v. Vendo Co.*,
   660 F.2d 255 (7th Cir. 1981) ................................................ 23

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................ 39, 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ................................................................................ 39

*Liston v. King.com, Ltd.,*
    254 F. Supp. 3d 989 (N.D. Ill. 2017) ............................................ 39, 40

*Marion Healthcare, LLC v. Becton Dickinson & Co.,*
    952 F.3d 832 (7th Cir. 2020) ......................................................... 13, 36

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.,*
    937 F.3d 1056 (7th Cir. 2019) ................................................................ 39

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,*
    62 F.3d 967 (7th Cir. 1995) ...................................................................... 37

*McWane, Inc. v. F.T.C.,*
    783 F.3d 814 (11th Cir. 2015) .................................................. 19, 33, 34

*MiniFrame Ltd. v. Microsoft Corp.,*
    No. 11 CIV 7419, 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) ........... 44

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
    465 U.S. 752 (1984) ................................................................................ 38

*Morrison v. YTB Int'l, Inc.,*
    649 F.3d 533 (7th Cir. 2011) .................................................................. 39

*Muir v. Nature's Bounty (DE), Inc.,*
    No. 15 C 9835, 2018 WL 3647115 (N.D. Ill. Aug. 1, 2018) .............. 39, 40

*N. Cty. Commc'ns Corp. v. Verizon New York, Inc.,*
    233 F. Supp. 2d 381 (N.D.N.Y. 2002) ...................................................... 44

*NYNEX Corp. v. Discon, Inc.,*
    525 U.S. 128 (1998) ................................................................................ 25

*Ohio v. American Express Co.,*
    138 S. Ct. 2274 (2018) ............................................................................ 28

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,*
    585 F.2d 821 (7th Cir. 1978) ............................................................ 27, 28

*Palmer v. BRG of Georgia, Inc.,*
    498 U.S. 46 (1990) .................................................................................. 24

*Paper Sys. v. Nippon Paper Indus. Co.,*
    281 F.3d 629 (7th Cir. 2002) .............................................................. 9, 12

*Payton v. Cty. of Kane,*
    308 F.3d 673 (7th Cir. 2002) ............................................................ 39, 40

*Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn.,*
    745 F.2d 248 (3d Cir. 1984) .................................................................... 22

*Polk Bros. v. Forest City Enterprises, Inc.,*
    776 F.2d 185 (7th Cir. 1985) ........................................................... 26, 28

*Procaps S.A. v. Patheon, Inc.,*
    845 F.3d 1072 (11th Cir. 2016) .............................................................. 34

*Republic Tobacco Co. v. N. Atl. Trading Co.,*
    381 F.3d 717, 738 (7th Cir. 2004) ......................................................... 30

*Sandee's Catering v. Agri Stats, Inc.,*
    No. 20 C 2295, 2020 WL 6273477 (N.D. Ill. Oct. 26, 2020) ................... 40

*Sanner v. Board of Trade,*
    62 F.3d 918 (7th Cir. 1995) ............................................................. 12, 14

*Schor v. Abbott Labs,*
    457 F.3d 608 (7th Cir. 2006) .................................................................. 19

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc,*
    No. 15 CIV. 6549, 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ........... 43

*Shady Grove Orthopedic Assocs. v. Allstate Insurance Co.,*
    559 U.S. 393 (2010) ............................................................................... 41

*Spray-Rite Serv. Corp. v. Monsanto Co.,*
    684 F.2d 1226 (1982) ............................................................................. 30

*Staley v. Gilead Scis., Inc.,*
    446 F. Supp. 3d 578 (N.D. Cal. 2020) .............................................. 42, 44

*State ex rel. Ford v. Wenskay,*
    824 S.W.2d 99 (Mo. Ct. App. 1992) ....................................................... 45

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................................. 39

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.,*
    200 F.3d 307 (5th Cir. 2000) .................................................................. 38

*Tamburo v. Calvin,*
    No. 94 C 5206, 1995 WL 121539 (N.D. Ill. Mar. 17, 1995) ................... 27

*Tampa Electric Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ................................................................................ 20, 30

*Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*,
    244 F. App'x 130 (9th Cir. 2007) ...................................................................... 23

*TV Commc'ns Network, Inc. v.* Turner *Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ......................................................................... 23

*United States v. Andreas*,
    216 F.3d 645 (7th Cir. 2000) ............................................................................. 26

*United States v. Dentsply International, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .............................................................................. 33

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .......................................................................................... 19

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...................................................................... 15, 19

*United States v. Nunez*,
    673 F.3d 661 (7th Cir. 2012) ............................................................................. 36

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948) .......................................................................................... 37

*United States v. Topco Associates*,
    405 U.S. 596 (1972) .......................................................................................... 24

*Viamedia, Inc. v. Comcast Corp.*,
    No. 18-2852, 2020 U.S. App. LEXIS 5469 (7th Cir. Feb. 24, 2020) ............... 16, 30

*Wagner v. Magellan Health Servs., Inc.*,
    121 F. Supp. 2d 673 (N.D. Ill. 2000) ................................................................ 22

*Watkins v. Smith*,
    2012 WL 5868395 (S.D.N.Y. Nov. 19, 2012) .................................................. 30

*Wilson P. Abraham Const. Corp. v. Texas Indus., Inc.*,
    604 F.2d 897 (5th Cir. 1979) ............................................................................. 36

*Woodman's Food Mkt., Inc. v. Clorox Co.*,
    833 F.3d 743 (7th Cir. 2016) ............................................................................. 39

*Zemeckis v. Global Credit & Collection Corp.*,
    679 F.3d 632 (7th Cir. 2012) ............................................................................... 8

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ................................................................... 19, 23, 33

**Other Authorities**
1 H. Newberg & A. Conte, Newberg on Class Actions § 2.07(3d ed.1992) ............................... 40
California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq* ......... 43
Illinois Antitrust Act ................................................................................ 41, 42
Montana's Unfair Trade Practices and Consumer Protection Act................................. 42
Sherman Act.................................................................................... passim

**Rules**
Rule 12 ............................................................................................. 13, 37
Rule 23 ............................................................................................. 40, 41

## INTRODUCTION

Plaintiffs' Second Consolidated Amended Complaint ("SAC") alleges that Defendant Surescripts is a monopolist with at least a 95% market share in both the e-prescription routing and eligibility markets.[1] Plaintiffs are nine independent pharmacies who contend they paid more on routing transactions—Surescripts charges pharmacies a fee for each one—than they would have absent Defendants' misconduct. Plaintiffs allege that Surescripts has maintained its dominant market status (and high pricing) over the last decade not through business acumen, but instead through an anticompetitive scheme—aided by Defendants RelayHealth and Allscripts and co-conspirator pharmacy technology vendors ("PTVs")—that effectively foreclosed more than 70% of both markets.[2]

Defendants' motions[3] improperly (1) attempt to recast facts alleged in the SAC in the light most favorable to Defendants, (2) assert facts not contained in the SAC, (3) and argue inferences against Plaintiffs. Each argument for dismissal hinges on fact-intensive issues inappropriate for a Rule 12(b)(6) motion to dismiss for failure to state a claim. The Court should deny the motions entirely.

*First*, the named Plaintiffs are proper parties to this litigation. Nothing in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) or its progeny forecloses Plaintiffs' federal damages claims where, as here, Plaintiffs are purchasers in a non-traditional chain of distribution that includes ancillary companies (i.e., PTVs) that cannot themselves recover federal overcharges on the same

---

[1] SAC ¶¶ 1-4, ECF No. 148.

[2] *Id.*, ¶¶ 4-12, 141-197, 224-235.

[3] Allscripts Healthcare Solutions, Inc.'s Mem. of Law in Supp. of Its Mot. to Dismiss, ECF No. 161 (N.D. Ill. Dec. 4, 2020) ("Allscripts Mem."); Surescripts' Mem. in Supp. of Its Mot. to Dismiss, ECF No. 165 (N.D. Ill. Dec. 4, 2020) ("Surescripts Mem.").

transactions. Further, backed by Defendants' own documents, Plaintiffs have alleged unique and specific facts that show that the relevant PTV "intermediaries" are co-conspirators to the scheme here,[4] making Plaintiffs the "first innocent purchasers" and thereby allowing for damages claims under federal antitrust law.

*Second*, as the court in the parallel action brought by the Federal Trade Commission (FTC), *FTC v. Surescripts, LLC*, No. 19-1080, 2020 U.S. Dist. LEXIS 8360 (D.D.C. Jan. 17, 2020) (Bates, J.) ("*Surescripts I*"), has already found, Surescripts's exclusionary pricing policy and other anticompetitive contractual arrangements have allowed it to illegally maintain a monopoly. *Id.* at *6 (rejecting Surescripts's argument that Plaintiffs must allege predatory pricing to maintain a monopolization claim). More specifically, the court found that Surescripts has successfully used its monopoly power to block new entrants, leaving it free to continue to charge supracompetitive prices. *Id.* at *21-27. Plaintiffs here, too, have properly pled illegal monopolization in Counts I (federal) and V (state).

*Third*, Plaintiffs have pled a viable conspiracy to monopolize claim against Surescripts and RelayHealth in Counts II (federal) and VI (state). The SAC alleges that before 2010, RelayHealth was well situated to enter the routing market as a competitor to Surescripts. Such a change in the market would have drastically decreased the price that Surescripts—or any competitor—could charge its customers. But, recognizing the threat that RelayHealth posed to its business, Surescripts, in 2010 and 2015, entered into two contracts with RelayHealth. Pursuant to those contracts, which were designed to maintain Surescripts' routing market monopoly, RelayHealth agreed not to enter the routing market and compete with Surescripts in exchange for receiving a greater share of the monopoly prices being charged to pharmacies.

---

[4] SAC ¶¶ 67-92.

2

*Fourth*, Plaintiffs have adequately alleged a section 1 restraint of trade claim against Surescripts and RelayHealth in Counts III (federal) and VII (state).  Plaintiffs allege that (1) RelayHealth had the financial wherewithal, customer relations, and experience in an adjacent market to out-compete Surescripts in the routing market, and that it would have done so but for the agreement at issue; (2) a competitive e-prescription routing market would have resulted in transaction prices of 1 to 3 cents, far lower than the prevailing rate for Plaintiffs and the putative Class; and (3) both RelayHealth and Surescripts found it more profitable to work together to foreclose other competitors.  Plaintiffs further allege that RelayHealth and Surescripts entered into two contracts that prevented competition by forbidding RelayHealth from entering the routing market, as noted above.  This arrangement resulted in a restraint of trade by preventing competition, restricting output, and ultimately, keeping routing prices high.  Thus, Plaintiffs have sufficiently alleged that Surescripts and RelayHealth engaged in conduct that resulted in a restraint of trade.

*Fifth*, Plaintiffs have adequately alleged a section 1 restraint of trade claim against Surescripts and Allscripts in Counts IV (federal) and VIII (state).  Plaintiffs allege that Allscripts' agreement with Surescripts foreclosed a key routing competitor, Emdeon, which would have routed e-prescriptions to Plaintiffs at a lower cost.  SAC ¶¶ 172-208, 308-316.  Plaintiffs have also alleged that Allscripts was bribed for its cooperation and refused to break ranks even when Emdeon tried to break up the Surescripts-Allscripts agreement.  *Id.*, ¶¶ 187-197.  Allscripts' conduct was exclusionary and directly foreclosed competitors in the routing market.  Plaintiffs have thus stated a viable claim against both Defendants in Counts IV and VIII.

