**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION | No. 19-cv-06627 |
| This Document Relates To: All Class Actions | Judge John J. Tharp, Jr. |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, nine community pharmacies seeking to represent a putative class, assert that the defendants have conspired to monopolize and restrain trade in the market for e-prescribing services. The defendants are Surescripts, LLC and Allscripts Healthcare Solutions, Inc., two health information technology companies. Both have moved to dismiss the Second Amended Consolidated Class Action Complaint, ECF No. 147 ("SAC"), for failure to state a claim upon which relief may be granted.

The defendants first argue the plaintiffs' claims under the Sherman Act are barred by the direct purchaser rule set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In the present posture of this case, however, that argument is premature. Even if *Illinois Brick* does bar the plaintiffs' claims under federal law, the plaintiffs also assert various state law theories to which *Illinois Brick* is not an impediment. Because relief may be granted as to the claims alleged in the SAC regardless of *Illinois Brick*, there is no basis to dismiss the claims under Rule 12(b)(6). Rule 12(b)(6) authorizes the dismissal of claims, not legal theories.

As for the merit of the plaintiffs' claims, which center on the defendants' use of loyalty pricing agreements, the defendants argue such agreements are legal in accordance with the price-cost test. That test is inapposite. The apt test is the rule of reason, and under it, the complaint

plausibly paints the agreements as illegal, *de facto* exclusive deals. The complaint also plausibly suggests the defendants entered into conspiracies to monopolize and restrain trade based on the alleged contracts between them. Accordingly, the defendants' motions to dismiss are denied.

## BACKGROUND

This antitrust action concerns the market for e-prescribing services. *E-prescribing* refers to the computer-based electronic transmission of prescription information from a doctor to a pharmacy.[1] It became legal nationwide in 2007 and has since expanded dramatically. Between 2008 and 2017, the per annum e-prescribing transaction rate increased from 70 million to over 1.7 billion. SAC ¶ 3. By 2017, 77% of all prescriptions were being delivered electronically. *Id.* ¶ 41.

Defendant Surescripts, LLC is the nation's largest provider of e-prescribing services. The plaintiffs are nine pharmacies (the "Pharmacies") that pay fees to receive prescriptions via Surescripts' e-prescribing network. They allege Surescripts has maintained a "95% share, by transaction volume," of the e-prescribing industry, leaving them "no commercially reasonable [e-prescribing] alternative." *Id.* ¶ 3. "[A]s a result, Surescripts has been able to charge pharmacies supracompetitive prices for almost ten years." *Id*. Specifically, the Pharmacies say they have paid roughly seventeen cents per e-prescribing transaction, yet prices in a competitive market should be no more than three cents. *Id.* ¶ 10. Given the annual volume of e-prescribing

---

[1] Within the industry, this service is known as "routing." The term *e-prescribing* also encompasses a separate but interrelated service known as "eligibility." Eligibility involves the electronic transmission of a patient's benefit information from the patient's health insurer to a doctor. It is discussed briefly in part V; but save for this exception, *e-prescribing*, as used here, refers only to the routing market. This Opinion also uses the term *doctor* as shorthand for any medical professional authorized to issue prescriptions or any intermediary acting on a prescriber's behalf to facilitate an e-prescribing transaction, such as providers of electronic health records software.

transactions, this overcharge totals in the millions for the Pharmacies and the class they seek to represent. *Id.* ¶ 12.

The Pharmacies contend that Surescripts has been able to exclude e-prescribing competitors and sustain supracompetitive prices through illegal monopolization. They primarily point to three features of Surescripts' business to explain how Surescripts has illegally obtained and maintained a monopoly.

The first is the two-sided nature of the e-prescribing market itself. Broadly speaking, a two-sided market is one in which two sets of agents interact through an intermediary and the decisions of one affect the other. Here, an e-prescribing network serves as the intermediary between doctors and pharmacies, and each side's decision to use a particular network is affected in part by how many on the other side have chosen to do the same. It creates an issue of multi-party coordination— or what is referred to as "the chicken and the egg" problem—for any e-prescribing firm looking to enter the market. *Id.* ¶ 44. An e-prescribing firm cannot attract doctors to its network unless it first attracts pharmacies, but it cannot attract pharmacies unless is first attracts doctors. This creates a natural barrier to entry for nascent competitors because the value of a network to each side of the market is dependent on the number of connections the network can facilitate. For the same reason, this market dynamic also naturally advantages any established firm.

Second, the Pharmacies allege that Surescripts was able to partially solve this "chicken and egg" problem using illegal non-compete and exclusive dealing agreements. In the early years of the e-prescribing boom, they allege Surescripts formed contractual relationships with two fellow health information technology companies: RelayHealth and Defendant Allscripts.[2] These

_____

[2] RelayHealth was named as a defendant in the original complaint but has settled the claims against it and is no longer a party. This Court approved the settlement on February 24, 2022. Order, ECF No. 202.

companies were operating in adjacent markets involving the electronic transmission of patient health insurance information and thus had already established multi-party connections among a significant volume of doctors and pharmacies. Surescripts' contracts with RelayHealth and Allscripts (discussed further in parts III and V) ensured each would not compete with Surescripts in the e-prescribing market in exchange for a share of the incentives earned from and fees paid to Surescripts by RelayHealth's and Allscripts' respective customer bases. Additionally, the contracts compelled RelayHealth and Allscripts (either through express requirements or additional monetary incentives) to sign their customer bases onto Surescripts' loyalty pricing agreement—an agreement the Pharmacies paint as an illegal exclusive deal. In the case of Allscripts, the contract also expressly forbade Allscripts' doctor clientele from dealing with one of Surescripts' emergent market threats, Emdeon. In sum, the agreements with RelayHealth and Allscripts helped Surescripts mollify potential competitors and secure a dominant number of multi-party connections within the e-prescribing market; connections Surescripts then made exclusive through its loyalty pricing scheme.

The alleged loyalty pricing scheme is the third central feature on which the Pharmacies' anticompetitive allegations are based. As pled, that scheme (discussed further in part II) uses long-term exclusivity commitments to bifurcate both sides of the e-prescribing market into loyal and non-loyal Surescripts customers. Any doctor who opts into the loyalty program is given a bonus incentive payment for every e-prescribing transaction on the condition they limit themselves to only using Surescripts' e-prescribing network; likewise, on the same condition, pharmacies who opt-in pay a discounted price. Importantly, however, all bonuses and discounts a doctor or pharmacy receives throughout the term of their exclusivity commitment must be returned as soon

as they begin using a competitor's network.[3] The Pharmacies say this "clawback" provision operates like a penalty on disloyal customers. *Id.* ¶ 128. Those customers also must forgo bonuses or discounts on future transactions. The rub, however, is that given Surescripts' dominant market share, few customers are able to satisfy their e-prescribing needs without using Surescripts to some extent. Thus, the differential between Surescripts' loyalty rate and its non-loyalty rate, which a disloyal customer would incur on every Surescripts transaction it might still need, acts as a second penalty for using a competitor's network. The Pharmacies claim it is simply impossible for a would-be Surescripts competitor to offer low enough prices to offset both penalties—*i.e.*, the retroactive clawback and the prospective rate differential—even though Surescripts' loyalty rate (inclusive of the bonuses and discounts) is worse than what a competitor may offer. The ultimate result, the Pharmacies say, is that alternative e-prescribing networks are not viable because no competitor can convince enough customers on both sides of the market to break from Surescripts. This, they assert, leaves Surescripts free to charge supracompetitive prices.

Following a similar complaint filed in 2019 by the Federal Trade Commission in the United States District for the District of Columbia, the Pharmacies brought suit here seeking damages and injunctive relief pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26. They assert claims of monopolization and conspiracy to monopolize under section 2 of the Sherman Act, *id.* § 2, and two claims under section 1, *id.* § 1, for conspiracies in restraint of trade. They also reassert these claims under thirty different state antitrust statutes.[4] Both defendants have moved to

---

[3] Although this exclusivity requirement is often absolute, some Surescripts loyalty agreements allow customers to use a competitor network for up to 10% of their e-prescribing transactions. *See* SAC ¶¶ 85–89.

