# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br>All Class Actions | No. 1:19-cv-06627<br><br>Judge John J. Tharp, Jr.<br><br>Magistrate Judge Susan E. Cox |

## DEFENDANTS SURESCRIPTS, LLC AND ALLSCRIPTS HEALTHCARE SOLUTION, INC.'S MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY OF DANIEL F. SPULBER, PH.D.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

RELEVANT BACKGROUND ....................................................................................3

    I.      Plaintiffs' Claims and the E-Prescribing Industry ....................................3

    II.     Dr. Spulber's Proposed Impact and Damages Analyses..........................6

LEGAL STANDARDS ..............................................................................................12

ARGUMENT ..............................................................................................................13

    I.      Dr. Spulber's Impact and Damages Opinions are Unreliable and Do Not
          Fit the Facts of This Case Because They Rely on Speculative and
          Unsupported Benchmarks ......................................................................13

          A.     Dr. Spulber's Opinion That All Pharmacies Would Pay a Uniform
                 Price For Every Transaction for 12 Years Is Premised On An
                 Inapposite Theory and Not Supported by the Facts of the Case...............15
          B.     Dr. Spulber's "Average Economic Cost" Benchmark Is Not Based
                 on Reliable Methodology and Does Not Fit the Facts of the Case...........20
          C.     Dr. Spulber's "Admission" Benchmark Is Unreliable and Does Not
                 Fit the Facts of the Case.......................................................................25

    II.     Dr. Spulber's Impact and Damages Opinions Are Unreliable Because
          They Do Not Measure Purported Overcharges Against the Prices Class
          Members Actually Paid..........................................................................27

CONCLUSION.............................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007) ............................................................17

*In re Aluminum Phosphide Antitrust Litigation*,
   893 F.Supp. 1497 (D. Kan. 1995) ...............................................25, 27, 29

*Amari Co. v. Burgess*,
   No. 07 C 01425, 2012 WL 5389787 (N.D. Ill. Nov. 2, 2012) ................13

*In re Apple iPhone Antitrust Litig.*,
   No. 11-CV-6714-YGR, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ........................ *passim*

*Bielskis v. Louisville Ladder, Inc.*,
   663 F.3d 887 (7th Cir. 2011) ...................................................................23

*Clark v. Takata Corp.*,
   192 F.3d 750 (7th Cir. 1999) ...................................................................13

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   363 F.3d 761 (8th Cir. 2004) ...................................................................14

*Daubert v. Merrell Dow Pharms. Inc.*,
   509 U.S. 579 (1993) .................................................................................13

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
   223 F.R.D. 506 (S.D. Ill. 2004) ..............................................................30

*Hartman v. EBSCO Indus., Inc.*,
   758 F.3d 810 (7th Cir. 2014) ...................................................................23

*Hyland v. HomeServices of Am., Inc.*,
   No. 3:05-CV-612, 2012 WL 12995647 (W.D. Ky. July 3, 2012) ...............15, 19, 21

*Lewis v. CITGO Petroleum Corp.*,
   561 F.3d 698 (7th Cir. 2009) ...................................................................13

*Marion Healthcare, LLC v. S. Ill. Healthcare*,
   No. 3:12-CV-871-MAB, 2020 WL 1527771 (S.D. Ill. Mar. 31, 2020)...................29

*McCabe v. Crawford & Co.*,
   272 F. Supp. 2d 736 (N.D. Ill. 2003) ......................................................13

*Price v. L'Oreal USA, Inc.*
No. 17 CIV. 614 (LGS), 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ................................27

*TK-7 Corp. v. Estate of Barbouti*,
993 F.2d 722 (10th Cir. 1993) ................................................................................................26

*In re Wholesale Grocery Prod. Antitrust Litig.*,
946 F.3d 995 (8th Cir. 2019) ........................................................................................ *passim*

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ............................................................................................25, 26

**INTRODUCTION**

The named Plaintiffs base their effort to certify a nationwide class of tens of thousands of pharmacies, and their prayer for almost ███████ dollars in damages from Defendant Surescripts, LLC ("Surescripts"),[1] on the faulty work of their economic expert, Daniel F. Spulber. Specifically, Dr. Spulber seeks to use a "benchmark" analysis to opine that "but-for" Surescripts' purported conduct all pharmacies would have paid one of two per-transaction prices for every single transaction for an entire 12-year period. He purports to compare Surescripts' per-transaction cost to provide e-prescriptions (his proxy for but-for pricing) to the per-transaction price that pharmacies paid in the real world. But he gets both parts of that equation so wrong that the entire analysis fails the *Daubert* standard. Dr. Spulber's selection of his "cost" benchmarks, and his calculation of the prices that pharmacies paid in the real-world, are unprincipled, unreliable and do not fit the facts of this case as required by Federal Rule of Evidence 702. Dr. Spulber's errors are not nuanced; they are fundamental and visceral. Dr. Spulber fails to proffer any cognizable economic methodology, much less one that fits the facts of this case, and his opinions on impact and damages cannot be admitted.

***First***, Dr. Spulber makes a variety of fatal errors and unsupported assumptions in constructing his two alternative "cost" benchmarks. Dr. Spulber assumes that but-for Surescripts' alleged conduct, every pharmacy in America would have paid exactly the same, single price for every routing transaction, across the entire 12-year period he studied. He further assumes that price would have been equal to or less than any e-prescription routing network's costs, returning ***zero*** economic profit. Dr. Spulber proposes two alternative numbers that purportedly represent an

---

[1] It is unclear whether Plaintiffs seek any damages from Defendant Allscripts Healthcare Solutions, Inc. ("Allscripts"), now known as Veradigm, Inc., because Dr. Spulber has not calculated any damages amount arising out of the single claim involving Allscripts.

e-prescribing network's "costs" to provide e-prescribing services in a so-called "competitive" market. But at deposition, he serially disavowed reliance on the various economic theories explored in the authorities to which he cited to support his notion that prices would (at most) equal cost; he admitted that all are theoretical, academic exercises that do not match the realities of e-prescribing. Dr. Spulber admits that e-prescription routing is a "natural monopoly" setting— meaning that a single firm can serve it at a lower per-transaction cost than could multiple competitors. He also concedes the market has high entry barriers. But the economic literature supports his "price = cost" theory only in inapposite market settings with minimal barriers to entry and a multitude of competitors. He never identifies any cognizable definition of a "competitive" market that fits this natural monopoly setting, nor does he identify any recognized economic principle that fits the facts of this case, and also supports an assumption that e-prescribing platforms would price at cost.

**Second**, Dr. Spulber failed to fit his analysis to the record because he blatantly ignored ██████████████ of dollars of costs and rebates involved in e-prescription routing. That resulted in unreliable and unsupported benchmarks and wholly inaccurate calculations of what pharmacies paid for routing in the actual world. On the cost side, although purporting to measure Surescripts' actual, historic costs, he omitted ████████████ of dollars that Surescripts paid to the electronic health record providers ("EHRs") that control access to those who write electronic prescriptions. And, on the price side, although purporting to measure the actual, historic prices that pharmacies paid, he omitted ████████████ of dollars in price discounts that Surescripts paid directly to pharmacies, in the form of rebates. Together, just those two errors alone skewed his numbers by more than $1 billion, or up to 90% of his claimed damages. His justifications for

those omissions were a mix of admitted factual errors and vague assertions not tied to any recognized economic authority.

**Third,** Dr. Spulber ignores the real-world implications of the fact that 99% of the pharmacies in the putative class do not contract with or connect to Surescripts directly; they connect indirectly, through intermediaries. Those intermediaries (which are ***not*** class members) actually set the routing prices that most pharmacies pay. Dr. Spulber repeatedly conflates intermediary prices with pharmacy class member prices and does nothing to justify or remedy those errors. His "impact" and damages analyses necessarily assume that all intermediaries would have passed through 100% of all but-for world price decreases to their pharmacy customers. But Dr. Spulber did not perform any analysis of intermediaries' pricing to support that assumption. And he simply ignores the record evidence, which shows the contrary.

