**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Class Actions | Civil Action No. 1:19-cv-06627 |

**PLAINTIFFS' THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

### TABLE OF CONTENTS

I.     NATURE OF THE ACTION ............................................................................... 1

II.    JURISDICTION AND VENUE ......................................................................... 6

III.   PARTIES ............................................................................................................ 6

IV.    E-PRESCRIBING INDUSTRY OVERVIEW ................................................. 13

     A.     Incentives to Using E-prescribing.......................................................... 15

     B.     The Chicken-and-Egg Problem............................................................... 17

     C.     PTVs and Software Management Entities In E-Prescription Workflow.............. 19

     D.     PTVs Advance Surescripts's Monopolistic Scheme and Help Restrain Trade .... 25

     E.     Surescripts Views Pharmacies, Not PTVs, as Its Customers................................ 32

V.     SURESCRIPTS FORMATION........................................................................ 35

VI.    ANTICOMPETITIVE CONDUCT ................................................................. 36

     A.     Surescripts Learns of an Emerging Threat to its Monopolies.............................. 37

     B.     Surescripts Blocks Competition and Forecloses the Markets by Spinning a Web of Anticompetitive Exclusive Contracts .................................... 38

     C.     Surescripts Structures Pharmacy, PTV, and Health Plan/PBM Contracts to Foreclose Competition and Punish Disloyalty........................................ 39

     D.     Surescripts Ensures That It Controls the Chicken-and-Egg Problem By Implementing Anticompetitive EHR Contracts.................................... 42

     E.     Surescripts, RelayHealth, and Co-Conspirator PTVs Reject Competition to Join Forces and Share Surescripts's Monopoly Profits................................. 44

     F.     Surescripts Colludes with Critical EHR Allscripts to Crush Routing Competitor Emdeon .................................................................. 52

     G.     Defendants' Scheme Has Succeeded in Excluding All Meaningful Competition From Both Routing and Eligibility ...................................... 58

VII.   MARKET POWER AND MARKET DEFINITION ........................................ 61

VIII.  ANTICOMPETITIVE EFFECTS ON PHARMACIES AND CONSUMERS ................ 63

     A.     Defendants' Misconduct Has Led To Higher Prices for Routing and Eligibility . 67

     B.     Defendants' Misconduct Has Reduced Service Quality and Innovation in Routing And Eligibility ............................................................ 68

     C.     There Is No Legitimate Procompetitive Business Justification For Defendants' Misconduct............................................................. 72

IX.    FRAUDULENT CONCEALMENT TOLLING THE STATUTE OF LIMITATIONS .. 74

X.      ANTITRUST IMPACT AND IMPACT ON INTERSTATE AND INTRASTATE CONDUCT .................................................................................................................. 75

XI.     CLASS ACTION ALLEGATIONS ................................................................................ 75

XII.    CLAIMS FOR RELIEF .................................................................................................. 78

XIII.   DEMAND FOR JUDGMENT ........................................................................................ 92

XIV.    JURY DEMAND ............................................................................................................ 93

Plaintiffs Corner Pharmacy, Summers Pharmacy, Logan Primary Pharmacy, Bartow Pharmacy Medical Supply ("Bartow"), Concord Pharmacy, Whitman Pharmacy, Kennebunk Village Pharmacy, Inc. ("Kennebunk"), and 731 Pharmacy Corp. d/b/a Ivan Pharmacy ("Ivan Pharmacy") bring this class action on behalf of themselves and all others similarly situated against Surescripts, LLC ("Surescripts"), RelayHealth, and Allscripts Healthcare Solutions, Inc. ("Allscripts"). Plaintiffs allege the following based upon personal knowledge, investigation of counsel, information and belief, and Defendants' documents now available to Plaintiffs.

## I. NATURE OF THE ACTION

1. This is an action brought under state antitrust laws as well as Sections 1 and 2 of the federal Sherman Act, 15 U.S.C. §§ 1 & 2, to restrain anticompetitive conduct by Surescripts, the nation's largest provider of "e-prescribing" services, and to remedy the harms of its decade-long anticompetitive scheme.

2. Surescripts possesses monopoly power in two markets: (1) electronic prescription routing and (2) eligibility, collectively known as "e-prescribing" services. "Routing" is the transmission of prescription and prescription-related information from a prescriber (such as a physician) to a pharmacy, like Plaintiffs here. Routing information is transmitted from the prescriber's electronic health record ("EHR") system to the pharmacy's computer database to effectively deliver the "e-prescription" from physician to pharmacy on behalf of a patient. E-prescriptions sent by a prescriber are commonly referred to as being sent from the "EHR." "Eligibility" is the transmission of a patient's formulary and pharmaceutical benefit information from the patient's health care plan (usually the patient's health insurer or pharmacy benefit manager) to a prescriber physician's EHR system.

3.      Despite the explosive growth of routing and eligibility transactions—from nearly 70 million routing transactions in 2008 to more than 1.7 billion in 2017—Surescripts has maintained at least a 95% share, by transaction volume, in both the routing and eligibility markets.  As such, pharmacies have no commercially reasonable alternative to Surescripts for these "e-prescribing" services.  And as a result, Surescripts has been able to charge pharmacies supracompetitive prices for almost ten years.

4.      Surescripts was able to maintain this dominant market position not through competition on the merits but instead through a multifaceted scheme to exclude competitors. Surescripts has taken several anticompetitive steps to ensure that it—and it alone—controls routing service and pricing in the United States.  The goal and effect of Surescripts's overarching scheme was to neutralize actual and nascent competitors before they could undermine Surescripts's ability to charge monopoly prices in the e-prescribing industry.  As a result of Surescripts's unlawfully maintained dominance, pharmacies—such as Plaintiffs here—have been forced to pay considerably more for their routing services than they otherwise would have paid in the presence of lawful competition.

5.      The details of this scheme were first revealed to the public through the Federal Trade Commission lawsuit against Surescripts in the United States District Court for the District of Columbia on May 3, 2019.

6.       There are numerous facets to Surescripts's anticompetitive scheme.  First, Surescripts established pricing protocols that required long-term exclusivity commitments from virtually all its routing and eligibility customers.  These protocols ensured that Surescripts's customers—like Plaintiffs here—would pay a higher price on all Surescripts's transactions unless they were "loyal" to Surescripts, *i.e.*, exclusively used Surescripts for routing and/or

2

eligibility.  With its 95%-plus share of volume in both markets, Surescripts knew that no aspiring

small-volume competitor could ever offer customers low enough prices to offset the exorbitant

punitive prices that those customers would face from Surescripts on the bulk of their transactions

should the customer become "non-loyal."  Surescripts strangled the market with a web of loyalty

contracts that prevented competitors from attaining the critical mass necessary to become viable

competitive threats in routing or eligibility.  Surescripts's loyalty contracts alone effectively

foreclosed at least 70% of each market and eliminated competitive attempts from other

companies that offered lower prices and greater innovation.  When Emdeon (n/k/a eRx

Network), an aspiring competitor, was effectively excluded from the market by the web of

loyalty contracts, one Surescripts vice president even bragged: "It[']s nice when a plan comes

together."  Another executive testified under oath, "[P]ricing isn't dictated by competition at

Surescripts."

7.     Second, Surescripts threatened boycotts against customers and other stakeholders

to ensure that competition remained foreclosed in the routing and eligibility markets.  As one

example, Allscripts, a large EHR customer of Surescripts, attempted to enter into a non-exclusive

agreement with Surescripts in 2014 so Allscripts could use aspiring routing competitor Emdeon,

Surescripts threatened to retroactively charge Allscripts millions in fees for what should have

been a separate free service; it also offered Allscripts increased incentives if Allscripts would

join the monopolization effort.  Allscripts ultimately chose to join the anticompetitive scheme

instead of fighting Surescripts.  Thus, the competitive threat from Emdeon as a routing provider

was eliminated.

8.     Third, faced with imminent competitive risk from RelayHealth, a subsidiary of

McKesson Corporation ("McKesson"), again in the routing market, Surescripts entered into an

agreement with RelayHealth that allowed the horizontal competitors to allocate the market and split monopoly profits instead of competing with each other. Surescripts feared that RelayHealth—backed by the giant McKesson, with its extensive connections to many of the same customers Surescripts wanted to keep locked up in restrictive exclusive contracts—had a "natural ability to capture 15-20% of transaction volume[,]" and competition from RelayHealth would have "dropped the price [for routing] down to 2 or 3 cents at any time."

9.      In 2010, to eliminate the competitive risk from RelayHealth, Surescripts and RelayHealth entered into an agreement that prohibited RelayHealth from competing in the routing market for six years. Although couched as a continuation of the "value-added reseller" relationship between Surescripts and RelayHealth, this agreement was in fact a naked market allocation agreement and agreement not to compete between competitors.[1] In exchange for agreeing to the anticompetitive scheme, RelayHealth received a portion of the supracompetitive routing profits. Surescripts executives repeatedly stated that the sole benefit of the RelayHealth relationship was to sideline RelayHealth as a competitor. Although the formal non-compete is no longer in the agreement, strict contract provisions continue to prevent RelayHealth from competing against Surescripts in routing, ensuring that the routing market still suffers from the effects of that non-compete today.

10.      Due to Defendants' ongoing conduct, there is no meaningful competition in the markets for routing or eligibility. The decade-long monopolies in these markets have produced predictable effects: higher prices, reduced quality, stifled innovation, suppressed output, and stymied alternative business models. Surescripts has admitted that competitive prices in the

---

[1] Though contractually conceptualized as a Surescripts "reseller," RelayHealth does not actually receive any "product" to resell; pursuant to its agreement with Surescripts, it simply markets and sells Surescripts routing connectivity to pharmacies and PTVs under its own name.

routing market would be between *1 and 3 cents* a transaction. But pharmacies, like Plaintiffs here, typically have paid at least *17 cents* per routing transaction under Surescripts's monopolistic regime. Using Surescripts's own numbers, revealed by the Federal Trade Commission investigation, Plaintiffs have paid, and continue to pay, routing prices that are inflated by *at least 566-1700%* due to Defendants' anticompetitive conduct.

11. These pennies add up for independent pharmacies like Plaintiffs and the members of the Class. In 2013, 1 billion new and refill prescriptions were routed to pharmacies electronically. In 2018, Surescripts claims it processed 1.9 billion e-prescriptions alone.[2] Over a decade, that is *billions* of overcharge transactions and supracompetitive prices charged to pharmacies that are trying to deliver timely, quality medicine to consumers nationwide. Small business community pharmacies, like Plaintiffs, now number around 21,000 in the United States but that number has been decreasing as pharmacies face increased financial pressure. Approximately 1,800 rural independent pharmacies serve as the only pharmacy provider in their community. Margins for these pharmacies are often razor thin and anticompetitive conduct like that alleged here can mean the difference between life and death as a business. Defendants' conduct injures each and every one of these pharmacies, every day, and makes it that much harder for consumers to find fair prices and accessible quality prescription care.

12. Had Surescripts's 1.9 billion e-prescriptions in 2018 been routed at competitive prices instead of monopoly prices, Plaintiffs and the Class would have saved many millions of dollars in that year alone. And this scheme has been underway for almost a decade.

---

[2] https://surescripts.com/news-center/national-progress-report-2018/

## II.     JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the defendants. The Court further has jurisdiction over this action pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337, as this action also alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, that are actionable under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court also has jurisdiction over the claims under the various state laws under both 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367(a).  Plaintiffs seek damages for their injuries, and those suffered by members of the Class, resulting from Defendants' anticompetitive conduct that inflated the price of e-prescription routing services to pharmacies. Plaintiffs also seek injunctive and equitable relief as is necessary to correct the anticompetitive effects of Defendants' misconduct.

14.     Defendants transact business within this district, and they transact their affairs and carry out interstate trade and commerce, in substantial part, in this district and/or have an agent and/or can be found in this district.  Venue is also appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. §1391(b) and (c) (general venue provisions).

## III.     PARTIES

15.     **Plaintiff** Corner Pharmacy is a pharmacy located at 1701 Alexandria Drive, Suite C, Lexington, KY 40504.  During the relevant period, Corner Pharmacy paid Surescripts e-prescription routing charges.  Surescripts e-prescription routing charges are invoiced by the PTV retained by Corner Pharmacy as a software management system.  During the relevant time period, Corner Pharmacy retained Health Business Systems ("HBS") to manage pharmacy

6

software and aggregate invoices from various electronic data and services sellers, such as Surescripts. Corner Pharmacy can view itemized Surescripts billing by requesting such data from the PTV. For example, an itemized invoice from HBS to Corner Pharmacy is titled "Summary Surescripts Billing (NonTaxable)" and itemizes the date, cost, and number of e-prescriptions billed by Surescripts to Corner Pharmacy on a monthly basis. Corner Pharmacy makes a lump sum payment to its PTV for aggregating the itemized invoiced charges and the PTV, as part of its professional services, passes payment to the individual electronic data and service providers selling to the pharmacy, including to Surescripts. As explained in more detail below, HBS is a co-conspirator and a party to anticompetitive exclusive dealing contracts with Defendant RelayHealth during the Class period, in furtherance of Surescripts's scheme.

16.     **Plaintiff** Summers Pharmacy is a pharmacy located at 605 Pawnee Street, Clinton, MO 64735. During the relevant period, Summers Pharmacy paid Surescripts e-prescription routing charges. Surescripts e-prescription routing charges are invoiced by the PTVs retained by Summers Pharmacy as software management systems. During the relevant time period, Summers Pharmacy retained Computer Rx, and previously Liberty Software, to manage pharmacy software and aggregate invoices from various electronic data and services sellers, such as Surescripts. Itemized invoices Summers Pharmacy receives from Computer Rx detail by quantity, price, and total amount e-prescriptions billed by Surescripts to Summers Pharmacy on a monthly basis. Summers Pharmacy makes a lump sum payment to its PTV for aggregating the itemized invoiced charges and the PTV, as part of its professional services, passes payment to the individual electronic data and service providers selling to the pharmacy, including to Surescripts. As explained in more detail below, Computer Rx is a co-conspirator

and a party to anticompetitive exclusive dealing contracts with Defendant Surescripts during the
Class period, in furtherance of Surescripts's scheme.

17.     **Plaintiff** Logan Primary Pharmacy is a pharmacy located at 401 Rushing Drive,
Herrin, IL 62948.  During the relevant period, Logan Primary Pharmacy paid Surescripts e-
prescription routing charges.  Surescripts e-prescription routing charges are invoiced by the
PTVs retained by Logan Primary Pharmacy as software management systems.  During the
relevant time period, Logan Primary Pharmacy retained HBS Health Business Systems, SXC
Health, OptumRx, RX30, and Pioneer to manage pharmacy software and aggregate invoices
from various electronic data and services sellers, such as Surescripts.  Logan Primary Pharmacy
can view itemized Surescripts billing by requesting such data from the PTV.  For example, an
itemized invoice from HBC to Logan is titled "Summary Surescripts Billing" and itemizes the
date, cost, and number of e-prescriptions billed by Surescripts to Logan Primary Pharmacy on a
monthly basis.  Logan Primary Pharmacy writes a lump check to its PTV for aggregating the
itemized invoiced charges and the PTV, as part of its professional services, passes payment to
the individual electronic data and service providers selling to the pharmacy, including to
Surescripts.  As explained in more detail below, HBS and Rx30 are co-conspirators and parties
to anticompetitive exclusive dealing contracts with Defendant RelayHealth, in furtherance of
Surescripts's scheme.  OptumRx (formerly operating as RxSolutions) and SXC Health are also
co-conspirators and parties to an anticompetitive exclusive dealing contract with Defendant
Surescripts, in furtherance of Surescripts's scheme.

18.     **Plaintiff** Integrated Pharmaceutical Solutions LLC d/b/a Bartow Pharmacy
Medical Supply is a Florida limited liability corporation located at 1478 N. Wilson Avenue,
Bartow, FL 33830.  During the relevant period, Bartow paid Surescripts e-prescription routing

charges. Surescripts e-prescription routing charges are invoiced by the PTVs retained by Bartow Pharmacy as software management systems. During the relevant time period, Bartow Pharmacy retained MicroMerchant Systems, Inc., and previously Abacus, to manage pharmacy software and aggregate invoices from various electronic data and services sellers, such as Surescripts. Itemized invoices Bartow Pharmacy receives from MicroMerchant Systems, Inc., and previously Abacus, detail by quantity, price, and total amount e-prescriptions billed by Surescripts to Bartow Pharmacy on a monthly basis. Bartow Pharmacy makes a lump sum payment to its PTV for aggregating the itemized invoiced charges and the PTV, as part of its professional services, passes payment to the individual electronic data and service providers selling to the pharmacy, including to Surescripts. As explained in more detail below, MicroMerchant is a co-conspirator and a party to anticompetitive exclusive dealing contracts with Defendant RelayHealth, in furtherance of Surescripts's scheme.

19.     **Plaintiff** Concord Pharmacy is a pharmacy located at 10220 Route 60, Fredonia, NY 14063. During the relevant period, Concord Pharmacy paid Surescripts e-prescription routing charges. Surescripts e-prescription routing charges are invoiced by the PTV retained by Concord Pharmacy as a software management system. During the relevant time period, Concord Pharmacy retained Pioneer Rx to manage pharmacy software and aggregate invoices from various electronic data and services sellers, such as Surescripts. Itemized invoices Concord Pharmacy receives from Pioneer Rx detail by quantity, price, and total amount e-prescriptions billed by Surescripts to Concord Pharmacy on a monthly basis. Concord Pharmacy makes a lump sum payment to its PTV for aggregating the itemized invoiced charges and the PTV, as part of its professional services, passes payment to the individual electronic data and service providers selling to the pharmacy, including to Surescripts.

