IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br>All Class Actions | No. 19-cv-06627<br><br>Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

The plaintiffs in this case are eight pharmacies ("the Pharmacies") seeking to represent a class of U.S. pharmacies that paid for e-prescriptions routed through Surescripts' electronic network.[1] 3d Amd. Consol. Class Action Compl. ("TAC") ¶¶ 15-22, 273, ECF No. 333. They bring this action pursuant to Sections 1 and 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-2, and the antitrust laws of twenty-nine states. The defendants are two health information technology companies, Surescripts, LLC ("Surescripts") and Allscripts Healthcare Solutions, Inc. ("Allscripts").[2] Pursuant to Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the defendants have moved to exclude or limit the testimony of two proposed expert witnesses: Dr. Daniel F. Spulber and Michele V. Davidson. The defendants filed joint motions to limit Dr. Spulber's testimony, ECF No. 283, and to exclude Ms. Davidson's testimony and report, ECF No. 285-1. Allscripts also filed separate motions to exclude Dr. Spulber's and Ms. Davidson's testimony and reports as to

---

[1] Previously, there were nine pharmacy plaintiffs in the TAC. Jordan Drug, Inc. d/b/a Powell Prescription Center, dismissed its claims against the defendants with prejudice. ECF No. 244.

[2] RelayHealth, Inc. is named as a defendant in the TAC but has settled the claims against it and is no longer a party. *See* Order, Feb. 24, 2022, ECF No. 202.

Allscripts. ECF Nos. 287, 290. For the following reasons, the defendants' joint motions as to Dr. Spulber and Ms. Davidson are granted in part. Allscripts's separate motions are denied.

## BACKGROUND

The relevant factual background has been set forth in several prior opinions in this case and in a related case brought by the Federal Trade Commission ("FTC") against Surescripts in the United States District Court for the District of Columbia, which has since settled. *See generally In re Surescripts Antitrust Litig.* ("*Surescripts III*"), No. 19 C 6627, 2024 WL 1195571 (N.D. Ill. Mar. 20, 2024) (granting in part Surescripts' motion to compel responses to certain discovery requests); *In re Surescripts Antitrust Litig.* ("*Surescripts II*"), 608 F. Supp. 3d 629 (N.D. Ill. 2022) (denying the defendants' motions to dismiss the second amended complaint); *In re Surescripts Antitrust Litig.* ("*Surescripts I*"), No. 19-cv-6627, 2020 WL 4905692 (N.D. Ill. Aug. 19, 2020) (granting the defendants' motions to dismiss the first amended complaint); *Fed. Trade Comm'n v. Surescripts, LLC* ("*FTC II*"), 665 F. Supp. 3d 14, 22-30 (D.D.C. 2023) (granting the FTC's partial motion for summary judgment and reserving decision on Surescripts' motion for summary judgment); *Fed. Trade Comm'n v. Surescripts, LLC* ("*FTC I*"), 424 F. Supp. 92, 95-97 (D.D.C. 2020) (denying Surescripts' motion to dismiss). As follows, the Court briefly recounts aspects of this background relevant to the defendants' *Daubert* motions.

## I.    Factual Background

### A.    Routing and Eligibility

"E-prescribing is the computer-based electronic transfer of prescription data between prescribers (usually through the prescriber's [electronic health record ("EHR")] vendor), pharmacies, and payers." TAC ¶ 29. This action concerns two components of e-prescribing: electronic routing and eligibility. The plaintiffs contend that electronic routing and eligibility are the relevant markets for purposes of antitrust analysis. TAC ¶ 211; *see also FTC II*, 665 F. Supp.

3d at 44 (finding, based on the record in the FTC action, that "the relevant markets are electronic routing and electronic eligibility"). "Routing is the transmission of prescription and prescription-related information between the prescriber's EHR and a pharmacy" either directly or indirectly, through a pharmacy technology vendor ("PTV"). TAC ¶ 31. "Eligibility is the transmission of a patient's formulary and benefit information from a [pharmacy benefit manager ("PBM")] to a prescriber's EHR prior to the patient's appointment." TAC ¶ 32. Surescripts provides network infrastructure that connects parties on both sides of electronic routing and eligibility transactions: at the far ends, prescribers to pharmacies and PBMs to prescribers. *See* TAC ¶ 50.

Historically, routing and eligibility were provided by analog methods such as paper, fax, or phone. E-prescribing became legal nationwide in 2007, and a transition to electronic methods followed. TAC ¶ 35. As of 2016, nearly 70% of U.S. physicians were e-prescribing, and as of 2017, 77% of all prescriptions were delivered electronically. TAC ¶ 40.

Surescripts was formed in 2008, early in the transition to e-prescribing, by the merger of RxHub, LLC ("RxHub") and SureScripts Systems, Inc. ("SureScripts Systems"). TAC ¶ 100. RxHub was the first major eligibility network, while Surescripts Systems focused on electronic routing. TAC ¶ 101-02. Post-merger, Surescripts controlled at least 95% of electronic eligibility and routing, as measured by transaction volume. TAC ¶ 103. According to the most recent data included in the complaint, Surescripts maintains 95%-plus market shares in both markets. TAC ¶ 220.

**B.    Surescripts' Loyalty Program**

In both routing and eligibility, Surescripts' network provides a two-sided platform with indirect network effects, meaning that participants on one side of the platform value having more participants on the other side of the platform. TAC ¶ 45; *see also FTC II*, 665 F. Supp. 3d at 23. In routing, Surescripts charges pharmacies and PTVs per-transaction fees but often provides EHR

3

vendors per-transaction payments. In eligibility, a similar fee structure applies: Surescripts charges PBMs per-transaction fees but often provides EHR vendors pre-transaction payments. Prescribers neither pay fees nor receive incentive payments (indeed, incentive payments would violate anti-kickback laws). Defs. Surescripts and Allscripts' Reply Supp. Defs.' Spulber Mot. Exclude ("Defs.' Spulber Reply Br.") 15 n.4, ECF No. 310. A free service is still a form of subsidy, however, so with respect to Surescripts' network, pharmacies, PTVs, and PBMs are the "money" side of routing and eligibility, while EHR vendors and prescribers are the subsidy side. *See* TAC ¶ 120.

In mid-2009, Surescripts began a loyalty program to restrict "multihoming" (the use of more than one network). TAC ¶ 120. Under loyalty contracts with PTVs, directly connecting pharmacies, and PBMs (the "money" side), Surescripts provided discounts in exchange for exclusivity, specifically an agreement to use Surescripts' network for all routing or eligibility transactions with Surescripts-connected EHR vendors. TAC ¶¶ 121-22. Similarly, under loyalty contracts with EHR vendors (the subsidy side), Surescripts conditioned incentive payments on exclusivity in routing, eligibility, or both, with higher incentive payments to EHR vendors that agreed to exclusivity in both routing and eligibility. TAC ¶ 131. Surescripts' loyalty contracts typically included multi-year initial terms, sometimes as long as five years, and automatically renewed for one-year terms upon expiration if not terminated. TAC ¶¶ 136, 138. Many contracts also included clawback provisions, under which customers agreed to repay discounts or payments retroactive over the term of the contract if they violated the exclusivity agreement. TAC ¶¶ 127-29, 134.

Some of Surescripts' loyalty contracts included other restrictive terms. In particular, the Pharmacies highlight Surescripts' contracts with Allscripts and RelayHealth. In 2010, Surescripts

4

signed a four-year contract with Allscripts, an EHR vendor, that (1) required Allscripts to terminate its routing connection with Emdeon, a Surescripts competitor, at the expiration of Allscripts' contract with Emdeon, in June 2013; (2) prohibited Allscripts from renewing contracts with PBMs to provide them with direct eligibility connections and from marketing or entering into new eligibility contracts with PBMs; (3) imposed a "right of first refusal" on Allscripts' e-prescribing business, which required Allscripts to refer prospective e-prescribing customers to Surescripts; and (4) required Allscripts to remind its sales and business development personnel of the above terms annually. TAC ¶¶ 180-84. In 2015, Surescripts and Allscripts signed an amendment extending the 2010 contract for five years, although the parties removed some terms in 2018. TAC ¶¶ 195-96. The Pharmacies also highlight a non-compete agreement between Surescripts and RelayHealth that the parties signed in 2003 and renewed in 2010 and 2015. TAC ¶¶ 140-70.

Through its loyalty contracts, Surescripts secured exclusivity with customers representing large shares of electronic routing and eligibility, as measured by transaction volume. Within a few years, in routing, Surescripts' contracts with PTVs, directly connecting pharmacies, and EHR vendors covered 78% of the pharmacy side (as of January 2011) and 81% of the prescriber side (as of November 2010). TAC ¶ 224, 226. In eligibility, Surescripts' contracts with PBMs and EHR vendors covered 74% of the PBM side (as of October 2011) and 78% of the prescriber side (as of November 2010). TAC ¶¶ 225-26. According to the complaint, Surescripts' contracts "currently" cover similar shares of routing and eligibility: at least 79% of pharmacy-side routing, 78% of PBM-side eligibility, and 87% of prescriber-side routing and eligibility. TAC ¶¶ 224-26.

## II.   Procedural Background

Based on these allegations, the Pharmacies bring this action on behalf of the following putative class: "All pharmacies in the United States and its territories who paid for e-prescriptions routed through the Surescripts network during the period September 21, 2010, through the date of

5

trial." TAC ¶ 273. Their complaint asserts nine counts.[3] They allege that Surescripts maintained a monopoly in two national markets—electronic routing and eligibility—through anticompetitive conduct, in violation of Section 2 of the Sherman Act and the antitrust laws of twenty-seven states. TAC ¶¶ 211, 282-88, 316-18. Based on the 2010 contract between Surescripts and Allscripts and its 2015 amendment, the Pharmacies also allege that Surescripts and Allscripts engaged in a combination in restraint of trade, in violation of Section 1 of the Sherman Act and the antitrust laws of twenty-five states. TAC ¶¶ 307-15, 325-27. Based on the Surescripts-RelayHealth non-compete agreement, the Pharmacies allege that Surescripts and RelayHealth conspired to monopolize the electronic routing and eligibility markets and engaged in a conspiracy or combination in restraint of trade, in violation of Sections 1 and 2 of the Sherman Act, respectively, and the antitrust laws of twenty-nine states. TAC ¶¶ 289-306, 319-24. The Pharmacies allege that

---

[3] These counts, as set forth in the TAC, are: (1) monopolization in violation of Sherman Act § 2 against Surescripts; (2) conspiracy to monopolize in violation of Sherman Act § 2 against Surescripts and RelayHealth; (3) conspiracy/combination in restraint of trade in violation Sherman Act § 1 against Surescripts and RelayHealth; (4) combination in restraint of trade in violation of Sherman Act § 1 against Surescripts and Allscripts; (5) monopolization under state law against Surescripts; (6) conspiracy to monopolize under state law against Surescripts and RelayHealth; (7) combination in restraint of trade under state law against Surescripts and RelayHealth; (8) combination in restraint of trade under state law against Surescripts and Allscripts; and (9) injunctive relief for violations of Sherman Act §§ 1-2 against all defendants. TAC ¶¶ 282-330.