## SUMMARY OF FACTS

Plaintiffs are independent pharmacies. SAC ¶¶ 11, 15-23. They serve, or used to serve, as the healthcare pillars of their communities. These days, industry consolidation and exploitative business practices have pushed them to the fringes of our nation's healthcare system, decimated their customer bases, and slashed their margins. Conduct like Defendants' has jeopardized their ability to stay in business.

Surescripts is a monopolist in the markets for e-prescription routing and eligibility services. *Id.*, ¶¶ 2-3. E-prescription services include the electronic routing of prescription information from prescribers[5] to pharmacies and the transmission of insurance eligibility information from pharmacy benefit managers to prescribers. *Id.*, ¶¶ 2, 32-35.

In the late-2000s, Congress enacted legislation to encourage the development and use of e-prescription services. *Id.*, ¶¶ 36-43. This fueled growth in e-prescription transaction volume, from 70 million transactions in 2008 to 1.7 billion transactions in 2017. *Id.*, ¶ 3. With a 95% share of routing and eligibility transactions, Surescripts has been the primary beneficiary of the federal push towards e-prescription services. *Id.*, ¶¶ 3, 40-43. Surescripts has embarked on a multifaceted scheme to maintain its monopoly. Given its dominant market share, Surescripts knew that if it could dissuade its customers from multihoming, then it could deny competitors the "critical mass" necessary to create a viable alternative to Surescripts. *Id.*, ¶¶ 108-109.

In 2009, Surescripts recognized a looming competitive threat to its growing monopoly: Emdeon. *Id.*, ¶¶ 114-118. Surescripts understood that competition from Emdeon would "drive lower prices," and with "lower prices and further capabilities, the new Emdeon could

---

[5] Prescribers contract with electronic health records (EHR) vendors to convey prescription information to pharmacies across an e-prescribing network.

significantly compete" in the e-prescription services markets. *Id.*, ¶¶ 115-117. In response, Surescripts began to weave a tapestry of contractually-imposed customer loyalty programs. *Id.*, ¶¶ 119-121. More specifically, Surescripts implemented loyalty contracts with prescribers and pharmacies that conditioned lower transaction prices on customers routing 100% of their transactions "through and only through the Surescripts network." *Id.*, ¶¶ 122-127, 132-134. Surescripts also incorporated "claw-back" provisions to further ensure customer loyalty through the explicit threat that it would seek to retroactively recover the difference between loyalty and non-loyalty rates. *Id.*, ¶¶ 128-131, 135.

Surescripts' loyalty-based pricing policy raised the costs for customers to multihome. *Id.*, ¶¶ 124-127. Because new market entrants could only offer better rates to Surescripts' customers on a subset of transactions, the retaliatory penalties on the remaining transaction volume would more than offset any benefits offered by competitors. *Id.*, ¶¶ 6, 198-208, 229-232. This strategy worked: it "[p]rotect[ed] [Surescripts'] most critical asset—[its] network—by addressing competitive pressures and locking-in key customers." *Id.*, ¶¶ 131, 136.

Surescripts also signed a series of exclusivity agreements with RelayHealth and Allscripts to further entrench its monopoly. In 2003, Surescripts and RelayHealth, a health information technology company and subsidiary of McKesson, entered into an agreement whereby RelayHealth agreed not to compete with Surescripts in routing services. *Id.*, ¶¶ 141-144. Instead, RelayHealth agreed to connect its pharmacy customers to the Surescripts network in exchange for a percentage of the fee charged by Surescripts. *Id.*, ¶ 145.

In 2010, Surescripts obtained RelayHealth's renewed promise not to compete against it in routing for an additional six years. *Id.*, ¶¶ 146, 159. This agreement neutralized RelayHealth as a "significant threat in the near term" that had the "natural ability to capture 15-20% of

5

transaction volume" due to its relationship with McKesson.  *Id.*, ¶¶ 147-155.  Surescripts feared

that if RelayHealth "dropped the price down to 2 to 3 cents" per transaction, they would "take

business away from us" by offering terms Surescripts could not match.  *Id.*, ¶¶ 156-157.  The

2010 contract "maintain[ed] the current status where RelayHealth does not become a

competitor."  *Id.*, ¶¶ 158-159.[6]  It also required RelayHealth to use "commercially reasonable

efforts to offer terms to incentivize exclusive use of the Surescripts network" by pharmacies,

PTVs, and EHRs, and to help Surescripts clawback incentive fees from disloyal EHRs.  *Id.*, ¶¶

160-163.

Surescripts and RelayHealth renewed their anticompetitive accord once again in 2015.

This iteration required RelayHealth to terminate its prescriber relationships and transfer them

directly to Surescripts, and "remov[ed] [RelayHealth] as an EHR aggregator," allowing

Surescripts to leverage the network effects of two-sided markets against RelayHealth should it

decide to compete with Surescripts in the future.  *Id.*, ¶¶ 165-171.

Surescripts also struck an exclusive arrangement with Defendant Allscripts, a critical

EHR with access to a substantial prescriber population.  *Id.*, ¶ 172.  As one of the few EHRs

multihoming, Allscripts provided an opportunity for competitors to connect to its centralized hub

of prescriber customers and expand their networks.  *Id.*  Emdeon, for example, connected to

Allscripts and routed prescriptions between its pharmacy customers and Allscripts' prescriber

customers.  *Id.*, ¶ 173.  Access to Allscripts' sizable prescriber base made Emdeon more

---

[6] Although Surescripts refers to the RelayHealth agreement as a "value-added reseller" partnership, Surescripts Mem. at 8, the agreement was, in Surescripts' own words, a "value subtract" in which "the exclusivity" was the "only real value" because it sidelined "one of [Surescripts'] biggest competitive threats."  *Id.*, ¶ 164.

attractive to pharmacy customers. Allscripts was one half of the solution to Emdeon's "chicken and the egg" problem; it would help Emdeon reach critical mass. *Id.*, ¶¶ 173-174.

Realizing that the "key to Emdeon is Allscripts," Surescripts sought to "contain" Emdeon's "access to [prescribers]" by striking a deal with Allscripts to route transactions exclusively over the Surescripts network. *Id.*, ¶¶ 174, 179-180. Surescripts leveraged its status as a "must-have" pharmacy partner to negotiate an anticompetitive deal that required Allscripts to terminate its agreement with Emdeon. *Id.*, ¶¶ 181-186. In return, Surescripts provided Allscripts with "enhanced" revenue sharing. *Id.*, ¶ 187. In other words, Surescripts paid Allscripts to destroy any competition from Emdeon. Then, in 2014, Surescripts resorted to anticompetitive pressure to secure a renewed exclusivity commitment from Allscripts, thus preventing "a bidding war for [Allscripts'] transactions or access to their physician community" that would allow a competitor, such as Emdeon, to sustain a competing network. *Id.*, ¶¶ 188-197.

As a result of Defendants' misconduct, Plaintiffs paid and continue to pay higher prices for e-prescription routing. *Id.*, ¶¶ 10-12, 236-240. Surescripts, aided by its explicit exclusivity agreements with RelayHealth and Allscripts, has insulated 80% of all pharmacy and prescriber transaction volume, respectively, from competition. *Id.*, ¶¶ 224-235. Absent Defendants' exclusionary conduct, competitors would have solved the "chicken and the egg" problem by offering better rates and services, thus lowering e-prescription costs. *Id.*, ¶¶ 109, 241-257. Instead, because "pricing isn't dictated by competition at Surescripts," Plaintiffs have been forced to pay approximately 17 cents or more per transaction. *Id.*, ¶ 6. That is 14-16 cents more than Surescripts estimates would be charged in a competitive market. *Id.*, ¶¶ 10, 239.

**STANDARD OF REVIEW**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain enough factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "When considering a motion to dismiss, the Court construes all inferences in favor of the plaintiff." *Immanuel Baptist Church v. City of Chicago*, 344 F. Supp. 3d 978, 982 (N.D. Ill. 2018) (citing *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012)).

**ARGUMENT**

**I.     PLAINTIFFS ARE THE PROPER PARTIES TO BRING THIS PRIVATE ANTITRUST ACTION FOR DAMAGES.**

Whether Plaintiffs here are the "proper part[ies] to bring a private antitrust action" under federal antitrust law is a *merits* question and not a jurisdictional question. *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002).

Plaintiffs here are proper parties because they suffered "antitrust injury" from anticompetitive behavior as opposed to injury from competition, their injuries were proximately caused by Defendants' misconduct, and they have alleged that they purchased e-prescriptions from Surescripts. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-89 (1977); *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 544-45 (1983) ("*AGC*"); *Illinois Brick*, 431 U.S. at 729-30. As the "consumers" of the product at issue, Plaintiffs have suffered "paradigmatic antitrust injury." *See BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 822 (7th Cir. 2008). "The harm to [Plaintiffs] and [the] class was clearly

foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy[,]" and thus Plaintiffs here satisfy the "proximate cause" requirements of *AGC*. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982).

    **A.**    ***Illinois Brick* does not bar Plaintiffs' claims**

    Defendants' *Illinois Brick* argument (Surescripts Mem. at 10-16; Allscripts Mem. at 13-14) fails on multiple grounds: (1) though Plaintiffs do not hand cash directly to Surescripts or write checks directly to Surescripts, Plaintiffs have nonetheless alleged and confirmed the economic reality of the e-prescription markets (SAC ¶¶ 15-23, 51-66, 93-100) that aligns this case with other cases in which plaintiffs successfully invoked federal antitrust law; and (2) even if the Court is inclined to reject Plaintiffs' allegations regarding the economic reality of the market, Defendants' documents have revealed the details of agreements between co-conspirator PTVs and Surescripts. Thus, as the first innocent purchasers in the anticompetitive scheme, Plaintiffs have valid federal damages claims against Defendants. *Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631 (7th Cir. 2002) ("The first buyer from a conspirator is the right party to sue.").

    **1.**  **The economic reality of the market shows that Plaintiffs—pharmacies—pay Surescripts for e-prescription routing.**

    *Illinois Brick* stands for the proposition that a plaintiff may not recover damages under federal antitrust law if there is a market intermediary that purchases the product at issue directly from the alleged wrongdoer and is entitled to recover overcharge damages of the same type in the same market. *See Loeb*, 306 F.3d at 481 ("[T]he chain-of-distribution inquiry in *Illinois Brick* was meant only to preclude duplicate recovery."). "*Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase)." *Id.*

(emphasis added); *see also McCready*, 457 U.S. at 468-70; *In re Microsoft Crop. Antitrust Litigation*, 127 F. Supp. 2d 702, 710 (D. Md. 2001) ("*Illinois Brick* does not require that monies be paid directly to the antitrust violator."). Properly viewed, PTVs are not intermediaries in a traditional "chain of distribution" but rather operate entirely in a secondary market.