[4] The Pharmacies invoke the following state antitrust laws: Ariz. Rev. Stat. §§ 44-1402–03; Cal. Bus. & Prof. Code §§ 16700, 17200, *et seq.*; Conn. Gen. Stat. §§ 35-26–27; D.C. Code §§ 28-4502–03; Fla. Stat. § 501.204; 740 Ill. Comp. Stat. 10/3; Iowa Code §§ 553.4–5; Kan. Stat. Ann. § 50-112; Me. Stat. tit. 10 §§ 1101–02; Md. Code Ann., Com. Law § 11-204; Mich. Comp.

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). They argue the Pharmacies' complaint is barred by the direct purchaser rule set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and also attack the sufficiency of the complaint on its merits. This Court holds the *Illinois Brick* argument to be premature and the complaint to be sufficient.

## DISCUSSION

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In ruling on a motion to dismiss under Rule 12(b)(6), a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but the court need not accept legal conclusions or conclusory allegations. *Id*. at 680–82.

## I.     *Illinois Brick*

The defendants lead with the argument that the federal claims should be dismissed because the SAC fails to allege that the Pharmacies are direct purchasers and therefore lack antitrust standing under the *Illinois Brick* doctrine. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977),

---

Laws §§ 445.772–73; Minn. Stat. §§ 325D.51–52; Miss. Code Ann. § 75-21-3; Mo. Rev. Stat. § 416.031; Mont. Code Ann. § 30-14-205; Neb. Rev. Stat. §§ 59-801–02; Nev. Rev. Stat. § 598A.060; N.H. Rev. Stat. Ann. § 356:2–3; N.M. Stat. Ann. §§ 57-1-1–2; N.Y. Gen. Bus. Law § 340; N.C. Gen. Stat. §§ 75-1, 2.1; N.D. Cent. Code §§ 51-08.1-02–03; Or. Rev. Stat. §§ 646.725, 730; R.I. Gen. Laws §§ 6-36-4–5; S.D. Codified Laws §§ 37-1-3.1–2; Tenn. Code Ann. § 47-25-101; Utah Code Ann. § 76-10-3104; Vt. Stat. Ann. tit. 9, § 2453; W. Va. Code §§ 47-18-3–4; Wis. Stat. § 133.03.

the Supreme Court held that only an "overcharged direct purchaser, and not others in the chain of manufacture or distribution," may bring a claim for damages under the Clayton Act, 15 U.S.C. § 15(a). *See also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) ("*Illinois Brick* established a bright-line rule that authorizes suits by **direct** purchasers but bars suits by **indirect** purchasers."). This rule is often referred to as a component of "antitrust standing," although it is not jurisdictional. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480–81 (7th Cir. 2002).

The Seventh Circuit has recognized an exception to the direct purchaser rule for conspiracies: If manufacturers and distributers have entered into a conspiracy that makes an otherwise indirect purchaser the "first innocent purchaser," *Illinois Brick* will not bar the claim, as the "first buyer from a conspirator is the right party to sue." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631 (7th Cir. 2002). This "exception," as it is often described, "is not so much a real exception as it is a way of determining which firm, or group of firms collectively, should be considered to be the relevant seller (and from that, identifying which one is the direct purchaser) . . . ." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). Hence, at its most basic, even when considering a conspiracy, the *Illinois Brick* inquiry is one that "requires the court to identify which entity is the seller and which the direct purchaser." *Id.* at 838.

This Court dismissed the Pharmacies' First Amended Consolidated Class Action Complaint ("FAC") because it did not reasonably permit such identification. In it, the Pharmacies vaguely alleged that pharmacy technology vendors (PTVs)—firms that provide the software interface necessary for pharmacies to connect to e-prescribing networks—acted as intermediaries between themselves and Surescripts. The Pharmacies did not, however, allege any details about their relationships with the PTVs nor did they allege that they purchased e-prescribing services

directly from Surescripts. *In re Surescripts Antitrust Litig.*, No. 19-cv-06627, 2020 WL 4905692, at *4 (N.D. Ill. Aug. 19, 2020). Because this left the Court without any plausible way to answer the *Illinois Brick* inquiry, the FAC was dismissed without prejudice. *Id.* at *6.

The SAC adds considerable detail as to the Pharmacies' relationships with the PTVs. *See* SAC ¶¶ 15–23, 27–29, 51–66, 93–100. It also adds detail in support of the Pharmacies' argument that the PTVs are Surescripts' co-conspirators. *See id.* ¶¶ 67–92. Nonetheless, the defendants contend the complaint is still insufficient to meet *Illinois Brick*'s mandate. But while this inquiry was indispensable for judging the sufficiency of the FAC, which invoked only federal law in support of its claims,[5] it would be premature to address application of the rule to the claims set forth in the SAC. That is because the Pharmacies now also invoke state law theories of relief that are ostensibly indifferent to direct purchaser status, making resolution of the defendants' *Illinois Brick* argument superfluous to the question of whether the SAC plausibly sets forth claims upon which relief can be granted.[6]

The FAC asserted only four counts. Those counts corresponded to the Pharmacies' four claims for damages under section 4 of the Clayton Act. Along with adding details about the PTVs, the SAC adds five new counts—four that reassert the Pharmacies' claims for damages under the laws of thirty state antitrust statutes and one seeking an injunction under section 16 of the Clayton

---

[5] There is no requirement to identify in the complaint the legal theories that purportedly support the claims set forth. *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014). The plaintiffs did so in the FAC, however, declaring that "this is an action under Sections 1 and 2 of the Sherman Act . . . ." Consol. Class Action Compl. ¶ 1, ECF No. 52. Consequently, the sufficiency of claims asserted in the FAC was assessed solely by reference to federal law; the plaintiffs did not attempt to argue that the claims were adequately alleged under state law theories.

[6] The defendants do not argue that the direct purchaser rule of *Illinois Brick* bars antitrust claims under any of the relevant state laws. Accordingly, the Court eschews any state-by-state analysis of whether the direct purchaser rule applies.

Act, 15 U.S.C. § 26. These new counts do not reflect the addition of any new claims, but they do add theories of relief which are not dependent on direct purchaser status.

In deferring resolution of the dispute as to the Pharmacies' status as direct purchasers, the Court heeds the important distinction between "claims" and "counts." Claims "explain the plaintiff's grievance and demand relief," while counts "describe legal theories by which those facts purportedly give rise to liability and damages." *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013). Pleading in counts is not required unless "doing so would promote clarity" as to "each claim ***founded on a separate transaction or occurrence***." Fed. R. Civ. P. 10(b) (emphasis added). When presented with a motion to dismiss pursuant to Rule 12(b)(6), courts have the authority to dismiss deficient claims, but cannot dismiss legal theories. Fed. R. Civ. P. 12(b)(6); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of ***parts*** of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.") (emphasis in original). As long as a discernable legal theory plausibly provides a remedy for a claim, a motion to dismiss that claim must be denied, even if the complaint sets forth a host of alternative theories that fail. *See Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012) ("One claim supported by multiple theories does not somehow become multiple claims."). "[D]ifferent legal theories . . . do not multiply the number of claims for relief." *NAACP v. Am. Family Mut. Ins. Co.,* 978 F.2d 287, 292 (7th Cir. 1992).