In sum, Dr. Spulber did not use any accepted economic methodology at all. He did not support his opinions with a well-specified but-for world, a regression analysis, or any similar recognized econometric work. He also did not test his theories for sensitivity or error rates. Instead, Dr. Spulber relied adamantly on the *ipse dixit* proposition that even the threat of a single (unidentified) potential competitor would, as a matter of necessity, drive all prices to, at most, cost. Extraordinary *ipse dixit* assertions and stylized analyses divorced from the facts in the case are not proper bases for admissible expert opinion. The Court should exclude his "impact" and "damages" opinions in their entirety.

## RELEVANT BACKGROUND

## I. PLAINTIFFS' CLAIMS AND THE E-PRESCRIBING INDUSTRY

Surescripts provides e-prescribing services, including routing and eligibility transactions. Ex. 1, Spulber Rep. ¶¶ 16-17. Routing is the transmission of prescription and prescription-related information (including prescription refills) from a prescriber to a pharmacy. Dkt. 148, Plaintiffs'

Second Amended Consolidated Class Action Complaint ("Compl.") ¶ 30; Ex. 1, Spulber Rep. ¶ 16. Prescribers often contract with EHRs (*e.g.*, Allscripts) to handle the transmission of the prescriptions and related information. Ex. 1, Spulber Rep. ¶¶ 25, 34. Some pharmacies (generally the larger pharmacy chains) contract and connect directly with Surescripts for routing. Compl. ¶ 121 n.8. But many thousands of pharmacies, including all 8 named Plaintiffs in this case, did not contract with or connect to Surescripts directly; they instead contract with one or more levels of intermediaries including pharmacy technology vendors ("PTVs") and resellers. Compl. ¶ 27. These PTVs and resellers aggregate pharmacies and contract with them to provide services, including but not limited to software for routing transactions. Ex. 1, Spulber Rep. ¶¶ 38-39.

Routing is a fully cross-subsidized market, meaning that Surescripts pays EHRs an incentive fee for each routing transaction (Compl. ¶ 133) and collects transaction fees from its directly contracted customers on the other side, including pharmacies, PTVs, and resellers. Ex. 1, Spulber Rep. ¶ 386. PTVs and resellers then charge their pharmacy customers for each routing transaction as well as all of the other products and services that they provide to them. Compl. ¶¶ 27-28. Resellers also mark up the cost of each of their routing transactions, and those markups vary. Ex. 2, Rebuttal Rep. ¶ 41; Ex. 3, Spulber Dep. 200:15-24.

EHR incentives are commonplace in the industry. EHRs negotiated incentives for a variety of reasons, including because █████████████████████████████████████████████████████ █████████████████████████████████████████████████. *See, e.g.,* Ex. 4, DuAime (NextGen) Dep. 68:6-23, 208:11-24 ████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████; Ex. 5, Dvorak (Epic) Dep. 50:24-51:3; Ex. 6, Susnow (NewCrop) Dep. 118:6–21; Ex. 7, Mushtaq

(Allscripts) Dep. 143:12-144:8, 160:19-161:25. While Surescripts did tie some incentives to loyalty, it also paid incentives throughout the relevant period that were not based on loyalty. *See, e.g.*, Ex. 3, Spulber Dep. 172:12-173:13; Ex. 8, (SS_Civil_00961001) at -013-014.[2] And, both Surescripts and its primary network competitor, Emdeon, began paying paid incentives before Surescripts even instituted loyalty incentives in 2010. *See, e.g.*, Ex. 3, Spulber Dep. 167:17-169:6; Ex. 9, (ALLSCRIPTS-DDC-0241820) at -822; Ex. 10, (SS_Civil_02461146) at -152; Ex. 11, (SS_Civil_02455697) at -712.

Surescripts paid rebates directly to pharmacies that connected directly and indirectly during the years 2014 to 2022. *See* Ex. 3, Spulber Dep. 216:12-19. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ Ex. 12, Joseph (Surescripts) Dep., April 13, 2023, 93:13-94:1; *see also* Ex. 13, (SS_Civil_00216352) at -352. Surescripts accordingly paid those price discounts directly to all pharmacies, including the named Plaintiffs, in the form of rebates that were not tied to loyalty and could not be kept by PTVs or resellers. Ex. 14, (SS_Civil_03065941) at -941 (defining eligible pharmacies).

Plaintiffs allege Surescripts possessed monopoly power in routing and maintained it through the loyalty and other contract terms with its direct customers. Compl. ¶¶ 2-4. Plaintiffs seek to represent a class of "all pharmacies" (both direct- and indirect-connecting) that they claim paid overcharges for per-transaction routing prices. Compl. ¶ 274.

---

[2] *See also* Ex. 4, DuAime (NextGen) Dep. 94:22-95:10 ████████████████████████████
████████████████████████████████████████ Ex. 3, Spulber Dep. 172:12-25.

## II.     DR. SPULBER'S PROPOSED IMPACT AND DAMAGES ANALYSES

Dr. Spulber proffers what he calls an "impact" analysis that he claims tests whether putative class members experienced injury in the form of higher prices from the alleged conduct. Using this analysis, he finds that the entire putative class was injured. Ex. 1, Spulber Rep. Section X. Dr. Spulber also opines about a "damages" analysis that purportedly calculates the amount of the damages to the putative class. *Id.* Section XII. For both, Dr. Spulber compares (a) two alternative "competitive benchmark prices," both of which assume any competitors would price at their average cost with (b) his assessment of the price that pharmacies allegedly paid. *Id.* ¶¶ 275-94, 399-415.

***Average Economic Cost Benchmark***: Dr. Spulber first claims that in the absence of Surescripts' challenged conduct, each and every class member would have paid ███ per transaction for every routing transaction, throughout the years 2010-2021. *Id.* ¶¶ 399-403. This "Average Economic Cost" benchmark is based on Dr. Spulber's assertion that, "in a competitive market, a firm with economies of scale is expected to price its product at its average economic cost." *Id.* ¶ 399. To calculate the benchmark, Dr. Spulber purports to assess Surescripts' average per-transaction cost, averaged over the entire relevant period of 2010-2021. *Id.* ¶¶ 275-93 (as detailed below, he does not actually do this). This opinion is, by Dr. Spulber's own admissions, unsupported by economic literature, contrary to the real world facts, and contrary to Dr. Spulber's own assertions as to proper analyses. Importantly, Dr. Spulber did not specify a standard error rate or another objective measure to test the reliability of his Average Cost Benchmark. Indeed, he testified at deposition that he is not familiar with the concept of a known error rate or sensitivity analysis. Ex. 3, Spulber Dep. 77:12-25.

***Dr. Spulber's Average Economic Cost benchmark does not rely on reliable economic methodology.*** At the outset, Dr. Spulber's opinion makes no logical sense. Dr. Spulber's entire

6

opinion presumes that starting in 2010, Surescripts would set prices based on an average of its costs from 2010-2021. In short, Dr. Spulber's opinion assumes Surescripts could somehow foresee its costs 10 years into the future and fully include that forecast in its pricing. But that is nonsense. As even Dr. Spulber recognizes, costs have changed over that decade, including due to changes in economies of scale. Ex. 1, Spulber Rep. ¶ 293, Table 4. Dr. Spulber offers no theory or actual analysis to support such a fantastical assertion, nor could he.