9

20.     **Plaintiff** Jerald Whitman d/b/a Whitman Pharmacy is a pharmacy located at 4950 York Road, Holicong, PA 18928.  During the relevant period, Whitman Pharmacy paid Surescripts e-prescription routing charges.  Surescripts e-prescription routing charges are invoiced by the PTV retained by Whitman Pharmacy as a software management system.  During the relevant time period, Whitman Pharmacy retained QS1 to manage pharmacy software and aggregate invoices from various electronic data and services sellers, such as Surescripts. Itemized invoices Whitman Pharmacy receives from QS1 detail by quantity, price, and total amount e-prescriptions billed by Surescripts to Whitman Pharmacy on a monthly basis. Whitman Pharmacy makes a lump sum payment to its PTV for aggregating the itemized invoiced charges and the PTV, as part of its professional services, passes payment to the individual electronic data and service providers selling to the pharmacy, including to Surescripts.  As explained in more detail below, QS1 is a co-conspirator and party to an anticompetitive exclusive dealing contract with Defendant Surescripts, in furtherance of Surescripts's scheme.

21.     **Plaintiff** Kennebunk Village Pharmacy, Inc. was a pharmacy located at 18 Blue Wave Professional Center, Kennebunk, ME 04043.  During the relevant period, Kennebunk paid Surescripts e-prescription routing charges.  Surescripts e-prescription routing charges were invoiced by the PTV retained by Kennebunk Village Pharmacy as a software management system.  During the relevant time period, Kennebunk Village Pharmacy retained McKesson Pharmacy Systems to manage pharmacy software and aggregate invoices from various electronic data and services sellers, such as Surescripts.  Itemized invoices Kennebunk Village Pharmacy received from McKesson Pharmacy Systems detail by quantity, price, and total amount e-prescriptions billed by Surescripts to Kennebunk Village Pharmacy on a monthly basis. Kennebunk Village Pharmacy made a lump sum payment to its PTV for aggregating the itemized

invoiced charges and the PTV, as part of its professional services, passed payment to the individual electronic data and service providers selling to the pharmacy, including to Surescripts. As detailed further below, McKesson Pharmacy Systems is a co-conspirator and party to an anticompetitive exclusive dealing contract with Defendant RelayHealth, in furtherance of Surescripts's scheme.

22.     **Plaintiff** 731 Pharmacy Corp. d/b/a Ivan Pharmacy is a pharmacy located at 691 Columbus Avenue, New York, NY 10025. During the relevant period, Ivan Pharmacy paid Surescripts e-prescription routing charges.  Surescripts e-prescription routing charges are invoiced by the PTV retained by Ivan Pharmacy as a software management system.  During the relevant time period, Ivan Pharmacy retained MicroMerchant Systems to manage pharmacy software and aggregate invoices from various electronic data and services sellers, such as Surescripts.  Itemized invoices Ivan Pharmacy receives from MicroMerchant Systems detail by quantity, price, and total amount e-prescriptions billed by Surescripts to Ivan Pharmacy on a monthly basis.  Ivan Pharmacy makes a lump sum payment to its PTV for aggregating the itemized invoiced charges and the PTV, as part of its professional services, passes payment to the individual electronic data and service providers selling to the pharmacy, including to Surescripts.  As explained in more detail below, MicroMerchant is a co-conspirator and party to an anticompetitive exclusive dealing contract with Defendant RelayHealth, in furtherance of Surescripts's scheme.

23.     **Defendant** Surescripts is a for-profit Delaware limited liability company, with its principal place of business at 2800 Crystal Drive, Arlington, VA 22202.  Except where otherwise specified, "Surescripts" refers to Surescripts, LLC and all corporate predecessors, subsidiaries, successors, and affiliates.

11

24.     **Defendant** RelayHealth is a corporation organized under the laws of the State of Delaware, with its principal place of business at 561145 Sanctuary Parkway, Alpharetta, GA 30009.  RelayHealth, a division of McKesson Technologies Inc., is a wholly-owned subsidiary of McKesson Corporation.

25.     **Defendant** Allscripts Healthcare Solutions, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 222 Merchandise Mart Plaza, Suite 2024, Chicago, IL 60654.  Except where otherwise specified, "Allscripts" refers to Allscripts Healthcare Solutions, Inc. and all corporate predecessors, subsidiaries, successors, and affiliates.

26.     **Pharmacy Technology Vendors/Aggregators:** Pharmacy technology vendors/aggregators ("PTVs") provide pharmacies with pharmacy software and computer technology that facilitates a pharmacy's connection to the Surescripts routing system, other claims adjudication services, eligibility and benefit network messaging, and clinical messaging systems (among other things).  PTVs design the software gateways that allow pharmacies to access and use Surescripts routing.  Pharmacies, including named Plaintiffs here, typically pay for Surescripts e-prescription routing through PTVs that aggregate bills from myriad pharmacy service providers and present the pharmacy with an itemized lump sum invoice.

27.     In addition to providing access to the Surescripts network, PTVs provide pharmacies with several additional practice-based services and solutions.  The services provided by PTVs include, among others things, pharmacy management software (such as automated prescription processing and claims management), real-time inventory tracking and order management, payment reconciliation, fully integrated point-of-sale software, electronic vouchers for patients with high out-of-pocket costs, data conversion and storage, and mobile applications

designed to encourage patient engagement (including prompt pick up reminders, medication adherence reminders, patient refill requests, and delivery options). PTVs are paid by pharmacies for providing these important pharmacy management services. As described in detail below, some PTVs entered into anticompetitive exclusive dealing contracts with Surescripts that entitle them to receive "loyalty" payments from Surescripts for their loyalty to the Surescripts network for e-prescription routing.

28. Surescripts refers to PTVs as "aggregators" because PTVs (i) "aggregate" Surescripts's customers—pharmacies on the buy side of the routing market and prescribers/EHRs on the sell side of the e-prescription routing market—and (ii) assist Surescripts with logistics such as bill collection, loyalty monitoring, and data aggregation. Unlike a "value-added reseller," like RelayHealth, PTVs do not contract with Surescripts for an independent right to "resell" Surescripts's routing connectivity; they contract with Surescripts and RelayHealth on behalf of and for the benefit of pharmacies. As alleged in detail below, PTVs—including those retained by the Plaintiffs—have entered into anticompetitive agreements with Surescripts and RelayHealth to maintain and extend Surescripts's monopoly in return for a share of the profits.

## IV.    E-PRESCRIBING INDUSTRY OVERVIEW

29. E-prescribing is the computer-based electronic transfer of prescription data between prescribers (usually through the prescriber's EHR vendor), pharmacies, and payers. "Payers" are typically health insurers or health plans (though the term often includes Pharmacy Benefit Managers ("PBMs") that act as administrative intermediaries for health insurers/plans). E-prescribing includes the electronic generation and transmission of new prescriptions, messages regarding prescription changes, refill requests, prescription fill status notification, prescription cancellations, and medication history.

13

30.    E-prescribing is intended to provide a safe and secure platform that improves the standard of care, increases administrative efficiency, and reduces medication errors.  It essentially replaces the pen and pad prescription method.  Cost savings due to improved patient outcomes and decreased patient visits are estimated to be between $140 billion and $240 billion over 10 years.[3]

31.    There are two key components to e-prescribing: routing and eligibility.  Routing is the transmission of prescription and prescription-related information between the prescriber's EHR and a pharmacy.  Routing communications also include the transmission of a pharmacy's request to a prescriber's EHR for a refill of a patient's prescription.  Electronically sending and receiving prescriptions has streamlined the clinical practice workflow, which has increased levels of patient satisfaction and compliance, while simultaneously reducing paperwork and the associated mistakes that may occur from reliance on handwritten notes.  This change has produced time and cost savings for all parties involved.[4]

32.    Eligibility is the transmission of a patient's formulary and benefit information from a PBM to a prescriber's EHR prior to the patient's appointment.  This information allows a prescriber to know, for example, which drugs are covered under the patient's drug benefit plan, the location of covered drugs on the patient's health insurance formulary, and what copay (if any) the patient will have to pay to obtain the prescribed drug.  On the pharmacy side, eligibility is the process beyond receiving the prescription to transmitting claims to payers and obtaining adjudication so that copayments and deductibles can be calculated and collected.

---

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3995494/
[4] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3995494/

14

33. Although these routing and eligibility services are usually provided together in the same prescribing workflow, each transaction serves a different purpose, delivers different information, and occurs between different customers.

34. Each routing and eligibility transaction is governed by its own industry-wide standard created by the National Council for Prescription Drug Programs ("NCPDP"). There is no patent or other intellectual property protection for either the routing or the eligibility transactions.

A. **Incentives to Using E-Prescribing**

35. E-prescribing became legal nationwide in 2007, but it initially experienced only limited adoption among prescribers and related stakeholders. In 2008, however, Congress sought to speed up the process and passed two pieces of legislation designed to encourage the expansion of e-prescribing and its attendant benefits.

36. On July 15, 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"). Through regulations implemented by the Centers for Medicare and Medicaid Services ("CMS"), MIPPA adopted a carrot-and-stick incentive program to encourage prescribers to e-prescribe. As the carrot, MIPPA provided financial incentives to prescribers who adopted e-prescribing in the form of a Medicare reimbursement bonus based on the prescriber's total charges for professional services to Medicare and Medicaid. As the stick, MIPPA established penalties in the form of reduced Medicare and Medicaid reimbursements to prescribers who were not "successful electronic prescriber[s]." To be considered a successful electronic prescriber under MIPPA, a prescriber must use an EHR that, among other things, allows the prescriber to obtain eligibility information and "electronically transmit prescriptions" for a specified percentage of total prescriptions.

15

37.     On February 17, 2009, Congress passed the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), which further expanded the regulatory regime CMS had implemented to increase e-prescribing.  The HITECH Act encourages the "meaningful use" of EHRs throughout the United States.  It does so by authorizing carrot-and-stick financial incentives and payment reductions to prescribers depending on whether they "meaningfully used" EHR technology.

38.     The purpose of meaningful use is to use technology to coordinate and improve patient care.  The ability to generate and transmit prescription information electronically is critical to the meaningful use mandate.  To prescribe electronically—and thus obtain the financial incentives and later avoid penalties—prescribers (via their EHRs) need to connect to pharmacies and Health Plans/PBMs.  Therefore, e-prescribing is a way of using EHRs meaningfully because the technology is used to enhance the quality of patient care.

39.     The financial incentives provided by MIPPA and the HITECH Act effectively encouraged prescribers to trade in their paper-based systems for the electronic transmission of prescription data.  Through today, CMS has paid out over $38 billion in meaningful use financial incentives, which does not account for the effect of the potential penalties.

40.     From 2008 to 2016, the number of routing and eligibility transactions increased over 23-fold, from 147 million to over 3 billion, and the percentage of U.S. physicians e-prescribing increased to nearly 70%.  In 2017, 77% of all prescriptions were delivered electronically.

41.     This growth was primarily driven by MIPPA and the HITECH Act.  Surescripts agrees, writing in 2014: "We believe the dramatic growth in adoption and use [of e-prescribing] is a function of the combined forces of federal financial incentives and an aggressive response by

16

the technology sector." As Surescripts's former CEO Harry Totonis testified, "[M]eaningful use totally helped e-prescribing happen."

42. Due to the nature of the marketplace, Surescripts has been able to entrench its position and foreclose potential competition.

**B.** **The Chicken-and-Egg Problem**

43. A company in a two-sided market with network effects must coordinate two distinct groups of users to provide value to either group. In other words, users on one side of the network will find it useful and join only if users on the other side also join. The value to participants on one side of the platform increases with each additional participant on the other side. And neither side will join if they do not believe users on the other side will join as well. Thus, many companies seeking to innovate or enter into a two-sided market, such as the e-prescribing market, experience a problem of multi-party coordination referred to as the "chicken and the egg" problem.

44. For routing, an e-prescribing platform needs physicians on one side of the platform to utilize their routing services and send prescriptions electronically to pharmacies, and it also needs pharmacies on the other side to accept routing information from the prescribing physicians. Providing routing thus requires building a network linking EHRs/physicians to pharmacies. Without a supply of physicians to route prescriptions, there is no benefit to pharmacies to join the platform; without pharmacies electronically accepting their prescriptions, there is no value to the prescribers to join.

45. Pharmacies get more value from a network that connects to more EHRs/physicians because there is a greater supply of prescribers that can send patients to those pharmacies to purchase prescribed drugs. And EHRs/physicians get more value from a network

17

that connects to more pharmacies because prescribers can send prescriptions to more pharmacies, which increases the likelihood that patients will be able to use their preferred pharmacy.

46.     On the eligibility end, providing eligibility requires building a network (or platform) linking EHRs/physicians to Health Plans/PBMs ("Payers").  Payers get more value from a network that connects more EHRs/physicians, as the increased distribution of a Payer's formulary and benefit information helps more prescribers prescribe on-formulary drugs and thereby saves Health Plans/PBMs more money.  And the EHRs/physicians get more value from a network that connects to more Health Plans/PBMs because EHRs/physicians are able to obtain more complete insurance benefit information, such as for those patients who have multiple insurers.

47.     Creating viable routing and eligibility networks requires a company to solve the chicken-and-egg problem by providing sufficient value to both sides of the platforms. Economists recognize that to solve the chicken-and-egg problem networks must get a "critical mass" of customers on both sides to sign up.

48.     A new platform can achieve critical mass either by obtaining customers who have not signed on to any platform or by obtaining customers from an existing platform.  Customers of an existing platform face less cost and risk when they can use both their current platform and the new platform.  Economists refer to the use of more than one platform simultaneously as "multihoming."  Multihoming is common, and new platforms routinely rely on multihoming to enter and compete with existing platforms.  Put simply, having a choice of suppliers leads to lower costs and increased product quality for customers.

49.     If a company cannot achieve critical mass on both sides of the platform due to, for example, contractual prohibitions against multihoming, then it is unlikely to establish a viable

18

platform. The platform would offer only limited value to potential users that may not be worth the investment to join. Once established, however, companies operating in two-sided markets are protected by high barriers to entry that can be used to stifle nascent competitors.

### C. PTVs and Software Management Entities in E-Prescription Workflow

50.     Surescripts describes itself as the "pipeline" for e-prescriptions. It provides the network infrastructure that connects prescribers with pharmacies. The Surescripts network allows prescribers to send prescriptions electronically to the computer system at the pharmacy of the patient's choice. To gain access to the Surescripts network, pharmacies generally obtain the necessary software applications from PTVs.

51.     To gain access to the Surescripts network, pharmacies may only use PTVs that are certified by Surescripts for e-prescription services. In addition to facilitating access to the Surescripts network, PTVs offer pharmacies other business services such as appointment and scheduling management and patient billing functions.

52.     PTVs provide pharmacies the gateway to the Surescripts network. Once connected to the network, pharmacies can receive e-prescriptions from participating physicians and send refill requests. Surescripts describes the e-prescription workflow for a new prescription as follows:

- The prescriber initiates a new prescription for a patient via the prescriber system;
- The prescriber system successfully transmits the new prescription to Surescripts;
- Surescripts validates the message;
- Surescripts utilizes the pharmacy identifier and routes the message appropriately; and
- The pharmacy validates the prescription requests.

53.     The e-prescription workflow is represented graphically by Surescripts as follows:



54.     As shown above, the e-prescription is routed from the prescriber's software system to the Surescripts network and directly to the patient's pharmacy.

55.     Similarly, Surescripts's "E-prescribing Transaction Workflow" charts correctly show the PTV ███████████████████████████████



56.     The pharmacy's connectivity to the network is established through the PTV, but the pharmacy is the sole recipient of the e-prescription.  The PTV does not buy, sell, modify, re-direct, or take possession of the e-prescription at any point between the prescriber's transmission of the e-prescription and receipt by the patient's chosen pharmacy.

57.     Because the e-prescription network is designed to connect prescribers with a patient's chosen pharmacy, Surescripts considers the pharmacy, not the PTV, to be its customer.  And Surescripts maintains a directory of all of its pharmacy customers.  It is the pharmacy that, through invoices issued by its PTVs, pays for e-prescriptions routing on a per-transaction basis.  As Surescripts has stated when describing ███████████████████████ ████████████████████████████████████████ Put

21

simply by ███████████████████████████████████████████████
████████████████████████

58.     Surescripts's business relationships with its PTVs reflect this market reality. PTVs contract on behalf of pharmacies with Surescripts so that pharmacies may connect to the Surescripts network to receive e-prescriptions.

59.     The purpose and effect of Surescripts's agreements with PTVs is to provide access to the e-prescription network for the pharmacies that are charged and pay for e-prescription transactions.  To the extent that PTVs charge pharmacies amounts above and beyond what Surescripts charges for routing, those charges are for additional services that PTVs provide (such as developing and updating software, and the administrative task of aggregating invoices into a single itemized bill).  Non-pharmacy entities (such as PTVs) do not control Surescripts's charges; PTVs itemize those charges as Surescripts charges and e-prescription charges are contractually controlled by Surescripts.

60.     In addition to designing the software gateways that provide access to the Surescripts network, PTVs also act as bill collectors for Surescripts.  Pharmacies receive itemized invoices from their PTVs that identify the Surescripts routing transactions and the Surescripts charges and other charges the pharmacies received over the billing cycle.