Although not particularly problematic in the context of these motions, it bears noting that this organization conflates the plaintiffs' claims and the legal theories that support them. "Counts" are the authorized device for asserting distinct claims—that is, claims "founded on a separate transaction or occurrence"—*see* Federal Rule of Civil Procedure 10(b)—but, as here, are often improperly employed to assert different legal theories in support of a claim. As Judge Shadur explained in *Bonestroo, Rosene, Anderlik & Assocs., Inc. v. Devery*, No. 05 C 2184, 2006 WL 1005284, at *11 (N.D. Ill. Apr. 12, 2006), "the use of separate counts to set out different theories of recovery is a mistaken manifestation of the state law 'cause of action' approach, rather than the federal concept of 'claim for relief' (*see NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir.1991)). That is not what Rule 10(b)'s last sentence defines as the proper role for any such separation of a pleading into different counts." *See also, e.g., Orthodontic Centers of IL v. Michaels*, 407 F. Supp. 2d 934, 935 (N.D. Ill. 2005) ("the concept of a separate count … does not properly encompass the statement of what is no more than a different theory of recovery on the same claim.").

as result of this conduct, class members paid overcharges for routing, and they seek damages in the form of these overcharges and injunctive relief. TAC ¶¶ 267-72.

## **DISCUSSION**

### I.      **Legal Framework**

The admissibility of expert testimony is governed by *Daubert* and Federal Rule of Evidence 702. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending the application of *Daubert* to non-scientific experts). The current version of Rule 702 essentially codifies the principles set forth in *Daubert*. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Under this framework, district courts perform a gatekeeper function. Before admitting expert testimony, a court must ensure that the testimony is relevant and reliable, which involves a three-step inquiry: (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). The proponent of the expert bears the burden of demonstrating, by a preponderance of the evidence, that "the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *see* Fed. R. Evid. 104(a).

7

A witness is qualified if he has sufficient "knowledge, skill, experience, training, or education" related to the subject matter of his testimony. Fed. R. Evid. 702. "The question [a court] must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The "court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

As for reliability, Rule 702 sets forth the following factors for a court to consider when assessing the expert's methodology: (1) whether "the testimony is based on sufficient facts or data"; (2) whether "the testimony is the product of reliable principles and methods"; and (3) whether "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Daubert*, which assessed scientific testimony, set forth a more specific list: "(1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (citing *Daubert*, 509 U.S. at 593-94). While the principles set forth in *Daubert* apply equally to non-scientific fields, the specific factors mentioned in *Daubert* may not neatly apply to testimony from a non-scientist, and district courts have "broad latitude" to decide what factors are "reasonable measures of reliability in any particular case." *Kumho*, 526 U.S. at 153. Thus, the list of factors set forth in Rule 702 is intentionally more general than *Daubert*'s list; reflecting the Supreme Court's guidance in *Kumho*, the factors mentioned in Rule

8

702 "are broad enough to require consideration of any or all of the specific *Daubert* factors where appropriate." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

The discretion afforded to district courts in assessing an expert's methodology, while broad, is limited by the district court's role, as distinct from a jury's role. "[T]he court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis." *Manpower*, 732 F.3d at 808. Methodology is distinct from "the selection of data inputs to employ in a model" and the conclusions produced. *Id*. at 807. This line, while not always easy to discern, marks the boundary of the court's role; thus, "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury." *Id.* at 808 *see also Daubert*, 509 U.S. at 595 (stating that the court's "focus . . . must be solely on principles and methodology, not on the conclusions that they generate"). The qualifier "normally" alludes to the gray area between methodology and data. Importantly, the court must still ensure that there is some link between data and methodology; where opinion evidence "is connected to existing data only by the *ipse dixit* of the expert[,] [a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" for the expert's testimony to be reliable. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Finally, the requirement that evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue, or the "fit" requirement, "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. (internal quotation marks and citation omitted). Helpfulness is a matter of "fit" between the suggested testimony and the relevant issue. *See id.*; *Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 616 (7th Cir. 1993). To prevail in an antitrust action, the

9

plaintiffs must establish (1) a violation of the antitrust laws; (2) individual injury resulting from that violation, or antitrust impact; and (3) measurable damages. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009). Therefore, in this case, expert testimony must sufficiently relate to one of these issues to be helpful. An indirect relationship can suffice. *See Smith*, 215 F.3d at 721 ("[E]xpert testimony need only be relevant to *an* issue in the case; it need not relate directly to the ultimate issue.").

## II.    Challenges to the Pharmacies' Experts

The Pharmacies intend to rely on Dr. Spulber's testimony as an economic expert and Ms. Davidson's testimony as an industry expert. The defendants jointly move to exclude certain opinions of Dr. Spulber for failure to meet the reliability requirement of the Rule 702 and *Daubert* framework. They jointly move to exclude Ms. Davidson's testimony and report for failure to meet all three requirements (qualifications, reliability, and fit). Separately, Allscripts moves to exclude Dr. Spulber's and Ms. Davidson's testimony and opinions as to Allscripts for failure to meet the fit requirement because neither expert opines about the independent and particularized effects of Allscripts' alleged conduct. As follows, the Court addresses the defendants' joint arguments as to Dr. Spulber and Ms. Davidson, then turns to Allscripts' separate arguments as to both experts.

### A.    Dr. Spulber

Dr. Daniel F. Spulber is the Elinor Hobbs Distinguished Professor of International Business and Professor of Strategy at the Kellogg School of Management at Northwestern University and Professor of Law (by Courtesy) at the Northwestern University Pritzker School of Law. He holds a Ph.D. in economics from Northwestern University. The Pharmacies asked Dr. Spulber to analyze the relevant markets and provide opinions directly related to the three elements of their antitrust claims: "whether and how . . . Surescripts engaged in anticompetitive, exclusionary conduct to monopolize the e-prescribing market" (violation of the antitrust laws) and "whether and to what

10

extent class members were damaged due to Surescripts's alleged anticompetitive scheme" (antitrust impact and damages). Spulber Report ¶ 9, ECF No. 304 Ex. A.

The defendants challenge Dr. Spulber's impact and damages opinions, which are based on a benchmark analysis. Dr. Spulber calculates "the Surescripts overcharge" using the difference between his estimates of what Surescripts charged pharmacy class members for electronic routing, or the real-world price, and the price that class members would have paid absent the defendants' alleged conduct, that is, the "but-for" price. *Id*. at ¶¶ 370-71. As for the real-world price, Dr. Spulber bases his primary estimate on a contract review, and provides an alternative estimate based on Surescripts' monthly average revenue per transaction and customer. *See id*. at ¶¶ 387-98, 402 n.739. As for the but-for price, Dr. Spulber provides two benchmarks: a competitive, or contestable, market in which firms earn zero economic profits—he estimates the price in this market using Surescripts' average cost of production—and an "admission" benchmark drawn from testimony by Surescripts' former CEO, Harry Totonis. *Id*. at ¶¶ 399-407. Dr. Spulber concludes that a pharmacy was harmed if it paid a positive overcharge at least once during the relevant period. *Id*. at ¶ 372. He estimates damages as the sum of all overcharges across the period. *Id*. at ¶ 419.

Dr. Spulber elaborates on his opinions in his 226-page opening report (ECF No. 283 Ex. 1), a 180-page rebuttal report (ECF No. 304 Ex. B), and deposition testimony (ECF No. 283 Ex. 3). In his opening report, he summarizes his impact and damages opinions as follows:

> A review of Surescripts's contracts and their loyalty and exclusivity provisions, as well as an economic analysis of the e-prescribing markets, shows that Surescripts's conduct had a common negative impact on pharmacy class members due to overcharges for e-prescription routing.
>
> . . . .
>
> The damages to the pharmacy class members caused by Surescripts's anticompetitive conduct are equal to $1,182.4 million using Surescripts's average cost of production as a benchmark competitive price and are equal to $1,452.8 million using a benchmark competitive price as per Surescripts's admissions about

11

the market prices that would have existed for e-prescribing if Surescripts had not excluded competitors.

Spulber Report ¶ 13.

The defendants argue that Dr. Spulber's impact and damages opinions should be excluded because "[Dr. Spulber] gets both parts of the equation," the real-world price and the but-for price, "so wrong the entire [benchmark] analysis fails the *Daubert* standard." Defs. Surescripts and Allscripts' Mot. Exclude Certain Expert Test. Daniel F. Spulber, Ph.D. ("Defs.' Spulber Mot. Exclude") 1, ECF No. 283. They argue that his estimates are unreliable measures of the routing prices that directly connecting pharmacies and intermediaries paid in the real world and would have paid in the but-for world. *Id*. at 13-27; Defs.' Spulber Reply Br. 2-11. The defendants also criticize Dr. Spulber for imputing a 100% pass-through of overcharges from intermediaries to indirectly connecting pharmacies. Defs.' Spulber Mot. Exclude 27-30; Defs.' Spulber Reply Br. 11-15. The Court considers the defendants' arguments as to Dr. Spulber's but-for price and real-world price opinions in turn, and then considers the defendant's arguments as to Dr. Spulber's pass-through opinion.

### 1. But-For Price

The but-for price is the price that pharmacy class members would have paid for electronic routing in the absence of the defendants' alleged conduct. "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981). In this context, "an expert may construct a reasonable offense-free world as a [benchmark] for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities." *LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003) (citation omitted); *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (holding that "a just and reasonable

12

estimate of the damage based on relevant data" may support an antitrust verdict). That is, the benchmark method is generally accepted for determining impact and damages in antitrust cases. For a benchmark opinion to be admissible under *Daubert* and Rule 702, however, it must also be based on sufficient facts or data and reflect a reliable application of the benchmark method to the facts of the case. A reliable application of the benchmark method requires a sufficient connection between the expert's chosen benchmark and the facts of the case. *See In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019) (holding that the question of whether an expert has "demonstrate[d] a relationship between [his benchmark] and [the relevant market]" is a question for the court under *Daubert* and Rule 702 because this relationship is "the foundation of the assumption underlying the application of the [benchmark] method").