Plaintiffs are mindful of the Court's reasoning in its August 19, 2020 opinion, but Defendants' reliance on *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) remains misplaced; their reading is contrary to *Loeb*, *McCready*, and *Illinois Brick* itself. Under Defendants' reading of *Apple*, there is *no* exception to the general *Illinois Brick* rule that limits the federal damages claim cause of action to plaintiffs that paid the alleged wrongdoer directly, *i.e.*, the "direct purchaser" rule. Such an expansive and broad interpretation of *Apple* would not just overrule *Loeb* and *McCready*, it would also overrule *Illinois Brick* itself because even *Illinois Brick* recognized, at a minimum, the cost-plus exception to its general "direct purchaser" rule. *Illinois Brick*, 431 U.S. at 735-36. *Apple* cannot bear the weight of that reading; it stands for the unremarkable proposition that *Illinois Brick* does not bar direct purchasers (app buyers) from suing their direct supplier (Apple) even when another party (there, the app developers) has a role in setting prices. *Apple*, 139 S. Ct. at 1522 ("[D]irect purchasers from monopolistic retailers are proper plaintiffs to sue those retailers."). *Apple* does not overrule *McCready* and *Loeb* and hold the inverse—that *Illinois Brick* forecloses *all* cases where there *is* some type of secondary market intermediary.[7]

---

[7] The Court in *Apple* may have referred to brokerage as "economically indistinguishable" from traditional purchaser-seller distribution chains (*id.* at 1523; *see also In re Surescripts Antitrust Litig.*, 19-cv-6627, 2020 U.S. Dist. LEXIS 150584, *21-22 (N.D. Ill. Aug. 19, 2020)), but the Court there is discussing distribution and payment arrangements *upstream* from the alleged monopolist. Here, the relevant inquiry is into the economic reality *downstream* of the monopolist. *See* SAC ¶¶ 15-23, 51-66, 93-100. Thus, *McCready* and *Loeb*--which address downstream questions—govern here, not *Apple*.

Here, as more fully discussed below, PTVs are co-conspirators with Surescripts, making Plaintiffs the first innocent purchasers with standing under *Illinois Brick*. Even as co-conspirators, however, PTVs are not intermediaries in a traditional chain of distribution. PTVs operate as ancillary office management software providers. They set up computer systems that allow pharmacies to purchase a variety of electronic services, such as claims adjudication services, eligibility and benefit network messaging, and clinical messaging. PTV software is also designed to allow a pharmacy to access, utilize, and pay for Surescripts' e-prescriptions. As part of their office software management and services—a market entirely distinct from the market for provision of e-prescriptions—PTVs generally aggregate and itemize invoices for pharmacies from various providers, such as Surescripts. SAC ¶¶ 51-66. This is no different than a credit card company invoicing and itemizing a consumer's purchases; the credit card company may have a separate contract with the vendor relating to its own separate market interests, but a credit card company does not become a direct purchaser under the antitrust laws on a consumer's retail purchase. Defendants' reading of *Apple* would dictate that credit card banks, not the credit card owners, are the only entities with federal damages claims in an antitrust case, and that clearly is not correct.

Both the Supreme Court and Seventh Circuit have upheld federal damages claims for plaintiffs who did not contract directly with defendants where: (1) the intermediaries at issue in the case suffered no damages or damages in an alternative market, (2) there was a minimal chance of duplicative recovery and complex damages apportionment, and (3) deterrence would be undermined by denying plaintiffs' claims. *See McCready*, 457 U.S. at 467-69, 75; *Loeb*, 306 F.3d at 475-76. In *Loeb*, the Seventh Circuit distinguished all of defendants' citations to traditional *Illinois Brick* cases, explaining, "[T]he plaintiffs [here] are not indirect purchasers

along a supply chain."  306 F.3d at 482; *see also Sanner v. Board of Trade*, 62 F.3d 918, 921-22,

929-30 (7th Cir. 1995) (applying *McCready* and *AGC* to uphold federal antitrust claim by

soybean farmers against defendants for artificially depressing the soybean futures market,

leading to a price decline in the soybean cash market where the farmers operated).  *Apple* did not

overrule this line of cases.

### 2.  Plaintiffs have federal damages claims as the first innocent purchasers.

As recognized in its August 19, 2020 Opinion, even if the Court adopts Defendants'

reading of *Apple* and *Illinois Brick*, Plaintiffs' federal damages claims can still proceed here

because Plaintiffs are the first innocent purchasers from co-conspirators.

In a case involving a vertical conspiracy or restraint of trade, "[t]he first buyer from a

conspirator is the right party to sue."  *Paper Systems*, 281 F.3d at 631.  Indeed, as first innocent

buyers, Plaintiffs are the right parties to sue even if the co-conspirators are "reluctant

accomplices."  *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 615 (7th Cir.

1997).[8]

As Surescripts admits, *Illinois Brick* does not bar federal claims for first innocent

purchasers under Seventh Circuit law.  Surescripts Mem. at 12-15.  Nonetheless, Surescripts

argues that Plaintiffs' claims still fail because, it claims: (1) Plaintiffs do not adequately plead the

existence of a "rim" to a "hub and spokes" conspiracy and (2) there are alternative explanations

for the PTVs' behavior.  Neither argument is persuasive.

---

[8] In fact, first innocent purchasers would still have valid claims even if some of the co-conspirators break
out of the scheme and bring their own suits (which they have not done here).  *Id*.  ("One virtue of the rule
of [*Illinois Brick*] is that it creates an incentive for middlemen to break out of a cartel and sue the supplier
members; it sows dishonor among thieves; they still may *be* thieves.") (emphasis in original).  "There is
nothing new about the idea that a cartel might 'hire' a customer to help police the cartel."  *Id*. at 614; *see
also Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980).

First, Plaintiffs have pled facts that adequately support the existence of an overarching anticompetitive scheme ("hub and spokes" and otherwise).[9]  Defendants rely heavily on *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832 (7th Cir. 2020), but that case supports Plaintiffs here.  Regarding hub-and-spokes conspiracies, the Seventh Circuit explained, "This type of conspiracy requires a plaintiff to allege both that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group." *Id.* at 842.  Plaintiffs have pled facts satisfying this standard.  SAC ¶¶ 67-92.  Each identified PTV recognized that it was part of the greater arrangement because "certified" Surescripts PTVs were and are publicly listed online by Surescripts.  *Id.*, ¶¶ 73-81.  This allows conspirators to patrol for compliance.  Moreover, it was only in each individual PTV's economic self-interest to join the exclusive dealing scheme if other PTVs joined.  *Id.*  Anything less and aspiring Surescripts competitors, like Emdeon, would enter the market and offer more attractive terms to non-conspirator PTVs, thus undermining the entire scheme.  *Id.*  The only way conspirator PTVs and Surescripts can protect their split supracompetitive profit margins is if all or virtually all PTVs agree to lock out aspiring Surescripts competitors, like Emdeon.

Second, under Rule 12, Plaintiffs are entitled to the benefit of the facts alleged in the SAC, and the inferences that derive from them, as pled.  Defendants will have the opportunity to present "alternative explanations" for the PTVs' actions at summary judgment or trial—if they can muster admissible evidence.  As it stands, Defendants simply repeat "lower prices" over and

---

[9] Even if Plaintiffs failed to adequately plead a "rim" to a hub and spokes conspiracy (and they have not), the factual allegations are also sufficient to establish standalone vertical conspiracies between Surescripts and PTVs with distinct anticompetitive effects.  SAC ¶ 72 (PTV agreements have "independent" anticompetitive effects).

over to manufacture a competing explanation for why all PTVs agreed to anticompetitive master agreements with Surescripts.[10]  However, Plaintiffs have alleged that these were not competitive "lower prices" but rather anticompetitive payments from Surescripts to PTVs.  At this stage, Defendants' *ipse dixit* characterization of anticompetitive payments from Surescripts to PTVs must be rejected because it directly conflicts with Plaintiffs' allegations.  *Id.*, ¶¶ 81-92.  *Illinois Brick* does not bar Plaintiffs' federal claims here.

    **B.**    **Plaintiffs are the proper parties under *Associated General Contractors*.**

    *AGC* "requires a court to examine through a case-by-case analysis the link between a plaintiff's harm and a defendant's wrongdoing."  *Loeb*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at 535-36).  The factors to be weighed include: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment."  *Id.*  This doctrine "is the equivalent of the common-law tort limitation of proximate cause."  *Sanner*, 62 F.3d at 927.  Allscripts argues that Plaintiffs have failed to plead a causal connection between the violation and harm because they do not allege that Allscripts is part of the distribution chain that

---

[10] Surescripts argues in passing that Plaintiffs' co-conspirator allegations are "inconsistent with the entire theory of Plaintiffs' case" (Surescripts Mem. at 15) but nothing could be further from the truth.  The Surescripts-PTV agreements locked out Surescripts' competitors and simple economic theory flows from there: by locking out competition, the conspirators ensured competition could not push prices closer to cost margins.  As Surescripts itself said, it was "win-win-win" for Surescripts and the PTVs—only the actual purchasers—pharmacies—were injured.  SAC ¶¶ 75-76.  Surescripts also briefly argues that it pays rebates directly to pharmacies and such behavior is "not a common activity" for a monopolist.  Surescripts Mem. at 14-15.  This is also false: companies with monopoly or market power routinely use rebates as a form of price discrimination—private rebates allow monopolists to optimize the monopoly rent that can be extracted from varied customers with varying sensitivities to price.  Moreover, these rebate payments bolster Plaintiffs' allegations that the pharmacies are, in fact, Surescripts' customers.  Why else would Surescripts directly send rebate payments to the pharmacies?

sells or resells "the connection that transmits the electronic prescription to pharmacies." That argument should fail; Plaintiffs are proper parties to bring claims here.

Plaintiffs allege that Allscripts is responsible for transferring the e-prescription from the provider through Surescripts and to the pharmacy, like Plaintiffs here. SAC ¶¶ 6–7, 172. Plaintiffs further allege that because of the Allscripts-Surescripts arrangement, no pharmacy could receive e-prescriptions from Allscripts' customers without using Surescripts, and no competing e-prescribing network could use Allscripts' customers to entice pharmacies to break away from Surescripts. *Id.*, ¶¶ 180, 182. Plaintiffs also allege that the Allscripts-Surescripts agreement eliminated nascent competition in the routing market. *Id.*, ¶ 310. That is more than enough to satisfy the causal connection element of *AGC*. *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) ("We may infer causation when exclusionary conduct is aimed at producers of nascent competitive technologies[.]") (citation omitted). Thus, Plaintiffs are proper parties to bring claims against Allscripts.