Here, the defendants concede that the Pharmacies' federal law counts and state law counts are predicated on the same substantive claims. Surescripts Mem. in Supp. of Mot. to Dismiss 16 n.5, ECF No. 165 ("S-MTD"); Allscripts Mem. in Supp. of Mot. to Dismiss 6 n.6, ECF No. 162 ("A-MTD"). They also concede that *Illinois Brick* is not an impediment under these various state

9

laws. *See* S-MTD at 1; A-MTD at 13 n.8. *But see* S-MTD at 28 (discussing partial *Illinois Brick*-based limitations applicable in Connecticut, Illinois, Maryland, and Rhode Island); A-MTD at 13 n.7 (same). Therefore, even if *Illinois Brick* were to bar monetary relief under federal law, that would not justify the dismissal of any claim that is plausibly stated under a legal theory to which *Illinois Brick* does not apply.[7] The bottom line is that the plaintiffs' ***claims*** do not turn on whether *Illinois Brick* applies, and Rule 12(b)(6) does not authorize this Court to dismiss the Pharmacies' federal law theories of relief in piecemeal fashion.[8] Given the viability of other theories that apply regardless of whether the Pharmacies qualify as direct purchasers, the Pharmacies' claims survive. We turn, then, to the question of whether the allegations of the SAC plausibly state claims upon which relief can be granted.

---

[7] Also of note, the Pharmacies here seek both damages and an injunction, but *Illinois Brick* only applies to suits for damages. *See U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) ("[T]he direct-purchaser doctrine does not foreclose equitable relief . . . ."). *But see Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 n.1 (2019) (implying that the question of whether *Illinois Brick* applies to actions for injunctive relief is unsettled); *but see also Pepper*, 139 S. Ct. at 1527 n.1 (Gorsuch, J., dissenting) ("[I]t's hard to make sense of the suggestion that *Illinois Brick* may not apply to claims for injunctive relief."). The defendants do not address the Pharmacies' claim for injunctive relief.

[8] The same can be said for the defendants' miscellaneous state law arguments. They simply address various state law theories of relief in piecemeal fashion and—even if accepted—would not foreclose any claim. *See* S-MTD at 27–30. The one exception to this is Surescripts' argument that the Pharmacies cannot pursue their claims under the laws of states within which no named plaintiff does business. Surescripts contends that "[i]n a putative class action, where the class has not been certified, some named plaintiff must actually possess the requisite Article III standing; it is not sufficient that an absent putative class member may have standing to press one of the claims." *Id.* at 26. Not so. "Although courts . . . have held that claims brought under the laws of the states in which no named plaintiff purchased goods must be dismissed for lack of Article III standing, the trend has been to treat the issue as one of statutory standing that can be deferred until class certification." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 548 (N.D. Ill. 2019) (cleaned up; citations omitted). As Judge Dow observed, "[t]his trend is consistent with recent Seventh Circuit caselaw holding that 'the question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III or jurisdiction.'" *Id.* (quoting *Woodman's Food Market, Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016)). Dismissal of state law "claims" at this juncture for lack of Article III standing is therefore not warranted.

## II.    **Monopolization (Surescripts)**

Section 2 of the Sherman Act makes it unlawful to "monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2.[9] Neither the mere possession nor the pursuit of monopoly power runs afoul of this offense; monopoly power must be abused or improperly obtained to warrant sanction. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see also id.* (viewing the lure of monopoly power as "an important element of the free-market system" which incentivizes risk taking and "produces innovation and economic growth"). Thus, a firm is only found in violation of section 2 when it (1) possesses "monopoly power in the relevant market" ***and*** (2) engages in "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Surescripts does not contest the Pharmacies' allegations that it has attained monopoly power within the e-prescribing market. It argues only that the Pharmacies' allegations fail to plausibly suggest such power was acquired or maintained willfully.

Various formulations exist for what constitutes "the willful acquisition or maintenance" of monopoly power, but all generally focus on whether a defendant has used exclusionary practices in anticompetitive ways. *See, e.g.*, *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (asking whether conduct "unfairly tends to destroy competition"); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (asking whether "valid business reasons" can explain the defendant's conduct); *Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)

---

[9] Putting aside the *Illinois Brick* issue, the state laws applicable to the Pharmacies' claims are consistent with federal antitrust law. *See* App. A to S-MTD 1–4, ECF No. 165-1 (collecting authority). Accordingly, the Court addresses the viability of the claims by reference to the Sherman Act.

(asking whether a defendant was "attempting to exclude rivals on some basis other than efficiency" in light of its conduct's effects on itself, smaller rivals, and consumers). Within this general understanding, distinct analytical frameworks are used to assess different categories of anticompetitive conduct. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) ("Conduct that can harm competition may fit into more than one of these court-devised categories."). The parties differ as to the appropriate framework to evaluate the conduct at issue in this case. Surescripts urges the Court to apply the predatory pricing analysis (*i.e.*, the "price-cost test"); the Pharmacies prefer the "rule of reason" analysis employed in the context of exclusive dealing agreements. The Court agrees with the Pharmacies that the alleged conduct at issue is better understood as a form of exclusive dealing.

### A. Predatory Pricing

Predatory pricing is an anticompetitive tactic whereby a would-be monopolist deliberately operates with negative net profit margins, reducing prices until rivals are driven from the market, and then reinflates prices to recoup its losses after a monopoly is secured. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–24 (1993) ("Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation."). To hold a competitor liable for predatory pricing, a plaintiff must prove (1) that "the prices complained of are below . . . its rival's costs," and (2) that the rival had "a dangerous probability[] of recouping its investment in below-cost prices." *Id.*; *see Am. Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991) ("The plaintiff must . . . show that the defendant's lower prices today presage higher, monopolistic prices tomorrow.").

To be considered a predatory pricing scheme, price must be the predominate method of exclusion. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d Cir. 2012).[10] Surescripts, for its part, characterizes the SAC as alleging that price is the principal means used by Surescripts to foreclose competition. That characterization, however, is off the mark. Nowhere in the complaint do the Pharmacies allege that Surescripts' prices are now, or ever were, too low. To the contrary, they allege Surescripts' prices are approximately nine times higher than what a competitive market would allow. *See* SAC ¶¶ 107, 111–13, 239. Surescripts' prices, then, as high as they allegedly are, would tend to invite competition, not exclude it. The predatory pricing rubric is therefore inappropriate here.

The Pharmacies do allege that "there was no price that [competitors] could offer that would reduce [a pharmacy's] total routing costs because of the Surescripts[] loyalty scheme." *Id.* ¶ 202. Citing this statement, Surescripts proclaims "[t]he crux of plaintiffs' claim is that Surescripts' low pricing injured competition." S-MTD at 17. But the complaint is clear that competition is only injured "because of the Surescripts[] loyalty scheme," not because of Surescripts' transaction prices standing alone. SAC ¶ 202; *see id.* ¶ 113 ("To prevent competition that would lead to lower prices, ***Surescripts substantially raised nearly all its customers' costs*** to [e-prescribe] . . . .")

---

[10] Expounding on this principle from *ZF Meritor*, the Third Circuit in *Eisai, Inc. v. Sanofi Aventis U.S., LLC* explains that "pricing [usually] predominates over other means of exclusivity . . . when a firm uses a ***single-product loyalty discount*** or rebate to compete with similar products." 821 F.3d 394, 409 (3d Cir. 2016) (emphasis added). Surescripts points to this comment to claim the price-cost test must be applied here. S-MTD at 19. However, the "loyalty discount[s]" the *Eisai* Court was referring to were those that lower prices to at or below the competitive market rate, not discounts which, like here, merely lower supracompetitive prices to less supracompetitive ones. *See Eisai*, 821 F.3d at 409 (referencing "equally efficient competitor[s]" to imply the discussed discounted prices are market rate). Moreover, the *Eisai* Court expressly distinguished the pricing program at issue with the pricing program in *ZF Meritor*, which (unlike the *Eisai* program) required customers "to repay all contractual savings" if they violated the terms of the program. *Id.* at 406–07. Thus, *Eisai* does not benefit Surescripts' position.