In his opening report, Dr. Spulber cited to theories of "contestability" and "monopolistic competition" to support his Average Economic Cost benchmark. *Id.* ¶¶ 280, 286, 399, nn.562-63, 738. But by their own terms, these theories cannot apply in the e-prescribing industry because they require the absence of barriers to entry, and Dr. Spulber concedes that such barriers exist in the routing market. *Id.* ¶ 271 (observing "natural barriers to entry" in the e-prescribing market); Ex. 3, Spulber Dep. 94:11-95:12, 98:2-6 (similar).[3] Forced to confront this fundamental error, Dr. Spulber pivoted and disavowed reliance on these theories. Ex. 3, Spulber Dep. 94:11-95:4, 117:8-119:14. Dr. Spulber now claims, without citing any economic literature or analyses, that barriers to entry do not matter in e-prescribing because he believes that Emdeon and RelayHealth had the ability to "jump over these barriers to entry" by bundling with another product called claims adjudication. *Id.* 100:18-101:10; *see also* Ex. 2, Rebuttal Rep. ¶ 121. That proposition is not part of the cited literature and he offers no independent economic analysis to support it.[4]

---

[3] In fact, Dr. Spulber could not provide a single concrete example of a market that is "competitive" in the sense of firms pricing at their average economic cost; instead, he vaguely referenced ridiculously broad "examples" such as the "retail sector" and the "wholesale sector." Ex. 3, Spulber Dep. 42:11-44:18.

[4] Dr. Spulber could not cite a single publication or case where this theory of "jumping over barriers to entry" was accepted. Ex. 3, Spulber Dep. at 107:15-108:15; 116:24-117:7. Barriers to entry need not be insurmountable to exist; the point is that they are costs that must be borne to enter.

***Dr. Spulber does not even follow his own formula for calculating actual economic costs.***

First, Dr. Spulber chose the ████████ benchmark by averaging his calculation of Surescripts' costs during an arbitrary sub-set of the relevant period, just the years 2015-2021. He did not include in this calculation the higher costs during the prior years. Ex. 3, Spulber Dep. 25:20-26:8. As a result, ██████████████████████████████████████████████████████████

██████████████████████ Ex. 1, Spulber Rep. ¶ 293, Table 4; Ex. 3, Spulber Dep. 175:9-15.[5]

Second, Dr. Spulber deliberately disregarded the ████████████████ of dollars Surescripts paid in per-transaction incentive payments to EHRs in his cost analysis, thus ***lowering*** his Average Economic Cost benchmark. Ex. 3, Spulber Dep. 149:25-150:17.[6] Dr. Spulber attempts a *post hoc* justification of this decision with the extraordinary assertion that simply removing Surescripts' loyalty contracts would result in a world in which neither Surescripts nor any other network would pay incentives to EHRs at all. Ex. 2, Rebuttal Rep. ¶¶ 101, 362; Ex. 3, Spulber Dep. 20:1-20. Dr. Spulber does not cite any record evidence to support this opinion, nor does he conduct any quantitative or qualitative analysis of how or why such a fundamental departure from the real world would occur. Plaintiffs understand that his assumption is wrong: They allege that absent the alleged conduct, incentives to EHRs would have ***increased***. Ex. 3, Spulber Dep. 166:11-16; Compl. ¶ 255.[7] Thus, Dr. Spulber fails to account for key (and obvious) per-transaction economic costs.

---

[5] He further admits that if Surescripts' faced competition and transaction volume declined, the per-transaction cost would necessarily increase. Ex. 3, Spulber Dep. 110:21-25. But he does not account for that fact in relying on this ████ benchmark either.

[6] Surescripts categorized EHR incentives as costs of goods sold ("COGS") until 2017, and thereafter as operating expenses. Ex. 1, Spulber Rep. ¶ 289; Ex. 3, Spulber Dep. 149:15-19

[7] Dr. Spulber does not explain how in a world with more networks competing for connections with a finite set of EHRs, incentives would do anything other than increase.

***Dr. Spulber incorrectly assumes that his Average Economic Cost benchmark would be a uniform price paid by every pharmacy for every routing transaction for the years 2010-2021.*** Dr. Spulber cannot identify ***any*** e-prescribing network that charged all of its customers a single uniform price for routing at ***any*** period of time, but chooses to ignore that fatally inconsistent fact in his analysis. Ex. 3, Spulber Dep. 194:2-16, 197:9-25, 198:14-17. Dr. Spulber conceded that pharmacies did not pay a single uniform routing price to Surescripts prior to the putative class period. *Id.* 194:2-8. He also conceded he was not aware of any pharmacies having ever paid a single uniform routing price to Emdeon, RelayHealth, or PTVs prior to the putative class period. *Id.* 194:9-195:19, 197:9-25. He further admitted that large pharmacies such as ▮▮▮ (a co-owner of Surescripts) and ▮▮▮▮ (the second largest pharmacy chain in the U.S.) have significant bargaining power and negotiated significant non-loyal discounts and savings for Surescripts' routing services during the putative class period. *Id.* 50:9-22; Ex. 2, Rebuttal Rep. ¶ 38.

Dr. Spulber asserts that these real world facts do not matter. Instead, he asserts for the first time on rebuttal that a theory called "the law of one price" ("LOP") dictates that in a so-called "competitive" market, all price variation will necessarily disappear and pricing will be driven towards a single, common price approaching average costs. Ex. 2, Rebuttal Rep. ¶¶ 62, 80-82, 91; Ex. 3, Spulber Dep. 131:2-9. But Dr. Spulber recognizes the LOP is a theoretical construct that studied pricing in commodity trading markets. It posits that differential ***commodity*** prices in ***two or more different geographic locations*** will eventually converge to one price because buyers will arbitrage by buying low in one location and reselling high in another. Ex. 3, Spulber Dep. 140:24-141:3. He admits that he has seen no evidence of anyone in the e-prescribing industry arbitraging with routing transactions before or after the class period. *Id.* 141:10-144:16. And, of course, there can be no "trading" of e-prescriptions, by arbitrageurs or anyone else. Incredibly, Dr. Spulber's

assertion appears to be that in any "competitive" market, all price differences would simply disappear even though he recognizes that "competition" generally entails competition on price. Ex. 1, Spulber Rep. ¶ 299.

**_Admission Benchmark_**: As an alternative, Dr. Spulber claims that in the absence of Surescripts' challenged conduct, each and every class member would have paid an even lower price, 2 cents per transaction, for every single routing transaction throughout the years 2010-2021. *Id.* ¶¶ 427-428. Dr. Spulber bases this so-called "Admission" "on certain statements" that he cherrypicked from prior testimony of a single lay witness, Surescripts' former CEO, Harry Totonis. *See id.* ¶¶ 404, 427, n.749. Specifically, Mr. Totonis testified:

> [T]he threat [of competition] was real because I inherited an e-prescribing transaction cost that was around 25 cents a transaction, and given the scale volume that Emdeon and RelayHealth, using the claims processing – claims processing were around cents a transaction, so understanding networks and network economics, Emdeon or RelayHealth could have dropped the price down to 2 to 3 cents any time, and they would have been able to take the business away from us.

Ex. 15, Totonis IH 49:17-25. Dr. Spulber admitted he is "absolutely" taking Mr. Totonis at his word and relying on this statement alone to support his 2 cents benchmark. Ex. 3, Spulber Dep. 186:2-20. He admittedly did nothing to confirm the reliability of this statement, did not investigate whether Mr. Totonis had any basis for it, and did not study the costs of Emdeon or RelayHealth to see if reaching 2 cents was even plausible. *Id.* 175:25-176:13, 177:6-10, 187:9-188:18. Again, because he is not familiar with the concepts, Dr. Spulber did not specify a standard error rate or sensitivity analysis to test the reliability of this benchmark. Ex. 3, Spulber Dep. 77:12-25.