61.     Similar to a credit card statement, the PTVs' invoice identifies the entity from which the purchase was made (Surescripts), the quantity purchased, and the purchase price.  Any charge in excess of the retail e-prescription price is remitted to the PTV for providing the pharmacy with the software and services to access to the Surescripts network as well as other PTV software management services.  For example, TDS (d/b/a Rx30) is a very large PTV (retained by numerous Plaintiffs here) and its support agreement welcome package expressly

22

notes that Surescripts charges are "billed separately" in order to highlight for the pharmacy that Surescripts charges are *from* Surescripts, not the PTV:

| 28 | 1 | Surescript E-Prescription Set Up - No Charge<br>(Surescripts are billed at 18 cents per script - Billed Separately.) | | $0.00 | $0.00 |

62. When a pharmacy wants to change PTVs, it fills out a form directly from Surescripts called a Pharmacy Vendor Release Form. This form—which is universal for Surescripts's pharmacy customers—sets up the logistics for pharmacy access to the Surescripts network (i.e., it establishes a customer number and proper contact information for the pharmacy). Recognizing the distinction between PTVs and Surescripts as different types of business entities, Surescripts expressly writes on that form: "Surescripts is NOT a software vendor."

63. Since at least 2013, Surescripts has administered a rebate program for pharmacies. The rebate program further demonstrates the relationship between Surescripts and its pharmacy customers. Pursuant to the program, Surescripts issues rebate checks directly to all participating pharmacies. Below is a cover letter accompanying a recent rebate check sent to Plaintiff Whitman Pharmacy as part of Surescripts's rebate program.

23



2800 Crystal Drive
Arlington, VA 22202

## Surescripts 2019
## **Rebate Payment**

NCPDP ███████

WHITMAN PHARMACY
PO BOX 299
HOLICONG, PA 18928

Dear Valued Independent Pharmacy Partner:

We are pleased to provide your 2019 Surescripts E-Prescribing rebate check below. With the support of the National
Community Pharmacy Association (NCPA) and the National Association of Chain Drug Stores (NACDS), our rebate program is
part of our commitment to continually **reduce the cost and improve the quality of e-prescribing.**

**Lower Cost Prescribing:** This rebate is distributed equally to all retail pharmacies based on utilization of Surescripts
E-Prescribing services. Since 2009, Surescripts has lowered average e-prescribing transaction fees by 69%. This includes a
32% decrease in gross unit price from 2009 to 2014 and a 37% decrease from the rebate program that went into effect in 2015.
Those fee reductions are being sent to you today in the form of the attached check, so **please be sure to cash it promptly.**

**Better Quality Prescriptions:** Since 2016, Surescripts has worked across the Network Alliance to improve our Quality
Index Score for e-prescriptions by 80%, which translates to less time your pharmacists spend out of workflow verifying a
prescription. We are also leading the industry's transition to NCPDP's new version of the SCRIPT e-prescribing standard, with
95% of pharmacies already migrated. And importantly, we have seen a significant increase in prescriber adoption of CancelRx,
which allows them to instruct pharmacies to cancel prescriptions, and nearly 50% of prescribers are enabled to electronically
prescribe controlled substances.

Thank you for being an engaged and collaborative participant in the Surescripts Network Alliance. We look forward to
continuing to help you serve patients by driving even more improvements in the quality, utility and efficiency of e-prescribing.
If you have any questions, please contact us at rebate@surescripts.com.

Sincerely,
Tom Skelton, CEO

64.    The 2013 rebate program implemented a ████████████ rebate for

pharmacies. One stated purpose and objective of the rebate program was █████████

████████████████████████████████████████████████████████████

███████████████████████

65.    Surescripts's stated preference was ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Upon information and belief, all named Plaintiffs received rebates directly from Surescripts. Powell Pharmacy even received a letter from Surescripts CEO Tom Skelton providing a list of ways Surescripts promised to "continue to deliver value to our pharmacy partners[.]"

**D. PTVs Advance Surescripts's Monopolistic Scheme and Help Restrain Trade**

66.     While PTVs serve an important purpose to pharmacies by providing logistic software support for an increasingly online business space, they are not e-prescription purchasers or brokers. In fact, Surescripts uses PTVs to further its monopolization of the e-prescription routing market. Through a "loyalty" program described in more detail below, Surescripts pays PTVs to ensure that 100 percent of routing transactions go through the Surescripts network.

67.     The standard template Surescripts ████████████████ Agreement offers both carrot and stick to the PTVs to act as cat's-paws supporting Surescripts's chokehold on the e-prescription market. The "Loyalty" provision provides a carrot: ████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████████

68.     This loyalty "discount" is a direct payment from Surescripts to PTVs joining the ████████████████ Agreement to ensure the PTVs remain loyal and serve to enforce Surescripts's monopoly position. As the Chief Administrative and Legal Officer of Surescripts, Paul Uhrig, described the ████████████████ Agreement in relation to ████, a PTV that Surescripts was trying to enlist in the conspiracy: ████████████████████████

████████████████████████████████

69.     The payment from Surescripts to a PTV typically averages at least ███████ per prescription, which is more than the entire e-prescription routing charge would be in a competitive electronic routing market.

70.     As a stick, Surescripts includes a "Loyalty Compliance" provision that ████████ ████████████████████████████████████████████████████████ ███████  Since PTVs only aggregate routing charges that pharmacies pay themselves, this ███████ provision amounts to a naked out-of-pocket penalty threat to any PTV that dares to leave the conspiracy and facilitate e-prescription routing through a network other than Surescripts.

71.     All PTVs that entered into anticompetitive exclusive dealing contracts with Surescripts, like the ████████████████ Agreement detailed herein, actively, voluntarily, and effectively advanced (jointly and independently) Surescripts's monopoly over e-prescription routing and eligibility.

72.     In a competitive market with more than one routing provider, it would be against each PTV's individual self-interest to agree to a Surescripts exclusive dealing loyalty agreement *unless* the vast majority of other PTVs also entered into the same type of contract.  In the competitive world that existed when Emdeon emerged and tried to compete with Surescripts (see detail below), it was contrary to any PTV's independent self-interest to lock itself into an exclusive deal with Surescripts at higher prices when Emdeon offered lower e-prescription routing prices (and thus the opportunity for a PTV to advertise the availability of lower prices to pharmacies), better customer service, and innovative partnerships…*unless* almost all other PTVs decided to go along with Surescripts's exclusivity and boycotting scheme.

26

73. Indeed, when Surescripts first began to weave its web of exclusive dealing contracts and bring PTVs into the conspiracy, it met resistance among some PTVs that were working with Emdeon and keeping competition alive. In emails discussing a ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Agreement draft between Surescripts and ▮▮▮—a PTV that used Emdeon for routing—Chief Administrative and Legal Officer, Mr. Uhrig, said he had to ▮▮▮▮▮ ▮▮▮▮▮▮▮ According to Uhrig, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

74. In preparing for their pitch to ▮▮, Surescripts's Chief Product Officer, Mike Pritts, explained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

75. ▮▮ did not join Surescripts, but most PTVs did—the anticompetitive pitch is perfectly summed up ▮▮▮▮▮▮▮▮▮—Surescripts and the PTVs picked up larger margins and greater supracompetitive profits (at the expense of pharmacies, and any aspiring routing competitor)—they just had to join together to protect Surescripts's monopoly. ▮▮▮ ▮▮▮ came with losses for payers—Plaintiffs and the Class here.

76. ▮▮ stayed with Emdeon, but as explained below, Emdeon was effectively pushed out of the routing market because, unlike ▮▮, most PTVs agreed to join the conspiracy and maintain Surescripts's monopoly in return for a share of the profits.

77. The scheme works because a substantial number of PTVs agreed to exclusive dealing contracts with Surescripts, which has allowed them all to enjoy monopoly profits in the form of "loyalty" payments. PTVs can police the conspiracy by verifying which of their competitors are working through Surescripts's publicly posted list of "certified vendors."

Furthermore, it is widely known that Surescripts uses a standard contract template that includes the anticompetitive exclusive dealing provisions.  In fact, the terms of Surescripts's ████████ ████████████ Agreement are so widely known in the industry that ████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ As a result, PTVs know that, if a competitor is listed as a Surescripts certified vendor, the competitor has agreed to the same exclusive dealing provisions.

78.     Surescripts's ████████████████████ Agreement is intended to and does incentivize PTVs' stake in maintaining Surescripts's e-prescription routing monopoly.  As long as all or virtually all PTVs adhere to the anticompetitive ██████████████████ Agreement, no e-prescription routing competition can emerge and no "renegade" PTV can gain an upper hand competitively on its fellow PTVs by signing up with a cheaper routing provider. It costs nothing to the PTVs to help maintain Surescripts's monopoly because pharmacies are the entities actually paying the e-prescription routing charges.  And while costing nothing to the PTVs, they earn millions of dollars for supporting the conspiracy—millions of dollars in "loyalty" payments.

79.     Surescripts dictates that any PTV using its system must provide pharmacies with prescribing software that has been certified by Surescripts prior to use.

80.     The role of the PTVs that Plaintiffs dealt with was to facilitate a transaction between Surescripts and Plaintiffs.  In that role as facilitator, all PTVs that joined the standard ████████████████████ Agreement with an enforced loyalty provision also helped further Surescripts's monopoly and restrained trade in the e-prescription routing market.  PTVs ██████ ████████████████████████████████████████████████████████████████████████████████

28

████████████████████████████████████████████ have joined ██████████

█████████████ Agreements or similar contracts with Surescripts that contain anticompetitive

exclusive dealing "loyalty" clauses.

81.    In 2015, ████ entered into a contract with Surescripts in which it agreed to

designate Surescripts as its "preferred vendor" for e-prescription routing. ████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Pursuant to the 2015 contract, ████ agreed

to route e-prescriptions through Surescripts whenever there was a choice between Surescripts

and a different e-prescription network.  In return, Surescripts paid █████████████ per

routed prescription.   This agreement achieved Surescripts's goal of ensuring that ████ would

behave similar to those that receive a loyalty rate.  The "preferred vendor" provision therefore

operated as *de facto* loyalty provision, which encouraged exclusive use of Surescripts's e-

prescription network in return for a share of the monopoly profits. ████ was a former PTV for

█████████████ during the relevant time period and is currently the PTV for ██████████

██████████

82.    In June 2010 ████████████████████████ entered into a contract with

Surescripts in which it agreed to route all e-prescriptions through Surescripts.  In return, it would

receive between ██████████████ per routed prescription in loyalty "discounts." ██████████

was a former PTV for █████████████ during the relevant time period.

83.    In September 2010, █████████████ entered into a contract with Surescripts in

which it agreed to route all e-prescriptions through Surescripts.  In return, it would receive a ████

███ per routed prescription. ██████████ is a current PTV for ████████████████

███████

84. In 2009, PTV █████████████████████ signed an amendment to its original ██████████ agreement with RelayHealth—which operated as a co-conspirator "reseller" of Surescripts's routing—and ██████ agreed to route at least ██████ of routing prescriptions through the RelayHealth/Surescripts regime. In 2012, the agreement was further amended and ██████ agreed to continue to route 90% of prescriptions through the Surescripts network. In return, ██████ would receive from Surescripts ██████ per routed prescription. In 2015, the agreement was amended again. For ██████ continued loyalty, it would receive an additional ██████ per routed prescription from the 2012 rate. ██████ was a former PTV for ████████ during the relevant time period, and it is the current PTV for █████████████

85. In 2015, if not earlier, PTV ████████████ entered into an agreement with co-conspirator RelayHealth to ensure 100% loyalty to the RelayHealth/Surescripts routing regime. In return, ██████ would receive from Surescripts ██████ per routed prescription. ██████████ is a former PTV for ████████████ during the relevant time period and it is a current PTV for ████████████ Pursuant to the same anticompetitive contract and conspiracy, ██████ also does business as ████████████ and is a current PTV for ████████████████

86. In 2013-14, ██████ negotiated with Surescripts for a routing contract and the parties worked intensely to determine the contours of ██████████████████ In February 2015, ██████ entered into an agreement with Surescripts to ensure 100% of prescriptions from ████████████████ would be routed to pharmacies through Surescripts. In return, ██████ would receive from Surescripts between ██████████████ per prescription routed. Upon

information and belief, ██████ agreed that all e-prescriptions routed for its customers—██████
█████████████—would go through Surescripts or Surescripts via RelayHealth.

87.     In September 2010, ████████████████ signed an amendment to an earlier
██████████████████ Agreement and ████████ agreed that it would route 100% of
all prescriptions through the Surescripts network.  In return, it would receive a ████████ per
routed transaction.  ████████████ is the current PTV for ██████████████.

88.     ███████████████████ is a subsidiary of █████████████████████
████████, and has throughout the relevant time period maintained exclusive dealing contracts
requiring 100% of prescriptions be routed through RelayHealth and Surescripts.  For example, in
March 2013, ██████████████████ was party to an agreement between RelayHealth,
██████████████████████ which required ███████████████████
██████████████████████████████████
███████████████████████ In return, █████████████████
would pocket a full ████████████████████████████
████████ In 2015, ████████ further confirmed the loyalty agreement by signing another
contract with RelayHealth that acknowledged ███████████████████████
████████████████████████ For its
continued loyalty, ████████ continued to receive ████████████████████
████████████████████████████ was the PTV for
█████████████████ during the Relevant Period.

89.     While Plaintiffs do not yet have access to all of Surescripts's ████████
██████████ Agreements—and thus cannot identify every specific contract and co-
conspirator PTV—Surescripts's documents show that the ████████████████

31

Agreement is a universal template used for all pharmacies. As Associate Counsel for

Surescripts, Kristin Hall, explained to her colleagues:



Later in her email, Ms. Hall notes that ███████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

90.     Upon information and belief, all or virtually all ██████████████████

Agreements between Surescripts and PTVs include anticompetitive exclusive dealing provisions

and all or virtually all PTVs facilitating e-prescription routing have signed a Surescripts

██████████████████ Agreement or a similar anticompetitive Surescripts contract.

91.     In paying their individual PTV for invoiced Surescripts e-prescription charges,

each named Plaintiff in this case was paying an identified co-conspirator PTV that was party to

Surescripts's anticompetitive scheme and party to an unlawful, Surescripts-led, exclusive dealing

boycott in the e-prescription routing market.

**E.  Surescripts Views Pharmacies, Not PTVs, as Its Customers.**

92.     While using PTVs as a tool for monopoly control, Surescripts views pharmacies

as its customers and it views the economic flow of payment as between Surescripts and

pharmacies. As a July 2012 Surescripts letter ███████████████████ begins:



93.     Surescripts, not the PTVs, is responsible for refunding pharmacies for duplicate transactions.  Surescripts's initial proposal for fixing the problem of duplicate prescriptions billed to a pharmacy was simple, and conceded that the economic reality is that ████████

94.     ████████████████████████████████████████████████████████

95.     Surescripts's direct connections with pharmacies are more than economic, they are also contractual.  Surescripts's ████████████████ Agreement requires *pharmacies*—though they are not direct signatories—████████████████████

96.     Surescripts also retains the right to ████████████████████

33

97.     Surescripts also claims the rights ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████     Surescripts retains a unilateral right to ████████████████████

██████████████████████

98.     Surescripts's ████████████████████████████ testified under oath

██████████████████████



99.     In fact, ████████████ repeatedly testified ██████████████████████

██████████████

• ████████████████████████████████████████████
  ████████████████████████

• ████████████████████████████████████████████
  ██████████████████████████████████████████████
  ██████████████████████████████████████████████
  ████████████

## V.    SURESCRIPTS FORMATION

100.    Surescripts, LLC was formed on May 9, 2008, through a cashless merger of two companies: RxHub LLC ("RxHub") and SureScripts Systems, Inc. ("SureScripts Systems").

101.    RxHub was the first major eligibility network.  It was formed by three PBMs in February 2001—CVS Caremark Corp., Express Scripts, and Medco Health Solutions—to deliver drug-benefit information to prescribers at the point-of-care.[5]

102.    Six months later, in response to RxHub's formation, two pharmacy trade groups formed SureScripts Systems.  SureScripts Systems primarily focused on routing.

103.    As a result of the merger, Surescripts possessed at least 95% of the routing market (by transaction volume) and at least 95% of the eligibility market (by transaction volume).  The merger created an e-prescribing network that controlled the flow of drug information from the point-of-care to a patient's pharmacy.  As RxHub's CEO said at the time, "We're bringing together two halves of the same whole."[6]

104.    Surescripts is currently owned by CVS Health ("CVS") (17%) (a pharmacy and PBM), Express Scripts (33%) (a PBM), the National Association of Chain Drug Stores (25%) (a trade association), and the National Community Pharmacists Association (25%) (a trade association).

105.    Surescripts provides connections between EHRs, pharmacies, and Health Plans/PBMs for routing and eligibility.

106.    Surescripts and RelayHealth charge pharmacies an itemized fee for each routing transaction.  For instance, Plaintiffs Corner Pharmacy, Summers Pharmacy, Logan Primary

---

[5] https://www.modernhealthcare.com/article/20080701/NEWS/951955186/surescripts-rxhub-merge-in-cashless-deal
[6] https://www.modernhealthcare.com/article/20080701/NEWS/951955186/surescripts-rxhub-merge-in-cashless-deal

Pharmacy, Bartow, Concord Pharmacy, Whitman Pharmacy, and Kennebunk Village Pharmacy are charged 18, 19, 16.5, 19, 18, 18.5, 18.5, and 18.9 cents per routing prescription, respectively. Plaintiffs cannot and do not recoup supracompetitive Surescripts routing charges; drug prices are set by PBMs and Health Plans, not pharmacies.