To measure impact and damages in this case, Dr. Spulber identifies two benchmarks that approximate, in his opinion, the but-for world: (1) a perfectly competitive or contestable market (his average economic cost benchmark), and (2) an "admission" benchmark based on testimony by Surescripts' former CEO, Harry Totonis. Spulber Report ¶¶ 399-407.

a)   *Average Economic Cost Benchmark*

First, Dr. Spulber compares the electronic routing market to a perfectly contestable or competitive market, as those market structures are defined in the economics literature. *See* Spulber Report ¶¶ 280 n.562 (citing William J. Baumol, *Contestable Markets: An Uprising in the Theory of Industry Structure*, 72 Am. Econ. Rev. 1, 4 (1982)), 286 n.563 (citing Gregory N. Mankiw, *Principles of Microeconomics* 351 (5th ed. 2009)). Contestability theory "provides a generalization of the concept of the perfectly competitive market": "a perfectly competitive market is necessarily perfectly contestable, but not *vice versa*." Baumol, *supra*, at 2, 4. "A contestable market is one in which entry is absolutely free, and exit is absolutely costless." *Id*. at 3 (emphasis omitted). As the

13

term is used by Dr. Baumol, freedom of entry does not "mean that [entry] is costless or easy, but that the entrant suffers no disadvantage in terms of production technique or perceived product quality relative to the incumbent, and that potential entrants find it appropriate to evaluate the profitability of entry in terms of the incumbent firms' pre-entry prices." *Id*. at 3-4. In short, free entry requires "that there be no cost discrimination against entrants." *Id*. at 4. Freedom of exit means that "any firm can leave without impediment, and in the process of departure can recoup any costs incurred in the entry process." *Id*. In addition to free entry and exit, a perfectly competitive market has other essential features, including small and numerous firms independent in their decision making that produce homogenous products. *Id*

Free entry and exit drive economic profits to zero. This is because "any economic profit earned by an incumbent automatically constitutes an earning opportunity for an entrant." *Id*. A firm's economic profit is "the firm's total revenue minus [the firm's economic cost, or] all the opportunity costs (explicit and implicit) of producing the goods and services sold." Spulber Report ¶ 276 n.561 (quoting Mankiw, *Principles of Microeconomics*, *supra*, at 270). "Economic cost includes both operating expenses and the opportunity cost of invested capital." *Id*. at ¶ 287. In sum, competitive pressure drives prices towards firms' economic cost.

Competitive pressure also "lead[s] to significantly diminished price variation." Spulber Rebuttal Report ¶ 62. Dr. Spulber bases this proposition on the law of one price hypothesis, the model of perfect competition, and contestability theory. He defines competitive pressure in a perfectly contestable or competitive market as the "law of one price." *Id*. ("This competitive pressure, which is well understood by economists, is often called the 'law of one price.'"); *see also* *id*. at ¶ 82. The law of one price hypothesis "states that the same good cannot sell for different prices in different locations at the same time." *Id*. at ¶ 62 n.81 (quoting Gregory N. Mankiw,

*Microeconomics* 145-46 (7th ed. 2010). Dr. Spulber also quotes from an article by Dr. John Baffes, which states that "[i]nternational trade models often postulate the existence of a representative price, i.e., the price which prevails at all markets. This is known as the 'Law of One Price.'" *Id.* (quoting John Baffes, *Some Further Evidence on the Law of One Price: The Law of One Price Still Holds*, 73 Am. J. Agric. Econ. 1264, 1723 (1991)).

Dr. Spulber relies on economic principles derived from the model of perfect competition and contestability theory to explain the mechanism by which competitive pressure diminishes price variation. He cites the following passage from *Principles of Microeconomics*:

> [I]n many cases, firms sell the same good to different customers for different prices, even though the costs of producing for the two customers are the same. This practice is called price discrimination. . . . [P]rice discrimination is not possible when a good is sold in a competitive market. In a competitive market, many firms are selling the same good at the market price. No firm is willing to charge a lower price to any customer because the firm can sell all it wants at the market price. And if any firm tried to charge a higher price to a customer, that customer would buy from another firm. For a firm to price discriminate, it must have some market power.

*Id.* at ¶ 63 n.83 (quoting Mankiw, *supra*, at 326). This passage describes the effect of competitive pressure in a competitive market. In a contestable market, the threat of entry by new firms creates competitive pressure to similar effect. *See id.* at ¶ 82; Baumol, *supra*, at 4-5.

Based on these principles, selecting a perfectly contestable or competitive market as a benchmark, Dr. Spulber opines that in the but-for world, suppliers in the electronic routing market, whether Surescripts or other firms, would have charged a single price approaching their average per-transaction economic cost, or operating expenses plus opportunity cost of invested capital. *See* Spulber Report ¶¶ 286, 399; Spulber Rebuttal Report ¶¶ 62-66, 81-82, 85.

In his opening report, Dr. Spulber estimates the but-for price for the entire relevant period as the 2015-2021 average of Surescripts' per e-prescribing transaction economic cost. Spulber Report ¶¶ 287-96, 399-403, 423-26. He calculates Surescripts' operating expenses as the total

operating expenses reported in its audited financial statements, less incentive payments. *Id*. at ¶ 289. He calculates Surescripts' opportunity cost of invested capital as the product of the amount of invested capital and its cost of capital. *Id*. at ¶ 290. Dr. Spulber adds these two components of Surescripts' economic cost, then divides by the volume of e-prescribing transactions Surescripts processed through its network. *Id*. at ¶¶ 291-92. In his rebuttal report, Dr. Spulber stands by his original estimate, but he provides "two additional checks on [his] calculations" in the form of alternative estimates: Surescripts' per-transaction economic cost averaged over the entire relevant period (2010-2021) and in each year. Spulber Rebuttal Report ¶¶ 87-89.

The *Daubert* and Rule 702 framework requires the Court to distinguish the methodology of the expert's analysis, the selection of data inputs, and the conclusions produced. In this context, the methodology of Dr. Spulber's analysis is the benchmark method. Dr. Spulber applied this method by selecting a perfectly contestable or competitive market as a benchmark against which to measure impact and damages. In a perfectly contestable or competitive market, competitive pressures drive the market price toward firms' average economic cost.[4] Dr. Spulber estimates firms' average economic cost in the but-for electronic routing market—*i.e.*, the but-for price based on his benchmark—using Surescripts' 2015-2021 average economic costs (his data inputs). His methodology produces a 3.5-cent but-for price (his conclusion).

---

[4] The defendants latch onto Dr. Spulber's reference to the law of one price hypothesis in support of this proposition. They argue that the law of one price hypothesis is inapplicable to the facts of the case. Defs.' Spulber Mot. Exclude 17-18; *see also infra* at 17-18. Perhaps so, but the defendants ignore that Dr. Spulber relies on Dr. Mankiw's description of a perfectly competitive market in support of the proposition that competitive pressure (which Dr. Spulber, perhaps erroneously, defines as the law of one price) erases price variation. *See* Spulber Rebuttal Report ¶ 63 n.83. The defendants do not attack the reliability of Dr. Mankiw's description of a perfectly competitive market.

16

Under *Daubert* and Rule 702, the Court must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is [ ] valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Based on the above characterization of Dr. Spulber's benchmark opinion, the Court asks the following questions: Are contestability theory and the model of perfect competition valid economic theories? If so, has Dr. Spulber "demonstrate[d] a relationship between [a perfectly contestable or competitive market] and [the electronic routing market]"? *Wholesale Grocery*, 946 F.3d at 1001; *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-57 (8th Cir. 2000) (using this structure to assess expert testimony in a case where the expert used an economic model to construct a benchmark).[5]

The defendants do not challenge the validity of contestability theory or the model of perfect competition, but they submit that these theories are not applicable to the facts of the case because of two real-world features of the electronic routing market: barriers to entry and price variation. Defs.' Spulber Mot. Exclude 7, 9, 16-17, 20-21. Dr. Spulber characterizes the electronic routing market by two-sided network effects and economies of scale, which both create barriers to entry. *See* Spulber Report ¶¶ 175-91, 261-74. These barriers to entry mean that the electronic routing market lacks free entry and exit, a crucial feature of perfectly contestable and competitive markets. Defs.' Spulber Mot. Exclude 7, 20-21; Spulber Dep. 95:2-4 ("[T]hese barriers to entry mean that

---

[5] The defendants argue that the Court should also consider the benchmark method's known or potential rate of error. *See* Defs.' Spulber Mot. Exclude 23 ("Dr. Spulber's failure to proffer a known error rate or another objective measure of the benchmark's reliability, standing alone, is a basis for exclusion."). This factor is included in the *Daubert* list of factors but is not a reasonable measure of reliability here, so the Court does not consider it. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1049 (N.D. Ill. 2022) (explaining that scientific criteria for testability are not well suited to economics). In addition, the Court does not consider "arguments about how the selection of data inputs affect the merits of the conclusions produced" *Manpower*, 732 F.3d at 808. These arguments are for the jury.

17

the market is not contestable, let alone highly contestable."). In addition, pharmacies have never paid a uniform price for electronic routing, even prior to the relevant period. Defs.' Spulber Mot. Exclude 9, 16. Therefore, price variation in the real-world electronic routing market is inconsistent with the attributes of a perfectly contestable or competitive market. Based on these premises, the defendants argue that Dr. Spulber has failed to reliably apply the benchmark method.

Dr. Spulber concedes the premises of the defendants' argument (barriers to entry and price variation exist in the electronic routing market), but he disputes the conclusion that they draw from those premises. Dr. Spulber responds that barriers to entry in the electronic routing market caused by network effects and economies of scale would have been surmountable in the but-for world. Spulber Report ¶ 270; Spulber Rebuttal Report ¶¶ 117-21. As he tells the story, actual or potential entry by firms able to surmount these entry barriers would have created competitive pressure that would have driven routing prices toward a single price approaching average economic cost. Spulber Rebuttal Report ¶¶ 62, 81. Dr. Spulber dismisses real-world price variation as irrelevant because, he opines, that variation comes from sources that would not have existed in the but-for world during the relevant period: Price variation prior to the relevant period occurred because the "industry [was] getting underway." Spulber Dep. 198:7. Routing prices continued to vary during the relevant period, even as the industry matured, but this variation was "because Surescripts held a monopoly position and used its market power to engage in price discrimination," and Surescripts would not have possessed market power in the but-for world because of actual or potential entry by new firms. Spulber Rebuttal Report ¶¶ 62-66, 77-82. Therefore, according to Dr. Spulber, a perfectly contestable or competitive market is sufficiently comparable to the but-for electronic routing market—and he reliably applied the benchmark method.

A perfectly contestable or competitive market is a theoretical construct. In the article on contestability theory cited by Dr. Spulber, Dr. Baumol acknowledges that "perfectly contestable markets do not populate the world of reality," but he asserts that contestability theory is still useful because if market pressures "make [a] very inefficient market structure vulnerable to entry[,] . . . the market structure that is called for by contestability theory may not prove to be too bad an approximation to what we encounter in reality." Baumol, *supra*, at 2, 8. Here, the comparability of the electronic routing market and a perfectly contestable or competitive market—and the admissibility of Dr. Spulber's opinion—depends on whether, despite barriers to entry caused by network effects and economies of scale, the electronic routing market would have been sufficiently vulnerable to entry in the but-for world. (Vulnerability to entry would reduce price variation, so this is the key market feature.) The Court therefore considers whether Dr. Spulber has explained why new firms would have been able to surmount these barriers.

The Court starts by describing the barriers to entry caused by network effects and economies of scale, drawing from Dr. Spulber's report. "The term 'network effect' refers to the benefits that a network participant receives from other participants joining the network." Spulber Report ¶ 177. In the case of the electronic routing and eligibility markets, these network effects are two-sided because the benefits are cross-market: network participants receive benefits from participants on the other side of the market joining the network. *Id*. at ¶ 178. Dr. Spulber finds that Surescripts' platform exhibits four network effects: in routing, prescribers benefit from an increase in the number of pharmacies on the network and vice versa, and in eligibility, prescribers benefit from an increase in the number of payers and PBMs on the network and vice versa. *Id*. at ¶¶ 179-83. These network effects are interdependent for prescribers because they are members of both markets, and they benefit from the convenience of using the same network for routing and

19

eligibility. *Id*. at ¶ 185. Network effects create the "network coordination problem," or "the need to attract participation of groups whose benefits depend on the participation of other groups" to establish a network. *Id*. at ¶ 193. "There may be a need to have a 'critical mass' of one group to attract other groups." *Id*. at ¶ 194. These effects can create a barrier to entry because an entrant may find it difficult to match the cross-market benefits of an incumbent. *See id*. at ¶ 269.