Furthermore, a plaintiff need not be in the same distribution chain as the defendant in order to show a causal connection between the violation and harm. Instead, the plaintiff need only show that it participated "in the very market directly distorted by the antitrust violation" and that its injuries are "inextricably intertwined with the injury that [Defendants] sought to inflict." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 159 (2d Cir. 2016) (citation omitted). Plaintiffs have done so here. Plaintiffs have alleged that the Surescripts-Allscripts agreement harmed the routing market. SAC ¶ 307. Plaintiffs have further alleged that both they and Allscripts participated in the routing market. *Id.*, ¶¶ 7, 44-47. And Plaintiffs have explained that the injury that Surescripts and Allscripts sought to inflict—the monopolization of the routing market—is "inextricably intertwined" with the injuries that Plaintiffs suffered. An e-prescribing

provider needs access to a critical mass of both pharmacies and EHRs to succeed. *Id*., ¶¶ 45-46, 48, 50. Thus, by agreeing to the Surescripts deal, Allscripts ensured that competing e-prescribing providers like Emdeon could not obtain the critical mass necessary to break Surescripts' monopoly. *Id*., ¶¶ 172-196. As a result, pharmacies were stuck paying Surescripts' supracompetitive rates, which were between 566 and 1700 percent higher than a competitive price. *Id*., ¶ 239. These allegations are sufficient. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 751 (N.D. Ill. 2019); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09-cv-7666, 2012 WL 39766, at *9 (N.D. Ill. Jan. 9, 2012).

## II. PLAINTIFFS HAVE ADEQUATELY ALLEGED AN ILLEGAL MONOPOLIZATION CLAIM AGAINST SURESCRIPTS BASED UPON ITS EXCLUSIONARY CONDUCT (COUNTS I AND V).

Plaintiffs properly allege that Surescripts created and enforced anticompetitive exclusive dealing contracts. In two-sided markets, like the markets here, control over market access "can be used to exclude competitors and harm competition" when a company abuses its position of market dominance. *Viamedia, Inc. v. Comcast Corp*., No. 18-2852, 2020 U.S. App. LEXIS 5469, at *18 (7th Cir. Feb. 24, 2020) (reversing decisions in favor of defendants in monopolization case involving two-sided market). Surescripts illegally uses its dominance in the routing and eligibility e-prescribing markets to implement loyalty programs that contractually commit pharmacies, health plans/PBMs, co-conspirator PTV partners, and EHRs to exclusively use Surescripts' e-prescribing network, thus securing Surescripts' stronghold. These contracts prevent actual and nascent competitors from gaining enough customers to compete with Surescripts.

In defense of these claims, Surescripts contorts Plaintiffs' allegations in the SAC to argue that its loyalty programs are merely "optional low pricing" and urges this Court to improperly

apply a predatory pricing analysis. Surescripts Mem. at 16-20. This argument was rejected by the court in the parallel and factually identical case, *Surescripts I*,[11] and there is no reason why this Court should reach a different conclusion.

### A. Anticompetitive exclusivity contracts are the predominant mechanism of exclusion.

The implementation of Surescripts' loyalty programs through exclusive dealing contracts with pharmacies, health plans/PBMs, co-conspirator PTV partners, and EHRs is the cornerstone of the anticompetitive conduct alleged in the SAC. There is no merit to Surescripts' argument that this case is about Surescripts offering low prices that no other competitor can match or beat—Plaintiffs do allege that other competitors *could* and *have* offered better prices (SAC ¶¶ 198-208, 236-240)—rather, that argument is merely a weak attempt to have the court analyze this case under a predatory pricing analysis. *See* Surescripts Mem. at 17. Surescripts created loyalty programs designed to lock up the majority of e-prescribing customers, thus thwarting potential competitors from gaining enough customers on both sides of the network to challenge Surescripts' monopoly. *See* SAC ¶¶ 4, 109, 136.[12] As the industry evolved and pharmacies moved to utilize PTVs as "gateways" to Surescripts' network, Surescripts entered into exclusionary contracts with PTVs that provided them with direct payments disguised as "loyalty discounts" in exchange for their commitment to route 100% of the pharmacies' transactions exclusively through Surescripts. *See id.*, ¶¶ 68-69, 121-125. These exclusionary contracts

---

[11] According to the Seventh Circuit, this Court should give the *Surescripts I* decision "serious consideration." *See Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1124 (7th Cir. 1987).

[12] According to the SAC, "[t]he term 'discounts' is misleading because…the only 'discount' received by loyal customers was freedom from the punitive price hikes (above and beyond the existing supracompetitive 'loyal' price) and clawbacks that Surescripts levied on non-loyal customers." SAC ¶ 121. Thus, at all times, the prices charged by Surescripts were supracompetitive, regardless of whether the customer was engaged in the loyalty program or not.

contained clawback provisions pursuant to which pharmacies, health plans/PBMs, and PTVs that breach the loyalty commitment must pay back potentially millions in retroactive price penalties. *Id.*, ¶¶ 71, 79, 122-129.

Likewise, Surescripts' exclusionary contracts with EHRs "condition[ed] any incentive payment to the EHR on the EHR's exclusivity to Surescripts for routing, eligibility, or both." *Id.*, ¶¶ 132-133. If an EHR decided to multihome or use Surescripts for less than 100% of its transactions, Surescripts terminates incentive fees to that EHR and the contract's clawback provision requires the EHR to pay back the incentive fee for historical transaction volume. *See id.*, ¶ 134-135.

Thus, Surescripts' exclusionary contracts, with their severe clawback provisions, allow Surescripts to strangle the market so tightly that no actual or nascent competitor could offer prices low enough or incentive payments high enough to offset the immense penalties direct-contract pharmacies, co-conspirator PTV partners, health plans/PBMs and EHRs would have to pay back to Surescripts for their non-loyalty. *See id.*, ¶¶ 131, 198-200. Plaintiffs and the Class have therefore paid more for e-prescribing services than they would have paid had competitors not been thwarted from entering the relevant markets.

The *Surescripts I* court recognized that the exclusionary contracts in this case are *prima facie* anticompetitive:

> For an exclusionary act to be anticompetitive, "it must harm the competitive process and thereby harm consumers." Here, the FTC alleges that Surescripts's loyalty programs—and the implicit threat to charge non-exclusive customers higher prices—prevented the entrance of competitors into e-prescribing markets. The absence of competitors, in turn, allegedly led to increased prices for pharmacies and PBMs and lower incentive payments for EHRs. At least on the face of its complaint, then, the FTC appears to allege facts sufficient to state a claim under Section 2 of the Sherman Act.

*Surescripts I*, 424 F. Supp. 3d 92, 100-101 (citations omitted). Seventh Circuit courts have condemned similar exclusivity contracts as anticompetitive. *See, e.g.*, *Schor v. Abbott Labs*, 457 F.3d 608, 610 (7th Cir. 2006) (including "tie-in sales…group boycotts, exclusive dealing and selective refusal to deal, or predatory pricing" as exclusionary practices.); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 800 (N.D. Ill. 2019).

Consequently, there is no merit to Surescripts' argument (Surescripts Mem. at 17-19) that a predatory pricing analysis should apply here; Plaintiffs allege that exclusivity contracts are the first-line mechanism that Surescripts used to illegally maintain its monopoly and prevent competitors from entering the routing and eligibility markets. The court in *Surescripts I* explained:

> Like the behavior at issue in [*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)] Surescripts's alleged practice of charging loyal pharmacies and PBMs less, and paying loyal EHRs greater incentives, do not need to constitute predatory pricing for Surescripts's exclusionary practices to constitute illegal maintenance of a monopoly. [See *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)]. "Where, as here, a dominant supplier enters into *de facto* exclusive dealing arrangements with every customer in the market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete. . . ." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012)

*Surescripts I*, 424 F. Supp. 3d at 102; *see also ZF Meritor*, 696 F.3d at 278 (rejecting predatory pricing analysis where defendant offered a rebate program that the competitor was unable to match because "this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price"); *McWane, Inc. v. FTC*, 783 F.3d 814, 819 (11th Cir. 2015) (affirming FTC decision that manufacturer defendant's conduct "constituted an illegal

exclusive dealing policy used to maintain [defendant's] monopoly power in the domestic fittings market"). Surescripts' proposed predatory pricing analysis is inapplicable here.[13]

**B.** **Surescripts' claim that the exclusivity contracts and "loyalty programs" were "optional" does not negate the fact that they are anticompetitive.**

Surescripts argues that because access to the Surescripts network and "loyalty pricing" is "optional" (Surescripts' characterization), the terms of routing and eligibility access and pricing cannot be anticompetitive. Surescripts Mem. at 16-17.

The *Surescripts I* court rejected the same argument. Quoting the Supreme Court in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961), the court stated that "a contract need 'not contain specific agreements not to use the [services] of a competitor' as long as 'the practical effect…is to prevent such use.'" *Surescripts I*, 424 F. Supp. 3d at 101. The court further explained that:

> The FTC alleges that the threat of increased prices had the "practical effect" of preventing customers from working with other e-prescribing platforms, "since doing so would trigger the massive penalty provisions in their contracts with Surescripts ... and cost routing [and eligibility] customers millions of dollars through increased prices or, for EHRs, decreased incentive payments."
> 
> \*\*\*
> 
> Here, the government has pleaded facts demonstrating such substantial foreclosure.

*Surescripts I*, 424 F. Supp. 3d at 101 (citations omitted); *see also Collins v. Associated Pathologists, Ltd.*, 884 F.2d 473, 478 (7th Cir. 1988) ("Whether a particular contract [violates the Sherman Act] depends on the effect that contract has upon competition in the relevant market

---

[13] Surescripts' reliance on *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) is misplaced. There, the plaintiffs relied on the exclusionary effect of the defendants' prices alone—not on the anticompetitive effects of exclusionary contracts and separate contracts in restraint of trade, as Plaintiffs do here. *See ZF Meritor, LLC*, 696 F.3d at 277 ("Here, in contrast to…*Brooke Group*, Plaintiffs did not rely solely on the exclusionary effect of Eaton's prices, and instead highlighted a number of anticompetitive provisions in the [long term agreements].").

place.").  The exclusionary contracts are restrictive in their purpose and effect, and thus anticompetitive.

### III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED A CONSPIRACY TO MONOPOLIZE CLAIM AGAINST SURESCRIPTS AND RELAYHEALTH (COUNTS II AND VI).

To plead a conspiracy to monopolize, a plaintiff must allege: "(1) the existence of a combination or conspiracy, (2) overt acts in furtherance of the conspiracy, (3) an effect upon a substantial amount of interstate commerce, and (4) the existence of specific intent to monopolize." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 755 (N.D. Ill. 2019).  Surescripts challenges the first and fourth elements. *See* Surescripts Mem. at 20-22.

Plaintiffs have sufficiently alleged that Surescripts and RelayHealth conspired to maintain Surescripts' monopoly.  In 2010, RelayHealth and Surescripts entered into a contract that required RelayHealth to stay out of the market for six years, and required RelayHealth to enforce exclusivity to the Surescripts network among pharmacies.  *See* SAC ¶¶ 146-163.  In 2015, Surescripts and RelayHealth entered into a new contract that required RelayHealth to end its relationships with EHRs and transfer its EHR connections to Surescripts, eliminating RelayHealth's ability to be a competitive threat in a two-sided routing network.  *See id.*, ¶¶ 165-171.  Both contracts provided RelayHealth with a successively larger share of Surescripts' monopoly profits.  *See id.*, ¶¶ 161, 166.