(emphasis added). That scheme, at its most basic, provides preferential pricing to pharmacies that exclusively use Surescripts. *See id.* ¶¶ 122–31, 229–30. And alleging that total aggregate e-prescription costs would be lower for pharmacies offered Surescripts' loyalty rate compared to those offered Surescripts' non-loyalty rate is much different than alleging that Surescripts' per transaction price is lower than that offered by competitors. Predatory pricing concerns below-market prices, not pricing disparities a monopolist creates among its own customers. Even with Surescripts' loyalty "discount," its price for e-prescribing is still allegedly well above market. *See id.* ¶¶ 126, 239. Thus, Surescripts' characterization of this case as a species of predatory pricing is not persuasive.

## B.  <u>Exclusive Dealing</u>

Exclusive dealing describes the alleged monopolizing conduct with more accuracy. "An exclusive dealing contract obliges a firm to obtain its inputs from a single source." *Paddock Publications, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 46 (7th Cir. 1996). Courts appraise such agreements via the so-called "rule of reason." *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977). Appropriate factors include specific information about the relevant business, including whether the businesses involved have market power, and the restraint's history, nature, and effect. *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). In practical application of the rule of reason—given the procompetitive advantages exclusive deals often provide—exclusive dealing arrangements do not violate antitrust laws "unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the

line of commerce affected." *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *see Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 306–07 (1949) (describing procompetitive advantages of exclusive deals); *see also, e.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (exclusive dealing eliminates divided loyalties and reduces free riding). Because this overall analysis is fact-intensive, "it is typically considered an 'adequate pleading in a rule of reason antitrust case' for a plaintiff to allege (1) 'evidence of market structure' . . . and (2) 'exclusionary effect' . . . [to] indicate that an antitrust violation is plausible." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020) (quoting Herbert Hovenkamp, The Rule of Reason, 70 Fla. L. Rev. 81, 90 (2018)).

Here, to reiterate, Surescripts does not challenge any allegations of market structure. And given the Pharmacies' allegations of exclusionary effect, it is plausible that Surescripts' loyalty scheme unreasonably restrains competition to foreclose a substantial share of the e-prescribing market (and is therefore illegal monopolization). The thrust of the Pharmacies' complaint is that Surescripts uses loyalty pricing deals to deny competitors entry into the e-prescribing market, thereby permitting Surescripts to charge pharmacies supracompetitive e-prescribing fees. A review of the incentives at play will help illustrate how these deals could plausibly manipulate the e-prescribing market to exclude competitors.

The value of an e-prescribing network is its ability to connect doctors with pharmacies. Pharmacies pay for this service because their commercial viability depends on the receipt of prescriptions. SAC ¶¶ 45–47. Doctors, on the other hand, have no intrinsic need for e-prescribing—a piece of paper would suffice.[11] To get doctors to participate, e-prescribing firms

---

[11] This is admittedly reductive. For various reasons, e-prescribing may be more appealing to doctors than the traditional method of prescribing. Aside from providing the means to

offer doctors incentive payments (subsidized by fees charged to pharmacies) for each time they use the firm's network to transmit a prescription. *Id*. Thus, both doctors and pharmacies are incentivized to establish as many doctor-to-pharmacy e-prescribing connections as possible. For pharmacies, it increases the opportunities to receive prescriptions; for doctors, it increases the opportunities to earn incentive payments. *Id*. Naturally, then, save for other extrinsic factors, it is in the self-interest of both doctors and pharmacies to use as many e-prescribing networks as the market provides. For instance, if a particular pharmacy cannot be accessed via one network, a doctor will simply use another network to which that pharmacy is connected. And if this pharmacy happens to be on multiple networks, the doctor will likely use the network that offers the best incentive payments. The corollary is true for pharmacies; they will presumably choose the lowest cost e-prescribing provider when multiple networks are available.

Surescripts' loyalty pricing program alters this calculus. It offers doctors a new choice: either (1) maximize doctor-to-pharmacy connections by using multiple e-prescribing networks while earning Surescripts' non-loyalty incentive payments every time Surescripts' network is used, or (2) use only Surescripts' network and receive a higher loyalty incentive payment on each transaction. *See id.* ¶¶ 119–36. The second option limits the number of pharmacies a doctor can connect with (because not every pharmacy is a Surescripts customer), although the doctor may still reap greater total incentive payments on fewer transactions. To illustrate how this result may plausibly occur, imagine Surescripts pays a doctor's office 6¢ each time a prescription is sent via Surescripts' network but pays it 8¢ per transaction if the doctor never uses a competitor's network. Those competing networks offer doctors a better, going rate, of say 10¢ per transaction. Now also

---

electronically generate and transmit prescriptions, e-prescribing may enhance patient care, increase administrative efficiency, and reduce medication errors. SAC ¶¶ 30–31.

imagine that 80 out of 100 pharmacies are connected exclusively to Surescripts' network, 10 are connected only to a Surescripts competitor, and 10 are connected to both. The first option—the non-loyal option—would yield a doctor $6.80 (80×6¢ + 20×10¢) in total incentive payments, while the second option—the loyalty option—would yield $7.20 (90×8¢ + 0×10¢) even though 10 fewer prescriptions could be electronically routed.[12]

But why would 80 out of 100 pharmacies choose to limit themselves to Surescripts' network? As discussed above, it is in pharmacies' self-interest to connect to multiple networks as means to maximize their connections to doctors and thereby maximize their opportunities to receive prescriptions. The answer is unsurprising: Surescripts offers the same loyalty choice to pharmacies. Pharmacies can either (1) pay Surescripts' non-loyalty e-prescribing fees to use Surescripts' network while paying a competitor's lower, market-rate fees to connect to any doctor which can be found on another network, or (2) pay Surescripts' loyalty fees to use Surescripts' network but forego any off-network connections. *See id*. Again, depending on the number of doctors exclusively found on Surescripts' network, pharmacies may be economically justified in choosing the loyalty option even though Surescripts' loyalty pricing is higher than the market rate.

---

[12] The prices in the foregoing example are used for illustration only; the Pharmacies do not allege rates for doctor-side incentive payments. They do, however, allege rates for pharmacy-side fees. As an approximation, the loyalty rate paid by pharmacies is 17¢, SAC ¶¶ 10, 107; the non-loyalty rate is around 20¢, *see id*. ¶¶ 69–70, 82–88, 126; and the market rate is about 3¢, *id*. ¶¶ 8, 10, 157; while the pharmacy-side market shares reflect the aforementioned 80-10-10 split, *id*. ¶¶ 221, 225. Applying these figures instead of those used in the hypothetical would result in similar market incentives: a pharmacy incurs greater costs via the non-loyalty option (80×20¢ + 20×3¢ = $16.60) than the loyalty option (90×17¢ + 0×3¢ = $15.30). An issue with this pharmacy-side calculation, however, is that it does not account for the downstream costs (*i.e.*, the resultant business lost) pharmacies incur by foregoing 10 out of 100 e-prescribing connections. Such a figure cannot be reasonably teased from the Pharmacies' complaint. The overall point remains the same, however: it is ***plausible*** that Surescripts' pricing scheme perverts market incentives in a manner that excludes rivals on some basis other than efficiency.

For doctors, choosing the loyalty option is not economically justified unless a critical mass of pharmacies also choose the loyalty option; and at the same time, pharmacies are not justified in choosing the loyalty option unless a critical mass of doctors do as well. *See id*. Applying the above hypothetical rates, it would not be economically justified for a doctor to choose the loyalty option unless 70% or more of pharmacies already have ($70×6¢ + 30×10¢ = \$7.20$). This reveals two things about Surescripts' loyalty scheme: First, it only works if Surescripts is already dominant in the market and thus it is not a tactic available to smaller competitors. This fact, at the very least, divests Surescripts' loyalty scheme of any presumption of legality it otherwise may have been afforded. *See* William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 3:5 (2021) (identifying throughout section 2 jurisprudence a shared "reluctance to penalize a dominant firm for engaging in the same market behavior lawfully available to its smaller rivals, simply because it happens to be dominant"). And second, once that dominance is achieved, the loyalty scheme becomes a self-reinforcing barrier to entry for smaller competitors.