**_"Impact" and Damages Analyses_**: Dr. Spulber's two alternative benchmarks underlie his opinion that every class member was impacted or injured by Surescripts' alleged conduct, and his attempt to calculate class-wide damage from that harm. Both analyses then purport to compare those but-for benchmarks to the prices that pharmacies actually paid for routing transactions, in

10

the real world.  Dr. Spulber offers two different, but equally flawed, "formulas" to assess what pharmacies paid: a "contract review" and a "revenue"-based analysis.  Both analyses fail because neither captures the actual prices that Surescripts charged class members during the relevant period.

In his contract review, Dr. Spulber constructs what he refers to as "Minimum Lowest Regular Price" (or "MLRP") and "Minimum Lowest Loyalty Price" (or "MLLP") that pharmacies paid during the relevant period, and compared them to the two alternative benchmarks to assess impact.  Ex. 1, Spulber Rep. ¶¶ 390-98; Ex. 2, Rebuttal Rep. ¶ 24.  This MLLP and MLRP are essentially just the lowest "loyalty" price and the lowest "regular" list prices that Dr. Spulber's team found in the contracts that they reviewed.  Of necessity, because he was only looking at contracts with Surescripts, he did not measure the prices that intermediaries actually charged to the many thousands of indirectly connecting pharmacies.  And Dr. Spulber looked at contracts for only 63 directly-connecting customers, including pharmacies and PTVs, so his review at most encompassed **one percent** of the approximately 34,000 pharmacies in the putative class.  Ex. 16, Johnson Rep. ¶ 28, n.43.  Dr. Spulber simply has no idea what the contractual pricing for the other 34,000 pharmacies is because he did not look at them, and the contract review says nothing about what any class member actually paid.

Dr. Spulber's backup methodology for assessing "impact" compares the aggregated routing revenue that Surescripts received during the years 2010-2021 to what Surescripts' revenue would have been during the same period had it priced throughout that period at his two alternative benchmarks.  Ex. 1, Spulber Rep. ¶¶ 416-30, Tables 18-21.  He used this analysis both as a second impact analysis and also for his damages calculations.  With regard to damages, he sums up the differences for each year and calls the amount "class-wide damages."  *Id.* ¶¶ 423-30, Tables 18-

21.  This aggregate view again disregards actual prices paid by the class members.  It also necessarily includes the revenue derived from non-class member PTVs and resellers because they directly connect with Surescripts.  He is counting apples when he should be counting oranges.

Finally, and with regard to both analyses, Dr. Spulber again engages in selective omission by choosing to ignore the rebates that Surescripts paid to all pharmacies, despite the undisputed fact that Surescripts paid rebates to all pharmacies – both those that connected directly and indirectly, whether in a loyalty program or not – throughout the years 2014 to 2021.  *See* Ex. 3, Spulber Dep. 216:12-19, 218:13-21; Ex. 14, (SS_Civil_03065941) at -941.  And the revenue-based analysis also excludes the incentives that Surescripts paid to EHRs in the revenue calculation, further extending his error with respect to those payments.

Perhaps due to the internal inconsistencies and lack of a reliable methodology, Dr. Spulber has posited **18** alternative damages numbers between his two reports, and it is not at all clear which number Plaintiffs actually intend to claim for damages in this case.  And these various figures cover a vast range even when citing to the same "benchmark"– for his ▮▮▮▮▮ benchmark he offers damages figures from approximately ▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 1, Spulber Rep. Tables 18-19; Ex. 2, Rebuttal Rep. Tables 3-4, 17-18), and for his 2 cents benchmark the figures range from ▮▮▮▮▮▮▮▮▮▮.  Ex. 1, Spulber Rep. Tables 20-21; Ex. 2, Rebuttal Rep. Tables 5-6, 19-20.

## LEGAL STANDARDS

Expert testimony is only admissible under Federal Rule of Evidence 702 if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

12

The party proffering the expert opinion bears the burden of establishing that the expert testimony meets the requirements for admissibility. *Amari Co. v. Burgess*, No. 07 C 01425, 2012 WL 5389787, at *16 (N.D. Ill. Nov. 2, 2012) (Tharp, J.) (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)). The Seventh Circuit has cautioned that even "a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant." *Lewis*, 561 F.3d at 705 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)). Each court has a "special obligation" to act as a "gatekeeper" to ensure that only relevant and reliable expert testimony is admitted into evidence. *Clark*, 192 F.3d at 756; *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993). The Court's role in keeping unreliable evidence from the jury is crucial because expert testimony can be "powerful and misleading" and have a significant impact on the outcome of a case. *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 739 (N.D. Ill. 2003). If Plaintiffs do not meet their burden, the expert opinion cannot be admitted. *Daubert*, 509 U.S. at 594-95.

## ARGUMENT

### I. DR. SPULBER'S IMPACT AND DAMAGES OPINIONS ARE UNRELIABLE AND DO NOT FIT THE FACTS OF THIS CASE BECAUSE THEY RELY ON SPECULATIVE AND UNSUPPORTED BENCHMARKS

Dr. Spulber's cost-equals-price benchmarks, which are the basis for both his "impact" and "damages" opinions, are not based on a reliable methodology and do not fit the facts of the case, as required under *Daubert*.

Benchmark-based expert analyses are not automatically admissible. Plaintiffs may argue that the use of benchmarks is a reliable methodology and any criticism of the benchmark selected goes to weight, not admissibility. That is not the law. In fact, Courts cannot admit benchmarks unless the benchmarks are based on sufficient facts and data, "incorporating all aspects of the relevant markets to demonstrate the veracity of the benchmark chosen." *In re Wholesale Grocery*

13

*Prod. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019). Courts must exclude benchmarks as unreliable and "speculative" where the expert cherry-picks the benchmark and does not provide any rigorous analysis demonstrating "whether this particular methodology and reasoning, as . . . applied to the[] facts, passe[s] muster." *Id.* at 1002-03; *In re Apple iPhone Antitrust Litig.*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *3 (N.D. Cal. Mar. 29, 2022) (excluding expert's benchmark that the expert arbitrarily "cherry picked from a few data points" without attempting to account for the "market realities").

For instance, in *Wholesale Grocery* the plaintiffs' expert attempted to compare what plaintiff grocery retailers actually paid to a but-for benchmark based on a specific customer's pricing. 946 F.3d at 999-1001. The expert selected a large retailer, Stop & Shop, as the benchmark because, according to the expert, "Stop & Shop's size and its ability to self supply limited the impact of any increased market power" resulting from the challenged agreement. *Id.* at 999. The Eighth Circuit affirmed the district court's exclusion of the benchmark because the plaintiffs' expert simply assumed the applicability of the benchmark without actually "incorporating all aspects of the relevant markets to demonstrate the veracity of the benchmark chosen." *Id.* at 1002. As the court recognized, the plaintiffs bear the "burden to establish the reliability of the posited expert testimony, including a determination of whether other factors affected the pricing at issue, if only to eliminate those factors, specifically using the relevant data and time frame presented." *Id.* at 1003 (citing *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004)).

Similarly, *Apple iPhone Antitrust Litigation* excluded benchmarks in a consumer putative class action against Apple relating to the sale of iPhone apps. 2022 WL 1284104, at *1. The plaintiffs' expert performed a "benchmark analysis" in order to construct a "but-for commission

14

rate" and "but-for pricing." *Id.* at *3. The district court excluded the expert's proffered benchmarks because they were based on "cherry picking" rates of third parties without "consider[ing] the context" or "commercial reality" in which the rates were adopted. *Id.* at *4-5. Significantly, the expert failed, as Dr. Spulber does here, to explain why a "known unprofitable rate should be at the *top* of his range" for the proposed benchmarks. *Id.* at *4 (emphasis in original).