## VI.  ANTICOMPETITIVE CONDUCT

107.   Given its market dominance, nearly all routing and eligibility customers use Surescripts's platform, so aspiring competitors must compete for customers already using Surescripts's routing and eligibility platforms.  Because customers often prefer to avoid the cost and risk of a complete switch to an entrant, the entrant is most likely to win business through multihoming.  Customers want to multihome because it encourages price competition and innovation in e-prescribing.

108.   Surescripts intentionally set out to substantially increase all routing and eligibility customers' costs to multihome, significantly elevating the barriers to obtaining the critical mass a Surescripts competitor would need to achieve to become a viable network in either routing or eligibility.  Absent Surescripts's conduct, entrants in routing and/or eligibility would have used multihoming to overcome the chicken-and-egg entry barrier through normal, market-based competition on price and merits.

109.   In 2009, Surescripts, with its extensive connectivity to e-prescribing stakeholders, was well positioned to benefit from the enormous growth in routing and eligibility catalyzed by MIPPA, the HITECH Act, CMS regulations, and a broader movement towards computerizing health records.  Surescripts foresaw a vast, open, and untapped market.  However, other companies saw the same potential.

110.   Surescripts faced substantial competitive threats to its routing and eligibility monopolies from competitors that offered more innovation and was concerned that competition

would drive the "commoditization" of routing and eligibility, reduce prices for each, and "devastate" Surescripts's cash flow.

111. In late September 2009, Surescripts's management explained to its board of directors that these "competitive pressures require precipitous price drops . . . ."

112. To prevent competition that would lead to lower prices, Surescripts substantially raised nearly all its customers' costs to multihome, rendering the chicken-and-egg problem insoluble for a competitor. The result has been the total exclusion of all meaningful competition in routing and eligibility, higher prices, reduced innovation, lower output, and no customer choice.

### A. Surescripts Learns of an Emerging Threat to Its Monopolies

113. On July 1, 2009, a health information technology company called Emdeon acquired eRx Network, a routing network. Although eRx Network only transmitted approximately 5% of routing market transactions at that time, it was well positioned for significant growth as eRx Network maintained connectivity with Allscripts, a large EHR, and PDX, a PTV providing routing connectivity that marketed primarily to medium-to-large sized retail pharmacy chains.

114. Surescripts recognized that competition from Emdeon would "drive lower prices."

115. On July 22, 2009, Surescripts's Chief Strategy Officer, Scott Barclay, explained that with "lower prices and further capabilities, the new Emdeon could significantly compete" with Surescripts.

116. If Emdeon could provide lower prices to pharmacies, higher incentives to EHRs, or both, Emdeon could attract enough customers to its routing network and solve the chicken-and-egg problem. Surescripts understood that if additional customers were to multihome with

Emdeon, "[t]hen it becomes a price game[7] at pharmacy and an incentive game at the POC [point of care, i.e., prescribers/EHRs]. . . . [E]ach network fights for itself and the market share game becomes paramount quickly."

117.    Surescripts thus acted to eliminate the outbreak of competition—an outcome in which one set of customers (pharmacies and PBMs) would pay lower prices, another set of customers (EHRs) would receive higher incentive payments, but Surescripts would lose its supracompetitive profits.

## B.    Surescripts Blocks Competition and Forecloses the Markets by Spinning a Web of Anticompetitive Exclusive Contracts

118.    In the early days of the evolving routing and eligibility markets, most Surescripts contracts were made directly with pharmacies; PTVs had not yet evolved in any material fashion. Thus, as potential competition from Emdeon and others burgeoned in the early years of e-prescribing, Surescripts's exclusive dealing loyalty scheme primarily focused on direct contract pharmacies; PTV contracts were important but less common in the 2009-10 years.

119.    In response to the threat from Emdeon and other competitors, Surescripts, with its 95%-plus established share in both markets, sought to eliminate all competition by significantly raising its pharmacy customers' costs to multihome, thereby dramatically increasing the barrier to prevent competitors from obtaining the critical mass necessary to become viable.  Surescripts did so by locking up the markets for routing and eligibility with anticompetitive loyalty pricing and exclusivity contracts.

120.    Beginning in mid-2009, Surescripts devised a scheme to include "loyalty" provisions in contracts with co-conspirator PTV partners and direct contract pharmacy

---

[7] Yet another example of Surescripts recognizing that its customer is the pharmacy, not PTV, that pays Surescripts's charges.

customers[8] in the routing and eligibility markets. These contracts conditioned "discounts" (while still charging supracompetitive prices) or payments on actual or de facto exclusivity. Loyalty "discounts" apply to Surescripts's pharmacy and Health Plan/PBM customers and their co-conspirator PTV partners. The term "discounts" is misleading because, as explained below, the only "discount" received by pharmacies was freedom from additional punitive price hikes (above and beyond the existing supracompetitive "loyal" price) and clawbacks that Surescripts levied on non-loyal customers. For co-conspirator PTVs, who do not actually pay for e-prescription routing themselves, loyalty "discounts" were in fact direct payments from Surescripts to make sure the PTVs continued to maintain the Surescripts monopoly.

## C. Surescripts Structures Pharmacy, PTV, and Health Plan/PBM Contracts to Foreclose Competition and Punish Disloyalty

121.    For a direct contract pharmacy to receive a loyalty "discount," the pharmacy must be an exclusive Surescripts customer. Put another way, and more accurately, to avoid a punitive price hike above the monopoly prices already charged, a pharmacy must be exclusive to Surescripts. To be considered exclusive, Surescripts requires that a pharmacy route 100% of its transactions "through and only through the Surescripts network." While this requirement only applies to Surescripts-connected entities if the sending/receiving EHR is also connected to Surescripts, Surescripts maintains connectivity to nearly all EHRs, thus effectively requiring 100% exclusivity from pharmacies, directly or through co-conspirator PTVs. Surescripts generally refers to exclusive direct contract pharmacy customers or co-conspirator PTV partners as "loyal" and those that are not exclusive as "non-loyal."

---

[8] Today, the vast majority of pharmacies, including all named Plaintiffs here, do not contract directly with Surescripts; they contract with co-conspirator PTVs (*see supra*), but at the time Surescripts first implemented its scheme (discussed in this section), it was more common for Surescripts to contract directly with pharmacies.

122.     The same structure exists for PBMs in eligibility.

123.     Under these loyalty provisions, because pharmacies and Health Plans/PBMs must use Surescripts for all or nearly all of their transactions, becoming non-exclusive and losing the loyalty "discounts" results in a significant cost increase. As the industry evolved in 2011 in response to federal legislation that encouraged greater use of technology, more and more direct contract pharmacies moved to employ PTVs that could offer a variety of additional services related to the increasingly complicated online e-prescription market. Surescripts moved faster. By the time pharmacies shifted from contracting with Surescripts directly to contracting with PTVs to take advantage of the suite of diverse services offered by PTVs, Surescripts had already approached PTVs and locked in deals that guaranteed (and continue to guarantee) routing loyalty to Surescripts.

124.     Under the PTV loyalty provisions, discussed in detail *supra*, co-conspirator PTVs must use Surescripts for all or nearly all of their pharmacies' transactions. If a PTV goes non-exclusive or becomes "disloyal," the respective PTV loses all profit-sharing "loyalty discount" payments from Surescripts. Therefore, for nearly all pharmacies and PBMs, Surescripts's loyalty pricing scheme substantially increases the cost of multihoming. And for co-conspirator PTVs, the loyalty pricing scheme provides substantial (if unlawful) additional supracompetitive profits, as long as most other PTVs join and continue the scheme.

125.     Though the difference in the per-transaction price between a loyal and non-loyal transaction is often a few pennies, because many pharmacies and PBMs send millions of transactions across the Surescripts network, a difference of a few pennies results in hundreds of thousands or even millions of dollars in cost increases. Of course, PTVs do not inform

pharmacies of the terms of the "loyalty" payments that PTVs receive by supporting Surescripts's monopoly.

126.    These non-loyal per-transaction prices are not justified by any increased costs faced by Surescripts in transmitting routing or eligibility information; they exist only to act both as penalties to those direct contract pharmacy customers that may consider being non-loyal to Surescripts and as deterrents to co-conspirator partners that might consider betraying the monopolistic scheme.  The non-loyal per-transaction prices are an exclusionary tactic against potential competitors in routing or eligibility; they reinforce and maintain Surescripts's monopolies in routing and eligibility.

127.    In many contracts, Surescripts also requires direct contract pharmacy customers or co-conspirator PTV partners to pay the price differential between the loyal and non-loyal price for historical transaction volume *retroactive* over the term of the contract.  For pharmacy customers, these additional clawback obligations total millions of dollars and substantially strengthen the lock-up effect of the contracts.  Indeed, Surescripts refers to these clawback provisions as the "teeth" in its loyalty contracts.  For co-conspirator PTVs, these additional clawback obligations threaten the PTV with millions of dollars in punitive penalties effective long after pharmacy customers paid their e-prescription invoices.

128.    Exhibit Two (A) of Surescripts's September 28, 2010 contract with a PTV provides a typical example of the "teeth" in Surescripts's contracts:

> If, during the Loyalty Term, Aggregator [*i.e.*, PTV] ceases to route all of its electronic Prescription Routing messages to Prescribing Participants through, and only through, the Surescripts network and fails to cure within the applicable cure period, then Surescripts shall immediately cease calculating the Loyalty Discount and Aggregator agrees to pay Surescripts the amount of the Loyalty Discount received by Aggregator during the Loyalty Term.

129.    Similarly, Surescripts's June 2, 2010 contract with a PBM customer provides:

41

> If, during the Loyalty Term, PBM ceases to route all of its electronic Prescription History and Benefit (Ambulatory) messages to Participants through, and only through, the Surescripts network, then Surescripts shall immediately cease applying the Loyalty Eligibility Transaction Fee price and PBM agrees to pay Surescripts the difference in the amount of Transaction Fees PBM would incur had PBM paid the [non-loyal price] versus the [loyal price] as of the Amendment Effective Date.

130.    These clawback provisions effectively eliminated multihoming competition and serve no legitimate purpose.  The provisions threaten direct contract pharmacies with enormous financial exposure should they dare to entertain offers from Surescripts's competition and deter co-conspirator PTVs that might consider breaking out of the scheme.

**D.    Surescripts Ensures that It Controls the Chicken-and-Egg Problem by Implementing Anticompetitive EHR Contracts**

131.    Surescripts requires loyalty from EHRs—the "suppliers" of e-prescriptions through prescribers—just like it requires loyalty from pharmacies, PTVs, and Health Plans/PBMs.  The primary difference with EHRs is that Surescripts conditions any incentive payment to the EHR on the EHR's exclusivity to Surescripts for routing, eligibility, or both.

132.    Under most of the implemented EHR loyalty programs, if an EHR agrees to be exclusive only in routing, Surescripts pays the EHR an incentive fee tied to the routing fee paid by pharmacy customers to Surescripts for each routing transaction.  If an EHR agrees to be exclusive only in eligibility, Surescripts pays the EHR an incentive fee tied to the eligibility fee paid by PBM customers to Surescripts.  If the EHR agrees to be exclusive in both routing and eligibility, Surescripts pays the EHR a higher incentive fee on both transactions.  Not surprisingly, because of the higher incentive fee paid to EHRs for loyalty in both markets (i.e., routing and eligibility), nearly all EHRs participating in Surescripts's loyalty program agree to exclusivity on both transactions.

133. If an EHR decides to multihome and use Surescripts for less than 100% of its transactions, Surescripts terminates incentive fees to that EHR. In other words, Surescripts raises the EHR's price by reducing the EHR's incentive fees to zero. As with the penalty prices Surescripts charges non-loyal pharmacies and PBMs, there are no legitimate reasons (e.g., increased costs) for Surescripts to decrease its EHR payment to zero for non-loyal EHRs.

134. As with its clawback provisions to direct contract pharmacies, co-conspirator PTVs, and PBMs, Surescripts also requires the EHR to pay back the incentive fees for historical transaction volume if the EHR violates the exclusivity commitment. Some contracts require repayment on transactions over the full term of the contract. For example, Surescripts's April 14, 2010 contract with one EHR provides:

> If, during the Loyalty Term, Surescripts determines that Aggregator [i.e., the EHR] has failed to comply with the loyalty requirements . . . Aggregator shall promptly pay back to Surescripts the amount of Incentive Fees paid by Surescripts to Aggregator during the Loyalty Term, and Aggregator shall no longer receive the Incentive Fees.

135. Surescripts implemented loyalty pricing and exclusivity requirements to make the chicken-and-egg problem insurmountable for any competitor in either routing or eligibility (or both). As Surescripts explained in a presentation to its board, the new loyalty strategy would "[p]rotect [Surescripts's] most critical asset—[its] network—by addressing competitive market pressures and locking-in key customers."

136. Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility have a multi-year initial term. With some larger customers, the terms are as long as five years.

137. Surescripts prefers long-term contracts because they allow Surescripts to lock up its customers for extended periods of time and amplify the effects of the clawback provisions.

As Surescripts's then-Vice President of Account Management explained in a February 2010 email to the company's then-CEO, "[o]ur 3 year commitments keep[] our competition out of those customers."

138.    Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility automatically renew for one year unless either party gives notice.

139.    In early 2010, as demand for routing and eligibility was growing and inviting entry to compete with Surescripts, Surescripts began executing loyalty pricing with nearly all of its direct contract e-prescribing pharmacies.  Most of these contracts had an effective date retroactive to January 1, 2010.

**E.    Surescripts, RelayHealth, and Co-Conspirator PTVs Reject Competition to Join Forces and Share Surescripts's Monopoly Profits**

140.    While Surescripts was able to push its loyalty pricing and exclusive contracts onto its direct contract customers, Surescripts was only able to lock up direct contract pharmacies with whom Surescripts already had a contract.  Surescripts was concerned about a large subset of pharmacies that it did not have contracts with (and thus did not have exclusivity commitments from)—namely those pharmacies that connected to Surescripts through RelayHealth or connected to Surescripts/RelayHealth through a PTV.

141.    RelayHealth is a health information technology company that is a subsidiary of McKesson.  Since 2003, RelayHealth has contracted with Surescripts to "resell" routing transactions to a subset of pharmacies.  RelayHealth does not "resell" e-prescription routing in the traditional sense of "resale" where a reseller purchases/holds/or brokers a physical product; instead, RelayHealth "resells" under its own name access to Surescripts's network.  In a sense, RelayHealth is allowed to market Surescripts's network access with its own RelayHealth "brand" stamp.

44

142.    RelayHealth and Surescripts contract with PTVs for routing service.  RelayHealth also provided Surescripts's routing connectivity to some EHRs until 2015, but it no longer does so except for EHRs associated with McKesson.

143.    As part of the 2003 agreement, RelayHealth expressly agreed not to compete with Surescripts in routing, meaning that while RelayHealth could "resell" Surescripts's routing services to certain customers, it could not compete with Surescripts by starting its own routing network.

144.    Surescripts offers the routing transaction price to RelayHealth at a "wholesale" rate slightly discounted from the full monopoly price charged to pharmacies.  RelayHealth then "resells" the transaction to a subset of pharmacies and PTVs at the higher "retail" monopoly rate. RelayHealth profits from the margin between the monopoly retail rate pharmacies pay RelayHealth and the slightly lower "wholesale" rate RelayHealth pays to Surescripts.  Co-conspirator PTVs operate between RelayHealth and end-user pharmacies and these PTVs enforce, with RelayHealth, the same anticompetitive loyalty agreements that are in Surescripts's contracts with co-conspirator PTVs.  PTVs contracted with RelayHealth as a "reseller" of routing take their own cut of the monopoly profits as a "loyalty" payment.

145.    Through two contracts, one executed in 2010 and a second executed in 2015, Surescripts provided RelayHealth with contractual and monetary incentives to convince RelayHealth to enforce Surescripts's routing loyalty rather than establish a competitive network.

146.    As Surescripts was formulating its plan to push its exclusive contracts into the markets, Surescripts executives knew that its most recent agreement with RelayHealth was scheduled to expire on April 10, 2010 and along with it RelayHealth's contractual obligation not to compete against Surescripts in routing.

147.    In an August 2008 strategic risk analysis memorandum, Surescripts's executives recognized that RelayHealth and its corporate parent, McKesson, presented a "significant threat in the near to longer term," particularly the threat that "RelayHealth will create a competitive [routing] network to [Surescripts]." Such competition from RelayHealth would cause Surescripts to lose transaction volume but would produce consumer benefits in the form of lower prices, increased innovation, and more choice.

148.    McKesson sells pharmaceutical and medical products as well as business services to pharmacies, hospitals, and health systems throughout North America and internationally. McKesson has sold and currently sells pharmacy management software to pharmacies. McKesson has also sold EHRs to hospitals and other health systems. In fiscal year 2008, McKesson generated nearly $102 billion in total revenue and was ranked 15th on the Fortune 500 list.