"Economies of scale refers to properties of the firm's technology such that the firm's cost per unit of output is decreasing in the output produced by the firm." *Id*. at ¶ 188. Surescripts has economies of scale in transactions, meaning that Surescripts' cost per transaction decreases as the volume of transactions increases, because "operating a digital transmission network involves fixed costs," so "[i]ncreases in the number of transactions on the network increase fees from pharmacies and payers and PBMs and at the same time lower average fixed cost per transaction." *Id*. Dr. Spulber quotes Seth Joseph, Surescripts' former director of strategy and innovation, as observing that Surescripts' "cost structure is virtually entirely fixed (including distribution costs to hundreds of EHR [vendor]s and tens of thousands of pharmacies)." *Id*. at ¶ 191 (quoting Seth Joseph, *Price Transparency or Price Obfuscation? Is a PBM-Backed Network Using Its Monopoly in One Business to Advantage Itself in The Next?*, Forbes (Mar. 2, 2022), https://perma.cc/PNK8-8NFG). Economies of scale can create a barrier to entry because larger incumbents have a cost advantage over smaller new entrants: incumbents can spread fixed costs over more units of output.

According to Dr. Spulber, barriers to entry created by network effects and economies of scale "help explain Surescripts' initial market dominance in [the electronic routing and eligibility] markets as of 2010, which was further secured by Surescripts' anticompetitive conduct." *Id*. at ¶ 261. Through various mechanisms, Surescripts overcame the network coordination problem to obtain a critical mass of participants in routing and eligibility as of 2010. *Id*. at ¶ 158. As noted in

20

the background section, Surescripts was formed in 2008 by the merger of SureScripts Systems (a routing network) and RxHub (an eligibility network). On the routing side, SureScripts Systems began by attracting pharmacies, which was "straightforward" because two major pharmacy associations formed SureScripts Systems in 2001—the pharmacy associations promoted participation by pharmacies on the Surescripts Systems network. *Id*. at ¶¶ 199, 263. On the eligibility side, RxHub began by attracting payers and PBMs to its network because of a founding connection to this side of the market: three leading PBMs—CVS Caremark Corp., Express Scripts, Inc., and Medco Health Solutions—established RxHub. *Id*. at ¶ 265. Prescribers were attracted to the individual SureScripts Systems and RxHub networks and the later combined Surescripts network by cross-market benefits (enhanced post-merger because of interdependence), payments in the form of free routing and eligibility services, and the start of federal regulations and incentives that encouraged e-prescribing. *Id*. at ¶¶ 201-4, 264, 266-68. By 2010, the start of the relevant period, Surescripts had attracted over 97% of chain pharmacies, 62% of independent pharmacies, 100% of e-prescribing doctors (Dr. Spulber does not state the overall share of all prescribers), and payers and PBMs linked to over 65% of patients in the United States to its network. *Id*. at ¶ 235.

As relevant to economies of scale, as of 2010, Surescripts served almost the entire markets for electronic routing and eligibility. In mid-2009, Surescripts estimated that 96% of routing transactions went through its network. *Id*. at ¶ 236. Similarly, "around the beginning" of the relevant period, about 95% of eligibility transactions went through Surescripts' network. *Id*.

In this context, even prior to Surescripts' alleged anticompetitive conduct, potential entrants into the electronic routing and eligibility markets faced "high barriers to entry." *Id*. at ¶ 269. "A potential competitor would find it difficult to match the extent of the cross-market benefits in Surescripts's two related two-sided markets," making it difficult "to attract a critical

21

mass of participants from at least some of the market sides," as required to overcome the network coordination problem. *Id*. In addition, "[a] potential competitor would need to expend time and resources to generate [ ] a network, whereas Surescripts's costs of building [a] network [had] already been sunk." *Id*. More importantly from a cost perspective, Dr. Spulber suggests (in an earlier section) that Surescripts' economies of scale are "so extensive" that Surescripts is a natural monopoly in electronic routing and/or eligibility, meaning that it can serve the entire demand of one or both markets more cheaply than two or more firms. *Id*. at ¶ 190. This suggests that a competitor would find it difficult to match Surescripts' per-transaction costs.

Despite these barriers to entry, Dr. Spulber opines that "Surescripts was not perfectly insulated from competitive threats [as of 2010], as it faced the possibility [of] other companies that already had connections to one or more of the three constituents of Surescripts's platform entering the routing and eligibility markets." Spulber Report ¶ 270; *see also* Spulber Rebuttal Report ¶¶ 117-21. "These companies would be able to gain a critical mass of participants," thereby solving the network coordination problem. Spulber Report ¶ 270. Given sufficient size, according to Dr. Spulber, these companies could also surmount the barrier to entry caused by economies of scale. Specifically, Dr. Spulber highlights two companies that fit this description: RelayHealth and Emdeon. *Id*. at ¶ 271. He explains that "Emdeon, because of its connections in adjacent markets and its size, was capable of surmounting barriers to entry in the routing and eligibility markets to compete in those markets." *Id*. at ¶ 272. In support of this opinion, Dr. Spulber also cites to internal Surescripts documents indicating that Surescripts considered claims adjudication companies such as Emdeon and RelayHealth to be competitive threats. *Id*. at ¶¶ 271-73. The Pharmacies defend Dr. Spulber's average economic cost benchmark opinion based on these documents. Pls.' Mem. Opp. Defs.' Spulber Mot. Exclude ("Pls.' Resp. Defs.' Spulber Mot. Exclude") 15, ECF No. 304.

22

Although the electronic routing market is not a perfectly contestable or competitive market because of barriers to entry into the market, perfection is not required. Dr. Spulber has explained why companies such as Emdeon and RelayHealth would have been able to surmount barriers to entry caused by network effects and economies of scale, such that the electronic routing market would have been vulnerable to entry in the absence of the defendants' alleged anticompetitive conduct. Documents produced during discovery support his explanation. Some evidence cuts the other way, especially Surescripts' economies of scale, which lead Dr. Spulber to describe Surescripts as a natural monopoly. But this evidence goes to the weight of his testimony, not its admissibility. Dr. Spulber has demonstrated a sufficient connection between a perfectly competitive or contestable market and the electronic routing market. Therefore, the Court finds that Dr. Spulber has reliably applied the benchmark method to the facts of the case.

The defendants also criticize Dr. Spulber's selection of data inputs and conclusion. "Even if Dr. Spulber had a reliable basis to opine that but-for Surescripts' loyalty contracts every pharmacy would have paid a uniform price equal to Surescripts' economic cost,"[6] the defendants argue that "his calculation of 3.5 cents for that price would remain utterly wrong and unsupported" because he uses Surescripts' 2015-2021 economic costs to estimate the but-for price, although the relevant period begins in 2010, and he excludes incentive payments to EHR vendors from his measure of economic costs. Defs.' Spulber Mot. Exclude 21. In addition, they argue that his

---

[6] This statement mischaracterizes Dr. Spulber's benchmark opinion. He opines that but for Surescripts' alleged anticompetitive conduct, suppliers in the electronic routing market, whether Surescripts or other firms, would have charged a uniform market price approaching their average economic cost (his benchmark opinion), and he estimates this price using Surescripts' 2015-2021 average economic cost (his data inputs). *See* Spulber Rebuttal Report ¶ 91 ("[I]n the but-for world in which, *but for* Surescripts's exclusionary anticompetitive conduct, pharmacy class members were able to purchase routing services at competitive rates, there is no reason to believe that any or all of those transactions would have been processed by Surescripts.").

calculation "leads to absurd results, which is another independent basis for exclusion." *Id*. at 24. As discussed above, such arguments are for the jury, so the Court does not consider them here, except to say that Dr. Spulber pointedly defends his selection of data and persists in his conclusions even if costs from the entire relevant period (2010-2021) are used and incentive payments are included in his measure of costs. *See* Spulber Rebuttal Report ¶¶ 85-90, 95-116.

Accordingly, reserving judgment on Allscripts' separate motion to exclude Dr. Spulber's testimony and report, the Court allows Dr. Spulber's but-for price opinion based on his average economic cost benchmark as to directly connecting pharmacies. The opinion's relevance and, therefore, admissibility as to indirectly connecting pharmacies depends on the admissibility of Dr. Spulber's pass-through opinion, which the Court will assess after his other price opinions.

### b)    *Admission Benchmark*

Second, Dr. Spulber selects a benchmark based on testimony of former Surescripts CEO Harry Totonis. Spulber Report ¶¶ 404-7. In a January 31, 2017, investigative hearing, Mr. Totonis testified that during his tenure as Surescripts' CEO, he "ended up spending an awful lot of time reducing [the cost of] e-prescribing transactions because [of] the threat that someone else would come in and offer a lower price," explaining that "given the scale [ ] that Emdeon and RelayHealth [had], . . . understanding networks and network economics, Emdeon or RelayHealth could have dropped the price down to 2 to 3 cents any time, and they would have been able to take the business away from us." Totonis Tr. 49:8-25, ECF No. 304 Ex. C. Based on this testimony, Dr. Spulber estimates a but-for price of two cents. Spulber Report ¶ 405. In his opening report, Dr. Spulber provides no other analysis to support this benchmark. In his rebuttal report, he defends this benchmark on the basis that "Mr. Totonis's statement is consistent with my own economic analysis of Surescripts's costs, alongside internal Surescripts documents." Spulber Rebuttal Report ¶ 125.

These documents include a September 29, 2009, board presentation stating that without a change in strategy, a "most likely" scenario would be, "[a]ll else equal, we are able to hold on to our current customers, but competitive pressures require precipitous price drops, down near or below our average unit costs (~5c)." Pls.' Resp. Defs.' Spulber Mot. Exclude Ex. J (SS_Civil_03074726).

The defendants argue that Dr. Spulber's admission benchmark is unreliable because "he selected the . . . benchmark from a snippet of deposition testimony alone and did nothing to verify or test whether this was actually a viable competitive price for routing." Defs.' Spulber Mot. Exclude 26. In support of their argument, the defendants cite *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012). In that case, the "core" of the plaintiff's expert's damages analysis was one page of the plaintiff's 2002-2005 strategic business plan ("SBP"), which was presented to the plaintiff's board of directors in November 2000, and which the expert used as a benchmark against which to calculate lost profits attributable to the defendant's conduct. *Id*. at 290-91. The district court excluded the expert's opinion under *Daubert* "because the underlying data was not sufficiently reliable." *Id*. at 291. Affirming that ruling, the Third Circuit explained that "an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id*. at 292.