Prior to 2010, RelayHealth purchased connectivity to Surescripts' network at a wholesale rate slightly discounted from the monopoly price charged to pharmacies.  *See id.*, ¶ 145.  As the renewal date approached, RelayHealth and Surescripts had three choices: (1) RelayHealth could continue to resell Surescripts' connectivity at slim margins subject to potential competition; (2) RelayHealth could enter the market by undercutting Surescripts or creating a more attractive product through bundling connectivity with McKesson and RelayHealth's other adjacent

21

products (*see id.*, ¶¶ 148-158); or (3) a new contract could be formed under which RelayHealth imposed exclusivity to Surescripts on its customers to ensure Surescripts could freeze out nascent competitors and continue to charge monopoly prices, which Surescripts would then share with RelayHealth through a deeper discount and exclusivity incentive fees. *See id.*, ¶¶ 159-163). Surescripts and RelayHealth's decision to pursue the third option was anticompetitive.

In addition, both Surescripts and RelayHealth shared the requisite intent to exclude competition or control prices. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 789 (1945); *accord In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2019 WL 1397228, at *18 (E.D. Va. Feb. 6, 2019), *report and recommendation adopted as modified,* 400 F. Supp. 3d 418 (E.D. Va. 2019) (finding intent to monopolize in the context of an exclusionary contract). At the pleading stage, specific intent may be inferred from defendants' conduct. *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019) (holding it appropriate to infer intent based on adequately pled overt acts in a case involving exclusive dealing); *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000).[14]

Surescripts argues that it is "unreasonable to infer that a customer would conspire to assist its supplier's monopoly." Surescripts Mem. at 21. However, RelayHealth was able to procure more favorable pricing and incentive terms for itself *because* of its agreement to stay out of the market and help shut out all other nascent competitors—*i.e.*, Surescripts paid RelayHealth to join its conspiracy and not to compete. RelayHealth's own internal documents show its belief that Surescripts' "dominant contracting strategy . . . [was] to prevent [RelayHealth] from

---

[14] *See also Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 257 (3d Cir. 2010) (*Dentsply II*) (**"**[s]pecific intent in the antitrust context may be inferred from a defendant's unlawful conduct"); *Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn.*, 745 F.2d 248 (3d Cir. 1984) ("[d]irect evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct").

22

competing [with Surescripts.]" SAC ¶ 158. And Surescripts described RelayHealth as "sh[*]tty, non-value added partners but at least they're one of our biggest competitive threats." *Id.*, ¶ 164. Both parties understood that they had agreed not to compete and to share monopoly profits. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition.").

RelayHealth did more than merely "acquiesce[]" to Surescripts' "monopolistic demands." *See* Surescripts Mem. at 22. RelayHealth had enormous bargaining power over Surescripts because its parent, McKesson, had the resources, expertise, and customers to be an existential threat to Surescripts. SAC ¶¶ 8, 25, 148-158. This bargaining power was not present in *Gravity, Inc. v. Microsoft Corp.*, 127 F. Supp. 2d 728 (D. Md. 2001), in which Microsoft required original equipment manufacturers to accept restrictive agreements designed to preserve Microsoft's monopolies. *Id.* at 729-30.[15] Nor did the *Gravity* OEMs benefit from their arrangement with Microsoft through a share of monopoly profits, as alleged here.

Surescripts cites cases decided at summary judgment or after trial, or in which "no rational motive" was pled for the alleged conspiracy.[16] In contrast, Plaintiffs here have pled that e-prescription routing rates in a competitive market would have been as low as 1 to 3 cents per transaction, as compared to the 17 cents charged in a monopoly market. SAC ¶¶ 156-157, 239.

---

[16] *See, e.g., TV Commc'ns Network, Inc. v.* Turner *Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir. 1992) (dismissing complaint that did "little more than "recite the relevant antitrust law"); *Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*, 244 F. App'x 130, 132 (9th Cir. 2007) (dismissing claim on summary judgment); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 272 (7th Cir. 1981) (post-trial opinion).

23

Since the 2010 and 2015 contracts provided RelayHealth a larger share of Surescripts' routing fees, it was economically rational for RelayHealth to help Surescripts keep rates at a monopoly level. *Id.*, ¶¶ 161, 166. *Cf. In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, No. CIV. 12-711, 2013 WL 812143, at *4-5, *20-21 (D.N.J. Mar. 5, 2013) (plaintiffs sufficiently pled that manufacturer conspired with one of its distributors and potential rivals in which the distributor agreed to stay out of the market, enforce exclusionary provisions, and squash a mutual rival's nascent efforts to enter the market as a competitor to the manufacturer).

## IV. PLAINTIFFS HAVE ADEQUATELY ALLEGED A RESTRAINT OF TRADE CLAIM AGAINST SURESCRIPTS AND RELAYHEALTH (COUNTS III AND VII).

The same facts that underlie Plaintiffs' conspiracy to monopolize claim sufficiently support a restraint-of-trade claim under section 1 of the Sherman Act. Under either a *per se* or rule-of-reason analysis, the ultimate inquiry is "whether or not the challenged restraint enhances competition." *In re Delta Dental Antitrust Litig.*, No. 19-cv-6734, 2020 WL 5296996, at *2 (N.D. Ill. Sept. 4, 2020). Because Plaintiffs have sufficiently pled that the purpose of the 2010 and 2015 agreements were to eliminate all threats to Surescripts' dominance, they have pled a viable claim under either theory.

### A. Plaintiffs have sufficiently pled a naked restraint of trade sufficient for *per se* treatment.

"Horizontal agreements to allocate markets among competitors are *per se* violations of § 1 of the Sherman Act." *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995) (citing *United States v. Topco Associates*, 405 U.S. 596 (1972); *Palmer v. BRG of Georgia, Inc*., 498 U.S. 46 (1990)); s*ee also General Leaseways, Inc. v. National Truck Leasing Assoc*., 744 F.2d 588, 591 (7th Cir. 1984) ("[I]n short, horizontal market divisions are illegal *per se*."). "An agreement to engage in anti-competitive conduct need not, and generally will not, be established by direct

evidence of a combination or conspiracy. The requisite concerted action may be inferred from a course of dealing or from other circumstantial evidence." *Contractor Utility Sales Co. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1074 (7th Cir. 1981).

Group boycotts—occurring when two or more entities conspire to foreclose competition—are also *per se* illegal. *See, e.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). While the Supreme Court has held that boycotts involving solely vertical arrangements are to be judged under the rule of reason analysis, *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998), the Court has distinguished pure vertical price restraints from those vertical price restraints that are used to organize horizontal arrangements, which are, "and ought to be, *per se* unlawful." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).

Courts do not normally determine whether a challenged restraint is *per se* illegal on the pleadings and confine their analysis to whether plaintiffs have *alleged* facts supporting a plausible claim that defendants engaged in conduct that resulted in a restraint of trade. *See, e.g., Rockford*, 360 F. Supp. at 754 (finding that plaintiff had properly alleged a Section 1 violation by a monopolist drug manufacturer and its exclusive distributor who had conspired to "keep prices high, restrict output, and prevent competition from entering the market.") (citation omitted).

Here, Plaintiffs have alleged that RelayHealth had the financial wherewithal, customer relations, and experience in an adjacent market to out-compete Surescripts in the routing market, and that it would have done so but for the agreement at issue. *See generally In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 WL 5008090, at *16 (D.N.J. Oct. 20, 2011) (discussing pleading standard for a horizontal market allocation claim among potential competitors). Both RelayHealth and Surescripts found it more profitable to work together to

25

shut out other competitors.  Thus, their agreement was one to restrict output (routing e-prescriptions) for the purpose of keeping prices high, an arrangement considered a naked restraint of trade entitled to *per se* treatment.  *See United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) (explaining why agreements to restrict output are entitled to *per se* treatment).

Surescripts argues that Plaintiffs' *per se* claim should be dismissed on the grounds that the restraint alleged should be viewed as merely ancillary to a procompetitive agreement. However, Plaintiffs have alleged that "[n]ot one joint Surescripts-RelayHealth value-added product or service resulted" from the 2010 or 2015 contracts.  SAC ¶¶ 245-247.  And "Surescripts repeatedly described the sole value of its agreements with RelayHealth as keeping RelayHealth's customers exclusive to Surescripts and preventing RelayHealth from competing against Surescripts in routing."  *Id.*, ¶ 248; *see also id.*, ¶¶ 159, 164, 248.  In other words, exclusion of competition was the purpose of the agreement, not a side feature.

RelayHealth erroneously relies on the post-trial opinion, *Polk Bros. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 187 (7th Cir. 1985), in which two store owners entered an agreement to build a building that could house them both.  *Id.* at 188.  Because neither was interested in investing in a facility to house a rival, they incorporated provisions into their agreement that restricted what type of products each would be entitled to sell.  *Id.*  The Seventh Circuit found that the goal of the agreement was to provide customers with a more convenient shopping experience, not to limit competition.  Therefore, the "ancillary" restraint "contribute[s] to the success of a cooperative venture that promises *greater productivity and output*," and was not a "naked" restraint that restricts competition without the benefit of a redeeming procompetitive virtue.  *Polk,* 776 F.2d at 188-89 (emphasis added).

Here, the goal of the 2010 agreement was to eliminate competition.  The agreement to

jointly develop products—which never actually resulted in any new products—was, if anything, ancillary to the naked *per se* illegal restraint to divide the market, refuse to compete, and share supracompetitive profits.  This much is clear from Surescripts' Chief Customer Officer's description of Relay Health as "sh[*]tty, *non-value added* partners but at least they're one of our biggest competitive threats."  SAC ¶ 164 (emphasis added).

The 2015 agreement eliminated the explicit non-compete but preserved the same anti-competitive effect by requiring RelayHealth to terminate its routing relationships with EHRs and turn over the connections to Surescripts, neutralizing RelayHealth as a competitive threat.[17] Both agreements were horizontal agreements that allocated control of the routing market to Surescripts and helped maintain supracompetitive prices.  *See Blackburn v. Sweeney*, 53 F.3d 825, 827 & 828 (7th Cir. 1995) (holding that an agreement to allocate markets is *per se* unlawful); *Tamburo v. Calvin*, No. 94 C 5206, 1995 WL 121539, at *5 (N.D. Ill. Mar. 17, 1995) (holding a non-compete clause was unlawful *per se* where its purported purpose was illusory).

**B.     Alternatively, Plaintiffs have sufficiently pled an anticompetitive restraint of trade under the Rule-of-Reason.**

As noted *supra*, courts typically do not undertake a rule-of-reason analysis on the pleadings.  *Rockford*, 360 F. Supp. 3d at 754.  That is because the rule-of-reason inquiry is fact intensive, requiring a court to determine that a "challenged action is unreasonable if—in light of facts particular to the industry, its condition before and after the imposition of the restraint, and

---

[17] RelayHealth is also wrong to compartmentalize its two separate Surescripts contracts as if they are two separate antitrust claims.  *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 828 (7th Cir. 1978) ("The character and effect of a conspiracy are not be judge by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

the restraint's nature, history, and effects—it suppresses rather than promotes competition." *In re Sulfuric Acid Antitrust Litig.,* 743 F. Supp. 2d 827, 864 (N.D. Ill. 2010) (setting forth standard to be applied on summary judgment). Nonetheless, Plaintiffs have pled sufficient facts to surpass this level of scrutiny. As the Seventh Circuit has held, even ancillary restraints are unlawful if they "bring a large market share under a single firm's control." *Polk*, 776 F.2d at 189.