Achieving critical mass is, to be sure, a barrier to entry for start-ups in many two-sided markets. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280–81 (2018) ("[T]wo-sided platforms often exhibit what economists call 'indirect network effects.' Indirect network effects exist where the value of the two-sided platform to one group of participants depends on how many members of a different group participate.") (citations removed). The added consideration here—and one that connotes illegal monopolization—is that Surescripts has used those barriers to charge supracompetitive prices and restrict the market's overall number of connections. *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) (naming "higher prices" and "lower output" as "the principal vices proscribed by the antitrust laws"). Ultimately, according to the Pharmacies, patients end up paying more for their prescriptions than they otherwise should.

18

Hence, this case is not one where Surescripts' loyalty discounts are used to undercut competitors in a price war. *Cf. Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060–63 (8th Cir. 2000) (single-product loyalty discounts on boat engines priced below competitors but above defendant's average variable cost are not anticompetitive). Here, a Surescripts competitor has the ability to undercut Surescripts by charging market rate prices; but as the above example has illustrated, Surescripts' loyalty scheme may create a net detriment for any individual pharmacy that accepts the competitor's better offer. *See* SAC ¶ 206 (quoting Surescripts' description of its scheme: "[A competitor] can undercut Surescripts on price, but only on a margin of volume . . . and Surescripts pricing differential on [the] pharmacy side and loyalty incentive program on [the doctor] side are worth more than [the competitor's] proposition on <10% of [prescriptions]."). Essentially, the scheme presents Surescripts customers with a prisoner's dilemma in which the rational choice for each individual pharmacy is to exclusively use Surescripts despite incurring a detriment (*i.e.*, higher market prices) to their collective interest.

The "clawback" provision of Surescripts' loyalty scheme greatly amplifies the scheme's exclusionary effect. That provision requires any loyal doctor or pharmacy who wishes to start using a competitor network to repay, respectively, any "bonuses" or "discounts" it received as a loyal customer. *See* SAC ¶¶ 119–36. A once-loyal pharmacy that begins using a competitor network would not only start incurring Surescripts' higher, non-loyalty price, but it would also retroactively incur the difference between the loyalty and non-loyalty rate for all the transactions it made with Surescripts since the start of its loyalty arrangement. *See id*. This "penalty," as the Pharmacies describe it, only further disincentivizes switching to a competitor.[13]

---

[13] Assume the hypothetical discussed previously represents the incentive payments a doctor could earn over the course of six months by choosing either the loyalty option ($7.20) or the non-loyalty option ($6.80). In order for an e-prescribing firm to compete with Surescripts on these

Taken together, Surescripts' loyalty scheme and its alleged effects on competitors and consumers do not pass scrutiny under the rule of reason—or, more precisely, the Pharmacies have sufficiently alleged they do not. The Pharmacies have also sufficiently alleged (and Surescripts does not contest), in accordance with *Tampa Electric*, 365 U.S. at 327, that the scheme "foreclose[s] competition in a substantial share" of the e-prescribing market. *See* SAC ¶¶ 225–26 (Surescripts' exclusive dealing arrangements are "imposed on nearly 80%" of both the doctor and pharmacy side of the e-prescribing market). It is plausible, then, that Surescripts' loyalty scheme represents anticompetitive exclusive dealing. In a factually identical suit brought against Surescripts by the Federal Trade Commission for the same conduct, the United States District Court for the District of Columbia came to the same conclusion. *See Fed. Trade Comm'n v. Surescripts, LLC*, 424 F. Supp. 3d 92, 100–04 (D.D.C. 2020) ("[O]n both sides of the market, Surescripts stood to gain above-market returns, charging higher fees and paying out lower incentives than its competitors.").

The counterarguments Surescripts offers are unavailing. Surescripts characterizes its loyalty arrangements as "simply offer[ing] better prices to customers." S-MTD at 17. This begs the question: better than what? Not better than the market rate for e-prescribing services. The SAC alleges that the loyalty prices are supracompetitive and are better only than the even-higher supracompetitive prices Surescripts can impose (given its monopoly power) on any pharmacy who declines the loyalty rate.

terms, it would have to raise its incentive payments above the market rate, say from 10¢ to 12¢ (80×6¢ + 20×12¢ = $7.20). Now imagine a doctor is presented with the same choice for the second half of a year but had already chosen the loyalty option for the first half. Given Surescripts' clawback provision, the non-loyalty option would require the doctor to payback the bonus incentive payments it earned over the previous half year (90×2¢ = $1.80). Thus, to entice a doctor to abandon Surescripts, an e-prescribing competitor would have to raise its incentive payments even further, from 10¢ to 21¢ (80×6¢ + 20×21¢ = $9.00 = $7.20 + $1.80).

Surescripts also contends its loyalty arrangements are categorically not exclusive deals (and thus a rule of reason analysis is inapposite) because they do not "require[] any customer to be exclusive to Surescripts." *Id*. Technically that may be true: the SAC does not allege that doctors or pharmacies are contractually required to use Surescripts' network exclusively. However, an arrangement is "proscribed" notwithstanding the absence of "specific agreements not to use the . . . competitor" so long as its "practical effect" is to "prevent a lessee or buyer from using . . . a competitor." *Tampa Elec.*, 365 U.S. at 326–27 (internal quotations omitted).

In *ZF Meritor, LLC v. Eaton Corp.*, for instance, the Third Circuit considered whether "long-term agreements" used by a dominant supplier in the heavy-duty truck transmissions market were anticompetitive. 696 F.3d 254, 263 (3d Cir. 2012). Those agreements were similar to the exclusive dealing arrangements here: they offered rebates to truck manufacturers only if those manufacturers purchased a specified percentage (between 70% and 90%) of its requirements from the supplier, they required repayment of all received rebates anytime a manufacturer failed to meet its percentage target, and they priced transmissions (rebate included) above the supplier's cost. *Id.* at 265. The Third Circuit first noted that above-cost pricing practices are not *per se* legal, *id.* at 278, and then conducted an exclusive dealing rule of reason analysis, observing "that an express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful." *Id.* at 282 (citing *Tampa Elec.*, 365 U.S. at 326). Turning to the facts, the Third Circuit reasoned that because of the defendant's "position as the dominant supplier, no [manufacturer] could satisfy customer demand without at least some [of the defendant's] products, and therefore no [manufacturer] could afford to lose [the defendant] as a supplier." *Id.* at 283. This type of market pressure, the court concluded, was akin to anticompetitive exclusive dealing: "Where, as here, a dominant supplier enters into *de facto* exclusive dealing arrangements with every customer in the

21

market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand." *Id.* at 281.

The same conditions present in *ZF Meritor* are present here, and for the same reasons, Surescripts' "optional low pricing" deals, coupled with the loyalty pricing clawback provision, may be considered *de facto* exclusive deals. The bottom line is that the SAC plausibly alleges that, by means of those *de facto* exclusive deals, Surescripts has exploited its monopoly position to foreclose competition in the e-prescription market. Accordingly, Surescripts' motion to dismiss the Pharmacies' monopolization claim (Counts I and V) is denied.

**III.  Conspiracy to Monopolize (Surescripts and RelayHealth)**

Alongside unlawful monopolization, it is an offense under section 2 of the Sherman Act to "combine or conspire with any other person or persons" to monopolize. 15 U.S.C. § 2. The Pharmacies claim Surescripts conspired with RelayHealth, a health information technology company. SAC ¶¶ 141–42. The Pharmacies' allegations center on a non-compete agreement Surescripts signed with RelayHealth in 2003 and renewed in 2010 and 2015. *Id.* ¶¶ 144, 146.