Nor can an expert shirk their duty to construct a reliable benchmark by relying solely on economic theory and refusing to test that theory against the realities of the market. In *Hyland v. HomeServices of Am., Inc.*, the expert adopted a benchmark to calculate class-wide damages for the plaintiffs, based on "a fictional, hypothetical benchmark that reflects his thoughts on how a real estate market should be structured." No. 3:05-CV-612, 2012 WL 12995647, at *12 (W.D. Ky. July 3, 2012). The court excluded his opinion because while he opined about what "should" happen in a competitive market, he failed to identify any market that actually employs such a commission structure. *Id.* "Simply put, what real estate brokers would ideally charge in a fictional, perfectly competitive market is irrelevant to a determination of what Defendants would charge in the absence of [the alleged conduct]." *Id.*

Dr. Spulber's arbitrary and unsupported selection of his two alternate benchmarks run afoul of this case law because he fails to offer any economic methodology to support those selections, much less one that can be reliably applied to the facts of this case.

### A. Dr. Spulber's Opinion That All Pharmacies Would Pay a Uniform Price For Every Transaction for 12 Years Is Premised On An Inapposite Theory and Not Supported by the Facts of the Case

Both of Dr. Spulber's benchmarks suffer from the same fatal flaw—a baseless assumption that but-for Surescripts' loyalty contracts, each and every pharmacy would have paid the same price as every other pharmacy, for every transaction for the 12-year period of 2010 through 2021.

He posits that had Surescripts not entered into its loyalty contracts, even the mere threat of competitive entry would have instantaneously forced Surescripts to charge a single uniform routing price to everyone, at a price at or below its average cost.  Ex. 3, Spulber Dep. 89:3-90:1.

### 1. Dr. Spulber's Assumption Is Contradicted By His Own Admissions and the Record Evidence

Dr. Spulber's theory of constant pricing is contrary to the record evidence and his own admissions.  Dr. Spulber could not identify any e-prescribing network that has ever charged its customers a single uniform price for routing.  *Id.* 198:14-17.  He also conceded that pharmacies did not pay a single, uniform routing price to Surescripts prior to the putative class period.  *Id.* 194:2-8.  He could not identify any pharmacy having ever paid a single uniform routing price to Emdeon, RelayHealth, or PTVs prior to the putative class period, and conceded that during the putative class period, they in fact "paid different prices."  *Id.* 194:9-195:19, 197:9-25.  During Dr. Spulber's contract review, he observed that prices "vary across contracts" (Ex. 1, Spulber Rep. ¶ 396), and he still finds significant price variation even after masking it by disregarding pharmacy rebates and rounding prices up to the nearest cent.  Ex. 2, Rebuttal Rep. ¶¶ 61, 140-42, n.79.  And he admitted that large pharmacies such as ████ and ███████ pay differential routing prices because they wield significant bargaining power and negotiate significant non-loyal discounts and savings for Surescripts' routing services.  Ex. 3, Spulber Dep. 50:9-22; Ex. 2, Rebuttal Rep. ¶ 38.

The notion of a single uniform price across all customers for more than a decade is also untenable because it ignores the role of intermediaries in pharmacies' pricing.  Only a small number of actual pharmacies (large pharmacy chains) connect directly to Surescripts; most pharmacies connect through PTVs or other resellers.  Dr. Spulber has done absolutely no work to determine how the prices that Surescripts charged to PTVs and other resellers were related (or not) to the routing prices those intermediaries charged to the actual pharmacy class members.  Dr.

16

Spulber concludes that "PTVs and other intermediaries pass along Surescripts's charges to their pharmacy customers with a positive markup that is consistent over time and uniform across pharmacies," but admittedly based that conclusion only on his "review of some invoices" and absolutely no economic analysis. Ex. 1, Spulber Rep. ¶ 386, n.730. In fact, he admitted at deposition that "there are some differences" among PTVs' markups. Ex. 3, Spulber Dep. 200:15-24. Dr. Spulber offers no analysis or reason explaining why, in a but-for world, intermediaries would change course and uniformly share with their pharmacy customers the benefit of any hypothetical lower price decreases. In particular, he posits no but-for world change in the number, nature or economic motivations of intermediaries that would lead to this result.

This failure to consider the "commercial reality" of pricing in the routing market renders his benchmarks unreliable and his opinion inadmissible. *Apple iPhone Antitrust Litigation,* 2022 WL 1284104, at *4-5; *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 167-69 (C.D. Cal. 2007) (denying motion to certify class because impact analysis was premised on an unsupported and mistaken assumption that "*each and every*" purchaser "would pay [a constant proposed but-for price] in the but-for world.").

### 2. The "Law of One Price" Does Not Apply in the E-Prescribing Industry

Confronted with these facts, Dr. Spulber contends for the first time in his rebuttal report that none of these real world facts matters because he relies on a stale and inapplicable academic theory called the Law of One Price ("LOP"). Again, the LOP is a theoretical construct that says differential **commodity** prices in **two or more different geographic locations** will eventually converge to one price because buyers will arbitrage by buying low in one location and reselling high in another. Ex. 3, Spulber Dep. 137:9-17. Dr. Spulber's attempt to justify his benchmarks via the LOP simply underscores its unreliability and lack of applicability in the e-prescribing industry.

17

To be clear, the LOP is not a widely applicable theory. The very text Dr. Spulber cites states that the LOP is a "hypothesis" that "[m]ost economists believe . . . does not provide a completely accurate description of the world" because "many goods are not easily traded" and "even tradable goods are not always perfect substitutes." Ex. 17, Gregory N. Mankiw, Macroeconomics 146-47 (7th ed. 2010).[8] His other cited authority, Dr. John Baffes, agrees—his empirical study of LOP found that it failed to apply to eight of 16 studied agricultural commodities. Dr. Baffes noted that "[e]xplanations abound for the failure of the LOP," and proffered a "test allow[ing] researchers to test the LOP rather than assume its existence before the price to be used is selected." Ex. 18, John Baffes, *Some Further Evidence on the Law of One Price: The Law of One Price Still Holds*, 73 Am. J. Agricultural Econ. 1271-72 (1991). Dr. Spulber was "surprised" to learn that Dr. Baffes' empirical study found the LOP did not hold true among all studied commodities and admitted that he is not even familiar with the study, even though he relied on it. Ex. 3, Spulber Dep. 140:8-141:3.

In fact, Dr. Spulber's reliance on the LOP lacks all of the hallmarks of reliability. He could not identify any case in which he or anyone else has applied an LOP-based benchmark methodology. *Id.* 145:7-15. Nor did he or Plaintiffs proffer any evidence that basing a benchmark on LOP is accepted in the economic community or has been subject to peer review. Dr. Spulber did not even attempt to test the applicability of the LOP in the e-prescribing industry (Ex. 2, Rebuttal Rep. ¶¶ 62, 80-82), an industry that on its face is not at all like the commodity trading industries to which the LOP has been applied. As in *Hyland*, Dr. Spulber's opinion about what he believes "should" happen in a "competitive" market cannot support an appropriate benchmark

---

[8] Professor Mankiw discussed the LOP generally, as well as an application of the LOP to the international marketplace ("purchase-power parity"), and noted criticisms of "[m]ost economists" about the same. *Id.*

because there is no evidence that it would actually have happened but-for Surescripts' alleged conduct. 2012 WL 12995647, at *12.