149.    In a January 2009 Surescripts presentation titled "McKesson Strategy," Surescripts executives worried that failure to renew a contract with RelayHealth containing the routing non-compete would mean that the "[r]isk of RelayHealth becoming a competitor remains," leaving RelayHealth free to leverage its business relationships with pharmacies, PBMs, and EHRs to start its own routing network and go head-to-head with Surescripts. In the same presentation, Surescripts recognized that it "[m]ay not be able to compete on transaction fees due to lack of products/services to bundle pricing."

150.    Surescripts executives understood that McKesson's ownership of RelayHealth "presents an additional threat to [Surescripts]." They recognized that McKesson was a "Fortune 15 Company" with "[$]1.4 billion in cash" and "[d]iverse product offerings that span many healthcare markets serving many key stakeholders in healthcare."

46

151.     McKesson also provided RelayHealth with an immediate customer base, as McKesson had its own EHR and PTV offerings.  In 2010, for example, McKesson owned and operated several EHR software platforms, including McKesson Horizon Clinicals, Practice Partner, and RelayHealth Consumer.  McKesson also provided technology to pharmacies that included routing connectivity capabilities, including its PharmacyRx pharmacy management system.

152.     Surescripts realized that RelayHealth had a "natural ability to capture 15-20% of transaction volume" if RelayHealth started connecting just McKesson's own pharmacy and prescriber products, to say nothing about what gains RelayHealth would make if it started competing in routing more broadly.

153.     Surescripts executives also knew that RelayHealth had experience in a closely related market, claims adjudication, a service that allows pharmacies to bill a patient's insurer for a prescription, usually via the PBM contracted with the patient's insurer.  Executives from both RelayHealth and Surescripts often referred to claims adjudication as an "adjacent" market to routing and eligibility.  RelayHealth's experience provided it with a distinct advantage to start a routing network.  RelayHealth already contracted with many pharmacies and PBMs for claims adjudication.  RelayHealth's claims adjudication business and Surescripts's routing and eligibility business shared many of the same customers.  In January 2009, Surescripts wrote that RelayHealth "plays in the same space as S[urescripts] (i.e. offering connectivity services to same customers)."

154.     Critically, RelayHealth also already had numerous contracts with both pharmacies and EHRs due to its relationship with Surescripts.  In 2009, RelayHealth connected approximately 50% of the pharmacy routing transactions connected to the Surescripts

network—including large pharmacies like Walgreens and Rite Aid—and approximately 40% of EHR routing transactions connected to the Surescripts network, including the large EHR Allscripts. RelayHealth thus enjoyed an advantage held by no other competitor: It had already partially solved the chicken-and-egg problem by having relationships with customers on both sides of the routing network.

155.    Surescripts was concerned not only that RelayHealth would enter routing but also that RelayHealth would offer a lower price that Surescripts would be unable to match. Surescripts executives believed in 2009 that the unit cost for claims adjudication was between one and two cents and that RelayHealth could bring its e-prescribing costs down to that price given its scale and McKesson's funding. At that time, Surescripts's net price to its pharmacy customers was approximately 10 times higher.

156.    Surescripts understood that, if RelayHealth "dropped the price down to 2 to 3 cents . . . they would have been able to take the business away from us." Surescripts's former Chief Strategy Officer also testified that he believed RelayHealth would be able to enter at a lower price than Surescripts could offer:

> I assumed Relay and Emdeon would consider offering e-prescribing for what I estimated to be their marginal costs that they wanted to be . . . or they might just try to undersell that and lose . . . to put us out of business and then combine and bundle that with their other fixed cost infrastructures on the adjudication side.

157.    These fears dominated Surescripts's negotiations with RelayHealth. As a result, Surescripts's primary goal during negotiations was to "[m]aintain current status where RelayHealth does not become a competitor" or, as the same presentation explained, use a strategy where Surescripts would "keep friends close but enemies closer." RelayHealth's own internal documents show that since 2003, Surescripts's "dominant contracting strategy . . . [was] to prevent [RelayHealth] from competing [with Surescripts]."

48

158.    Surescripts achieved this goal.  In the February 25, 2010 contract with RelayHealth ("2010 Contract"), Surescripts obtained RelayHealth's renewed promise not to compete in routing for an additional six years.  Surescripts has repeatedly admitted that the sole value of this 2010 contract is that it prevents RelayHealth from competing against Surescripts in routing.  One 2012 memo, circulated to senior Surescripts executives, explicitly stated, "[o]ur VAR contract prevents them from competing against us for core e-prescribing Routing. This was a substantial concern when we were founded [in 2008], and should still be a consideration today due to R[elay]H[ealth]'s vast market share in the Pharmacy financial Claims Processing part of our industry."

159.    The 2010 contract between Surescripts and RelayHealth required RelayHealth to use "commercially reasonable efforts to offer terms to incent exclusive use of the Surescripts network" by pharmacies, PTVs, and EHRs and to assist Surescripts in clawing back incentive fees from disloyal EHRs.

160.    Under the 2010 contract, if a RelayHealth customer remained loyal to Surescripts, Surescripts gave RelayHealth a larger "discount" off the monopoly retail routing transaction price so that RelayHealth would take home a bigger spread when it resold routing transactions at the monopoly price to pharmacy customers.  Put more simply, Surescripts increased the bribe to RelayHealth.  Pursuant to the 2010 contract, RelayHealth entered into contracts with its pharmacies for routing through the Surescripts network.  Nearly all of these contracts required that customers use RelayHealth exclusively (i.e., for 100% of their required transactions).  Because RelayHealth was itself exclusively loyal to Surescripts, this provision resulted in nearly all of RelayHealth's pharmacy customers routing all of their transactions through Surescripts.

As an October 2012 RelayHealth presentation put it, RelayHealth's strategy was to "[m]ove non-exclusive customers to exclusive wherever possible."

161.     Under the 2010 contract, RelayHealth also entered into contracts with EHRs for routing through the Surescripts network.  These contracts were typically for a length of two years or more, contained express exclusivity requirements to RelayHealth, and provided incentive payments to EHRs only if an EHR was 90-100% exclusive to the Surescripts network.  Again, because Surescripts was the only routing network to which RelayHealth provided access, this provision resulted in nearly all of RelayHealth's EHR customers routing all of their transactions through Surescripts.  For each exclusive routing transaction, Surescripts paid RelayHealth an incentive payment.  RelayHealth then passed a portion of those incentives on to its EHRs, but only if they met RelayHealth's and Surescripts's exclusivity requirements.

162.     RelayHealth's contracts with EHRs also required repayment of all incentive fees paid to the EHR if the EHR failed to comply with RelayHealth's Surescripts exclusivity requirement.

163.     As early as December 2008, Surescripts's documents characterized its relationship with RelayHealth as adding very little, if any, value to e-prescribing and described RelayHealth as a "value subtract," writing that "the only real value that we are getting out of the RelayHealth relationship at this point is the exclusivity."  In 2013, Surescripts's executives stated the only benefit it received from the 2010 contract with RelayHealth was that the contract "help[ed] keep market share."  In March 2014—four years into the five-year term of the 2010 contract—Surescripts's executives were still asking themselves in a presentation entitled "RelayHealth Partnership Assessment," "How does Surescripts + RelayHealth = more value than

Sur[e]scripts alone?" Surescripts's then-Chief Customer Officer described RelayHealth as "sh[*]tty, non-value added partners but at least they're one of our biggest competitive threats."

164.    In 2015, as Surescripts's agreement with RelayHealth was nearing expiration, Surescripts's fears of entry by RelayHealth persisted, and so—despite the fact that RelayHealth was otherwise a "sh[*]tty, non-value added partner[]"—Surescripts took renewed action to neutralize RelayHealth.  On January 16, 2015, Surescripts and RelayHealth executed a three-year contract that automatically renewed each year unless either party terminated it; upon information and belief, the contract is still in place today.

165.    This contract: (1) tightened RelayHealth's loyalty requirements and (2) exchanged the explicit routing non-compete provision for an implicit one, requiring RelayHealth to transition its EHR routing relationships to Surescripts directly.  The contract also provided RelayHealth with a higher wholesale "discount" for exclusive transactions, i.e., it again increased the bribe to keep RelayHealth on the sidelines as a competitor.

166.    The 2015 contract also required RelayHealth to terminate its routing relationships with EHRs and transfer its EHR connections to Surescripts.  RelayHealth, through its arrangement with Surescripts, had connections to both the pharmacy and the EHR sides of the routing network.  Surescripts's executives knew that EHRs were the "gatekeepers" to prescribers.  A link to the EHR side is necessary to operate a two-sided routing network, meaning that this termination would prevent RelayHealth from being a competitive threat in routing.  In exchange for removing the explicit non-compete provision from the contract, Surescripts required RelayHealth to terminate its EHR connections for routing and transition those relationships directly to Surescripts.  RelayHealth agreed.  RelayHealth therefore no longer provides routing connectivity to EHRs, except for EHRs associated with McKesson.

167.    Under the 2015 contract, RelayHealth has not changed its contracts with its end-user pharmacy customers to "resell" Surescripts's routing connectivity.  Thus, RelayHealth's contracts for Surescripts's routing network continue to require 100% exclusivity.

168.    Surescripts's executives understood that the 2015 contract continued to prevent RelayHealth from entering the routing market despite the removal of the explicit non-compete provision.  On February 4, 2015, shortly after the 2015 contract was executed, Surescripts's Chief Quality Officer emailed Surescripts's Vice President of Customer Accounts: "[C]ongratulations.  This is a hugely important deal for us, cementing our position for at least several more years.  I would not want to have Relay out there competing directly against us."

169.    An internal Surescripts competition analysis from that time characterized RelayHealth as a "Core Systemic [Competitor]," a "Direct Competitor to Core E-Prescribing Network," and a company that is "[a]lways one to watch since they have the assets and know-how to be a threat."  However, that same document continued, "[Surescripts] has done an exceptional job removing them as EHR aggregator" when assessing the competitive threat RelayHealth posed to Surescripts in routing.

170.    As of today, RelayHealth has not entered the routing market.

**F.    Surescripts Colludes with Critical EHR Allscripts to Crush Routing Competitor Emdeon**

171.    As Surescripts coiled its web of loyalty and exclusive contracts around the routing and eligibility markets, it devoted special attention and resources to locking up a critical EHR—Allscripts. In 2009, Allscripts represented approximately 25% of Surescripts's routing and eligibility transactions, making it a significant customer for any e-prescribing network. Allscripts's EHR technology relied on a centralized "hub" infrastructure for all of its customers, meaning that if Allscripts multihomed with an additional e-prescribing network, the added e-

52

prescribing network could quickly route e-prescriptions to and from Allscripts's entire e-prescribing customer base.  Allscripts's exclusivity was critical to Surescripts for two reasons: (1) Allscripts was one of the few EHRs that was multihoming, using Emdeon as an alternative routing network to Surescripts, which made Emdeon a more viable threat to Surescripts; and (2) Allscripts had implemented a new business model in eligibility that cut out Surescripts as the middleman.

172.    Allscripts had contracted with Emdeon for routing since 2007.  This connection allowed Allscripts to route prescriptions to Emdeon's pharmacy customers without utilizing the Surescripts network.  Emdeon paid Allscripts a routing transaction incentive fee that was higher than what Surescripts paid Allscripts.

173.    Surescripts recognized that Allscripts was crucial to Emdeon gaining scale in routing, overcoming the chicken-and-egg problem, and offering increased competition and lower prices.  Access to Allscripts's routing transaction volume (through its prescribers) made Emdeon more attractive to potential pharmacy customers.  In a November 17, 2009 email, a senior Surescripts executive wrote that in order to prevent Emdeon from solving the chicken-and-egg problem, "[t]he key to Emdeon is Allscripts[] (i.e., the key to fighting eRx networks [Emdeon] is containing their access to POC [point of care, i.e., prescribers])."

174.    In September 2009, before Surescripts fully unveiled its web of loyalty and exclusive contracts, Surescripts learned that Allscripts was transmitting eligibility requests around Surescripts's network directly to a PBM called SXC Health Solutions.  This practice of developing "direct connections" for eligibility with PBMs represented a different means for Allscripts to receive eligibility information from PBMs and, more broadly, a different model for e-prescribing, one that cut out Surescripts as a middleman.  From Surescripts's perspective,

Allscripts's development of direct connections to PBMs made Allscripts "a major competitor and our largest current risk" in eligibility.

175.    By May 2010, Allscripts sold or was attempting to sell direct connections to its prescriber network to at least six PBMs, often at prices below Surescripts's prices.

176.    PBMs hoped their relationships with EHRs would create a more competitive, innovative market that would exert pressure on Surescripts to innovate.  Many customers have complained that Surescripts's eligibility transaction is "not a reliable process" because it provides only static, non-patient-specific formulary information.

177.    Surescripts realized that Allscripts's direct eligibility connections were "a long-term potential threat[] coming true."

178.    Facing these threats, Surescripts implemented a "full combat strategy" to "lock up. . . Allscripts" through an exclusive contract with Allscripts, which Allscripts and Surescripts signed on May 31, 2010.

179.    As the preamble to that contract states, "the purpose of this [agreement] is to enter into a long term arrangement for [Allscripts] to utilize Surescripts exclusively" for both routing and eligibility.

180.    The 2010 contract had a term of four years and included several provisions tailored specifically to Allscripts to ensure exclusivity by Allscripts for both routing and eligibility.

181.    First, Surescripts required Allscripts to terminate its routing connection to the Emdeon network at the expiration of Allscripts's contract with Emdeon in June 2013.  Allscripts agreed; Surescripts's network is a "must-have" for nearly all EHRs because EHRs must connect

to pharmacies and PBMs to e-prescribe. Allscripts terminated its relationship with Emdeon on June 20, 2013.

182. Second, Surescripts grandfathered in Allscripts's current direct connections with PBMs but prohibited Allscripts from renewing its eligibility contracts with those PBMs and from proactively marketing or entering into new eligibility agreements with PBMs.

183. Third, Surescripts imposed a "right of first refusal" procedure on Allscripts's e-prescribing business: If any third party sought to do business with Allscripts in either routing or eligibility, Allscripts was required to set up a meeting with Surescripts and that third party "to facilitate a connection between such [third party] and Surescripts." Only if the third party did not want to do business with Surescripts after this meeting could Allscripts engage in business discussions with the third party for routing or eligibility.

184. Fourth, Surescripts required Allscripts to remind its sales and business development personnel annually of the above terms, and Surescripts maintained the right to "review and comment" on such annual reminders.

185. Allscripts lamented that it had to enter into this agreement as Surescripts was a "must-have" connectivity vendor, and without a contract, Allscripts would be unable to connect to pharmacies and PBMs and thus be unable to e-prescribe. Rather than fighting back against Surescripts through other avenues, Allscripts agreed to join Surescripts's efforts to foreclose the routing and eligibility markets from potential Surescripts competitors.

186. Surescripts knew that Allscripts was key to crushing Emdeon's ability to expand and eliminating any alternative e-prescribing business model that could rely on Allscripts' direct connections to PBMs. In return for Allscripts' agreement, Surescripts provided Allscripts with "enhanced" or "relatively more attractive revenue sharing." In other words, instead of

competing or resisting, Allscripts too got a share of Surescripts's monopoly profits. Specifically, Surescripts paid Allscripts an incentive portion of the routing and eligibility fees paid by pharmacy and PBM customers for each transaction, substantially more than similarly situated EHRs. One slide from an internal Surescripts presentation described an early version of its 2010 deal with Allscripts by including a picture of the movie poster from the 2009 film "The Proposal," which included the slogan "*HERE COMES THE BRIBE*."

187.   Surescripts and Allscripts renewed their agreement in 2015.

188.   In 2014, although Surescripts and Allscripts had agreed that Allscripts would sever its routing connection with Emdeon, Surescripts still worried that Allscripts would eventually restart multihoming, using Emdeon as an alternative, which would, in the words of Greg Hansen, Surescripts's then-Executive Vice President and Chief Customer Officer, "create what is essentially a bidding war for [Allscripts's prescribers'] transactions or access to their physician community." Hansen feared that Allscripts "intend[ed] to monetize access to their physician community."

189.   To stifle this "bidding war" and maintain this "balance of economic power," Surescripts engaged in a renewed campaign to agree with Allscripts as to its continued exclusivity.

190.   In the second half of 2014, Allscripts entered into a new exclusive agreement with Surescripts rather than losing access to Surescripts's "must-have" e-prescribing network for routing and eligibility.

191.   During the same time period, to secure Allscripts's exclusivity, Surescripts also threatened to (1) bar Allscripts from using eligibility information obtained from Surescripts's network for Allscripts' electronic prior authorization transactions, which increases efficiency

between prescribers and pharmacies by reducing the time it takes to receive pre-approval for certain prescription drugs from a patient's insurer; (2) cut Allscripts off from Surescripts's pharmacy directory, which is necessary to allow a prescriber to locate a patient's preferred pharmacy; and (3) sever Allscripts's access to a separate service called medication history, which Allscripts' prescribers used in both acute and ambulatory settings.

192.    Surescripts also sought to impose a penalty on Allscripts by making Allscripts pay millions of dollars if Allscripts did not enter into an exclusive agreement.  For example, Surescripts sent Allscripts a retroactive invoice for Allscripts's use of what was supposed to be a separate free service offered by Surescripts if Allscripts did not agree to the renewed exclusivity terms Surescripts had proposed.  Surescripts also withheld loyalty incentive payments from Allscripts until Allscripts signed the renewed contract.

193.    Surescripts referred to these tactics as "nuclear missile[s]" and admitted they were designed to ensure that Allscripts did not leave the exclusive relationship with Surescripts that protected Surescripts's monopoly position and profits in the routing and eligibility markets.