The Pharmacies argue that *ZF Meritor* is distinguishable because Dr. Spulber "relied on Defendants' own documents and testimony." Pls.' Resp. Defs.' Spulber Mot. Exclude 12 (emphasis omitted). But as was true of the expert in *ZF Meritor*, Dr. Spulber does not "know the methodology used to create [Mr. Totonis' estimate] or the assumptions on which the . . . estimate[] [was] based." *ZF Meritor*, 696 F.3d at 293. Indeed, it is not even clear that Mr. Totonis was providing an estimate of Emdeon's and RelayHealth's actual unit costs; that they "could have

25

dropped the price down to two or three cents" and taken business from Surescripts is not necessarily equivalent to a statement that their unit costs were two to three cents or that predatory pricing was a concern.[7] What's more, Mr. Totonis' testimony concerned Emdeon's and RelayHealth's costs even though he worked for Surescripts, and so had no internal knowledge of these companies' operations. Further, Mr. Totonis gave the testimony in an investigatory hearing in 2017, long after his employment with Surescripts ended. Putting aside any issue as to the reliability of his recollection almost a decade later, his estimate served no business purpose and Surescripts expended no time or resources to create, or vet, his estimate. These factors differentiate Mr. Totonis' testimony from the types of internal projections that often serve as legitimate bases for expert opinions; his estimate was not, as the Pharmacies contend, "the product of deliberation by experienced businessmen charting their future course." Pls.' Resp. Defs.' Spulber Mot. Exclude 10 (quoting *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970)).

The Court therefore concludes that Dr. Spulber's admission benchmark opinion rests on an evidentiary foundation that does not reliably support it, Accordingly, it is excluded.[8]

### 2. Real-World Price

Dr. Spulber estimates the real-world price using a contract review and, alternatively, a revenue-based analysis. Spulber Report ¶¶ 387-98; *see also* Spulber Rebuttal Report ¶¶ 31-58. For his opening report, he reviewed 166 contracts between Surescripts and 63 unique customers, which included directly connecting pharmacies, PTVs, and resellers. Spulber Report ¶¶ 387-88. At least

---

[7] "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117 (1986).

[8] This ruling also extends to Ms. Davidson's testimony concerning Mr. Totonis's so-called admission as to Surescripts cost basis. The Court intends no other suggestion, however, as to whether Totonis' testimony could, or could not be, otherwise admissible.

some of these contracts included two volume-based pricing schedules for routing: a schedule of "regular" prices and a schedule of "loyalty" prices, which would apply if the customer agreed to exclusivity. *Id*. at ¶¶ 390-91. From the contracts in his sample, Dr. Spulber calculated the "Minimum of the Lowest Regular Prices ('MLRPs')" for each month and year, which is the lowest non-loyal price listed in any effective contract, including volume discounts. *Id*. at ¶ 396. He contends that the MLRPs is "the economically appropriate" input to his analysis. *Id*. For robustness, however, he also calculated the "Minimum of the Lowest Loyalty Prices ('MLLPs')," which is based on the lower "loyalty" prices listed in Surescripts' contracts. *Id*. at ¶ 398. As another robustness check, Dr. Spulber also calculated Surescripts' average revenue per transaction, by customer and month, which he presents as an alternative estimate of the real-world price. *Id*. at ¶ 402 n.739.[9]

The defendants argue that Dr. Spulber's opinion is based on insufficient facts and data because he reviewed contracts with only 63 of Surescripts' customers, while the Pharmacies seek to represent a class of 34,000 pharmacies, "so his review at most encompassed one percent of the . . . pharmacies in the putative class." Defs.' Spulber Mot. Exclude 11 (emphasis omitted); *see also* Defs.' Spulber Reply Br. 11 & n.3. The Pharmacies respond that the 166 contracts that Dr. Spulber reviewed cover 85% of pharmacies that routed transactions over the Surescripts network and 98% of electronic routing transactions during the relevant period. Pls.' Resp. Defs.' Spulber Mot. Exclude 5. The enormous gap between the parties' pharmacy-based shares (1% vs. 85%) is due to methodological differences. The defendants count a contract as covering a pharmacy only if the

---

[9] This opinion relates to the rest of Dr. Spulber's analysis as follows: Dr. Spulber measures the overcharge by the difference between the real-world price directly connecting pharmacies and intermediaries paid Surescripts (the opinion assessed here) and the but-for price those customers would have paid (the opinion assessed above). He fully imputes the overcharge from intermediaries to indirectly connecting pharmacies (the opinion assessed next).

pharmacy is a party to the contract. Dr. Spulber did not review contracts between intermediaries and pharmacies (he only reviewed contracts with Surescripts as party), so the defendants count all indirectly connecting pharmacies as missing from his review. The Pharmacies, however, count a contract between Surescripts and an intermediary as covering all pharmacies that connect to Surescripts' network through that intermediary. *See* Spulber Rebuttal Report ¶ 35.

The Court's primary concern is bias in results, not the sample size per se.[10] Whether the sample of contracts that Dr. Spulber reviewed provides sufficient basis for his opinion turns on whether there is any reason to expect that nonreviewed contracts would contain lower prices than those that Dr. Spulber reviewed. In his rebuttal report, Dr. Spulber explains that, if anything, the opposite is true: many of the pharmacies whose contracts he did not review were substantially smaller than the pharmacies whose contracts he reviewed, and smaller pharmacy size implies lower transaction volume, lower bargaining power, and higher prices. Spulber Rebuttal Report ¶ 37-39. The defendants respond that this implication "is just another unsupported assumption that cannot survive under Rule 702 and *Daubert*." Defs.' Spulber Mot. Exclude 28 n.9. But the defendants themselves assert that large pharmacies leveraged their bargaining power to negotiate lower prices. *Id*. at 16. The Court finds Dr. Spulber's reasoning persuasive. Therefore, the Court concludes that the 166 contracts reviewed by Dr. Spulber provide sufficient foundation for his real-world price opinion.

---

[10] Opinions based on much smaller sample sizes have been admitted in antitrust cases. *See, e.g.*, *In re Apple iPhone Antitrust Litig.*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *9 (N.D. Cal. Mar. 29, 2022) (holding that a 0.1% sample size was sufficient based on "evidence that such sample size is widely accepted in economics, as well as surveys conducted by the government"); *see also In re Actiq Sales & Mktg. Pracs. Litig.*, No. CIV.A. 07-4492, 2014 WL 3572932, at *10 (E.D. Pa. July 21, 2014) (declining to exclude testimony based on a small sample size where there was no reason to expect bias in the expert's results and the data was generally accepted as the academic, government, and industry standard).

The defendants also criticize Dr. Spulber's calculation of the MLRPs and MLLPs because he excluded rebates from the price paid (in his rebuttal report, he offers alternative estimates that include rebates). *See* Defs.' Spulber Mot. Exclude 30; Defs.' Spulber Reply Br. 13-14. Surescripts began its rebate program in 2014. Defs.' Spulber Mot. Exclude 30. The program applies to all pharmacies, whether party to a loyalty program or not, including indirectly connecting pharmacies. *Id*. Surescripts issues rebates quarterly or annually in a lump sum paid directly to pharmacies. Pls.' Resp. Br. 18; Defs.' Spulber Reply Br. 14. Since the start of the relevant period, through the date of Dr. Spulber's analysis, Surescripts has paid $900.6 million in rebates. Spulber Report ¶ 161.

The defendants argue that rebates should be treated as a discount, effectively lowering the real-world price. Defs.' Spulber Mot. Exclude 30. In his opening report, Dr. Spulber justified his decision to exclude rebates from his analysis of the real-world price based on his understanding that rebates are tied to loyalty and "are speculative, subject to delay, and may be revoked and clawed back in the future by Surescripts." Spulber Report ¶ 381. It turns out, however, that rebates are not part of Surescripts' loyalty program and cannot be clawed back, based on the defendants' description of the rebate program. The Pharmacies do not dispute the defendants' description of the rebate program in the *Daubert* briefing, so the Court credits the defendants' description. *See also* Spulber Dep. 218:11-221:17 (Dr. Spulber acknowledging that he may have been mistaken). In his rebuttal report, Dr. Spulber relies only on his other rationales for excluding rebates: they are speculative (because they are not contractually guaranteed) and subject to delay. Spulber Rebuttal Report ¶¶ 70-73.

The Pharmacies explain the relevance of Dr. Spulber's remaining rationales for excluding rebates from the real-world price paid by pharmacies to Surescripts with a legal argument: because rebates are "after-the-fact payments" and not contractually guaranteed to pharmacies at the time

of invoice, they should "[a]t most . . . be considered as a potential damages setoff, an affirmative defense." Pls.' Resp. Defs.' Spulber Mot. Exclude 18 (citing *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 557 (S.D.N.Y. 2021)). The *Namenda* court relied on *In re Nexium Antitrust Litigation*, in which the First Circuit held that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." 777 F.3d 9, 27 (1st Cir. 2015). In *Nexium*, the First Circuit applied this holding to rebates, concluding that "rebates are only a damages setoff and do not affect the fact of injury." *Id*. at 28 n.23.

Ordinarily, arguments about the selection of an expert's data inputs are for the jury. Questions of law are for the Court, however, and here, the Pharmacies make a legal argument for excluding rebates, so the Court addresses it. Starting from first principles, to recover under federal antitrust laws, "[p]laintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The antitrust laws "were enacted for 'the protection of competition,'" so "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id*. at 488-89 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). In this case, the Pharmacies allege that the putative class members suffered damages in the form of overcharges on routing transactions. TAC ¶ 267. Under *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, paying an overcharge caused by anticompetitive conduct on a single transaction generally suffices to show antitrust injury as a legal and factual matter. 392 U.S. 481, 488-94 (1968). That is, except in limited circumstances not applicable here, "the victim of an overcharge is damaged within the meaning of [the federal antitrust laws] to the extent of that overcharge," and the antitrust defendant is not permitted to introduce evidence that the victim passed on the

overcharge to his customers—*i.e.*, evidence that the victim later recouped the overcharge. *Id.* at 491. This Court has held that the same rule applies under the state antitrust laws at issue in this case. *Surescripts III*, 2024 WL 1195571, at *20.[11]

The question here is how to measure an overcharge when the putative monopolist provides rebates based on transaction volume. If an overcharge is the "amount measured by the difference between the price paid and what the market or fair price would have been" absent the alleged anticompetitive conduct, *Hanover Shoe*, 392 U.S. at 489, should the price paid be net of rebates? The Pharmacies argue that the answer to that question is "no"—*i.e.*, that rebates should be ignored here because "Surescripts did not deduct the payments from the invoiced prices it charged customers or contractually guarantee the payments to pharmacies at the time of invoice" but rather "made these payments months later." Pls.' Resp. Defs.' Spulber Mot. Exclude 18. They do not, however, explain why this formalistic difference matters.