Surescripts argues that Plaintiffs fail to state a claim under the rule-of-reason because "they have not alleged net anticompetitive effects across both the pharmacy and EHR sides of the e-prescription routing market required by *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018)." Surescripts Mem at 23. But the complaint alleges that Surescripts' loyalty requirements alone, as bolstered by the non-compete with RelayHealth insulated between 70-80% of each side of the routing network from competition. *See, e.g.*, SAC ¶¶ 6, 120, 132, 136-138, 145, 166, 225-235. Plaintiffs allege that competition would have lowered net prices, considering both sides of the transaction. *Id.*, ¶¶ 236-240. These are anticompetitive effects.

It is not Plaintiffs' burden to plead the anticompetitive effects separately attributable to each agreement; a court does not "wipe the slate clean" after scrutinizing each component of an alleged conspiracy. *Ohio-Sealy*, 585 F.2d at 828. Nonetheless, Plaintiffs have alleged that the 2010 non-compete agreement neutralized RelayHealth's "natural ability to capture 15-20% of transaction volume" due to its relationship with McKesson. SAC ¶ 8. The 2015 agreement continued to sideline RelayHealth as a potential routing competitor and "remov[ed] [RelayHealth] as an EHR aggregator," ensuring that Surescripts would be able to leverage the "chicken and the egg" problem against RelayHealth should it decide to enter the routing market in the future. *Id.*, ¶¶ 155, 165-171. These agreements, individually and together, were intended to sustain Surescripts' monopoly by eliminating RelayHealth as a routing competitor.

28

Surescripts relies on *Dickson v. Microsoft Corp.*, 309 F.3d. 193 (4th Cir. 2002) for the proposition that "the law does not permit consideration of two admittedly different agreements in the aggregate." Surescripts Mem. at 24. However, the Dickson plaintiffs had only alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell. *Dickson*, 309 F.3d at 210 (internal quotations omitted). Because plaintiffs did not "allege a conspiracy among Microsoft and all OEMs," the district court "correctly determined that it could not consider the cumulative harm of Microsoft's agreements with all OEMs" but could only "consider—individually—Microsoft's agreements with Compaq and Dell to evaluate each agreement's potential for anticompetitive effects." *Id*. (emphasis added). By contrast, the challenged non-compete agreements here were between the same two parties—Surescripts and RelayHealth—and both had the anticompetitive effect of neutralizing RelayHealth as a competitive threat.

## V. PLAINTIFFS HAVE ADEQUATELY ALLEGED A RESTRAINT OF TRADE CLAIM AGAINST SURESCRIPTS AND ALLSCRIPTS (COUNTS IV AND VIII).

Plaintiffs sufficiently plead a Sherman Act Section 1 claim against Allscripts regardless of whether the rule of reason or *per se* analysis is applied. As set forth above, group boycotts are *per se* unlawful under the Sherman Act, while exclusive dealing arrangements are unlawful under the rule-of-reason if they foreclose competition in a substantial share of the line of commerce at issue. *Per se* analysis applies to "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Cont'l T.V. v. GTE Sylvania*, 433 U.S. 36, 49 (1977). Group boycotts are *per se* illegal. *See, e.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). So are concerted refusals to deal. *See Spray-Rite Serv.*

29

*Corp. v. Monsanto Co.*, 684 F.2d 1226, 1235 n.4 (1982). Exclusive dealing arrangements are unlawful under the rule-of-reason "when they foreclose competition in a substantial share of the line of commerce at issue." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 320-27 (1961)); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982).

At the motion to dismiss stage, the rule-of-reason inquiry requires the plaintiff to do nothing more than "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Watkins v. Smith*, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 538–39 (N.D. Ill. 2019). Alleging evidence of market structure and exclusionary effect is generally "adequate pleading in a rule of reason antitrust case." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020). Here, Plaintiffs have alleged sufficient facts to support combination-in-restraint-of-trade claims against Allscripts under both *per se* and rule-of-reason analytical frameworks for group boycotts, concerted refusals to deal, and exclusive dealing.

Surescripts' exclusive arrangement with Allscripts, a critical EHR with access to a substantial prescriber population, was an important component of the anticompetitive scheme alleged in this case. As one of the few EHRs multihoming, Allscripts provided an opportunity for e-prescribing networks competing with Surescripts to connect to Allscripts' centralized "hub" of prescriber customers and expand their networks. *See* SAC ¶ 172. Emdeon, for example, connected to Allscripts and routed prescriptions between its pharmacy customers and Allscripts' prescriber customers. *Id.*, ¶ 173. Access to Allscripts' sizable prescriber base made Emdeon more attractive to pharmacy customers. Allscripts would help Emdeon reach critical mass, and

30

Surescripts recognized Allscripts as one half of the solution to Emdeon's "chicken-and-egg" problem. *Id.*, ¶¶ 173-174.

Because it realized that the "key to Emdeon is Allscripts," Surescripts sought to "contain" Emdeon's "access to [prescribers]" by striking a deal with Allscripts to route transactions exclusively over the Surescripts network. *Id.*, ¶¶ 174, 179-180. Surescripts leveraged its status as a "must-have" pharmacy partner to negotiate an anticompetitive deal that required Allscripts to terminate its routing connection to the Emdeon network. *Id.*, ¶¶ 179-182, 186. In return, Surescripts provided Allscripts with "enhanced" revenue sharing. *Id.*, ¶ 187. As a result of the contract with Allscripts (a critical EHR representing 25% of Surescripts' routing and eligibility transactions), Surescripts not only eliminated Emdeon as a competing routing provider but other potential competitors as well. *Id.*, ¶¶ 172, 179-208, 310-313. Surescripts thus was able to obtain at least a 95% share of the routing market and effectively foreclose at least 70% of each market through its loyalty contracts. *Id.*, ¶¶ 2-3, 309.

The Allscripts-Surescripts Agreement was critical in locking up the eligibility market which, in turn, helped Surescripts maintain its stranglehold over the routing market. The arrangement ensured that no aspiring routing competitor would have access to Allscripts' cache of e-prescriptions. The facts alleged show support for both group boycott (*per se* unlawful) and exclusive dealing (unlawful under the rule of reason) theories of liability.

### A. Plaintiffs adequately plead market power and actual detrimental effects on competition.

For antitrust purposes, market power "is the power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 464 (1992) (internal quotation marks omitted). "It has been defined as the ability of a single seller to raise price and restrict output." *Id.* (internal quotation marks omitted).

Market power is a surrogate for actual detrimental effects and is not necessary where evidence of the latter is established. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986).

Plaintiffs clearly allege the Surescripts-Allscripts Agreement had an actual detrimental effect on competition by foreclosing Emdeon, the single-most threatening competitor to Surescripts, from the market. Plaintiffs allege that Allscripts had the market power to make or break the success of both Surescripts and competitor Emdeon in the routing and eligibility markets. SAC ¶¶ 172-174. The Allscripts-Surescripts Agreement required Allscripts to sever its connection with Emdeon, a devastating blow that pushed Emdeon out of the market. *Id.*, ¶¶ 179-182, 207-208. By removing Emdeon as a competitive threat, the Allscripts-Surescripts agreement resulted in "economic pain" for pharmacy customers and, ultimately, a 566-1700% increase in price per routing transaction. *Id.*, ¶ 239. Plaintiffs also allege the Allscripts-Surescripts agreement reduced service quality and innovation in the routing and eligibility markets. *Id.*, ¶¶ 241-242, 244, 249-257. Thus, Plaintiffs have pleaded that the Allscripts-Surescripts agreement caused actual detrimental effects on competition in the market, and therefore Plaintiffs have sufficiently alleged that Allscripts had market power. *See Ind. Fed'n of Dentists*, 476 U.S. at 460-61.

Finally, the authority Allscripts relies on is easily distinguishable from the present case. In *Dickson v. Microsoft Corp.*, the court affirmed dismissal of defendants Compaq and Dell for failure to allege market power because the plaintiff claimed that evidence of Compaq's and Dell's market power was immaterial to their ability to influence competition in the relevant market, and instead asserted that proof of defendant Microsoft's market power alone was sufficient to plead claims against Compaq and Dell. 309 F.3d 193, 209-11 (4th Cir. 2002).

Plaintiffs take no such position here. Plaintiffs allege that Allscripts' own market power resulted in actual detrimental effects on the relevant markets.

### B. Plaintiffs adequately allege substantial foreclosure.

The Court can similarly dispose of Defendants' argument that Plaintiffs have not alleged substantial foreclosure. Substantial foreclosure is "one of several factors [courts] examine in determining whether the conduct harmed competition," but "[t]he ultimate question remains whether the defendant's conduct harmed competition." *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 835 (11th Cir. 2015). "Foreclosure occurs when the opportunities for other traders to enter into or remain in the market are significantly limited by the exclusive dealing arrangements." *Id.* at 837 (internal quotation marks omitted). "Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (quoting *United States v. Dentsply International, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)).

Plaintiffs allege that the Allscripts-Surescripts agreement prevented competitor Emdeon from being able to reach the critical mass needed to pose a real competitive threat. SAC ¶¶ 173-174. By removing Emdeon as a competitive threat via the Allscripts-Surescripts Agreement, Allscripts helped Surescripts foreclose at least 70-80% of each of the relevant markets. *Id.*, ¶¶ 227-229. But for Allscripts' agreement to cut Emdeon off, the harm to competition would not have occurred. *Id.*, ¶ 250. Plaintiffs have pleaded sufficient facts to show that Allscripts' conduct harmed competition by foreclosing Emdeon as a potential competitive threat.

Defendants' reliance on *Dickson* is again misplaced. To establish that an alleged restraint has had an anticompetitive effect on the market, a plaintiff "may establish either (1) that the restraint had an "actual detrimental effect" on competition, or (2) that the restraint had the

potential for genuine anticompetitive effects and that the conspirators had market power in the relevant market." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016). In *Dickson*, the Court applied the latter test, finding that "absent an allegation regarding Compaq's or Dell's power or share in the PC market, there is no basis in Gravity's complaint for concluding that either of the two licensing agreements at issue, when considered individually, are likely to foreclose a significant share of the relevant software markets." 309 F.3d at 209. Here, however, Plaintiffs allege both market power and actual detrimental effects, as opposed to the mere possibility of anticompetitive effects. Because Plaintiffs plead that Allscripts' exclusive dealing arrangement significantly limited the opportunity for competitors, like Emdeon, to enter into or remain in the market, Plaintiffs sufficiently plead substantial foreclosure. *See McWane*, 783 F.3d at 837.