In 2003, RelayHealth contracted with Surescripts to resell access to Surescripts' network under the RelayHealth brand. *Id.* ¶ 142. For this purpose, Surescripts offered RelayHealth a "wholesale" per transaction rate that was slightly discounted from the rate charged pharmacies. *Id.* ¶ 145. In return, RelayHealth agreed not to create its own e-prescribing network to compete with that of Surescripts. *Id.* ¶ 144. When this contract renewed in 2010, a clause was added requiring RelayHealth to use "commercially reasonable efforts" to secure exclusivity with pharmacies and to enforce Surescripts' "clawback" provision. *Id.* ¶¶ 160, 163. To incentivize RelayHealth in this effort, Surescripts offered RelayHealth a larger discount on its wholesale price for transactions

22

RelayHealth sold to loyal pharmacies. *Id.* ¶ 161. The 2010 contract also gave RelayHealth a cut of the incentive payments offered to doctors whenever RelayHealth secured exclusive dealing arrangements with them. *Id.* ¶ 162. Finally, in 2015, the contract renewed again but this time required RelayHealth to transition its loyal doctor relationships directly to Surescripts in exchange for an even greater wholesale discount on the network transactions RelayHealth resold to pharmacies. *Id.* ¶ 167.

"For conspiracy to monopolize the plaintiff must prove 1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540–41 (7th Cir. 1986). Of these elements, Surescripts' seriously argues only that the Pharmacies fail to allege specific intent.[14] Specific intent to monopolize may be inferred from "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition."

---

[14] Surescripts also argues that the Pharmacies fail to allege the existence of a conspiracy. The alleged contracts between Surescripts and RelayHealth would constitute direct evidence of a conspiracy and are therefore sufficient. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (A conspiracy is established by circumstances showing "a unity of purpose or a common design and understanding, or a meeting of minds . . . ."). Remarkably, Surescripts contends the Pharmacies "affirmatively admit" that the contracts do not constitute a conspiracy. S-MTD at 20 (citing SAC ¶ 292). Surescripts points to the following sentence in the Pharmacies' complaint: "***In addition to*** agreeing to . . . contracts in restraint of trade with Surescripts, RelayHealth conspired with Surescripts to unlawfully maintain Surescripts' monopoly . . . ." SAC ¶ 292 (emphasis added). Surescripts reads the "in addition to" phrase to mean that RelayHealth's contractual agreement was wholly separate from whatever the Pharmacies are claiming constitutes the conspiracy. Surescripts then highlights that no facts apart from those relating to the RelayHealth contracts connote a conspiracy. At the pleading stage, however, plaintiffs are afforded reasonable inferences in their favor, *Iqbal*, 556 U.S. at 678; and Surescripts' strained reading of the complaint is neither favorable to the plaintiffs nor reasonable. Any ambiguity in the relied-upon sentence is alleviated just a few paragraphs later when the Pharmacies make clear that the RelayHealth contracts are central to the conspiracy claim: "By engaging in the foregoing conduct [contracting], Surescripts and RelayHealth have intentionally and wrongfully conspired to monopolize in violation of the Sherman Act." SAC ¶ 296.

*Id*. "[T]he mere intention to exclude competition and to expand one's own business is not sufficient . . . ." *Id*.

Here, the complaint plausibly imputes to both Surescripts and RelayHealth a specific intent to monopolize. From Surescripts' perspective, the only justification for contracting with RelayHealth was to eliminate RelayHealth as a potential competitor. *See* SAC ¶ 158–59, 164 (quoting various internal documents).[15] RelayHealth—a division of McKesson Technologies Inc., *id.* ¶ 25—was naturally poised to enter the e-prescribing market. *See id.* ¶ 170 (quoting a Surescripts competition analysis which labeled RelayHealth as a "Direct Competitor" with "the assets and know-how to be a threat"). It already had experience operating in an adjacent "claims adjudication" market (which involves the routing of bills from pharmacies to patients' healthcare insurer). *Id.* ¶ 154. And it had ample resources available from its parent company, McKesson Corporation. *See id.* ¶ 149 (noting McKesson ranked 15th on the Fortune 500 list in 2008, generating $102 billion in total revenue within the broader healthcare products and services industry). Most importantly, RelayHealth already had established a significant number of direct business relationships with doctors and pharmacies. *Id.* ¶¶ 150, 152–53, 155. By leveraging these relationships along with those provided to it indirectly by McKesson, RelayHealth posed a credible threat to enter the e-prescribing market with the critical mass needed to disrupt Surescripts' hold over it. *Id.* ¶ 155. This quality made RelayHealth unique among Surescripts' competitors. *Id.*

---

[15] RelayHealth internal documents claim "Surescripts's 'dominant contracting strategy . . . was to prevent RelayHealth from competing with Surescripts.'" SAC ¶ 158 (cleaned up). A 2012 executive memo from Surescripts "explicitly stated, 'our [RelayHealth] contract prevents them from competing against us for core e-prescribing Routing.'" *Id.* ¶ 159 (cleaned up). A Surescripts executive was quoted in 2013 as stating that "the only benefit it received from the 2010 contract with RelayHealth was that the contract 'helped keep market share.'" *Id.* ¶ 164 (cleaned up).

In recognition of the above, Surescripts viewed RelayHealth as a market threat. *See id.* ¶¶ 148, 150–51, 158. And the SAC alleges plausibly that it was for this reason, and only this reason, that Surescripts entered into its non-compete agreements with RelayHealth: "As early as December 2008, Surescripts's documents characterized its relationship with RelayHealth as adding very little, if any, value to e-prescribing and described RelayHealth as a 'value subtract,' writing that 'the only real value that we are getting out of the RelayHealth relationship at this point is the exclusivity.'" *Id.* ¶ 164. Thus, because Surescripts' only purpose in contracting with RelayHealth was to eliminate competition, the "value subtract" contracts it entered into plausibly imply a specific intent to monopolize.

Evidence of specific intent on the part of RelayHealth is not as patent but may nevertheless be reasonably inferred. Unlike the allegations attributable to Surescripts, the complaint alleges no direct evidence of RelayHealth's motivations. The complaint does, however, describe the business opportunity RelayHealth abandoned through its agreement not to compete with Surescripts. Given RelayHealth's relevant experience and business connections coupled with McKesson's funding, the Pharmacies allege that RelayHealth was in a position to enter the e-prescribing market offering prices at one-tenth of Surescripts'. *Id.* ¶ 156–57. This arguably would be a lucrative opportunity given Surescripts' market share. Instead, RelayHealth chose to help Surescripts secure exclusive deals in exchange for a commission. In light of the market dominance required to make Surescripts' loyalty scheme work, RelayHealth's willingness to forego other ripe competitive opportunities to profit from Surescripts' scheme connotes an intent to perpetuate that scheme's necessary precondition, *i.e.*, Surescripts' monopoly. This conclusion is bolstered by the fact that RelayHealth was no small partner; the Pharmacies allege that RelayHealth was helping to facilitate 50% of Surescripts' pharmacy connections and 40% of its doctor connections by 2009. *Id.* ¶ 155.

Contesting this conclusion, Surescripts cites a number of cases standing for the proposition that it is unreasonable to infer specific intent to monopolize when such intent would be irrational or against the alleged-conspirator's economic self-interest. *See Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*, 244 F. App'x 130, 132 (9th Cir. 2007) (unreasonable to infer that railroad would conspire to provide transloaders with monopoly power over transload terminals when logical result would be an increase in transloading rates paid by railroads); *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026–27 (10th Cir. 1992) (implausible for cable operators to conspire with TNT, Inc. to monopolize the market for the TNT Channel when the channel was essential to the cable operators' business and a monopoly over it would force them to pay supracompetitive prices); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731–32 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) (irrational to infer computer manufacturers intended to monopolize software market when they were required to purchase software for installation in the computers they manufactured); *see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) (allegations that the defendant "in essence . . . conspired to injure itself" are "inherently implausible"). Surescripts similarly claims that inferring specific intent here is irrational because RelayHealth is Surescripts' customer and RelayHealth would not conspire to assist Surescripts' monopoly when the result would be higher e-prescribing prices for RelayHealth and RelayHealth's own customers. S-MTD at 21.