Dr. Spulber admits that the real world facts do not support his use of the LOP theory either. The sources Dr. Spulber relied on discuss the application of the LOP in the context of trading of true commodity products; the notion, dating back to the 1700s, is that arbitrageurs will exploit price differences in two or more different geographic locations in a way that will, over time, cause trading prices to converge to one price. Ex. 3, Spulber Dep. 137:9-17. Dr. Spulber admits the existence of arbitrage is key to the concept of LOP. *Id.* 140:24-141:3 ("The whole point of the law of one price is that price differences are arbitraged away to the extent that frictions aren't there and to the extent frictions are there, then they are not arbitraged away."). Yet he could not identify any evidence of arbitrageurs in the e-prescribing industry, either prior to or during the class period. *Id.* 141:10-8-145:4 This is not a surprise given that e-prescription routing involves the transmission of an e-prescription between a prescriber, through its EHR, and the pharmacy of the patient's choice, with a network facilitating the transmission. Compl. ¶ 32; Ex. 1, Spulber Rep. ¶ 16; *id.* ¶ 22, Figure 1 (E-Prescribing Flowchart). Arbitrage is impossible because no one can engage in any trading of e-prescriptions, much less arbitrage trading. Nor can the "two or more geographic locations" aspect of LOP apply—prescribers and their patients determine the pharmacy that will fill a given prescription. Dr. Spulber's application of the LOP to this market makes no sense—the market contains precisely the "frictions" that he admits would prevent the arbitrage he contemplates. Ex. 3, Spulber Dep. 140:24-141:3.

The Court should, thus, exclude Dr. Spulber's benchmark opinions because they are not the product of an economic methodology, much less one that can be applied to the facts here.

**B.** **Dr. Spulber's "Average Economic Cost" Benchmark Is Not Based on Reliable Methodology and Does Not Fit the Facts of the Case**

**1.** **Dr. Spulber Presents No Reliable Basis to Conclude that Absent Surescripts' Loyalty Provisions Pharmacies Would Have Paid A Price Equal to Surescripts' Average Economic Cost**

Dr. Spulber's Average Economic Cost benchmark is premised on a theory that does not apply to the realities of the e-prescribing industry and is therefore inadmissible. At the outset, this benchmark is nonsensical because it rests on the radical notion that a routing network would know, in 2010, what its average costs would be across a decade into the future, such that it would price at the future-average level of cost. Dr. Spulber effectively concedes that the assumption is implausible, recognizing it would entail Surescripts pricing below its future-average cost level through the year 2017. Ex. 3, Spulber Dep. 175:9-15. That alone renders Dr. Spulber's Average Economic Cost benchmark unreliable and unhelpful to a factfinder, and highly misleading when presented by a purported expert.

Moreover, Dr. Spulber concedes that the economic theories on which he bases his Average Economic Cost benchmark do not fit the e-prescribing industry. He opines in his opening report that "according to standard economic principles, firms in a competitive market can at best earn zero economic profit in equilibrium." Ex. 1, Spulber Rep. ¶ 399. He grounded this notion on "contestability theory" and the theory of "monopolistic competition." *Id.* ¶¶ 280, 286, 399. However, and as Dr. Spulber concedes, these theories all require the absence of barriers to entry, and Dr. Spulber affirmatively opines that such barriers to entry exist in routing. Ex. 3, Spulber Dep. 94:11-95:4, 117:8-119:14 ("[T]hese barriers to entry mean that the market is not contestable, let alone highly contestable."). Confronted with these clear inconsistencies, Dr. Spulber changes course and claims that actually Emdeon and RelayHealth would "jump the entry barriers" in the but-for world and price at cost, despite it being economically irrational to do so. Ex. 2, Rebuttal

Rep. ¶¶ 121, 178; *see also* Ex. 3, Spulber Dep. 100:23-101:15. He cites no economic analysis or authority at all for this new theory (Ex. 3, Spulber Dep. 107:15-108:15, 116:24-117:7), which appears to be his own invention. In any event, it is wholly contrary to his presumption that "firms act to maximize profits." Ex. 2, Rebuttal Rep. ¶ 157.

Dr. Spulber's Average Economic Cost benchmark suffers from the same fatal flaw as in *Hyland*: it is not supported by any economic theory that he relies upon. Instead, he admittedly could not identify any economic, peer-reviewed work that supports his Average Economic Cost benchmark, nor any other case where someone has calculated a benchmark based on a company's average economic cost. Ex. 3, Spulber Dep. 78:16-79:1; 79:2-7. Thus, the Court should exclude the benchmark as unreliable because "what [networks] would ideally charge in a fictional, perfectly competitive market is irrelevant to a determination of what [Surescripts] would charge in the absence of [the alleged conduct]." *Hyland*, 2012 WL 12995647 at *12; *see also Wholesale Grocery*, 946 F.3d at 1002 (excluding benchmark opinion for expert's failure to "incorporat[e] all aspects of the relevant markets to demonstrate the veracity of the benchmark chosen"); *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *3-4 (excluding "cherry-picked" benchmark because it was "arbitrary" and based on ignorance of the "market realities").

### 2. This Benchmark Fails to Account for How Surescripts Priced and Operated

Even if Dr. Spulber had a reliable basis to opine that but-for Surescripts' loyalty contracts every pharmacy would have paid a uniform price equal to Surescripts' economic cost (he does not), his calculation of ▮▮▮▮ for that price would remain utterly wrong and unsupported.

*First*, Dr. Spulber manipulated his calculations to lead to an artificially low average cost and, thus, benchmark price. Dr. Spulber's relevant period is from 2010 to 2021, but he inexplicably calculated his "average" costs based on Surescripts' costs for the years 2015-2021

only. Ex. 2, Rebuttal Rep. ¶ 85 (stating that he "exclude[ed] the earlier years prior to which point Surescripts had not achieved those average costs."). Dr. Spulber admits that costs went down as transaction volume increased. Ex. 1, Spulber Rep. ¶ 293. And he further concedes that the course of adoption of e-prescribing was still very much underway during the 2010-2014 time period. Yet he consciously chooses to compare in that 2010-2014 period but-for prices that by his admission could not have existed, blithely claiming without support that "it is obviously appropriate to consider average cost at higher volumes of transactions achieved during the Relevant Period," Ex. 2, Rebuttal Rep. ¶ 86. Dr. Spulber does not try to test or support that counterintuitive claim. In reality, as Dr. Spulber himself calculated, Surescripts' costs varied over time as the volume of transactions dramatically increased, ████████████████████████████████████ ████████████████████████████████ Ex. 1, Spulber Rep. ¶ 293 & Table 4. It is clear, therefore, that he omitted those years from the "average" to artificially raise the so-called Average Economic Cost.

Dr. Spulber's benchmark is further unreliable because he does not include approximately ███████████ in incentives Surescripts paid to EHRs for their electronic routing transactions. *See Id.* ¶ 161 Figure 8. As a result, Dr. Spulber radically understates Surescripts' costs each year, skewing both his impact and damages analyses.

When confronted with this failure, Dr. Spulber just asserts, without any supporting economic analysis, that no network (including Surescripts) would offer incentives to EHRs in the but-for world. Dr. Spulber's *ipse dixit* assertion is contrary to Plaintiffs' express allegation that EHRs would have been able to negotiate *higher* incentives but-for the alleged conduct. Compl. ¶ 255. Dr. Spulber professed to have no knowledge of this core allegation. Ex. 3, Spulber Dep. 166:8-16. Further, Dr. Spulber's assertion that incentives would go to zero in the but-for world

(*id.* 20:5-13) because they are only "rewards Surescripts used to incentivize participation by EHRs in its anticompetitive scheme" (Ex. 2, Rebuttal Rep. ¶ 97) is not just unsupported but contrary to undisputed record evidence that e-prescribing networks paid incentives to EHRs as part of the normal competitive conditions in the industry. *See supra* at 4-5. Additionally, Dr. Spulber completely disregards the overwhelming testimony from EHRs establishing that they negotiate incentives for various reasons having nothing to do with loyalty or exclusivity. *See supra* at 4-5. And his no-incentives speculation contradicts his admission that EHRs are, and in the but-for world would be, profit-maximizing. Ex. 3, Spulber Dep. 164:18-20. It also simply makes no economic sense: in the but-for world, there would be more competition for EHRs' business. Plaintiffs' whole case is based on the notion that more competition among e-prescribing platforms brings better prices to those using the platform, meaning higher incentives to EHRs. Yet as to EHRs, Dr. Spulber inexplicably assumes the opposite.