194.    During this same period, Emdeon again attempted to sign Allscripts up as a customer by, for example, offering Allscripts increasingly large up-front payments and profit-sharing arrangements to compensate Allscripts for losing Surescripts's incentive fees.

195.    Despite Emdeon's efforts, Surescripts's agreement with Allscripts remained intact.  On January 31, 2015, Allscripts signed a new amendment with Surescripts, extending the term of the underlying exclusive contract for five years.

196.    On June 29, 2018, after Allscripts and Surescripts became aware that the Federal Trade Commission was investigating their conduct, Allscripts and Surescripts entered into a new amendment that deleted some of the more restrictive provisions contained in the 2010 Allscripts-

Surescripts agreement and the 2015 amendment. That 2018 amendment, however, did not alter the fact that Allscripts was still required to use Surescripts exclusively for routing and eligibility or face financial penalties.

### G. Defendants' Scheme Has Succeeded in Excluding All Meaningful Competition from Both Routing and Eligibility

197.    Over the course of the last decade, Emdeon attempted unsuccessfully to expand its presence in the routing and eligibility markets. Starting in 2009, Emdeon tried to convince pharmacies, PTVs, and EHRs to use its network to route transactions instead of the Surescripts network. To succeed, Emdeon would have to convince the pharmacies, PTVs and EHRs to become non-loyal to Surescripts or RelayHealth and pay back the discounts, loyalty payments, or incentive payments pharmacies, PTVs and EHRs already received, respectively. In many cases, Emdeon approached these potential stakeholders with lower per-transaction pricing than Surescripts charged, higher per-transaction incentive payments than Surescripts paid, and no loyalty requirements.

198.    Emdeon was not successful. Unsurprisingly, pharmacies and EHRs could not afford to entertain offers from a Surescripts competitor because doing so would trigger the massive penalty provisions in their contracts with Surescripts or RelayHealth. Also unsurprisingly, co-conspirator PTVs saw higher profits in eliminating Emdeon as a Surescripts competitor and sharing monopoly profits. As Surescripts's own Chief Product Officer explained in the PTV conspiracy pitch, sharing monopoly profits with PTVs "boots Emdeon out of the market, and at the same time gives us higher margin, and at the same time gives [the PTV] higher margin. Proverbial win-win-win!"

199.    Surescripts's anticompetitive loyalty provisions would cost pharmacies millions of dollars through increased prices and, for EHRs, decreased incentive payments.

200.   Because of Surescripts's existing domination of the market, Emdeon could not deliver low enough pricing on a high enough volume of transactions to make up for the huge penalties inflicted on any pharmacy, co-conspirator PTV, or EHR that chose to become non-loyal to Surescripts.  There was no price (or incentive payment) that Emdeon could offer that would offset the penalty customers would receive by becoming non-loyal to Surescripts simply because Surescripts controlled such a high percentage of the market in terms of volume.

201.   Surescripts's executives knew that the loyalty scheme was working as intended. They repeatedly admitted that Surescripts's web of exclusive contracts quashed any competitive threat.  As Surescripts explained in early 2010 to a RelayHealth direct contract pharmacy, Rite Aid, there was no price that Emdeon could offer that would reduce Rite Aid's total routing costs because of the Surescripts's loyalty scheme:

**Clarifying the Issues** 

**eRx/Emdeon cannot save Rite Aid money in e-prescription routing by splitting traffic:**

- While eRx/Emdeon may offer a low introductory price, they can only do so for a subset of your transactions
- Rite Aid would still need to route the great majority of transactions through Surescripts and RelayHealth
- The lowest transaction pricing from RelayHealth for Surescripts connectivity is only available when routing 100% of your transactions through us
- The total cost to Rite Aid to split traffic would therefore be higher than if you continue to route 100% through RelayHealth and Surescripts

Surescripts®                                        Confidential and Proprietary

202. In the above slide, Surescripts explained to Rite Aid how Surescripts's loyalty scheme disrupted competitive pricing in the routing market.

203. In September 2010, Surescripts articulated how its exclusive contracts restricted Emdeon's expansion and reduced its potential to reach critical mass:

> Surescripts's efforts to lock in our customers through Loyalty programs have likely had a strong impact to Emdeon's initial strategy. With most top Prescriber Vendors signed to Loyalty Incentive plans, and, a significant portion of the Pharmacy industry signed to Loyalty pricing plans (direct and via [RelayHealth]), Emdeon's ability to expand their direct connection to prescribers and pharmacies has been greatly reduced. Emdeon's ability to rapidly become a full national alternative to Surescripts is diminished.

204. In October 2010, a Surescripts vice president wrote "the loyalty/incentive strategy and execution made a very effective counter to the Emdeon/eRX acquisition. It[']s nice when a plan comes together."

205. In that same month, Surescripts described how its loyalty program foreclosed Emdeon from the market by disabling Emdeon's ability to compete on price: "eRx/Emdeon can undercut Surescripts on price, but only on a margin of volume . . . and Surescripts pricing differential on pharmacy side and loyalty incentive program on POC side are worth more than eRx / Emdeon's proposition on <10% of scripts."

206. When Emdeon's initial efforts to expand failed, Emdeon attempted a new strategy designed to work around Surescripts's massive financial penalty provisions. Emdeon resold the Surescripts routing transaction to a group of pharmacies that use a PTV called PDX. With the PDX pharmacies disconnected from the Surescripts network, EHRs would be free to route directly to Emdeon without incurring Surescripts's penalties for being non-loyal. This is because under Surescripts's contracts with EHRs, EHRs would not be penalized for routing to a pharmacy that could not be reached using the Surescripts network. Despite an organized

campaign to attempt to sign up EHRs with contingent contracts (where the EHR would agree to route through Emdeon only if Emdeon disconnected its pharmacies from the Surescripts network), Emdeon was unable to execute enough contracts to obtain enough scale to become viable in e-prescribing and solve the chicken-and-egg problem. In the midst of this campaign, Allscripts severed its connection with Emdeon, as required by Allscripts's 2010 agreement with Surescripts, a move Emdeon described as a "devastating" blow and one that pushed Emdeon almost completely out of the market.

207. In late 2013, Emdeon again attempted to compete with Surescripts, this time in eligibility. Emdeon approached potential PBM customers with lower pricing than Surescripts as well as offers to innovate in ways that would respond to PBM complaints regarding the quality of Surescripts's eligibility service. Although Emdeon gained some traction, it ultimately could not acquire the critical mass of PBMs and EHRs needed to overcome Surescripts's loyalty provisions.

## VII.    MARKET POWER AND MARKET DEFINITION

208. There are two relevant product markets: (1) routing transactions; and (2) eligibility transactions.

209. Other means of transmitting routing and eligibility information (e.g., paper, phone, fax) are not reasonably interchangeable with electronic prescribing because of safety concerns and greater efficiencies associated with electronic prescriptions, as well as the requirements of MIPPA, the HITECH Act, and HHS regulations.

210. The relevant geographic market is the United States. Pharmacies, EHRs, and PBMs make up nearly all of routing and eligibility transactions and operate throughout the country. Surescripts's prices and contract terms are set at a national level. Federal laws and

regulations that govern e-prescribing, i.e., MIPPA, HITECH, and associated CMS regulations, operate on a national level, further supporting a national geographic market.

211.    Thus, the relevant markets in which to evaluate Defendants' conduct are (1) routing transactions in the United States; and (2) eligibility transactions in the United States.

212.    Surescripts possesses durable monopoly power in each relevant market.

213.    Surescripts has possessed monopoly power in each relevant market from 2009 to present.

214.    There is substantial direct evidence that Surescripts possesses monopoly power including, but not limited to, the fact that Surescripts prices routing far above marginal cost and demonstrates direct ability to control prices in both relevant markets.

215.    Surescripts has the ability to price substantially higher than its competitors in the routing market without losing customers.  This includes both prices to pharmacies and incentives to EHRs.

216.    Surescripts has the ability to price substantially higher than its competitors in the eligibility market without losing customers.  This includes pricing to PBMs and incentives to EHRs.

217.    Other direct evidence of Surescripts's market power includes the lack of any meaningful competition in either routing or eligibility from 2009 to the present.  For example, when Surescripts refused to do business with a PTV called PrescribersConnection in 2015, that PTV was left with nowhere else to turn and as a result has had its e-prescribing gateway functionality permanently disabled—a situation that persists today.  Surescripts's customers agree that there are "no 1-1 alternatives to Surescripts," that Surescripts is a "must-have" network and a "monopolist for a key service."

218.    Surescripts's own admissions reflect an acknowledgment of the market power that the company wields.  As one Surescripts Vice President aptly put it in 2015: "We are a Monopoly when it comes [to] Prescription Routing."  Even if routing and eligibility were to be considered part of the same market, Surescripts's own then-Executive Vice President and Chief Customer Officer testified that Surescripts's market share in both products is "[l]ikely north of 90 percent."  Another Surescripts internal memo admits that "[b]ecause we didn't grow up in a competitive environment and we grew up as a monopoly, we don't have the best way of dealing with customers."

219.    There is also substantial indirect evidence that Surescripts possesses monopoly power.

220.    Surescripts possesses extremely high market shares in both relevant markets. Surescripts possesses at least 95% market share in the market for routing (by transaction volume).  Surescripts possesses at least 95% market share in the market for eligibility (by transaction volume).

221.    A small but significant, non-transitory price increase from the competitive price for routing by Surescripts remained profitable and did not cause a significant loss of sales to any other routing provider.  As Surescripts's then-Vice President of Corporate Strategy testified: "[P]ricing isn't dictated by competition at Surescripts."

222.    The markets for routing and eligibility are characterized by barriers to entry in the form of the chicken-and-egg problem, which Surescripts's conduct has rendered unsolvable.

## VIII.    ANTICOMPETITIVE EFFECTS ON PHARMACIES AND CONSUMERS

223.    Surescripts's anticompetitive course of conduct has resulted in the total exclusion of any meaningful competition in e-prescribing, repeated threats to routing customers to force exclusivity, higher prices, reduced innovation, and lower output.

224.    Surescripts, directly and with RelayHealth and PTVs, successfully imposed loyalty requirements on nearly all of its pharmacy customers.  By January 2011, Surescripts had loyalty contracts with at least 78% of the pharmacy side of the routing market (by transaction volume).  Nearly all of the loyalty contracts with pharmacies and PTVs have been renewed or amended with similar loyalty provisions, and they remain in place today.  Currently, Surescripts has loyalty contracts with at least 79% of pharmacy routing transaction volume.  These contracts therefore foreclose nearly 80% of the pharmacy side of the routing network from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for Surescripts's competitors.

225.    Surescripts also imposed loyalty requirements on nearly all its PBM customers. By October 2011, Surescripts had exclusivity contracts with at least 74% of the PBM side of the eligibility market (by transaction volume), including contracts with major PBMs such as Express Scripts, CVS, and Medco.  Nearly all of the loyalty contracts with these PBMs have been renewed or amended with similar loyalty provisions, and they remain in place today.  Currently, Surescripts has exclusivity contracts with at least 78% of PBM eligibility transaction volume. These contracts therefore foreclose nearly 80% of the PBM side of the eligibility network from potential competition.  The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for competitors.

226.    Surescripts also imposed loyalty requirements on nearly all EHR customers.  By November 2010, Surescripts had exclusivity contracts with at least 81% of the EHR routing market and at least 78% of the EHR eligibility market (both measured by transaction volume), including contracts with major EHRs such as Allscripts, Epic, and eClinicalWorks.  Nearly all of the loyalty contracts with these entities have been renewed or amended with similar loyalty

64

provisions, and they remain in place today. Currently, Surescripts—which in 2015 took direct control over nearly all of RelayHealth's routing contracts with EHRs—has loyalty contracts with at least 87% of EHR routing and eligibility transaction volume. These contracts therefore foreclose well over 80% of the EHR sides of the routing and eligibility networks from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for competitors.

227.    The foreclosure percentages above likely understate the foreclosure effects of Surescripts's conduct, which is based on contracts for Surescripts's largest routing and eligibility customers. There is a "long tail" of smaller Surescripts customers that are also foreclosed by the same loyalty contracts described above, which only further increases the percentage of each side of each market that Surescripts has been able to foreclose.

228.    Surescripts's loyalty contracts disrupt competition in routing and eligibility. Because Surescripts has foreclosed at least 70-80% of each of the routing and eligibility markets, even when a competitor offers lower per-transaction prices, no customer will do business with that competitor because that competitor cannot lower the customer's total e-prescribing cost. Because of Surescripts's conduct, no competitor can gain enough scale to solve the chicken-and-egg problem and compete with Surescripts. Health Plans/PBMs, EHRs, and pharmacies, are all harmed by not having any choice of routing or eligibility provider.

229.    Surescripts's loyalty regime ensures that no pharmacy could ever attain a lower total cost by multihoming, even if Emdeon or some other competitor offered that customer, in the words of one of Surescripts's former vice presidents, "some phenomenally low amount" on the transactions sent through Emdeon's network.

230.     A competing platform that sought to convince a pharmacy or PBM to multihome would need to offer a lower price to compensate that customer for losing its loyalty discount with Surescripts.  Due to the limited connections to EHRs that a competing platform could offer, the compensating price would have to be negative, meaning the competing platform would have to pay pharmacies and PBMs for each routing and eligibility transaction.  Likewise for co-conspirator PTVs: a competing platform would not only have to outbid the Surescripts's monopoly profit bribe that the co-conspirators receive going forward, it would have to indemnify PTVs for the clawback penalties Surescripts has in its co-conspirator PTV contracts.

231.     Similarly, EHRs receive incentive fees from Surescripts in exchange for agreeing to exclusivity.  A competing platform that sought to convince an EHR to multihome would need to offer higher incentive fees to compensate that customer for losing its incentive fees from Surescripts.  Due to the limited connections to pharmacies and PBMs that a competing platform could offer, the compensating incentive fees would be unprofitable for an equally efficient competitor.

232.     By foreclosing approximately 80% of both markets and making the chicken-and-egg problem insoluble, Surescripts has ensured that no other competitor can be or remain viable in either routing or eligibility.  Surescripts leverages its market dominance to maintain its monopolies instead of competing on the merits.

233.     As one Surescripts EHR customer recognized "the inclusion of the exclusivity provisions provided Surescripts with the ability to protect its dominance in the e-prescribing market place[.]"

234.     Surescripts does not compete on the merits, but instead relies on its size, its ability to force customers into exclusivity, and the success of its loyalty program to maintain its monopolies.

**A.      Defendants' Misconduct Has Led to Higher Prices for Routing and Eligibility**

235.     But for Defendants' anticompetitive course of conduct, the price that Plaintiffs and pharmacies pay for routing transactions would have been lower in the past and would be lower today.  As a result of Defendants' misconduct, Plaintiffs and members of the Class have paid substantial overcharges on routing transactions.

236.     On the EHR side, Surescripts understood and acknowledged its ability to price above the competitive level.  In an email exchange concerning EHR eClinicalWorks's attempts to negotiate for higher incentive payments, one Surescripts executive explained to another that "[eClinicalWorks's] position in negotiating for more and more $$ only seems relevant when there are at least 5 more 'Surescripts's' from which to choose. Today there is just one Surescripts."

237.     Because the loyalty contracts limited competitors' expansion, and thereby reduced pharmacies', PBMs', and EHRs' leverage with Surescripts, the contracts have enabled Surescripts, free from competitive discipline, to continue to demand supracompetitive monopoly prices from pharmacies.

238.     For example, in July 2013, Surescripts analyzed the impact of Allscripts's June 20, 2013 termination of its relationship with Emdeon, which the parties agreed to in the 2010 Surescripts-Allscripts agreement.  In a presentation that was circulated and commented on by senior Surescripts executives, Surescripts concluded that, because Allscripts had to stop using the cheaper Emdeon network and now had to route its volume through the more expensive Surescripts network, those few pharmacy customers that were not loyal to Surescripts were

"feeling economic pain" and "paying 'more at the pump.'"  This same presentation calculated exactly how much "economic pain" its pharmacy customers such as Kroger were experiencing: because Kroger no longer got its Allscripts prescriptions at Emdeon's much lower routing transaction rate, but now had to pay Surescripts's supracompetitive monopoly rate, Surescripts itself calculated a substantial increase in Kroger's routing costs.  Kroger itself documents the result of being forced to pay Surescripts's monopoly prices and noted that its routing costs "increased significantly[.]"  Indeed, Surescripts itself anticipated that competition would lead to routing prices as low as 1 to 3 cents per transaction.  Today, Plaintiffs and the Class pay at least 16.5 cents *per routing transaction*, an increase of around 566-1700% over the competitive price that Surescripts feared.

239.    On the EHR side, in April 2012, Surescripts increased transaction prices (by decreasing incentive payments) on all EHRs for both routing and eligibility.  In contemporaneous documents, Surescripts recognized that it was able to use its monopoly power to take money away from EHRs by decreasing these incentive payments.  Indeed, no EHR was able to avoid these incentive payment reductions.  No EHR moved its business to a Surescripts competitor or refused to do business with Surescripts as a result of this price increase.

**B.    Defendants' Misconduct Has Reduced Service Quality and Innovation in Routing and Eligibility**

240.    Surescripts's dominance in the routing and eligibility markets has allowed it to effectively strangle the rate of innovation.  As one RelayHealth senior executive testified: "I can tell that in general that the industry wants e-prescribing to evolve, and it's not."