Nor do the Pharmacies offer a persuasive basis to distinguish the treatment of rebates from that of discounts, which no one disputes are appropriately included in determinations of the real-world prices charged by putative monopolists. The Pharmacies rely on the First Circuit's opinion in *In re Nexium Antitrust Litigation* for the proposition that "rebates are only a damages setoff and do not affect the fact of injury." 777 F.3d 9, 28 n.23 (1st Cir. 2015). In *Nexium*, to resolve whether rebates affect the fact of injury in antitrust cases, the First Circuit applied Supreme Court precedent holding that downstream reimbursement doesn't affect fact of injury. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251 (1972) and *Adams v. Mills*, 286 U.S. 397 (1932). In *Hawaii*, the Supreme Court held that "[w]here the injury to the State occurs in its capacity as a consumer in the

---

[11] The Court held that for purposes of this case, only Michigan law permits a pass-on defense, or rejects the *Hanover Shoe* rule. ECF No. 323 at 3. The Pharmacies have since abandoned their Michigan-law claims, so Michigan law is no longer at issue. *See* TAC ¶¶ 317, 320, 323, 326.

marketplace, through a payment of money wrongfully induced, damages are established by the amount of the overcharge," and "courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way, even though a State, for example, may ultimately recoup some part of the overcharge through increased taxes paid by the seller." 405 U.S. at 262 n.14 (1972) (cleaned up). *Hawaii* relied, in turn, on *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), where the Supreme Court rejected the argument that "the buyer suffers no loss from the overcharge [within the meaning of the antitrust laws]" where the overcharged buyer passed on the overcharge to his customers. *Id.* at 492. Under *Hanover Shoe*, a plaintiff "prove[s] injury and the amount of its damages for the purposes of its treble-damage suit when it prove[s] that [the defendant] had overcharged it during the damage period and showed the amount of the overcharge." *Id.* at 494. Similarly, in *Adams*, which involved a claim that the defendants had overcharged the plaintiffs in violation of the Interstate Commerce Act, the Supreme Court ignored whether the plaintiffs had passed on the alleged overcharge to downstream customers. 286 U.S. at 407.

The First Circuit's holding in *Nexium*, however, appears to confuse the rebate situation with the situation at issue in *Hanover Shoe* where an overcharged buyer passes on the overcharge to his downstream customers. But rebates come from upstream—they are paid by an upstream seller. This means that a rebate reduces initial damages (at the level of the buyer), as distinct from reallocating the initial damages suffered by the buyer. *Hanover Shoe* tells us that the overcharge is measured by the amount the upstream violator charges the direct purchaser, without regard to whether the direct victim is able to pass on some or all of that overcharge to others downstream. As such, the *Hanover Shoe* rule answers a different question than presented here. It addresses the issue of how antitrust damages should be ***allocated,*** not how they should be ***calculated***. *Hanover*

*Shoe*'s anti-pass-on rule says don't allocate the overcharge among successive tiers of the distribution chain but does not reduce the total damages attributable to the overcharge. A rebate does.

Thus, the Court agrees with the defendants that rebates should not be ignored in determining the real-world price paid for purposes of calculating the overcharge.[12] The only valid rationale that the Court identifies for treating rebates differently from discounts is based on the time value of money. Plaintiffs would be justified in discounting rebates to their present value at the time class members paid for associated transactions. Otherwise, all else equal, rebates should be treated the same as discounts for purposes of proving impact and damages.

Accordingly, reserving judgment on Allscripts' separate motion to exclude Dr. Spulber's testimony and report, the Court allows Dr. Spulber's real-world price opinion as to directly connecting pharmacies, except that Dr. Spulber should account for rebates. The relevance and, therefore, admissibility of this opinion as to indirectly connecting pharmacies depends on the admissibility of Dr. Spulber's pass-through opinion, which the Court assesses next.

### 3. Pass-Through to Indirectly Connecting Pharmacies

The proposed class consists of U.S. pharmacies that paid for e-prescriptions routed through Surescripts' network during the relevant period, regardless of whether those pharmacies connected to Surescripts' network directly or indirectly (*i.e.*, through intermediaries). According to Dr.

---

[12] The Court nevertheless disagrees with the defendants' reasoning. The defendants argue that *Nexium* is distinguishable because "Surescripts paid rebates directly to putative class member pharmacies, rather than to third parties who might not pass the rebates on to pharmacies." Defs.' Spulber Reply Br. 14. In *Nexium*, which involved an antitrust action brought by indirect drug purchasers (a class of third-party payors, or TPPs) against drug manufacturers, rebates were indeed paid to intermediaries (PBMs), but this fact is not material to the issue of how rebates should be factored into the calculation of the price paid by the purchaser-plaintiffs (the issue here), as distinct from the issue of whether rebates were in fact paid to the purchasers in question.

Spulber's analysis of Surescripts' transaction data (for an unspecified period), 0.5% of pharmacies connect directly, 49.9% connect through a PTV, and 49.6% connect through a reseller (some of which connect through a PTV). Spulber Rebuttal Report ¶ 34. In his overcharge equation, Dr. Spulber does not distinguish between directly and indirectly connecting pharmacies. For all class members, he uses Surescripts' contractual prices, revenues, and costs to estimate the but-for and real-world prices, and he calculates "the Surescripts overcharge" as the difference between these prices. For this overcharge measure to determine antitrust impact and damages as to both directly and indirectly connecting pharmacies, intermediaries must fully pass on overcharges; to the extent that the intermediaries retain any portion of the overcharges, the pharmacies are spared that damage.

And, indeed, Dr. Spulber opines that intermediaries pass through the full amount of Surescripts' overcharges, asserting that "[p]harmacies [ ] bear the full extent of the harm from Surescripts's overcharges whether Surescripts contracts directly with those pharmacies or whether Surescripts contracts with PTVs and other intermediaries that serve pharmacies." Spulber Report ¶ 386. In his opening report, Dr. Spulber explains his pass-through opinion as based on his "review of some invoices that PTV intermediaries provided to pharmacies," from which he concluded that "PTVs and other intermediaries pass along Surescripts's charges to their pharmacy customers with a positive markup that is generally constant over time and uniform across pharmacies." *Id*. at 386 & n.730. In his rebuttal report, Dr. Spulber clarifies that he has reviewed 307 invoices for named plaintiffs and invoices from PTVs including TDS (which served 8,638 pharmacies), Pioneer, QS/1, and Micro Merchant Systems. Spulber Rebuttal Report ¶ 139.

In addition, in his rebuttal report, Dr. Spulber expands on the basis for his opinion. He explains that in the real world, (1) PTVs and RelayHealth viewed pharmacies as Surescripts' true

end customers, based on his review of invoices issued to named plaintiffs by their PTVs, a PTV-pharmacy contract (between Pioneer and Corner Pharmacy), and deposition testimony, *id.* at ¶¶ 134-38; (2) "the prices PTVs charged pharmacies were highly uniform," based on his analysis of Pioneer and TDS pricing data, *id.* at ¶¶ 139-43; and (3) the markups PTVs charged were "fairly uniform," based on his analysis of the price that PTVs charged five of the named plaintiffs, less the price that Surescripts charged those PTVs, *id.* at ¶¶ 144-51. Furthermore, Dr. Spulber opines that intermediaries would have charged the same markups in the but-for world as in the real world. *See id.* at ¶ 68 ("[B]ecause PTVs [already] compete for pharmacies' business, . . . it is unlikely that PTVs would have been able to mark routing prices further up (or down) to a greater extent in the but-for world than they already do."). Based on this evidence and analysis, Dr. Spulber reiterates his opinion that "PTVs pass along Surescripts's overcharge." *Id.* at ¶ 152.

The reasoning or methodology underlying Dr. Spulber's pass-through opinion is multi-pronged, but the original and core component is his analysis of PTV markups. As stated above, Dr. Spulber concludes from this analysis that markups are positive and "generally" or "fairly" constant over time. He explains the implication of positive markups as follows:

> My analysis found that PTV intermediaries charged a "markup" over the price Surescripts charged to them. That is, the price PTV intermediaries charged to pharmacy class members was always greater than the price Surescripts charged PTV intermediaries. As a result of this finding, it follows that . . . [PTVs] pass[] along Surescripts's overcharges to pharmacies.

*Id.* at ¶¶ 131, 138; *see also* Pls.' Resp. Defs.' Spulber Mot. Exclude 19 ("Because Surescripts overcharged PTVs, and PTVs mark up prices, Dr. Spulber reliably concluded that Surescripts overcharged pharmacies that indirectly connect to its network."). Dr. Spulber explains the implication of constant markups as follows:

> If Surescripts charged PTVs a lower price and such a price reduction was passed along by PTVs to pharmacies, then one should expect little to no changes in the markup. Alternatively, if the price reduction PTVs received were instead kept to

35

> themselves, one should observe a higher markup for the PTVs. Therefore, markups
> provide an economically sound basis for determining whether PTVs pass along
> price reductions to pharmacies.

Spulber Rebuttal Report ¶ 147 (ECF No. 304-3). The Court understands the other analyses in Dr.

Spulber's report as reinforcing his analysis of PTV markups and/or responding to arguments by

the opposing expert. Therefore, the Court focuses on Dr. Spulber's analysis of PTV markups,

which is also the focus of the parties' *Daubert* arguments with respect to his pass-through opinion.

To start, the Court assesses the validity of the reasoning underlying Dr. Spulber's pass-

through opinion. In the first part of his markup analysis, he reasons that if PTVs charge positive

markups, they fully pass on overcharges. The Court agrees with the defendants that this reasoning

is faulty. *See* Defs.' Spulber Reply Br. 11-12. An overcharge is "the ***difference*** between the price

paid in the real world and what the market or fair price would have been" in the but-for world.

*Hanover Shoe*, 392 U.S. at 489 (emphasis added). Thus, pass-through depends on the difference

between the markup charged and what the markup would have been in the but-for world. If PTVs

charge lower markups than they would have in the but-for world, they at least partially absorb the

overcharge. This observation contradicts Dr. Spulber's reasoning in the first part of his markup

analysis, but it supports his reasoning in the second part of his analysis, where Dr. Spulber reasons

that if PTVs charge constant markups, they must then be fully passing on price increases, ergo

they fully pass on overcharges caused by the defendants' alleged anticompetitive conduct. The

reasoning that constant markups indicate full pass-through has been applied in other antitrust cases.

*See, e.g. In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *18-19 (N.D.

Ill. May 27, 2022). The Court finds it valid. Because this reasoning independently supports Dr.

Spulber's pass-through opinion, the Court concludes that his opinion is the product of valid reasoning.[13]

Next, the Court considers the sufficiency of the facts and data analyzed by Dr. Spulber. The defendants argue that his opinion is based on insufficient data because he reviewed data from only four PTVs whose customer base covers less than half of the putative class and invoices produced by only the named plaintiffs. Defs.' Spulber Reply Br. 12. According to the defendants, this data "says nothing about the prices paid by approximately 20,000 putative class members that connected to Surescripts through a PTV or reseller." *Id.* (emphasis omitted). They do not, however, identify any reason to expect bias in Dr. Spulber's results. Furthermore, the Court notes that Dr. Spulber reinforced his analysis of PTV markups with analysis of other facts and data, including deposition testimony. *See, e.g.*, Spulber Rebuttal Report ¶ 138. Therefore, the Court declines to exclude Dr. Spulber's opinion based on the number of invoices he reviewed.