## VI. ALLSCRIPTS, AS A BUYER AND SELLER, IS A PROPER DEFENDANT FOR AN EXCLUSIVE DEALING CLAIM.

Allscripts is competitively situated as both a seller and a buyer of the services in the exclusive dealing arrangement alleged by Plaintiffs. Allscripts attempts to wash its hands of its role as a seller in order to avoid liability under section 1 of the Sherman Act. The Court should reject Allscripts' argument because Plaintiffs have alleged facts showing that Allscripts' involvement in the anticompetitive arrangement is more than that of a mere buyer.

Allscripts bases its argument on a District of Columbia decision, *Genetic Systems Corp. v. Abbot Labs*, 691 F. Supp. 407, 416 (D.D.C. 1988), in which the court dismissed exclusive dealing claims brought by a competing seller against a buyer of blood test equipment. In *Genetic Systems*, the court based its decision in part on "the fundamental antitrust concept that the alleged sins of sellers should not be visited on buyers because of the risk of chilling competition." *Id.* at 415.

34

Allscripts' argument is misplaced for a number of fundamental reasons. Most obviously, Allscripts did not purchase e-prescribing services from Surescripts; it received payments from Surescripts in exchange for exclusively using Surescripts for its EHR/prescribers' and PBM clients' needs. *See* SAC ¶ 187. Allscripts agreed to phase out its independent connections with PBMs in the eligibility market as part of its deal with Surescripts. *Id*., ¶¶ 176, 183. The "fundamental antitrust concept" regarding a buyer's liability announced in *Genetic Systems* simply does not apply here. *See* 691 F. Supp. at 415. Allscripts is a seller and aggregator of physician-side records and prescriptions, and it is in that role—as a seller or "supplier" of e-prescriptions—that Allscripts' impact in the anticompetitive scheme most directly impacts Plaintiffs here (pharmacy "consumers" of e-prescriptions). Allscripts does not receive immunity in this case because it *also* acts as a buyer and broker of other e-prescription related products and services.

By accepting payment from Surescripts in exchange for exclusivity and by terminating the sale of its own eligibility services, Allscripts joined Surescripts' anticompetitive scheme and restricted competition.

## VII.  PLAINTIFFS HAVE PLED A PLAUSIBLE CONSPIRACY BETWEEN ALLSCRIPTS AND SURESCRIPTS.

Allscripts' claim that Plaintiffs have failed to allege a plausible conspiracy fares no better. Allscripts myopically suggests that it merely received incentive payments from Surescripts, and that the receipt of payments pursuant to the terms of a contract do not establish a conspiracy. But Plaintiffs allege far more than this. Plaintiffs allege that Allscripts knew it needed to contract with Surescripts in order to connect with its pharmacies and PBMs, and that Surescripts knew that locking up Allscripts was key to preventing Emdeon or any other alternative e-prescribing models from obtaining significant market share. Instead of fighting

back, Allscripts agreed to join Surescripts' efforts to foreclose the routing and eligibility markets from competitors. SAC ¶¶ 186-87. To meet both sides' needs, Allscripts and Surescripts agreed that, in exchange for a share of the monopoly profits, Allscripts would terminate its routing connection with Emdeon; phase out its eligibility contracts with certain PBMs; facilitate a meeting between Surescripts and any entity that sought to do business in eligibility and routing; and regularly remind its sales and business development personnel of their obligations under the Surescripts-Allscripts agreement. *Id.*, ¶¶ 182-85. Plaintiffs further allege that the terms and conditions of the Surescripts-Allscripts agreement unreasonably restrained trade by preventing nascent competitors from accessing Allscripts' sizable market share. *Id.*, ¶ 310. No more is needed to allege a conspiracy, as parties that enter into a contract whose terms and conditions unreasonably restrain trade also "conspire" to restrain trade under the Sherman Act. *See United States v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012); *see also Fed. Trade Comm'n v. Vyera Pharm., LLC*, No. 20-cv-706, 2020 WL 4891311, at *10 (S.D.N.Y. Aug. 18, 2020) (explaining that the restrictive terms of the contract "made it obvious" that the parties "were agreeing to engage in anticompetitive conduct").[18] Thus Plaintiffs have adequately pled Allscripts' involvement in the conspiracy.[19]

Trying to portray itself as a victim, Allscripts further claims that Plaintiffs have failed to allege a conspiracy because they alleged facts showing that the agreement harmed Allscripts, and

---

[18] The case that Allscripts cites in support of this argument is easily distinguishable. *Marion Healthcare, LLC v. Becton Dickinson & Co.* was a hub-and-spoke case in which the Seventh Circuit held that contracts between the hub and spokes did not establish a conspiracy between the spokes. 952 F.3d 832, 842 (7th Cir. 2020). Plaintiffs have satisfied *Marion* here. *See supra*, Section I.A.2.

[19] Allscripts' suggestion that it is no different than the other EHRs who were not named as defendants in this litigation is of no moment. "A private plaintiff need not sue all coconspirators but may choose to proceed against any one or more of them." *Wilson P. Abraham Const. Corp. v. Texas Indus., Inc.*, 604 F.2d 897, 904 n.15 (5th Cir. 1979).

that Allscripts wanted to "get out" of it. The Court can quickly dispose of this argument. "[T]he 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 973 (7th Cir. 1995); *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987) ("The fact that Isaksen may have been coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1.").[20] The fact that Allscripts might have preferred a different deal does not excuse its liability under the Sherman Act, particularly since it earned a share of monopoly profits from the agreement. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948) (explaining that the fact that "large exhibitors . . . fathered the illegal practices and forced them onto the defendants . . . does not help the defendants.").

Finally, Allscripts claims that Plaintiffs have failed to allege a plausible conspiracy because the facts as pled could just as easily show that Allscripts engaged in unilateral, rational business behavior. This argument fails for two reasons. First, even if Allscripts' competing assessment of the allegations was accurate, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6)

---

[20] For this point, Allscripts relies on the distinguishable *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984). There, the plaintiff haul-away company sued Ford after it terminated the plaintiff's contract and entered into an exclusive contract with a new company for transport services. *Id*. at 1104. The plaintiff claimed that the exclusive contract violated federal antitrust law. *Id*. The court rejected this claim, holding that because "Ford . . . could 'dictate[] and control[]' the tariffs of its suppliers," it was implausible that Ford would enter into a contract that would cause it to pay higher prices. *Id*. at 1109. Here, Plaintiffs do not allege that Allscripts had the power to control Surescripts' prices. In fact, Plaintiffs allege nearly the opposite—that Allscripts conspired with Surescripts in order to keep its own payments at a supracompetitive level. Unlike the conspiracy alleged in *Car Carriers*, this is an entirely plausible outcome: Surescripts even titled the Allscripts' proposal "HERE COMES THE BRIBE." SAC ¶¶ 187, 311.

motion." *Anderson News LLC v. American Media, Inc.*, 680 F.3d 162, 185 (2d. Cir. 2012). This is true even if the Court finds Allscripts' version "more plausible." *Id.*[21]

Second, Allscripts' claim that it acted unilaterally is nonsensical. Plaintiffs are not relying on allegations of parallel decision-making alone, without more, as was the case in the authorities cited by Allscripts. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (explaining difference between unilateral and concerted price setting); *Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (rejecting claim that alleged bank followed interchange fee in determining merchant discount fee). Plaintiffs allege the Surescripts-Allscripts agreement is direct evidence of a quid pro quo. Surescripts agreed to cut Allscripts in on the monopoly profits. In return, Allscripts agreed to terminate its relationship with Emdeon, phase out its direct connections to PBMs, and refer entities that wanted to work directly with Allscripts to Surescripts instead. Plaintiffs need not allege any more to show concerted action. *See Albert H. Cayne Equip. Corp. v. Union Asbestos & Rubber Co.*, 220 F. Supp. 784, 787 (S.D.N.Y. 1963) ("A contract between a seller and a buyer . . . is enough to satisfy the joint conduct requirement of Section 1 of the Sherman Act."). It is undisputed that there is a written agreement between Surescripts and Allscripts; Plaintiffs have pled a plausible conspiracy.

## VIII. THE COURT SHOULD MAINTAIN PLAINTIFFS' STATE LAW CLAIMS

### A. Named plaintiffs can assert claims under the laws of states where they did not do business on behalf of putative class members.

Ignoring binding Seventh Circuit precedent to the contrary, Surescripts contends that Plaintiffs lack "standing" to assert state laws claims in states where they do not operate.

---

[21] Allscripts cites *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.* in support of this argument. 200 F.3d 307, 313 (5th Cir. 2000). That case was decided at summary judgment, where the standard is materially different. *Id.*

Surescripts Mem. at 25. This is incorrect. To establish Article III standing, it is only necessary to demonstrate three elements: "(1) a concrete and particularized injury in fact that is (2) fairly traceable to the alleged action of the defendant and (3) likely to be redressed by a favorable decision." *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (internal quotations and citation omitted). "[T]he question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III standing or jurisdiction." *Woodman's Food Mkt., Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).[22] "Because statutory standing is not jurisdictional, there is no *constitutional* imperative that the named plaintiff himself have a valid claim under every legal theory he proposes to assert on behalf of a class." *Muir v. Nature's Bounty (DE), Inc.*, No. 15 C 9835, 2018 WL 3647115, at *7 (N.D. Ill. Aug. 1, 2018) (emphasis in original; citing *Morrison*, 649 F.3d at 535-38).

At this stage, once standing is established nothing further is needed. As the Seventh Circuit has instructed, only "*once a class is properly certified*, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton v. Cty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (emphasis added). Indeed in *Lewis v. Casey*, a case Surescripts relies on,[23] the Supreme Court

---

[22] *See also Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("Plaintiffs have standing if they have been injured, the defendants caused that injury, and the injury can be redressed by a judicial decision . . . . If the Illinois Consumer Fraud Act law does not apply because events were centered outside Illinois, then plaintiffs must rely on some other state's law; this application of choice-of-law principles has nothing to do with *standing*") (emphasis in original); *Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1000 (N.D. Ill. 2017) ("The question of what legal theories [plaintiff] may advance as bases for recovering damages for his injury does not implicate Article III standing; the availability of any particular legal theory presents a question of substantive law.") (Tharp, J.); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016) ("Article III's injury-in-fact requirement 'has nothing to do with the text of the statute relied upon.'") (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998).

[23] Defendants cite *Lewis* for the unremarkable proposition that named plaintiffs must allege that they, themselves, have been injured. Surescripts Mem. at 25. Plaintiffs here have done just that. *See* SAC ¶¶

stated that "[w]hether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions." 518 U.S. 343, 395-96 (1996) (Souter, J., concurring) (quoting 1 H. Newberg & A. Conte, Newberg on Class Actions § 2.07, pp. 2-40 to 2-41 (3d ed.1992)).[24]

Accordingly, "the trend has been to treat the issue as one of statutory standing that can be deferred until class certification." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 548 (N.D. Ill. 2019) (denying motion to dismiss state-law claims in states where no named plaintiff operates and deferring issue to class certification); *see also Sandee's Catering v. Agri Stats, Inc.,* No. 20 C 2295, 2020 WL 6273477, at *5 (N.D. Ill. Oct. 26, 2020) (same); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 759 (N.D. Ill. 2019), *reconsideration denied*, No. 17 C 50107, 2019 WL 2763181 (N.D. Ill. May 3, 2019) (same); *Muir*, 2018 WL 3647115, at *8 (same); *Liston*, 254 F. Supp. 3d at 1001-02 (same); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 810 (N.D. Ill. 2017) (same); *Opana*, 162 F. Supp. 3d at 722 (same).[25] The Court should follow this trend and address these issues at class certification.