The flaw in Surescripts' argument is that it misconstrues RelayHealth's status as it is alleged in the SAC. RelayHealth is not alleged to be Surescripts' customer but rather Surescripts' potential-competitor-turned-partner. Surescripts' non-compete agreement vested RelayHealth with a financial interest in securing for Surescripts exclusive dealing arrangements with

pharmacies and doctors. These financial incentives would materialize for RelayHealth only if Surescripts maintained a dominant hold over the market (in other words, only if Surescripts achieved the critical mass necessary to justify pharmacies and doctors in choosing the loyalty option). Thus, on the face of the complaint, it is plausible to infer that RelayHealth intended for Surescripts to monopolize: it was being paid by Surescripts with a cut of Surescripts' monopoly profits to sit on the sideline rather than compete and drive down prices. In that light, the deals between Surescripts and RelayHealth are premised on the same logic that animates price fixing or market allocation schemes—that is, it is better to divide a bigger pie of monopoly profits by agreement than to compete to win a larger share of a smaller pie of competitive profits. Other legitimate business justifications for RelayHealth's actions may come to light, but the Pharmacies have currently met their burden to plausibly allege a conspiracy to monopolize between Surescripts and RelayHealth. *See generally Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000) ("Courts are wary to dismiss antitrust cases on intent solely on the pleadings because evidence of intent is often in the control of the defendants."). Surescripts' motion to dismiss the Pharmacies' conspiracy to monopolize claim (Counts II and VI) is denied.

## IV.    <u>Conspiracy in Restraint of Trade (Surescripts and RelayHealth)</u>

Based on the foregoing conduct, the Pharmacies also assert a claim against Surescripts and RelayHealth for conspiring in restraint of trade. Section 1 of the Sherman Act declares "[e]very contract, combination . . . or conspiracy[] in restraint of trade" illegal. 15 U.S.C. § 1.[16] Although

---

[16] The distinction among the terms *contracts*, *combinations*, and *conspiracies* in section 1 is unimportant. *United States v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012). A "'conspiracy' in section 1 is simply a pejorative term for a contract, both 'conspiracy' and 'contract' signifying an agreement, a meeting of minds." *Id*. "Courts use the words 'contract,' 'combination,' and 'conspiracy' interchangeably." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1080 (11th Cir. 2016) (quoting *Tidmore Oil Co., Inc. v. BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1991)).

a section 1 conspiracy in restraint of trade and a section 2 conspiracy to monopolize may be "reciprocally distinguishable from and independent of each other" whenever their objectives differ, *Am. Tobacco Co. v. United States*, 328 U.S. 781, 788 (1946); here, the alleged conspiracies are entirely coterminous. Given this condition, courts routinely apply the same analysis to both claims. *See, e.g.*, *Nynex Corp. v. Discon*, 525 U.S. 128, 139 (1998); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002); *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir. 2000); *Weit v. Cont'l Ill. Nat. Bank & Tr. Co. of Chi.*, 641 F.2d 457, 458 (7th Cir. 1981); *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 954, 968 (N.D. Ill. 2007); *see also United States v. Griffith*, 334 U.S. 100, 106 (1948) (exploring the relationship between section 1 and section 2 claims), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 763 n.8 (1984).

The only analytical distinction between overlapping section 1 and section 2 conspiracy claims is that the sections 2 version includes the additional requirement that the conspiracy to be formed with the specific intent to obtain or maintain a monopoly. *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1576 (11th Cir. 1991); *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000). Thus, having already determined that the Pharmacies' section 2 claim survives, the logical consequence is that their section 1 claim does as well. *See* Richard A. Posner, Antitrust Law: An Economic Perspective 216 (1976) ("As for conspiracy to monopolize, any such conspiracy is also a conspiracy in restraint of trade . . . .").

Although Surescripts contests only the specific intent element of the section 2 conspiracy claim, in the context of the section 1 conspiracy claim, Surescripts further argues that the alleged non-compete agreement with RelayHealth is not plausibly unlawful under the rule of reason.

28

S-MTD at 24.[17] As has been discussed, however, it is plausible the non-compete agreement was entered into with the intent to further or maintain Surescripts' monopoly. *See* part III. The Pharmacies have also adequately claimed the agreement had this intended effect, and therefore, it is, as alleged, an unreasonable restraint of trade. *See id.*; *see, e.g.*, SAC ¶ 164 ("Surescripts' executives stated the only benefit it received from the 2010 contract with RelayHealth was that the contract 'helped keep market share.'"). The potential procompetitive aspects of the non-compete agreement that Surescripts points to (*i.e.*, the "co-develop[ment] [of] an initial list of 27 different value-added services") do not alone demand a different conclusion. *See* S-MTD at 23–24 (quoting SAC ¶ 245); *see also* SAC ¶¶ 246–47 ("Not one Surescripts-RelayHealth value-added product or service resulted from the 2010 contract[] . . . [or] the 2015 contract."). Surescripts' motion to dismiss the Pharmacies' conspiracy in restraint of trade claim (Counts III and VII) is therefore denied.

## V.    Conspiracy in Restraint of Trade (Surescripts and Allscripts)

Finally, the Pharmacies also claim that Surescripts conspired in restraint of trade with Defendant Allscripts Healthcare Solutions, Inc.. This claim too survives.

Allscripts is an electronic health records provider. Doctors generally rely on electronic health records software to—among other things—interface with e-prescribing networks. SAC ¶¶ 2, 30. In 2009, doctors using Allscripts' software represented 25% of Surescripts' doctor-side customers. *Id.* ¶ 172. Importantly, at that time, Allscripts also allowed these doctors to connect to Emdeon, an e-prescription provider and an emerging threat to Surescripts' dominance. *Id.*

---

[17] The characterization of RelayHealth as Surescripts' competitor does not change the analytical lens through which this claim is viewed. Only "naked" non-compete agreements between competitors are *per se* illegal. *Polk Bros. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188 (7th Cir. 1985). "Ancillary" non-competes—ones that are a part of larger endeavors to promote new productions or products—are evaluated under the rule of reason. *Id.* at 188–89.

Up until 2010, Allscripts also managed its own e-prescribing network. *Id.* ¶ 175. This network, however, did not compete with Surescripts in the market for doctor-to-pharmacy transmissions (*i.e.*, the "routing" market). Instead, it competed with Surescripts in a separate market for insurer-to-doctor transmissions (*i.e.*, the "eligibility" market). The eligibility market involves the transmission of patients' formulary and pharmaceutical benefit information instead of prescriptions. *Id.* ¶¶ 32–33.

In 2010, Allscripts and Surescripts entered into a contract requiring Allscripts to exclusively use Surescripts for both routing and eligibility. *Id.* ¶¶ 179–80. The deal required Allscripts to abandon Emdeon as a routing provider and to surrender its eligibility business altogether. *Id.* ¶¶ 182–83. In exchange, Allscripts received "enhanced" incentive payments anytime an Allscripts doctor used Surescripts' network. *Id.* ¶ 187.

As the Pharmacies describe it, "Allscripts lamented that it had to enter into this agreement . . . ." *Id.* ¶ 186. To Allscripts, Surescripts' pharmacy and insurer connections made it a "must-have" e-prescribing vendor. *Id.* Thus, when Surescripts made its services contingent upon signing an exclusive deal, Allscripts felt forced to oblige. *See id.* ¶¶ 186, 192. Surescripts' contract also imposed on Allscripts various financial penalties—similar to the clawback provisions previously described—anytime Allscripts failed to renew the deal. *Id.* ¶¶ 193–94. Most recently, in 2015, Allscripts resigned. *Id.* ¶ 196.

The effect of Allscripts' exclusive deal with Surescripts was to "push[] Emdeon almost completely out of the market." *Id.* ¶ 207. Without Allscripts' doctor connections, Emdeon could not establish the critical mass necessary to compete with Surescripts. *Id.* ¶¶ 204, 207–08.