Once again, Dr. Spulber's analysis is utterly divorced from the real world facts of this case, rendering his benchmark unreliable. *Wholesale Grocery*, 946 F.3d at 1002 (excluding expert's benchmark for failure to "incorporat[e] all aspects of the relevant markets to demonstrate the veracity of the benchmark chosen"); *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *3-4 (excluding benchmark as "arbitrary" and contrary to "market realities").

**Second,** Dr. Spulber could not identify a known error rate or sensitivity analysis for his Average Economic Cost benchmark because, as he candidly admitted at deposition, he was not familiar with either concept. Dr. Spulber's failure to proffer a known error rate or another objective measure of the benchmark's reliability, standing alone, is a basis for exclusion. *See Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 818 (7th Cir. 2014) (affirming the exclusion of expert testimony where the expert "did not discuss the known or potential error rate of his theory"); *Bielskis v.*

23

*Louisville Ladder, Inc.*, 663 F.3d 887, 895 (7th Cir. 2011) (affirming exclusion of expert testimony in part because it was not "possible to assess the known or potential rate of error behind [the expert's] methodology").

 ***Finally,*** and as a result of all of these errors, Dr. Spulber's uniform application of ████████ as a benchmark across the entire relevant period leads to absurd results, which is another independent basis for exclusion. Dr. Spulber's analysis does not calculate a price equal to zero economic profit per transaction or even by year. Instead, he chooses an ***average*** cost over more than a decade of time in an admittedly evolving market and asserts that with competition pharmacies would have magically paid that price as of September 2010. This is absurd on its face. As Table 4 of his opening report shows, Dr. Spulber's own calculations of Surescripts' economic cost show they fell over time; in 2010, for example, the average cost ███████████, nearly double the price that he claims pharmacies would have paid in 2010, absent the alleged conduct.

 Dr. Spulber presumes Surescripts would operate at a loss, despite asserting that firms are profit-maximizing. He conceded that if Surescripts had priced at ████████ per transaction, Surescripts would have operated at an annual loss from at least 2010 to 2017, and a cumulative loss each and every year of its entire existence. Ex. 3, Spulber Dep. 175:9-15. Dr. Spulber never explains how any network could economically sustain such below-cost pricing. Indeed, at deposition, Dr. Spulber admitted that he did not assess the ability of any network to price at either of his benchmarks, incredibly claiming it was "not necessary" to do so. *Id.* 78:1-15. His conjecture that networks would suddenly price at breakeven or at a loss is contrary to his presumption that "firms act to maximize profits." Ex. 2, Rebuttal Rep. ¶ 157.

 Faced with plainly absurd results from his analysis, Dr. Spulber was required, but failed to explain and justify his analysis. *See In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *4-

5 (excluding expert's testimony that used a "known unprofitable rate . . . at the *top* of his [benchmark] range" because "[i]t is not logical that a but-for world would generate market rates which do not anticipate any profit in the foreseeable future"); *see also Wholesale Grocery*, 946 F.3d at 1002 (excluding expert's benchmark opinion for failure to study the commercial realities and "demonstrate the veracity of the benchmark chosen"); *In re Aluminum Phosphide Antitrust Litigation* ("*Aluminum Phosphide*"), 893 F.Supp. 1497, 1506-07 (D. Kan. 1995) (excluding damages calculation "based on unjustified assumptions" and that failed to account for "market conditions"). Because he did not, his Average Economic Cost benchmark should be excluded.

**C.      Dr. Spulber's "Admission" Benchmark Is Unreliable and Does Not Fit the Facts of the Case.**

Dr. Spulber proffers no reliable methodology to support his "Admission" benchmark of 2 cents per routing transaction either. At deposition, he was unable to identify any peer-reviewed work or prior matter supporting the notion that one could reliably construct a benchmark based on the statement of a single fact witness. Ex. 3, Spulber Dep. 79:8-18. Dr. Spulber's only "support" for selecting this number is that it is the lower bound of a 2-3 cent range referenced by Surescripts' former CEO, Harry Totonis in testimony he provided in 2017. Specifically, Mr. Totonis testified that at some point during his tenure at Surescripts he was worried that "Emdeon or RelayHealth could have dropped the price down to 2 to 3 cents any time, and they would have been able to take the business away from us." Ex. 15, Totonis IH 49:17-25.

Experts can rely on economic modeling done by parties and business people in the case when constructing their models and methods, if the expert vets and tests those models. Experts cannot blindly rely on the work of others when issuing their own opinions. In *ZF Meritor, LLC v. Eaton Corp.*, for example, the plaintiff's expert attempted to calculate lost profits attributable to the alleged anticompetitive conduct by using "a one-page set of profit and volume projections"

25

created by the defendant's employees as a yardstick or benchmark. 696 F.3d 254, 291-92 (3d Cir. 2012). The Court of Appeals for the Third Circuit explained that while it can be appropriate to rely on the estimates of others in constructing a benchmark, "to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id*. at 292. The court upheld the district court's exclusion of the opinion because the expert did not know "critical information," such as who calculated the figures, "the methodology used to create" the estimates, "or the assumptions on which the . . . estimates were based." *Id.* at 293. *See also TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (excluding expert opinion because "lack of familiarity with the methods and the reasons underlying [someone else's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination.").

These cases demonstrate exactly why Dr. Spulber's "Admission Benchmark" is unreliable and inadmissible. Dr. Spulber concedes that he selected the 2 cent benchmark from a snippet of deposition testimony alone and did nothing to verify or test whether this was actually a viable competitive price for routing. Ex. 3, Spulber Dep. 175:25-176:13, 177:6-10. Mr. Totonis did not describe how he came to these numbers or if he had any methodology at all for selecting them. Dr. Spulber also admits that he does not know whether Mr. Totonis performed any analysis that determined the competitive routing price was 2 to 3 cents per transaction. *Id.* 187:9-21. In fact, Dr. Spulber conceded at his deposition that he had not even "looked at all of" Mr. Totonis's testimony on the subject. *Id.* 183:24-184:6. Dr. Spulber has no idea as to whether Mr. Totonis, who had never worked at either company, had any knowledge of Emdeon's or RelayHealth's costs. *Id.* 187:9-188:18. And he fully ignored Mr. Totonis' further testimony in a later deposition that Surescripts could not meet any such price: "Surescripts would have not been able to match [a 2-3

cent per transaction price], because . . . we were losing money and there was no funding from the owners." Ex. 19, Totonis (Surescripts) Dep. 136:2–6.

Dr. Spulber's opinion is further unreliable because he failed to test this second benchmark with any other record evidence or using economic principles. Dr. Spulber concedes he did not study the costs of Emdeon or RelayHealth. Ex. 3, Spulber Dep. 175:16-24. Nor did he identify a known error rate or conduct any sensitivity analysis for the benchmark. *Id.* 77:12-25. And he could not identify any peer-reviewed work discussing the reliability of adopting a benchmark based on the statement of a single fact witness. *Id.* 79:8-13.

Finally, as with his first benchmark, Dr. Spulber's "Admission" benchmark would lead to absurd results—a conclusion Dr. Spulber surely would have drawn had he subjected it to any testing at all. Dr. Spulber's own calculations of ████████████████████████ ████████████████████████████████████████ Ex. 1, Spulber Rep. ¶ 293, Table 4. In fact, ████ ████████████████████████████████ *Id.* ¶ 293, Table 4. Applying the Admission benchmark, Surescripts purportedly would have charged every single routing transaction at a significant loss for the entire relevant period. Again, Dr. Spulber is faced with facially absurd results from his blindly adopted benchmark, yet he fails to explain and justify his opinion. It must therefore be excluded. *See In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *4-5; *see also Wholesale Grocery*, 946 F.3d at 1002; *Aluminum Phosphide*, 893 F.Supp. at 1506-07.