241.    Surescripts agrees.  As Surescripts's former Chief Strategy Officer testified, from the time he joined Surescripts until when he left in 2012, he "saw a bloated organization that wasn't lowering cost, not delivering where people would feel like they were true customers."  A

January 2013 Surescripts presentation forwarded to Surescripts's Executive Vice President and Chief Customer Officer summarized the issue succinctly: "There's a 'we've got such a dominant market position in e-prescriptions, who's going to come in and threaten us?' attitude."

242.    Surescripts's agreements with RelayHealth provide examples of how, in RelayHealth's words, "[t]he current [RelayHealth] relationship with [Surescripts] . . . inhibits innovation."

243.    Absent Defendants' misconduct, innovation would have occurred in not just the routing market but also in the eligibility market.  Because of Defendants' misconduct, however, consumers have had to wait many years to receive the benefits of innovation, when they have received the benefits of innovation at all.  Similarly, pharmacies, like Plaintiffs here, have been locked into e-prescription service and prices in markets that are themselves frozen in an anticompetitive status quo.

244.    The Surescripts-RelayHealth 2010 agreement is just one of the many examples of innovation being expressly undermined by Defendants' misconduct.  The 2010 Surescripts-RelayHealth contract ostensibly called for the two companies to co-develop an initial list of 27 different value-added services, including Adherence Monitoring, Prescription History to Hospitals, Print @ Patient Cell Phone, Rx Claim Pre-Adjudication, Real-Time Benefit Check, electronic Prior Authentication, and REMS-related services such as prohibiting the prescribing/dispensing of medications with Risk Evaluation and Mitigation Strategies.

245.    Not one joint Surescripts-RelayHealth value-added product or service resulted from the 2010 contract.

246.    Similarly, not one joint Surescripts-RelayHealth product or service has resulted from the 2015 contract.

247.     Surescripts repeatedly described the sole value of its agreements with RelayHealth as keeping RelayHealth's customers exclusive to Surescripts and preventing RelayHealth from competing against Surescripts in routing.

248.     The harms from Surescripts's agreement in restraint of trade with respect to RelayHealth and Allscripts continue through today.  The 2015 Surescripts-RelayHealth agreement, which is currently in effect, contains an implicit non-compete that prevents RelayHealth from competing against Surescripts in routing.

249.     Had Surescripts not excluded all competition from the relevant markets, RelayHealth not agreed to allocate the routing market to Surescripts in return for a piece of the monopoly profits, and Allscripts not agreed to abandon routing competitor Emdeon and hand over its EHRs to Surescripts, competitive forces would have spurred the routing market to innovate faster, bringing better services to the market earlier.  Pharmacies, and their consumers, were harmed as a result of these significant innovation delays.

250.     Because Surescripts faces no competition, it also has no incentive to improve its services, resulting in reduced quality to its customers.  Again, Surescripts agrees.  In 2015, Surescripts wrote, "Because we didn't grow up in a competitive environment and we grew up as a monopoly, we don't have the best way of dealing with customers."

251.     Customers also agree.  They have complained that Surescripts has poor customer service, is slow to innovate, impedes EHRs' ability to innovate due to stringent certification requirements, and uses opaque pricing strategies.  Surescripts's own executives report that customers use the following words to describe Surescripts: "monopoly," "entrenched," "slow," "difficult," "misleading," "challenging," "inconsistent," and "dictates."

252.     To take one example of Surescripts's systemic service quality failures, as early as January 2011 Surescripts knew that many of its pharmacy customers were dissatisfied with Surescripts's service surrounding a specific type of routing transaction called "Denied, NewRx to Follow" or "DNTF," which small, independent pharmacies—like Plaintiffs here—correctly believed caused Surescripts to double-bill the pharmacies for a single transaction.  In October 2012, Surescripts calculated that it was making substantial revenue annually in DNTF charges despite knowing that this was "a hot issue for independent pharmacies."  Surescripts, however, did not change its practices on DNTF until April 2013, over *two years* after Surescripts's senior executives knew that Surescripts was double-billing its pharmacy routing customers.

253.     Had Surescripts's anticompetitive conduct not allowed it to maintain its monopoly status, pharmacies would have been able to choose other options that would have provided better customer service and lower prices.  But because Surescripts has unlawfully maintained its monopolies through its exclusive dealing and other anticompetitive arrangements with RelayHealth and Allscripts, pharmacies and consumers have been denied the quality improvements that competition brings.

254.     On top of decreasing quality, Defendants' misconduct has also reduced output as measured by transaction volume.  As of 2017, 69% of doctors were utilizing e-prescribing.  But for Defendants' conduct, competition for prescribers (via their EHRs) would likely result in higher incentive payments to EHRs, which would in turn provide incentives to EHRs to increase their doctors' utilization of e-prescribing.  At least one EHR welcomed the idea of higher incentives tied to growth: "[W]e would welcome an additional 'target' level whereby the incentive would increase . . . as the volume grows."  Surescripts rejected this option and other

options aimed at increasing volume in favor of contractual language that protected its monopoly profits by implementing the exclusive loyalty scheme.

255.    Additionally, Surescripts's stringent certification requirements have delayed adoption and utilization of e-prescribing.  Absent the restraints, increased price, innovation, and quality competition among networks for EHR volume would likely further incentivize or enable EHRs to increase the utilization of e-prescribing among doctors.

256.    Similarly, but for Defendants' misconduct, PTVs and other technology intermediaries would be substantially freer to innovate in the routing market and provide creative and quality solutions that would further incentivize and increase routing utilization among pharmacies.

### C.    There Is No Legitimate Procompetitive Business Justification for Defendants' Misconduct

257.    As the Senior Vice President of one of Surescripts's large hospital system customers wrote in a March 2, 2011 letter to Surescripts's CEO expressing his "deep concern" about Surescripts's exclusivity requirements: "There is no conceivable justification for this policy other than Surescripts's desire to maintain an e-prescribing monopoly."

258.    Surescripts's exclusivity requirements do not serve any legitimate procompetitive business purpose.  Increases in adoption and utilization were largely driven by incentives under MIPPA, the HITECH Act, and a broader movement towards computerized health records generally.

259.    Surescripts's exclusivity requirements were not reasonably necessary to reduce prices and in fact do not reduce prices from the prices that would exist with free competition. Moreover, even if Surescripts's loyalty scheme did provide lower competitive prices—and it does not—Surescripts could have accomplished the same objective through less restrictive

alternatives, such as by offering true discounts based on volume instead of punitive price hikes above and beyond the monopoly price for any non-loyal customer or by levying clawbacks on any non-loyal customer.

260.    Surescripts is not a natural monopoly.  E-prescribing customers treat Surescripts like any other vendor, seeking alternatives to Surescripts for routing and eligibility.  At least one aspiring smaller-scale competitor, Emdeon, failed to succeed in the routing market despite offering lower prices to pharmacies and higher incentive payments to EHRs.

261.    There is no legitimate procompetitive justification for the features in Surescripts's contracts with Allscripts.  Indeed, though it was only after Surescripts and Allscripts became aware of the Federal Trade Commission's investigation that Surescripts and Allscripts dropped many of these provisions, Surescripts is still able to provide routing and eligibility services to Allscripts today.

262.    No procompetitive justification can be offered in defense of the Surescripts-RelayHealth agreement because it is per se illegal as an unlawful agreement not to compete and allocate markets.  However, even if a procompetitive justification were a legally cognizable defense to this agreement (and it is not), there is no legitimate procompetitive justification for Surescripts's non-competition agreement with RelayHealth.  Other provisions in the 2010 contract provided strong protections for any of Surescripts's proprietary information.  Any proprietary information disclosed by either party to the other in connection with the agreement was protected by the recipient party from disclosure to others.  Any documentation provided by Surescripts under the 2010 contract was designated proprietary to Surescripts, and RelayHealth could not copy or use that documentation in any way other than as specifically authorized by the agreement.

## IX. FRAUDULENT CONCEALMENT TOLLING THE STATUTE OF LIMITATIONS

263. Plaintiffs and members of the Class had no knowledge of Defendants' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years prior to the filing of the original Complaint.

264. This is the case because the nature of Defendants' conspiracy was self-concealing and because Defendants employed deceptive practices and techniques of secrecy to avoid detection of, and to fraudulently conceal, their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiffs by, among other things, concealing from Plaintiffs and the public the exclusive nature of the loyalty contracts between Surescripts and RelayHealth, Surescripts and Allscripts, and between Surescripts, RelayHealth, and PTVs.

265. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until May 3, 2019 at the earliest, when the Federal Trade Commission filed a complaint in the United States District Court for the District of Columbia alleging a Surescripts scheme to monopolize routing and eligibility markets.

266. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs and the Class's claims have been tolled.

74

## X. ANTITRUST IMPACT AND IMPACT ON INTERSTATE AND INTRASTATE CONDUCT

267.    During the relevant period, Plaintiffs and members of the Class paid substantial overcharges on routing transactions from Surescripts and RelayHealth.  As a result of the illegal conduct alleged in this complaint, members of the Class were compelled to pay, and did pay, artificially inflated prices for their routing transactions.

268.    Consequently, Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount, form, and components of such damages will be calculated after discovery and upon proof at trial.

269.    Defendants' efforts to monopolize and restrain competition in the markets for routing and eligibility have substantially affected interstate, intrastate, and foreign commerce. Surescripts's anticompetitive conduct raised the price of prescription routing for pharmacies in each state.

270.    At all material times, Defendants sold e-prescription routing and eligibility in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

271.    At all material times, Defendants transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of e-prescription routing and eligibility.

## XI. CLASS ACTION ALLEGATIONS

272.    Plaintiffs, on behalf of themselves and all Class members, seek damages, measured as overcharges, against Defendants based on allegations of anticompetitive conduct in

the markets for routing and eligibility. Plaintiffs also seek injunctive and equitable relief as is necessary to correct the anticompetitive effects of Defendants' misconduct.

273.    Plaintiffs bring this action on behalf of themselves and, under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All pharmacies in the United States and its territories who paid for e-prescriptions routed through the Surescripts network during the period September 21, 2010, through the date of trial.

Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

274.    Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that the Class numbers in the tens of thousands. Further, the Class is readily identifiable from information and records in Defendants' possession.

275.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of the Defendants, i.e., they paid artificially inflated prices for e-prescription routing and were deprived of earlier and more robust competition from cheaper competitors as a result of Defendants' wrongful conduct.

276.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

277.    Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular experience with class action antitrust litigation involving the healthcare industry.

278. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire Class thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

279. Questions of law and fact common to the Class include:

a. Whether Surescripts willfully obtained and maintained market power over e-prescription routing;

b. Whether Surescripts unlawfully excluded competitors and potential competitors from the markets for routing and eligibility;

c. Whether Surescripts has any legally cognizable procompetitive benefit that could not have been achieved using a means with less restrictions on competition, and if so, whether the anticompetitive effect of Surescripts's misconduct nonetheless outweighs the procompetitive benefit;

d. Whether Surescripts entered into an illegal agreement with RelayHealth not to compete and to allocate the routing market to Surescripts;

e. Whether the unlawful scheme alleged herein has substantially affected interstate commerce;

f. Whether Surescripts and PTVs with anticompetitive exclusive dealing clauses boycotted any potential competition in the routing market;

g. Whether Surescripts's anticompetitive agreement with Allscripts foreclosed a substantial share of the routing market;

h. Whether Defendants' anticompetitive conduct caused antitrust impact to Plaintiffs and members of the class; and

i. The quantum of aggregate overcharge damages to the class.

280. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

281. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XII. CLAIMS FOR RELIEF[9]

### COUNT I – MONOPOLIZATION
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)
### (ASSERTED AGAINST DEFENDANT SURESCRIPTS)

282. Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

283. As described above, from approximately September 2010 to the present, Surescripts possessed monopoly power in the markets for e-prescription routing and eligibility. No other competitor has been able to restrain Surescripts's ability to charge supracompetitive monopoly prices for routing transactions during the relevant time period. Surescripts had and has the ability to control prices and exclude competitors.

284. Surescripts willfully and unlawfully maintained its market power in the routing market by engaging in an anticompetitive scheme to prevent legitimate competition on the merits. Surescripts's monopolies have been maintained by its anticompetitive conduct and not as a result of providing a superior product, business acumen, or historical accident.

---

[9] The Court dismissed without prejudice the same Counts I-IV in Plaintiffs' original complaint; Plaintiffs replead those Counts here because Plaintiffs have added substantial additional factual allegations uncovered since the original complaint in support of Named Plaintiffs' ability to bring federal damages claims and to preserve these claims for appeal if one is warranted. The new Counts V-VIII consist of state law antitrust claims in "*Illinois Brick* repealer" states and Count IX seeks federal injunctive relief.

285.     Surescripts's course of anticompetitive conduct includes its exclusive or *de facto* exclusive agreements with pharmacies, PTVs, and EHRs, requiring those entities to use the Surescripts network exclusively or nearly exclusively for routing, as well as the non-compete provisions in its contracts with RelayHealth.  Collectively, Surescripts's contracts substantially foreclose the routing market from actual and potential competition.

286.     There are no valid procompetitive justifications for Surescripts's exclusionary conduct in the routing market and even if there were (and there are not), any such ostensible procompetitive benefit could have been obtained through a less restrictive means.

287.     By means of this scheme, Plaintiffs and members of the Class paid artificially inflated prices for routing transactions, for nearly a decade.  Plaintiffs and members of the Class have been injured in their property by Surescripts's antitrust violations.  Their injury consists of having paid, and continuing to pay, higher prices for routing transactions than they would have paid absent Surescripts's scheme.  Such injury is of the type antitrust laws were designed to prevent and flows from that which makes Surescripts's conduct unlawful.  Plaintiffs are the proper entities to bring a private case concerning this conduct.

288.     Surescripts's anticompetitive acts violate Section 2 of the Sherman Act.

## COUNT II - CONSPIRACY TO MONOPOLIZE
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)
### (ASSERTED AGAINST DEFENDANTS SURESCRIPTS AND RELAYHEALTH)

289.     Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

290.     As described above, from approximately September 2010 to the present, Surescripts possessed monopoly power in the markets for e-prescription routing and eligibility. No other competitor has been able to restrain Surescripts's ability to charge supracompetitive

monopoly prices for routing transactions during the relevant time period. Surescripts had and has the ability to control prices and exclude competitors.

291.     In addition to agreeing to express and per se unlawful contracts in restraint of trade with Surescripts, RelayHealth conspired with Surescripts to unlawfully maintain Surescripts's monopoly over the routing market. In coordination with Surescripts, RelayHealth effectively required pharmacy customers to use only the Surescripts routing network, furthering Surescripts's goal of maintaining its monopolies with a market-wide web of anticompetitive loyalty contracts.

292.     In return for requiring their own customers to remain loyal to Surescripts and eschew competitors' offers, RelayHealth and PTVs received a share of the monopoly profits that Surescripts secured through its monopolies. For RelayHealth, this payment took the form of increased margin, or "spread," between the price Surescripts charged RelayHealth for routing transactions and the price RelayHealth could charge pharmacies. For PTVs, this payment took the form of "loyalty" payments to PTVs guised as "discounts" on routing charges already paid in full by the PTVs' pharmacies.

293.     The goal, purpose, and effect of the Surescripts-directed conspiracy was to maintain and extend Surescripts's monopoly over the routing market so as to ensure continued monopoly profits for Defendants and to effectively fix e-prescription routing prices.

294.     As a direct and proximate result of the conspiracy to monopolize, Plaintiffs and the members of the Class paid artificially inflated prices for routing transactions and were harmed as a result. These injures are of the type the antitrust laws were designed to prevent, and flow from that which makes Surescripts's and RelayHealth's conduct unlawful.

295.    By engaging in the foregoing conduct, Surescripts and RelayHealth have intentionally and wrongfully conspired to monopolize in violation of the Sherman Act.

296.    But for the unlawful conspiracy to monopolize between Surescripts, RelayHealth, and PTV Co-Conspirators with anticompetitive exclusive dealing contracts, RelayHealth and other potential routing competitors would have competed in the routing market, leading to lower routing prices for Plaintiffs and members of the Class.

## COUNT III – CONSPIRACY/COMBINATION IN RESTRAINT OF TRADE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
### (ASSERTED AGAINST DEFENDANTS SURESCRIPTS AND RELAYHEALTH)

297.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

298.    As described above, from approximately September 2010 to the present, Surescripts possessed market power in the markets for e-prescription routing and eligibility; Surescripts had and has the ability to control prices and exclude competitors.

299.    In and around February 2010, in response to potential competition, Surescripts entered into an unlawful agreement with RelayHealth that prohibited RelayHealth from competing against Surescripts in the routing market.  Although couched as a continuation of the existing "value-added reseller" relationship between Surescripts and RelayHealth, this agreement was in fact a naked agreement not to compete and to allocate markets among actual and potential horizontal competitors and is a per se violation of the antitrust laws.

300.    Alternatively, even if found not to be a per se violation of the antitrust laws, the February 2010 Surescripts/RelayHealth agreement is a violation under the rule of reason framework; there is no valid procompetitive justification for the agreement to restrain trade and

even if there was (and there is not), any ostensible procompetitive benefit could have been achieved through lesser restrictive means.