The defendants' remaining arguments attack Dr. Spulber's conclusion that markups are uniform. The defendants contend that Dr. Spulber's own analysis "confirms" that PTV markups "vary significantly." Defs.' Spulber Reply Br. 3. For instance, they describe figures in his rebuttal report as "showing QS/1's markup generally increasing over time and Pioneer's markup sporadically increasing," rather than generally uniform markups. *Id.* This alleged inconsistency between Dr. Spulber's figures and his conclusion is fodder for cross-examination, however, not a

---

[13] Since the Court proceeds based on Dr. Spulber's reasoning that constant markups indicate full pass-through, the Court does not consider the parties' arguments about whether Surescripts' pricing to PTVs constitutes an accurate "proxy" for the prices paid by indirectly connecting class members. *See, e.g.*, Defs.' Spulber Mot. Exclude 29 n.10 (making much of the fact that "net of rebates some pharmacies paid less overall for routing than their PTVs paid to Surescripts"). Again, an overcharge is a price difference, so the question is whether PTVs passed on price differences, not whether pharmacies paid more, the same, or less for routing PTVs.

37

reason to exclude his pass-through opinion. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct").

Accordingly, the Court allows Dr. Spulber's pass-through opinion, setting aside Allscripts' separate motion to exclude Dr. Spulber's testimony and report. Therefore, the Court also allows Dr. Spulber's but-for price opinion (based only on his average economic cost benchmark) and his real-world price opinion (accounting for rebates) as to indirectly connecting pharmacies, reserving consideration of Allscripts' motion to exclude.

**B.    Ms. Davidson**

Michelle V. Davidson has decades of experience in the pharmacy industry, with a focus on pharmacy technology standards. Her experience includes over 20 years of involvement in the National Council of Prescription Drug Programs ("NCPDP"), a nonprofit standards development organization. During 12 years on the NCPDP's Board of Trustees, she held positions including secretary, board chair, chair of the standardization committee, and co-chair of a working group on e-prescribing. Through her NCPDP roles, she participated in the development and maintenance of the SCRIPT Standard, a standard for e-prescribing. In addition, she has experience as a retail pharmacist at Eckerd Drugs for 17 years and in executive positions at Eckerd Drugs, Brooks Corporation, the National Association of Chain Drug Stores, and Walgreen Company. In these executive positions, her responsibilities focused on pharmacy technology standards, including implementation and compliance. The Pharmacies asked Ms. Davidson to "[a]ssist the jury in understanding e-prescribing, how a pharmacy or pharmacy chain utilized e-prescribing services, and the relationship between [e-prescribing] and pharmacy claims adjudication" and to opine on the SCRIPT Standard and related publications, "as well as the technical and logistical capabilities of pharmacies." Davidson Report ¶ 6, ECF No. 295 Ex. 1.

The defendants challenge Ms. Davidson's qualifications and all of her opinions. In her report, she provides two opinions related to multihoming, an opinion on the effect of legislation and government incentives on e-prescribing adoption, and an opinion related to bundling. She summarizes these opinions as follows:

> Opinion 1: The NCPDP created uniform e-prescribing standards that facilitated multihoming and promoted numerous avenues for e-prescribing services. The NCPDP made these industry-wide e-prescribing standards and resources for implementation of the same available to any member of NCPDP, allowing any healthcare technology company with the technological means to route e-prescriptions.

> Opinion 2: Legislation and government incentives drove the adoption of e-prescribing.

> Opinion 3: Surescripts did not have any unique technological capabilities that made it more attractive for e-prescribing than other networks like eRx. The standards and technology used to route e-prescriptions were not unique to Surescripts. Community pharmacies and pharmacy chains had the technical and logistical capability to use multiple networks for e-prescribing and multihoming was feasible without any adverse impact on the quality of e-prescriptions because uniform standards existed.

> Opinion 4: Most, if not all, pharmacies were looking for the lowest price for e-prescribing services. Bundling of claims adjudication and e-prescribing services was technologically and logistically feasible and would have been attractive to pharmacies.

*Id*. at ¶ 9 (emphasis omitted).

The defendants argue that Ms. Davidson's qualifications do not provide a foundation for her opinions because her relevant experience is limited to experience with pharmacy technology standards, or the common language for the electronic transmission of healthcare data. Defs.' Davidson Mot. Exclude 1-3. In addition, they argue that Ms. Davidson's opinions are not the product of reliable methodologies and that her opinion on the effects of legislation and government incentives (Opinion 2) does not relate to a disputed issue in this case.

39

An expert must have sufficient qualifications related to the subject matter of her testimony for her opinions to be admissible. Courts assess qualifications on an opinion-by-opinion basis. *See Gayton*, 593 F.3d at 617 ("[W]e must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them."). Thus, the Court considers Ms. Davidson's qualifications related to her multihoming, federal legislation, and bundling opinions individually. If Ms. Davidson is qualified to reach her opinions, the Court also considers the reliability of her methodology and the relevance of her opinions.

With respect to multihoming, Ms. Davidson brings "deep knowledge and vast experience with . . . how e-prescribing standards were utilized by the industry and could have facilitated the use of multiple networks by pharmacies." Pls.' Resp. Defs.' Davidson Mot. Exclude 2. These qualifications provide a foundation for Ms. Davidson to opine that NCPDP e-prescribing standards facilitated multihoming and, relatedly, that the standards Surescripts used for routing were not unique (they were NCPDP standards). Some of Ms. Davidson's multihoming opinions arguably overextend from this process-based foundation, but there is a connection between developing and implementing processing standards and understanding the technological and infrastructure requirements of those standards. The development of e-prescribing standards is not done in a vacuum; standards have to take into account the technological means necessary to meet them. While it goes too far for Ms. Davidson to opine that "Surescripts did not have ***any*** unique technological capabilities that made it more attractive for e-prescribing than other networks" and that "multihoming was feasible without ***any*** adverse impact on the quality of e-prescriptions," Davidson Report ¶ 9 (emphasis added), that does not mean that Ms. Davison cannot speak to the technological means and infrastructure generally available to facilitate e-prescribing and multihoming. Ms. Davidson's work in executive positions at various pharmacies is also relevant

to her knowledge of the technological aspects of e-prescribing generally. Short of offering specific opinions about the defendants' e-prescription infrastructure and technological capabilities, Ms. Davidson is qualified to testify concerning the general feasibility of multihoming during the relevant period.

So limited, the Court also finds that Ms. Davidson's multihoming opinions are based on reliable methodology and are relevant. Her opinions are based on the application of her knowledge and experience related to pharmacy technology standards. In addition, these opinions are related to the issues in this case. The Pharmacies' theory of the case is that Surescripts' loyalty program restrained trade by raising customers' costs to multihome, which eliminated multihoming and thereby made it impossible for competitors to overcome the network coordination problem. *See* TAC ¶ 112. Ms. Davidson's opinions bear on whether Surescripts' customers would have multihomed in the absence of the defendants' alleged anticompetitive conduct, which is key to this theory. Accordingly, reserving consideration of Allscripts' separate *Daubert* motion, the Court allows Ms. Davidson's multihoming opinions as limited above.

Next, the Court considers Ms. Davidson's federal legislation and bundling opinions. In her report, she discusses two pieces of legislation: the Medicare Improvements for Patients and Providers Act ("MIPPA") of 2008, Pub. L. No. 110-275, 122 Stat. 2494, and the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") of 2009, 42 U.S.C. § 139w-4(o). She opines that this legislation drove the adoption of e-prescribing and given the length and breadth of her experience in the industry, she appears qualified to speak to what advantages this legislation offered to market participants. She is similarly equipped to opine that bundling claims adjudication with e-prescribing services would have been feasible and attractive to many in the industry. And here again, these opinions are plainly relevant to explain, in part, the growth of e-

prescribing, the advantages it offered, and whether those advantages would have been more fully and efficiently realized in the absence of the defendants' alleged anticompetitive conduct. Accordingly, the Court denies the motion to exclude these opinions.

### III.    Allscripts' Separate Motions

Allscripts filed separate motions challenging the relevance of Dr. Spulber's and Ms. Davidson's testimony and reports as to Allscripts. Allscripts argues that it "can be liable only for the claims made against Allscripts, which arise solely out of Allscripts' agreement with Surescripts." Allscripts' Reply Supp. Mot. Exclude Testimony and Report Michelle V. Davidson ("Allscripts' Davidson Reply Br.") 1, ECF No. 317. Relying on this premise, Allscripts argues that because Dr. Spulber did not calculate damages or perform any foreclosure analysis specific to the Surescripts-Allscripts agreement upon which the Pharmacies' claim against Allscripts is based, his opinions are irrelevant as to this claim. *See generally* Allscripts' Separate Mot. Exclude Testimony and Report Daniel F. Spulber ("Allscripts' Spulber Mot. Exclude"), ECF No. 290. Likewise, Allscripts argues that Ms. Davidson offers no opinions specific to Allscripts, so her testimony and report should be excluded as to Allscripts on relevance grounds, or failure to meet *Daubert* and Rule 702's fit requirement. *See generally* Allscripts' Mot. Exclude Testimony and Report Michelle V. Davidson ("Allscripts' Davidson Mot. Exclude"), ECF No. 287.

The Court has already excluded Dr. Spulber's admission benchmark opinion as to all defendants. Reserving judgment as to Allscripts' separate *Daubert* motions, the Court has allowed Dr. Spulber's other impact and damages opinions, as well as Ms. Davidson's multihoming opinions (with limits), federal legislation, and bundling opinions. Not subject to the defendants' joint motions—but subject to Allscripts' separate motions—are several other opinions by Dr. Spulber. These remaining opinions, in summary, consist of opinions by Dr. Spulber that the relevant markets are electronic routing and eligibility in the United States, that these markets are

characterized by network effects, that Surescripts achieved and maintained monopoly power in both markets during the relevant period, and that Surescripts achieved and maintained this monopoly power due to its loyalty program, of which the Surescripts-Allscripts exclusivity agreement is a component. *See* Spulber Report ¶ 13 (summarizing his opinions).

To satisfy the Rule 702 and *Daubert* fit requirement, an opinion must relate to an issue in the case. Allscripts moves to exclude Ms. Davidson's and Dr. Spulber's entire testimony and reports on relevance grounds, so Allscripts challenges the fit of every one of their opinions, although Allscripts does not discuss each opinion individually. As to Ms. Davidson's opinions, Allscripts relies on Ms. Davidson's supposed admission that she offers no opinions related to Allscripts or EHRs in support of its argument. *See* Allscripts' Davidson Mot. Exclude 2-3 (quoting her deposition testimony). As to Dr. Spulber's opinions, Allscripts focuses on the quantitative aspects of his foreclosure and damages opinions: Allscripts rests its entire argument for exclusion on the fact that Dr. Spulber does not disaggregate foreclosure or damages among the different components of the defendants' alleged anticompetitive conduct, including the Surescripts-Allscripts agreement. *See* Allscripts' Spulber Mot Exclude 5-7.[14] In this context, where Allscripts does not discuss specific opinions by Ms. Davidson or Dr. Spulber, and where Dr. Spulber's reports span more than 400 pages, containing opinions that could be defined at many levels of granularity, the Court proceeds issue-by-issue rather than opinion-by-opinion. The Court starts with an overview of the issues in this case as to Allscripts, then assesses whether Ms. Davidson's and Dr. Spulber's opinions relate to these issues, respectively.