---

268-69 (explaining that, because of Defendants' illegal conduct, Plaintiffs paid artificially inflated prices for routing transactions).

[24] Surescripts also cites *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) which holds that "a plaintiff must demonstrate standing for each claim he seeks to press." This is non-controversial. While Plaintiffs "seek redress under multiple legal theories, they satisfy the injury-in-fact, causation, and redressability requirements of Article III for each of these claims." *Muir*, 2018 WL 3647115, at *6

[25] Surescripts cites *In re Dairy Farmers of America Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013) in support of its argument but *Dairy Farmers* has been criticized for failing to address the Supreme Court's reasoning in *Lewis* and *Payton*: "*Dairy Farmers* failed to account for the fact that in *Payton* the named plaintiffs—like the named plaintiffs here—were able to establish their own standing apart from that of the class . . . . As the Supreme Court put it in *Lewis*, 'the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court.'" *Broiler Chicken*, 290 F. Supp. 3d at 810.

**B.      Defendants' other arguments for dismissal of Plaintiffs' state law claims are baseless.**

**1.   Plaintiffs may assert Illinois and Montana claims on behalf of a Class.**

Surescripts argues that only the Illinois Attorney General may bring a class action on behalf of indirect purchasers under the Illinois Antitrust Act ("IAA").  Surescripts Mem. at 27. However, even if Plaintiffs were considered "indirect purchasers" without valid federal damages claims, multiple courts in and outside of this district have held, under *Shady Grove Orthopedic Assocs. v. Allstate Insurance Co.*, 559 U.S. 393, 406 (2010),[26] that procedural restrictions in the *state-law* IAA cannot limit Rule 23's class action procedure under *federal* law.  *See, e.g.*, *City of Rockford*, 360 F. Supp. 3d at 765 (agreeing with courts that have found that the Illinois class action bar was not substantive under *Shady Grove* and thus denying defendants' motions to dismiss plaintiffs' class action antitrust claims based on the IAA) (citing authorities); *Broiler Chicken*, 290 F. Supp. 3d at 817 (finding that "*Shady Grove*'s reasoning with respect to New York's class action ban is equally applicable to Illinois's requirement that class actions be brought by the Attorney General" and permitting Illinois indirect purchaser antitrust class claims to proceed); *Hatchett v. Henry Schein, Inc.*, No. 3:19-CV-83, 2020 WL 733834, at *4 (S.D. Ill. Feb. 13, 2020).[27]

---

[26] In *Shady Grove*, the Supreme Court held that, in diversity actions, Fed. R. Civ. P. 23 preempts state laws restricting class actions and will control unless the federal rule interferes with substantive state law rights. The Court explained: "Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met. We cannot contort its text, even to avert a collision with state law that might render it invalid."  559 U.S. at 406 (emphasis in original).

[27] In support of its argument, Surescripts cites *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1070 (S.D. Cal. 2017).  There, the court erroneously applied its analysis of the Arkansas antitrust statute to the IAA. *Id.*  Under the Arkansas statute, "indirect purchasers have no individual claim, no class claim; no claim pursuant to their discretion, period." *Id.* 1069.  The IAA, on the other hand, *does* allow indirect purchasers to assert antitrust claims, just not as a class.  740 Ill. Comp. Stat. 10/7(2). EPPs recognize that "whether indirect purchasers can bring suit at all, even individually—is certainly substantive in that it affects the 'rights and remedies' of indirect purchasers."  *Broiler Chicken*, 290 F. Supp. 3d at 818. "But whether such plaintiffs may bring a class action does not affect their substantive

Surescripts also argues that Montana's Unfair Trade Practices and Consumer Protection Act prevents Plaintiffs from proceeding with a class action in federal court. Surescripts Mem. at 27. But for the same reasons that support allowing Plaintiffs' class claims under the Illinois Antitrust Act to proceed, Plaintiffs' claims under the Montana statute should also move forward. *See Broiler Chicken*, 290 F. Supp. 3d at 820 (rejecting defendants' argument that plaintiffs were prevented from bringing their Montana consumer protection claim "for the reasons stated with respect to the indirect purchaser class action bar under Illinois's antitrust statute").

### 2. Plaintiffs can assert claims under Utah's antitrust law.

Surescripts argues that Utah's antitrust law's residency requirement deprives Plaintiffs standing to bring a Utah antitrust claim. Surescripts Br. at 29. This is incorrect, as "[a]llegations that members of the putative class presumably include Utah citizens and residents are sufficient to overcome a motion to dismiss." *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharm., Inc.*, 353 F. Supp. 3d 678, 696 (M.D. Tenn. 2018); *see also Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 629 (N.D. Cal. 2020); *In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 434 (E.D. Va. 2019). Here, Plaintiffs' class definition includes "[a]ll pharmacies in the United States and its territories," SAC ¶ 274, which would by definition include Utah, and therefore the requirement of the statute is satisfied. There is no requirement that any of the named plaintiffs actually reside or do business in Utah. *See Zetia*, 400 F. Supp. 3d at 435 ("[A] class representative that is not a Utah citizen or resident may bring claims on behalf of absent class members who are citizens or residents of Utah.").

---

rights." *Id.* Surescripts also cites a state court decision, *Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228 (1996). This case is inapposite as the Federal Rules of Civil Procedure do not apply to procedural issues in state court litigation.

### 3. Plaintiffs may seek damages under Connecticut, Maryland, and Rhode Island antitrust laws.

Plaintiffs do not dispute that the statutes "repealing" *Illinois Brick* were passed in Rhode Island in 2013, Maryland in 2017, and Connecticut in 2018. Surescripts Br. at 28. Plaintiffs seek prospective application of these laws to redress overcharges suffered by Plaintiffs and the class post-enactment for each state respectively.

### 4. Surescripts monopolized the relevant market through concerted action in violation of California and New York law.

Surescripts contends that Plaintiffs cannot state monopolization claims under New York and California antitrust laws because those states' laws do not prohibit unilateral conduct. Surescripts Mem. at 29. Plaintiffs do not concede that Surescripts' view of those states' laws is correct,[28] but even if it were, Plaintiffs have pled concerted multilateral conduct. Specifically, Plaintiffs pled that (1) Surescripts entered into agreements with RelayHealth that prohibited RelayHealth from competing in the routing market (SAC ¶¶ 159-70) and (2) Surescripts offered Allscripts increased monetary incentives in exchange for an exclusivity agreement that prevented potential competitors from entering the routing and eligibility markets (*Id.*, ¶¶ 172-97).

Because Plaintiffs "plead some sort of concerted action in support of its non-conspiracy monopolization claims," the Court should not dismiss monopolization claims under New York or California antitrust laws. *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, No. 15 CIV. 6549, 2018 WL 7197233, at *27-28 (S.D.N.Y. Dec. 26, 2018) (upholding New York monopolization claims); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J.

---

[28] For example, the California claim survives even assuming that Plaintiffs had only alleged unilateral conduct. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, permits a claim of unfair competition based on unilateral conduct for injunctive relief and restitution. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1313 (D. Kan. 2018) (citing authorities).

2018) (same); *N. Cty. Commc'ns Corp. v. Verizon New York, Inc.*, 233 F. Supp. 2d 381, 385 (N.D.N.Y. 2002) (upholding claim for monopolistic activities under New York's antitrust law where plaintiff "allege[d] a conspiracy or some agreement among [defendants and/or their] affiliates to corner the telecommunications market in New York City"); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 265 (S.D.N.Y. 2019), *reconsideration denied*, No. 14-MD-2542, 2019 WL 2603187 (S.D.N.Y. June 25, 2019) (complaint "adequately allege[d] concerted conduct" and upholding claim under California statute).[29]

### 5. Plaintiffs can recover under the Missouri Merchandise Practices Act.

Contrary to Surescripts' argument, Surescripts Br. at 29, Plaintiffs are permitted to bring claims as "persons" under the Missouri statute, as the statute defines "person" to include entities. *See* Mo. Rev. Stat. § 407.010(5) ("'Person', any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or association . . . ."); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2011 WL 3268649, at *6 (N.D. Cal. July 28, 2011) (certifying an indirect purchaser class under MMPA of "all persons and **entities**") (emphasis added). The personal use limitation applies to the nature and intended use of the merchandise, not to the identity of the purchaser. *See Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 640 (N.D. Cal. 2020) (upholding plaintiffs' Missouri Consumer Protection claim and noting "the absence of

---

[29] Surescripts' cases are distinguishable because, in each, the courts dismissed monopolization claims relating to unilateral conduct—*not* concerted conduct, as we have here. *See MiniFrame Ltd. v. Microsoft Corp.*, No. 11 CIV. 7419, 2013 WL 1385704, at *7 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F. App'x 1 (2d Cir. 2013) (dismissing New York antitrust claim), *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 19 (Cal. Ct. App. 2012) (dismissing California antitrust claim), and *EpiPen*, 336 F. Supp. 3d at 1346 (dismissing California antitrust claim).

legislative history indicating that a consumer is restricted to one who purchases for his, her, or its own use."); *FTC v. Mylan Lab., Inc.*, 62 F. Supp. 2d 25, 48-49 (D.D.C. 1999) (personal use limitation did not exclude the state or state entities); *cf. State ex rel. Ford v. Wenskay*, 824 S.W.2d 99, 100 (Mo. Ct. App. 1992) ("Remedial statutes should be construed liberally to include those cases which are within the spirit of the law and all reasonable doubts should be construed in favor of applicability to the case.").

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss in their entirety.


Dated:  January 8, 2021

/s/ Kenneth A. Wexler
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
WEXLER WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Fax: (312) 346-0022
kaw@wexlerwallace.com
jnb@wexlerwallace.com
tjs@wexlerwallace.com

Tyler W. Hudson
Eric D. Barton
WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Ste. 300
Kansas City, MO 64112
Telephone: (816) 701-1100
Fax: (816) 531-2372
thudson@wcllp.com
ebarton@wcllp.com

Daniel E. Gustafson
Karla M. Gluek
Michelle J. Looby
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Ste. 2600

Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
mlooby@gustafsongluek.com

Robert N. Kaplan, Esq.
Elana Katcher, Esq.
KAPLAN FOX & KILSHEIMER LLP
850 Third Ave., 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: ekatcher@kaplanfox.com

W. Joseph Bruckner
Brian David Clark
Robert Kinney Shelquist
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South
#2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
rkshelquist@locklaw.com

Jeffrey L. Kodroff
John Macoretta
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street
Philadelphia PA 19103
T: (215) 4960300
jkodroff@srkattorneys.com
jmacoretta@srkatorneys.com

Gregory S. Asciolla
Karin E. Garvey
Jonathan S. Crevier
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212)-907-0700
Fax: (212)-818-0477

gasciolla@labaton.com
kgarvey@labaton.com
jcrevier@labaton.com

*Counsel for Plaintiffs and the Proposed Class*