The rule of reason analysis for exclusive dealing applies with equal force here. *See* part II.B (summarizing doctrine). And in all, these allegations plausibly support an inference that

Surescripts and Allscripts were conspiring to restrain trade for other than pro-competitive reasons.[18] Allscripts raises two points to contend otherwise. Surescripts echoes the second one.

### A.    **Market Power**

First, Allscripts argues the Pharmacies failed to allege it had market power. "Market power is a necessary ingredient in every case under the Rule of Reason." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986). Generally, market power is defined as the ability to raise prices and restrict output. *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969). The plaintiff must "prove that the defendant has sufficient market power to restrain competition substantially. . . . If not, the inquiry is at an end; the practice is lawful." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 596 (7th Cir. 1984).

Allscripts cites *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), to help make its point, A-MTD at 8, but that case hurts its cause. In *Dickson*, the Fourth Circuit considered a claim that two personal computer manufacturers (Compaq and Dell) conspired with a software developer (Microsoft) to restrain trade within the market for operating system software. 309 F.3d at 198–99. The anticompetitive allegations centered on the defendants' exclusive licensing agreements which offered Compaq and Dell discounts on and early-access to software in exchange for selling their

---

[18] Neither Allscripts nor Surescripts challenge the "combination or conspiracy" element of the Pharmacies' section 1 claim. It should be noted, however, that even though the Pharmacies allege Allscripts only entered into its exclusive dealing arrangement in response to economic coercion, this is not dispositive. "[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948); *see MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 973 (7th Cir. 1995) ("[T]he 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion.").

personal computers with Microsoft's operating system (Windows) pre-installed and un-removeable. *Id.* at 199–200. The plaintiffs claimed these agreements helped maintain Microsoft's monopoly over operating system software. *Id.* at 200.

After finding the plaintiffs adequately alleged two vertical conspiracies between the defendants, the *Dickson* Court then considered under the rule of reason whether the conspiracies imposed unreasonable restraints of trade. *Id.* at 205. It observed that substantial anticompetitive harm was unlikely unless the alleged facts demonstrate "that the defendants played a significant role in the relevant market." *Id.* at 207 (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991)). Microsoft's power in the operating system software market was adequately alleged, but Compaq's and Dell's market power was a different matter. Because neither operated independently within the operating system software market, their ability to influence competition in it was dependent on their ability to influence competition in the personal computer market. *Id.* at 207 n.18. But in that regard, the plaintiffs conceded that the personal computer market was "fiercely competitive" and thus conceded that neither Compaq nor Dell had market power. *Id.* at 207. Because "Compaq and Dell each possessed . . . no ability to control pricing or output in the [personal computer] market," their exclusive licensing agreements with Microsoft were incapable of "substantially reduc[ing] the usage share of . . . rival operating system software manufacturers." *Id.* at 208. Accordingly, the plaintiffs' claim was dismissed. *Id.* at 211.

The holding in *Dickson* is less instructive for this case than its contrapositive. Conveniently, the *Dickson* Court expressed what would have been needed to state a claim:

> For instance, without having alleged Compaq's or Dell's power or share in the [personal computer] market, [the plaintiffs] [are] unable to demonstrate that rival software firms' access **to Compaq or Dell** was an important component of those firms' potential ability to compete in the software markets, or that Microsoft's agreements with Compaq and Dell substantially hindered the entrance or

> operation of these rivals in the software markets or denied them access to a significant number of consumers of software. Similarly, given the failure to allege the market power of Compaq or Dell, [the plaintiffs] [are] unable to show that Compaq or Dell has forced, or is likely to be able to force, supracompetitive prices on consumers for undesirable software features.

*Id*. at 208 (emphasis in original).

Here, the Pharmacies allege what the *Dickson* plaintiffs omitted. They claim Emdeon—a once-viable Surescripts competitor—could not compete in the routing market without access to Allscripts' doctors. The complaint makes clear that Allscripts represented a particularly significant number of doctors. Along with explicitly alleging this, *see, e.g.*, SAC ¶ 174, the fact that Allscripts was able to compete directly with Surescripts in the parallel eligibility market also reasonably implies that it represented a substantial share of doctors. *See id*. ¶ 175 (quoting a 2009 Surescripts description of Allscripts as "a major competitor and our largest current risk" in the eligibility market). And unless Allscripts had its doctor clientele connect to Emdeon's network, Emdeon could not obtain the critical mass necessary to surmount the routing market's barrier to entry. Both Surescripts and Emdeon, evidently, shared this view. *See id*. ¶ 174 (quoting a Surescripts executive email: "the key to Emdeon is Allscripts"); *id.* ¶ 207 ("Emdeon described [Allscripts' 2010 agreement with Surescripts] as a 'devastating' blow and one that pushed Emdeon almost completely out of the market."). The proximate result of Allscripts' exclusive dealing, then, was Emdeon's relegation, which allowed Surescripts to retain its monopoly and provided Allscripts the ability to impose supracompetitive routing rates on its customers.

In short, although the Pharmacies have not alleged Allscripts competed directly in the routing market, because that market requires a certain threshold number of customers before any e-prescribing firm can start competing, Allscripts' alleged representation of a significant volume of customers plausibly implies that it had market power. The Pharmacies allege that Allscripts'

business was a make-or-break connection for any of Surescripts' competitors. This is sufficient to adequately plead market power.

**B.      Substantial Foreclosure**

Aside from market power, both Allscripts and Surescripts argue the Pharmacies have failed to allege substantial market foreclosure. Per the complaint, Allscripts ostensibly represents only 20% of prescribers within the e-prescribing market. A-MTD at 5 (citing SAC ¶¶ 172, 225).[19] The conclusion from the defendants is that 20% does not represent substantial foreclosure. *Id.*; S-MTD at 25.

To repeat the canon: "In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec.*, 365 U.S. at 327. Various quantitative figures exist in caselaw for what constitutes substantial foreclosure. For instance, in *United States v. Microsoft Corp.*, on appeal from a final judgment in favor of the plaintiff, the court noted that foreclosure of a "40% or 50% share [is] usually required in order to establish a § 1 violation." 253 F.3d 34, 70 (D.C. Cir. 2001). Likewise, the court in *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*—a case which Allscripts cites favorably—observed that "[c]ourts typically require a plaintiff to make an initial showing of foreclosure . . . in at least 30 to 40 percent of a market to proceed [past summary judgment]." No. 13-cv-01054-SLD-JEH, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017).

---

[19] The Pharmacies claim Surescripts' exclusive dealing arrangements generally "foreclose well over 80% of the [doctor] sides of the routing and eligibility networks from potential competition". SAC ¶ 227. They also claim "Allscripts represented approximately 25% of Surescripts' routing and eligibility transactions." *Id.* ¶ 172. Combining the two figures, Allscripts argues only 20% of the alleged market foreclosure is attributable to it (25% of 80% equals 20%).

The above figures are not controlling here. The only question at this stage is whether the "allegations raise a reasonable inference that . . . Defendants' exclusive-dealing provisions . . . could foreclose a substantial portion of the . . . market and reduce output." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 958 (N.D. Ill. 2018); *see In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, No. 12-711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage."). Recall that it is considered adequate for a plaintiff in a rule of reason case to allege "(1) evidence of market structure . . . and (2) exclusionary effect (*i.e.*, foreclosure of *a* competitor from a market) . . . ." *Viamedia*, 951 F.3d at 462 (emphasis added). Given the Pharmacies' extensive allegations regarding the foreclosure of Emdeon, their complaint is sufficient to state a plausible claim. The defendants' motions to dismiss the Pharmacies' conspiracy in restraint of trade claim (Counts IV and VIII) is therefore denied.

\*    \*    \*

For the foregoing reasons, the defendants' motions to dismiss are denied.

Date: June 21, 2022

John J. Tharp, Jr.
United States District Judge