## II. DR. SPULBER'S IMPACT AND DAMAGES OPINIONS ARE UNRELIABLE BECAUSE THEY DO NOT MEASURE PURPORTED OVERCHARGES AGAINST THE PRICES CLASS MEMBERS ACTUALLY PAID

Even if his benchmarks were reliable (they are not), Dr. Spulber's assessments of impact and damages are not the product of a reliable economic method because he failed to analyze the ***actual*** routing prices that class members paid. *Daubert* does not tolerate this level of imprecision. *See, e.g.*, *Price v. L'Oreal USA, Inc.* No. 17 CIV. 614 (LGS), 2020 WL 4937464, *5-6 (S.D.N.Y.

Aug. 24, 2020) (excluding expert's overcharge model in antitrust case because it was based on manufacturer suggested retail prices ("MSRP") even though the evidence showed actual prices varied and MSRP was not indicative of "what customers actually pay").

First, Dr. Spulber's contract review method of assessing "impact" ignores actual prices that all putative class members paid for routing. Instead, he reviews the contracts of only 63 pharmacies, PTVs and resellers and, recognizing prices "vary across contracts" (Ex. 1, Spulber Rep. ¶ 396), he focuses on the lowest "regular price" and "loyal price" that he observed in the contract pricing schedules he reviewed. *Id.* ¶¶ 390-98; Ex. 2, Rebuttal Rep. ¶ 24. To be clear, there are 34,000 putative pharmacy class members in this case, and Dr. Spulber did not review the contracts, and therefore knows ***nothing***, about the pricing for nearly all of them. He also reviewed contracts for PTVs and resellers—who are ***not*** members of the putative class at all—but as described above, did absolutely no work to determine how their prices were related (or not) to the routing prices charged to the actual pharmacy class members. Thus, Dr. Spulber's contract review says nothing about the actual prices paid by the 34,000 putative class members or anything about the class members whose contracts he did not review.[9]

Dr. Spulber's revenue-based analysis, which he used for his damages calculations and as an alternative impact analysis, is equally flawed. The revenue-based analysis compares the aggregated routing revenue that Surescripts received during the years 2010-2021 to what Surescripts' revenue would have been during the same period had it priced throughout that period

---

[9] Dr. Spulber claims he did enough to prove impact because he selected the largest customers that he believes had the most bargaining power, and thus "in all likelihood the contractual prices for small players with contracts would have been greater than the contractual prices for the pharmacies I reviewed." Ex. 2, Rebuttal Rep. ¶ 38. This is not a reliable analysis—this is just another unsupported assumption that cannot survive under Rule 702 and *Daubert*. He also claims to have "supplemented" his analysis with transaction data from Surescripts that accounts for 8,638 additional pharmacies (*id.* ¶¶ 43-44), but still says nothing about the tens of thousands of pharmacy class members that connect through PTVs and resellers. This "supplementation" is too little, too late.

at his two alternative benchmarks. Ex. 1, Spulber Rep. ¶¶ 416-30, Tables 18-21. As in the contract review analysis, the revenue-based analysis *does not* capture the payments made by indirect-connecting pharmacies (putative class members), but *does* include payments made by non-class member PTVs and resellers. Although Dr. Spulber presumes that the PTV and reseller payments can be a proxy for indirect pharmacy payments because he reviewed "some invoices" where PTVs and resellers passed on the routing transaction fee with a markup, he does nothing to vet or test that assumption.[10]

      Dr. Spulber's decision to disregard the EHR incentives further underscores the unreliability of his revenue-based analysis. Surescripts paid ███████ in EHR incentives over the relevant period and netted incentives from its revenue for most of that period. Ex. 1, Spulber Rep. ¶ 161, Figure 8; *id.* ¶ 289; Ex. 3, Spulber Dep. 149:15-150:17. Whether treated as operating expenses or COGS, they must be taken into account because Surescripts actually paid EHRs incentives from payments received from its direct routing customers. In short, his failure to account for these incentives in any way can only be explained "by a desire to enhance the measure of plaintiffs' damages, even at the expense of well-accepted scientific principles and methodology," and his impact and damages opinions must therefore be excluded. *Aluminum Phosphide*, 893 F.Supp. at 1506-07; *Marion Healthcare, LLC v. S. Ill. Healthcare*, No. 3:12-CV-871-MAB, 2020 WL 1527771, at \*7 (S.D. Ill. Mar. 31, 2020) (excluding expert's damages model that was "grossly inflated" based on unsupported assumptions).

---

[10] In fact, net of rebates some pharmacies paid less overall for routing than their PTVs paid to Surescripts. ███████████████████████████████████████████████████████████ Ex. 20, (IVAN_PHARM_001367) at -369; Ex. 21 (BARTOW_PHARM_002884) at -885; Ex. 22 (SS_Civil_02458598) at -598; *see also* Ex. 16, Johnson Rep. ¶ 46 n.86 (summarizing same).

Finally, both the contract review and revenue-based analysis specifically ignore the rebates that Surescripts paid to all pharmacies (direct and indirect connecting) beginning in 2014. Critically, Dr. Spulber does not cite any economic or accounting principle that would allow him to disregard the rebates actually paid to class members during the relevant period for any of these reasons. Nor could he, because the net price that a putative class member pays is what matters for assessing any harm inflicted. *See Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) ("A class member could not have actually been injured unless the alleged conspiracy inflated its *net payments* . . . above the competitive (or 'but-for') price.") (emphasis added). He is also wrong because, as discussed, undisputed facts show that Surescripts paid rebates to every pharmacy, whether loyal or not, and even to indirectly connecting pharmacies that did not contract with Surescripts and thus had no option to be "loyal." *See supra* at 5. When pressed, Dr. Spulber conceded that he "may have misspoken" when asserting that rebates were tied to loyalty (Ex. 3, Spulber Dep. 218:8-17) and could not identify any evidence that Surescripts ever clawed back a rebate, or even had a basis to do so. *Id.* 221:3-12.

## CONCLUSION

For the foregoing reasons, Dr. Spulber's impact and damages opinions fail to meet the threshold requirements of admissibility under Federal Rule of Evidence 702 and *Daubert*, and Defendants respectfully request that they be excluded.


Dated: November 17, 2023

/s/ *Alfred C. Pfeiffer, Jr.*
Alfred C. Pfeiffer, Jr. (CA Bar 120965)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Fax: (415) 395-8095
al.pfeiffer@lw.com

Amanda P. Reeves (*pro hac vice*)
Allyson M. Maltas (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2183
Fax: (202) 637-2201
amanda.reeves@lw.com
allyson.maltas@lw.com

Elyse M. Greenwald (pro hac vice)
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067-6268
Telephone: (424) 653-5500
Fax: (424) 653-5501
elyse.greenwald@lw.com

*Attorneys for Defendant Surescripts, LLC*

*/s/ Katharine M. O'Connor (with consent)*
Katharine M. O'Connor
Joshua W. Eastby
McDermott Will & Emery LLP
444 W. Lake Street, Suite 4000
Chicago, IL 60606
(312) 372-2000
koconnor@mwe.com
jeastby@mwe.com

Joel R. Grosberg
McDermott Will & Emery LLP
500 North Capitol St, NW
Washington, DC 20001
(202) 756-8000
jgrosberg@mwe.com

*Attorneys for Defendant Allscripts
Healthcare Solutions, Inc.*

31

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2023, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all attorneys of record. I also sent a copy of the foregoing to counsel for the parties via email.

/s/ Alfred C. Pfeiffer, Jr.
Alfred C. Pfeiffer, Jr.