301.    In or around January 2015, Surescripts and RelayHealth renewed the agreement not to compete, and for Surescripts to remain the sole provider of routing services to RelayHealth's routing resale operations.  RelayHealth also agreed to abandon its position in the EHR market and surrendered its EHRs to Surescripts.  This agreement expanded upon and continued the per se unlawful market allocation/agreement not to compete from 2010.  An internal competition analysis from Surescripts at the time characterized RelayHealth as a "Core Systemic [Competitor]."  Celebrating the agreement that neutralized the competitive threat, Surescripts's Chief Quality Officer emailed Surescripts's Vice President of Customer Accounts and congratulated him by noting that "I would not want to have Relay out there competing directly against us."  For its part in the scheme, RelayHealth was allowed a portion of the monopoly routing profits.

302.    As of today, RelayHealth has not independently entered the routing market.

303.    The purpose and effect of the agreements between Surescripts and RelayHealth and PTV Co-Conspirators anticompetitive exclusive dealing contracts was to eliminate competition in the routing market, allocate monopoly profits among competitors, and effectively fix e-prescription routing prices, all at the expense of Plaintiffs and the Class.

304.    As a direct and proximate result of the unlawful restraint of trade between Surescripts, RelayHealth, and PTV Co-Conspirators anticompetitive exclusive dealing contracts, Plaintiffs and the members of the Class paid artificially inflated prices for routing transactions and were harmed as a result.  These injures are of the type the Sherman Act was designed to prevent, and flow from that which makes Surescripts's and RelayHealth's conduct unlawful.

305.    By engaging in the foregoing conduct, Surescripts and RelayHealth have intentionally and wrongfully engaged in one or more combinations and conspiracies in restraint of trade in violation of the Sherman Act.

306.    But for the unlawful agreements between Surescripts and RelayHealth, RelayHealth and other potential routing competitors would have competed in the routing market, leading to lower routing prices for Plaintiffs and members of the Class.

## COUNT IV – COMBINATION IN RESTRAINT OF TRADE
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
## (ASSERTED AGAINST DEFENDANTS SURESCRIPTS AND ALLSCRIPTS)

307.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

308.    As described above, from approximately September 2010 to the present, Surescripts possessed market power in the markets for e-prescription routing and eligibility; Surescripts had and has the ability to control prices and exclude competitors.

309.    On or about May 31, 2010, Surescripts and Allscripts entered into an unlawful contract in restraint of trade that effectively eliminated Emdeon as a potential competitor in the routing market and ensured that nascent competitors in the routing market would not be able to access Allscripts' sizeable EHR market share.  The purpose and effect of the 2010 Surescripts-Allscripts agreement was to maintain Surescripts's monopolies; in return for joining the conspiracy, Allscripts received payments from Surescripts—out of its supracompetitive monopoly profits—in the form of higher-than-market incentive payments.

310.    Surescripts described an early version of this Allscripts agreement with a picture of a movie containing the slogan "HERE COMES THE BRIBE."

311.     Surescripts and Allscripts continued their agreement in restraint of trade through a 2015 contract that extended the exclusivity and revenue sharing provisions for another five years.

312.     The purpose and effect of the agreements between Surescripts and Allscripts was to eliminate competition in the routing and eligibility markets, share supracompetitive profits, and effectively fix e-prescription routing prices, at the expense of Plaintiffs and the Class.

313.     As a direct and proximate result of Surescripts's and Allscripts' unlawful restraint of trade, Plaintiffs and the members of the Class paid artificially inflated prices for routing transactions and were harmed as a result.  These injuries are of the type the Sherman Act was designed to prevent, and flow from that which makes Surescripts's and Allscripts' conduct unlawful.

314.     By engaging in the foregoing conduct, Surescripts and Allscripts have intentionally and wrongfully engaged in one or more combinations and conspiracies in restraint of trade in violation of the Sherman Act.

315.     But for the unlawful agreements between Surescripts and Allscripts, other potential routing competitors would have competed in the routing market, leading to lower routing prices for Plaintiffs and members of the Class.

### COUNT V – MONOPOLIZATION UNDER STATE LAW
### (ASSERTED AGAINST DEFENDANT SURESCRIPTS)

316.     Plaintiffs incorporate all allegations above, herein, and in Count I specifically.

317.     By engaging in the foregoing conduct, Surescripts intentionally, willfully, and wrongfully monopolized the relevant market in violation of the following state laws:

   a) Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases in Arizona by members of the class.

   b) Cal. Bus. & Prof. Code §§ 16700 and §§ 17200, et seq., with respect to purchases in California by members of the class.

c) C.G.S.A. §§ 35-27, et seq., with respect to purchases in Connecticut by class members.

d) D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia by members of the class.

e) Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida by members of the class.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois by members of the class.

g) Iowa Code § 553.5, et seq., with respect to purchases in Iowa by members of the class.

h) Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine by members of the class.

i) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland by members of the class.

j) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota by members of the class.

k) Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi by members of the class.

l) Mo. Rev. Stat. §§ 407.020, et seq., with respect to purchase in Missouri by members of the class.

m) Mont. Code Ann. §§ 30-14-101, et seq., with respect to purchases in Montana by members of the class.

n) Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to purchases in Nebraska by members of the class.

o) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada by members of the class.

p) N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to purchases in New Hampshire by members of the class.

q) N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico by members of the class.

r) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York by members of the class.

s)  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina by members of the class.

t)  N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by members of the class.

u)  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by members of the class.

v)  R.I. Gen. Laws §§ 6-36-5 et seq., with respect to purchases in Rhode Island by members of the class.

w)  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota by members of the class.

x)  Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah by members of the class, including citizens or residents of Utah.

y)  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by members of the class.

z)  W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia by members of the class.

aa) Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by members of the class.

318.  Plaintiffs and class members accordingly seek damages and multiple damages as permitted by law.

## COUNT VI ‑ CONSPIRACY TO MONOPOLIZE UNDER STATE LAW
### (ASSERTED AGAINST DEFENDANTS SURESCRIPTS AND RELAYHEALTH)

319.  Plaintiffs incorporate all allegations above, herein, and in Count II specifically

320.  By engaging in the foregoing conduct, Surescripts and RelayHealth intentionally, willfully, and wrongfully conspired to monopolize the relevant market in violation of the following state laws:

a)  Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona by members of the class.

b)  Cal. Bus. & Prof. Code §§ 16700 and §§ 17200, et seq., with respect to purchases in California by members of the class.

c) C.G.S.A. §§ 35-27, et seq., with respect to purchases in Connecticut by members of the class.

d) D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia by members of the class.

e) 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois by members of the class.

f) Iowa Code § 553.4, et seq., with respect to purchases in Iowa by members of the class.

g) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas by members of the class.

h) Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine by consumer members of the class.

i) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland by members of the class.

j) Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota by members of the class.

k) Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi by members of the class.

l) Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to purchases in Nebraska by members of the class.

m) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada by members of the class.

n) N.H. Rev. Stat. Ann. §§ 356:2-3, et seq., with respect to purchases in New Hampshire by members of the class.

o) N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico by members of the class.

p) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York by members of the class.

q) N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina by members of the class.

r) N.D. Cent. Code §§ 51-08.1-02, et seq., with respect to purchases in North Dakota by members of the class.

s)  Or. Rev. Stat. §§ 646.730, et seq., with respect to purchases in Oregon by members of the class.

t)  R.I. Gen. Laws §§ 6-36-4 et seq., with respect to purchases in Rhode Island by members of the class.

u)  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota by members of the class.

v)  Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee by members of the class.

w)  Utah Code Ann. §§ 76-10-3104, et seq., with respect to purchases in Utah by members of the class.

x)  W.Va. Code §§ 47-18-3-4, et seq., with respect to purchases in West Virginia by members of the class.

y)  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by members of the class.

321.  Plaintiffs and class members accordingly seek damages and multiple damages as permitted by law.

## COUNT VII ‑ COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (ASSERTED AGAINST DEFENDANTS SURESCRIPTS AND RELAYHEALTH)

322.  Plaintiffs incorporate all allegations above, herein, and in Count III specifically.

323.  By engaging the foregoing conduct, Surescripts and RelayHealth intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a)  Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases in Arizona by members of the class.

b)  Cal. Bus. & Prof. Code §§ 16700 and §§ 17200, et seq., with respect to purchases in California by members of the class.

c)  C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut by members of the class.

d)  D.C. Code §§ 28-4502, et seq., with respect to purchases in the District of Columbia by members of the class.

e) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois by members of the class.

f) Iowa Code § 553.4, et seq., with respect to purchases in Iowa by members of the class.

g) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas by members of the class.

h) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by consumer members of the class.

i) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland by members of the class.

j) Minn. Stat. §§ 325D.51, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota by members of the class.

k) Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi by members of the class.

l) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by members of the class.

m) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada by members of the class.

n) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by members of the class.

o) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by members of the class.

p) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York by members of the class.

q) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by members of the class.

r) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by members of the class.

s) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by members of the class.

t) R.I. Gen. Laws §§ 6-36-4 et seq., with respect to purchases in Rhode Island by members of the class.

u) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota by members of the class.

v) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee by members of the class.

w) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah by members of the class.

x) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia by members of the class.

y) Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by members of the class.

324. Plaintiffs and class members accordingly seek damages and multiple damages as permitted by law.

## CLAIM VIII – COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (ASSERTED AGAINST DEFENDANTS SURESCRIPTS AND ALLSCRIPTS)

325. Plaintiffs incorporate all allegations above, herein, and in Count IV specifically.

326. By engaging the foregoing conduct, Surescripts and Allscripts intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases in Arizona by members of the class.

b) Cal. Bus. & Prof. Code §§ 16700 and §§ 17200, et seq., with respect to purchases in California by members of the class.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut by members of the class.

d) D.C. Code §§ 28-4502, et seq., with respect to purchases in the District of Columbia by members of the class.

e) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois by members of the class.

f) Iowa Code § 553.4, et seq., with respect to purchases in Iowa by members of the class.

g) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas by members of the class.

h) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by consumer members of the class.

i) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland by members of the class.

j) Minn. Stat. §§ 325D.51, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota by members of the class.

k) Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi by members of the class.

l) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by members of the class.

m) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada by members of the class.

n) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by members of the class.

o) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by members of the class.

p) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York by members of the class.

q) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by members of the class.

r) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by members of the class.

s) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by members of the class.

t) R.I. Gen. Laws §§ 6-36-4 et seq., with respect to purchases in Rhode Island by members of the class.

u) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota by members of the class.

v) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee by members of the class.

91

w) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah by members of the class.

x) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia by members of the class.

y) Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by members of the class.

327. Plaintiffs and class members accordingly seek damages and multiple damages as permitted by law.

## COUNT IX – FOR INJUNCTIVE RELIEF FOR VIOLATIONS OF 15 U.S.C. §§ 1, 2
### (AGAINST ALL DEFENDANTS)

328. Plaintiffs incorporate all allegations above, herein, and in Counts I-IV specifically.

329. As set forth in Count I through IV, Defendants have violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

330. Plaintiffs request that the Court granted injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 as may be necessary and appropriate to restore competition in the market.

## XIII. DEMAND FOR JUDGMENT

331. WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully pray that the Court:

a. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3); direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class; and declare that Plaintiffs are the representatives of the Class;

b. Enter joint and several judgments against Defendants and in favor of Plaintiffs and the Class;

c.   Declare the acts alleged herein to be unlawful under the state statutes set forth

above;

d.   Award Plaintiffs damages as provided by law in the amount to be determined

at trial;

e.   Award the Class damages and, if applicable, treble, multiple, punitive and/or

other damages, in the amount to be determined at trial, including interest;

f.   Award Plaintiffs and the Class the costs of this suit, including reasonable

attorneys' fees as provided by law; and

g.   Grant such other further relief as is necessary to correct for the

anticompetitive market effects caused by Defendants' unlawful conduct as the

Court deems appropriate.

**XIV.   JURY DEMAND**

332.   Plaintiffs demand a trial by jury on all issues so triable.

Dated:  April 12, 2024                                   */s/Kenneth A. Wexler*
                                                        Kenneth A. Wexler
                                                        Justin N. Boley
                                                        Tyler J. Story
                                                        **Wexler Boley & Elgersma LLP**
                                                        311 South Wacker Drive, Suite 5450
                                                        Chicago, IL 60606
                                                        T: (312) 346-2222
                                                        F: (312) 346-0022
                                                        kaw@wbe-llp.com
                                                        jnb@wbe-llp.com
                                                        tjs@wbe-llp.com

                                                        Tyler W. Hudson
                                                        Eric D. Barton
                                                        **Wagstaff & Cartmell, LLP**
                                                        4740 Grand Avenue, Ste. 300
                                                        Kansas City, MO 64112
                                                        T: (816) 701-1100
                                                        F: (816) 531-2372
                                                        thudson@wcllp.com

ebarton@wcllp.com

Daniel E. Gustafson
Karla M. Gluek
Michelle J. Looby
**Gustafson Gluek PLLC**
120 South Sixth Street, Ste. 2600
Minneapolis, MN 55402
T: (612) 333-8844
F: (612) 339-6622
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
mlooby@gustafsongluek.com

Robert N. Kaplan, Esq.
Jeffrey P. Campisi, Esq.
Elana Katcher, Esq.
Matthew P. McCahill, Esq.
**Kaplan Fox & Kilsheimer LLP**
850 Third Ave., 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
ekatcher@kaplanfox.com
mmccahill@kaplanfox.com

W. Joseph Bruckner
Robert K. Shelquist
Brian D. Clark
Justin R. Erickson (*pro hac* forthcoming)
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
wjbruckner@locklaw.com
rkshelquist@locklaw.com
bdclark@locklaw.com
jrerikson@locklaw.com

Eugene A. Spector
William G. Caldes
Jeffrey L. Kodroff
John Macoretta
**Spector Roseman & Kodroff, P.C.**

2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
espector@srkattorneys.com
bcaldes@srkattorneys.com
jkodroff@srkattorneys.com
jmacoretta@srkattorneys.com

Gregory S. Asciolla
Karin E. Garvey
Jonathan S. Crevier
**Labaton Sucharow LLP\***
140 Broadway
New York, NY 10005
Tel: 212-907-0700
gasciolla@labaton.com
kgarvey@labaton.com
jcrevier@labaton.com

*Interim Co-Lead Counsel*

Chad McCoy
Jared Smith
**McCoy, Hiestand, & Smith, PLC**
108 Browns Lane
Louisville, KY 40207
T: (502) 233-8385
F: (502) 233-8409
chad@mhsattorneys.com
jared@mhsattorneys.com

Joseph J. Bogdan
**Law Office of Joseph J. Bogdan**
5950 E. Lincoln Ave. Ste. 200
Lisle, IL 60532
T: (630) 310-1267
F: (630) 206-2454
jbogdanlawoffice@gmail.com

*Counsel for Plaintiffs' Corner Pharmacy,
Summers Pharmacy, and Logan Pharmacy
and the Proposed Class*

D. Michael Campbell, Of Counsel
**Moody Law**

95

575 North Broadway Ave.
Bartow, FL 33830
T: (863) 733-9090
F: (863) 534-1001
dmcampbell@campbelllaw.com

*Counsel for Plaintiff Integrated
Pharmaceutical Solutions LLC d/b/a Bartow
Pharmacy and Medical Supply and the
Proposed Class*

Gary Specks
**Kaplan Fox & Kilsheimer LLP**
681 Prestwick Lane
Wheeling, Illinois 60090
Tele.: 847.831.1585
Fax.: 847.831.1580
Email: gspecks@kaplanfox.com

*Counsel for Plaintiff Falconer Pharmacy,
Inc. and the Proposed Class*

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
**Preti, Flaherty, Beliveau & Pachios LLP**
One City Center
P.O. Box 9546
Portland, ME 04112-9546
T: (207) 791-3000
F: (207) 791-3111
ghansel@preti.com
rweil@preti.com
msmith@preti.com

Eric C. Burns
**ECB Law LLC**
320 East Patrick Road
Palmyra, Pennsylvania 17078
T: 717-303-6520
eburns@ecblawllc.com

Simon B. Paris
Patrick Howard
Charles J. Kocher

**Saltz, Mongeluzzi, Barret & Bendesky, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 496-8282
Fax: (215) 496-0999
sparris@smbb.com
phoward@smbb.com
ckocher@smbb.com

*Counsel for Plaintiff Kennebunk Village
Pharmacy, Inc. and the Proposed Class*

Marc H. Edelson
Edelson & Associates, LLC
3 Terry Drive, Suite 205
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com

*Counsel for Plaintiff Whitman Pharmacy
and the Proposed Class*

Arthur M. Bailey, Esq.
Marco Cercone, Esq.
**Rupp Baase Pfalzgraf Cunningham, LLC**
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Tel: (716) 854-3400
Fax: (716) 664-2983
bailey@ruppbaase,com
cercone@ruppbaase.com

Melissa H. Maxman
Ronald F. Wick
Erica C. Lai
Danielle C. Morello
**Cohen & Gressler LLP**
2001 Pennsylvania Avenue NW, Suite 300
Washington, DC 20006
Tel: (202) 851-2070
mmaxman@cohengresser.com
rwick@cohengresser.com
elai@cohengresser.com
dmorello@cohengresser.com

Tina Wolfson
Henry Kelston
Ruhandy Glezakos
**Ahdoot & Wolfson, PC**
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: (310) 474-9111
Tel: (310) 474-8585
twolfson@ahdootwolfson.com
hkelston@ahdootwolfson.com
rglezakos@ahdootwolfson.com

*Counsel for the Proposed Class*

*Application to be appointed to the lead
counsel structure pending

98