---

[14] Allscripts' motion does not include page numbers. The page numbers used in this opinion refer to the page numbers at the top of the ECF filing.

In this action, the Pharmacies allege that Allscripts violated Section 1 of the Sherman Act and analogous state laws, and the Pharmacies seek damages from Allscripts. Section 1 of the Sherman Act prohibits every conspiracy that unreasonably restrains trade. Therefore, to prevail against Allscripts, the Pharmacies must establish that Allscripts was party to a conspiracy, that the conspiracy unreasonably restrained trade through its anticompetitive effects, that the Pharmacies suffered an injury reflecting the anticompetitive effect of the conspiracy, and damages. In their complaint, the Pharmacies identify direct evidence of a conspiracy in the form of the 2010 exclusivity agreement between Surescripts and Allscripts and its 2015 amendment. According to the Pharmacies, the effect of this agreement was to push Emdeon almost completely out of the electronic routing and eligibility markets. The Pharmacies contend that because of this anticompetitive effect, class members paid higher prices for electronic routing. *See Surescripts II*, 608 F. Supp. 3d at 652-53 (describing the Pharmacies' theory of the case as to Allscripts).

The Court starts with the § 1 violation element of the Pharmacies' claim against Allscripts: the Court asks, are Dr. Spulber's and Ms. Davidson's opinions relevant to the issue of whether the Surescripts-Allscripts agreement unreasonably restrained trade? The Pharmacies' theory proceeds as follows: Allscripts would have multihomed in the absence of its exclusivity agreement with Surescripts; access to Allscripts' network was crucial for entrants into the electronic routing market; and therefore, because of the Allscripts-Surescripts agreement, Emdeon and other entrants could not grow to become viable competitors. Ms. Davidson and Dr. Spulber both provide opinions related to different links in this logical chain. Ms. Davidson's multihoming opinions relate to the first link: the effect of the Surescripts-Allscripts agreement on Allscripts' decision whether to multihome. She opines that the SCRIPT Standard facilitates multihoming, which relates to whether Allscripts would have multihomed in the but-for world. Dr. Spulber provides opinions related to

44

the next link: the effect of Allscripts' exclusivity on competition. He opines that the electronic routing market is a relevant market, that the market has network effects, which create a network coordination problem, and that to solve the network coordination problem, entrants would need sufficient market participants to switch platforms or multihome. *See* Spulber Report ¶ 332. According to the Pharmacies, the Surescripts-Allscripts agreement made the difference between sufficient and insufficient market participants multihoming. Thus, Ms. Davidson's and Dr. Spulber's reports contain opinions relevant to at least one issue as to Allscripts: whether the Allscripts-Surescripts agreement unreasonably restrained trade.

Next, the Court turns to the issues of impact and damages as to Allscripts. Paying an overcharge caused by illegal conduct shows impact and damages. The question here is whether Dr. Spulber's overcharge equation measures overcharges caused by Allscripts' illegal conduct. Dr. Spulber does not disaggregate the overcharge among the different elements of the defendants' alleged anticompetitive conduct, including the Surescripts-Allscripts agreement, the Surescripts-RelayHealth agreement, and other conduct at issue. The Pharmacies' claim against Allscripts is based solely on the Allscripts-Surescripts agreement. That is, the Pharmacies do not contend that Allscripts was party to the Surescripts-RelayHealth agreement or any other conspiracy in violation of § 1. Members of an antitrust conspiracy are jointly and severally liable for all foreseeable harm caused by the conspiracy of which they were a member—but not, of course, unrelated harm. *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002). Therefore, Allscripts contends that the relevance of Dr. Spulber's overcharge equation as to the Pharmacies' claim against Allscripts depends on whether the entire overcharge can be attributed to the Allscripts-Surescripts agreement.

45

According to the Pharmacies' theory of the case, Allscripts can be held liable for the entire overcharge for two or three alternative reasons: First, they argue that each component of the defendants' alleged anticompetitive conduct contributed to the market-wide harm, and that all defendants, including Allscripts, are jointly and severally liable for this harm as concurrent tortfeasors. Pls.' Mem. Opp. Allscripts' Spulber Mot. Exclude 10-11, ECF No. 301. That is, the overcharge "is not the sum of [ ] separate individual harms emanating from each [component of the defendants' alleged anticompetitive conduct]; instead, it is a harm that all [components] work jointly to produce, even if there was no conspiracy between" Allscripts and RelayHealth (or other implicated actors besides Surescripts). *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 266 (3d Cir. 2016), *as amended* (Sept. 29, 2016). In *Modafinil*, the Third Circuit held that a concurrent tortfeasors theory is a viable theory of antitrust liability. *Id*. at 260-66. The Pharmacies also allege that the Surescripts-Allscripts agreement was a "material cause" of the market-wide harm (it is not entirely clear whether the pharmacies contend that this theory is distinct from the concurrent tortfeasor theory). *See* Pls.' Mem. Opp. Allscripts' Spulber Mot. Exclude 2.

The Pharmacies argue as well that the Surescripts-RelayHealth agreement and Surescripts' other loyalty contracts were reasonably foreseeable acts of a coconspirator committed in furtherance of the Surescripts-Allscripts agreement, so Allscripts is liable for all harm from the body of alleged anticompetitive conduct in this case. *See* Pls.' Mem. Opp. Allscripts' Spulber Mot. Exclude 3 (asserting that "as a coconspirator, Allscripts is accountable for all market foreclosure (and damages) that are the reasonably foreseeable consequences of its coconspirator's misconduct").

Allscripts argues that the Court should reject the Pharmacies' concurrent tortfeasor theory because it would collapse the distinction between a single conspiracy and multiple conspiracies

46

involving a common defendant, even though case law emphasizes this distinction. Allscripts' Spulber Reply Br. 3-10, ECF No. 316. Allscripts highlights two circuit court opinions: *Dickson v. Microsoft Corp.*, in which the Fourth Circuit interpreted Supreme Court precedent to mean that an antitrust conspiracy "in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction[,] . . . is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants," 309 F.3d 193, 203 (4th Cir. 2002), and *Marion Healthcare, LLC v. Becton Dickinson & Co.*, in which the Seventh Circuit likewise stated that to allege a single overarching conspiracy, plaintiffs must allege that "members of the conspiracy coordinated not only with [a common defendant], but also with each other," 952 F.3d 832, 842 (7th Cir. 2020).

Indeed, *Dickson* and *Marion* emphasize the distinction between a single conspiracy and multiple conspiracies involving a common defendant. Allscripts ignores, however, the reason why this distinction mattered in those cases, which has to do with the analytical lens through which courts determine whether an agreement unreasonably restrains trade. In *Dickson* and *Marion*, whether the plaintiffs had plead a single conspiracy or multiple conspiracies involving a common defendant determined whether the plaintiffs had plead a horizontal conspiracy or a collection of vertical conspiracies. Horizontal conspiracies are per se violations of § 1, whereas courts analyze vertical conspiracies under the rule of reason. *See Surescripts II*, 608 F. Supp. at 643 (describing rule of reason analysis). As the Ninth Circuit has explained, "[t]his distinction provides strong incentives for plaintiffs to plead a horizontal conspiracy (either alone or as part of a [ ] hub-and-spoke conspiracy). The prospect of establishing a violation per se is much more appealing to plaintiffs than the potential difficulty and costliness of proving a § 1 claim under the rule of

47

reason." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015). Therefore, the Pharmacies' concurrent tortfeasor theory does not collapse the distinction between a single conspiracy and multiple conspiracies involving a common defendant. *Dickson* and *Marion* pertain to the difficulty of proving a § 1 violation, which depends on the type of conspiracy plead, not the allocation of damages once a plaintiff has proved a violation or multiple violations of the antitrust laws, which might not.

In addition, Allscripts argues that the Pharmacies' concurrent tortfeasor theory should be rejected because it could produce absurd results. Specifically, Allscripts decries the possibility that this theory "could allow a plaintiff to pick out one agreement from a broad web of exclusive dealing agreements and hold the one party to that agreement jointly and severally liable with the alleged monopolist at the 'hub'—regardless of that party's size or market power." Allscripts' Spulber Reply Br. 8 (emphasis omitted). There is, however, nothing "absurd" about the application of joint and several liability. As the Seventh Circuit has explained, "[j]oint and several liability is [a] vital instrument for maximizing deterrence." *Paper Sys.*, 281 F.3d at 633. Holding Allscripts jointly and severally liable with Surescripts and RelayHealth for the entire web of exclusive dealing arrangements alleged in this case is compatible with the goal of maximizing deterrence. Furthermore, an expected result of joint and several liability is that defendants of different sizes and market power will share liability.

The Court is not persuaded by Allscripts' arguments for rejecting the Pharmacies' concurrent tortfeasor theory. Rather, the Court is persuaded by *Modafinil*'s tort law-based reasoning. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 634 (1981) (noting that "courts generally have acknowledged that treble-damages actions under the antitrust laws are analogous to common-law actions sounding in tort"). Following *Modafinil*, the Court finds that a

concurrent tortfeasor theory is a viable theory of antitrust liability (whether the Pharmacies can prove this theory is an issue for a later stage in this litigation). Therefore, the Court concludes that Dr. Spulber's overcharge equation is relevant to the issues of impact and damages as to Allscripts, based on the Pharmacies' concurrent tortfeasor theory. The Court need not and does not consider the viability of Pharmacies' other theories with respect to impact and damages allocation.

In sum, Ms. Davidson's and Dr. Spulber's reports contain opinions relevant to the issues of proving a § 1 violation, impact, and damages. Perhaps these reports also contain some narrowly defined opinions that are not relevant as to Allscripts, but in the absence of briefing regarding specific opinions (beyond Allscripts' arguments as to Dr. Spulber's generally defined foreclosure and damages opinions, which the Court has addressed), the Court will not define and parse each individual opinion by Ms. Davidson and Dr. Spulber. Accordingly, the Court denies Allscripts' motion to exclude Ms. Davidson's and Dr. Spulber's testimony and reports.

*    *    *

49

Accordingly, for the reasons stated above, the Court denies Allscripts' separate motions to exclude the testimony and reports of Dr. Spulber and Ms. Davidson. The Court grants in part the defendants' motions to exclude certain expert testimony of Dr. Spulber and to exclude the expert testimony and report of Ms. Davidson. Specifically, the Court excludes Dr. Spulber's admission benchmark opinion and Ms. Davidson's multihoming opinion as it relates specifically to Surescript's technological capabilities or to the feasibility of multihoming without adverse effect on the quality of e-prescriptions. In addition, the Court holds that Dr. Spulber's real-world price opinion should account for rebates. Otherwise, the Court allows Dr. Spulber's and Ms. Davidson's testimony as to all defendants.

Enter: November 21, 2024

John J. Tharp, Jr.
United States District Judge

Dated:

DRAFT
John J. Tharp, Jr.
United States District Judge

50