**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION | Civil Action No. 1:19-cv-06627 |
| This Document Relates To: All Class Actions | Honorable John J. Tharp Jr. |

**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF
SETTLEMENT WITH DEFENDANTS SURESCRIPTS LLC AND ALLSCRIPTS
HEALTHCARE SOLUTIONS, INC., CERTIFICATION OF THE PROPOSED
SETTLEMENT CLASS, APPROVAL TO NOTIFY THE SETTLEMENT CLASS,
AND RELATED RELIEF**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

I.       BACKGROUND ................................................................................................................. 2

II.      SUMMARY OF THE SETTLEMENT AGREEMENT .................................................... 7

III.     LEGAL STANDARD FOR PRELIMINARY APPROVAL OF THE SETTLEMENT ................. 8

IV.      THE COURT IS LIKELY TO APPROVE THE SETTLEMENT UNDER 23(e)(2) ..................... 9

         A.       The Class Representatives and Class Counsel Have Adequately Represented the Class . 10

         B.       The Settlement Is Fair and Resulted from Arm's-Length Negotiations ........................... 11

         C.       The Terms of the Proposed Settlement Are Fair, Reasonable, and Adequate ................. 13

                  1.       The Settlement Provides Substantial Relief in Light of the Costs, Risks, and
                           Delay of Further Litigation ................................................................................ 13

                  2.       The Effectiveness of the Proposed Form of Distributing Relief to the Class
                           Weighs in Favor of Preliminary Approval .......................................................... 16

                  3.       Plaintiffs Have Identified All Agreements Made in Connection with the
                           Settlement ........................................................................................................... 17

         D.       The Proposal Treats Class Members Equitably Relative to Each Other ........................... 17

V.       THE Settlement CLASS SATISFIES the STANDARDS FOR CLASS CERTIFICATION ........ 18

VI.      NOTICE TO THE SETTLEMENT CLASS SHOULD BE APPROVED ................................... 22

VII.     APPOINTMENT OF ESCROW AGENT TO MAINTAIN SETTLEMENT FUNDS ................ 24

VIII.    CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Int'l Grp. v. ACE INA Holdings, Inc.*,
No. 07-cv-2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) ............................................. 9

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................. 18, 21, 23

*Armstrong v. Bd. of Sch. Dirs.*,
616 F.2d 305 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134
F.3d 873 (7th Cir. 1998) ................................................................................. 8, 11

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) ............................................................................. 14

*Beezley v. Fenix Parts, Inc.*,
No. 17-cv-07896, 2020 WL 4581733 (N.D. Ill. Aug. 7, 2020) ........................................ 23

*Fed. Trade Comm'n v. Surescripts, LLC*,
665 F. Supp. 3d 14 (D.D.C. 2023) ......................................................................... 6

*Fed. Trade Comm'n v. Surescripts, LLC*,
Case No. 1:19-cv-01080, ECF No. 187 (D.D.C. August 9, 2023),
https://www.ftc.gov/system/files/ftc_gov/pdf/surescriptsstipulatedorder.pdf ..................... 6

*Gautreaux v. Pierce*,
690 F.2d 616 (7th Cir. 1982) ................................................................................ 9

*Goldsmith v. Tech. Sols. Co.*,
No. 92-cv-4374, 1995 WL 17009594 (N.D. Ill. Oct. 10. 1995) ...................................... 11

*Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P*,
212 F.R.D. 400 (E.D. Wis. 2002) ........................................................................... 9

*Hefler v. Wells Fargo & Co.*,
No. 16-cv-05479, 2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) .................................... 17

*Hughes v. Baird & Warner, Inc.*,
No. 76-cv-3929, 1980 WL 1894 (N.D. Ill. Aug. 20, 1980) .......................................... 21

*Hughes v. Kore of Indiana Enter., Inc.*,
731 F.3d 672 (7th Cir. 2013) ............................................................................... 23

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) ..................................................................... 23

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005) ................................................................................ 18

*In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*,
795 F.3d 380 (3d Cir. 2015) ......................................................................... 10

*In re HealthSouth Corp. Sec. Litig.*,
334 F. App'x 248 (11th Cir. 2009) ................................................................ 17

*In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 631 (E.D. Pa. 2003) ............................................................ 11

*In re Linerboard Antitrust Litig.*,
296 F. Supp. 2d 568 (E.D. Pa. 2003) ............................................................ 15

*In re Mexico Money Transfer Litig. (W. Union & Valuta)*,
164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001) ...................................................... 11

*In re N.J. Tax Sales Certificates Antitrust Litig.*,
No. 12-cv-1893, 2016 WL 5844319 (D.N.J. Oct. 3, 2016) ............................ 15

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. 2020) ........................................................... 15

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................... 14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) ..................................................................... 15

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
No. 06-cv-7023, 2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ........................ 11

*In re TikTok, Inc., Consumer Priv. Litig.*,
565 F. Supp. 3d 1076 (N.D. Ill. 2021) ............................................................ 9

*In re TikTok, Inc., Consumer Priv. Litig.*,
617 F. Supp. 3d 904 (N.D. Ill. 2022) ............................................................ 23

*In re Titanium Dioxide Antitrust Litig.*,
No. RDB-10-0318, 2013 WL 5182093 (D. Md. Sept. 12, 2013) ................... 15

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) .................................................................... 8, 10

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
264 F.R.D. 438 (N.D. Ill. 2009) ............................................................... 8, 19

*Kohen v. Pacific Inv. Mgmt. Co. LLC*,
571 F.3d 672 (7th Cir. 2009) ........................................................................ 10

*McCue v. MB Fin., Inc.*,
No. 15-cv-00988, 2015 WL 1020348 (N.D. Ill. Mar. 6, 2015) ..................... 12

iii

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*,
   231 F.R.D. 280 (N.D. Ill. 2005) ................................................................. 20

*Phillips v. Sheriff of Cook Cnty.*,
   828 F.3d 541 (7th Cir. 2016) ................................................................. 19

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ................................................................. 8

*Saltzman v. Pella Corp.*,
   257 F.R.D. 471 (N.D. Ill. 2009) ................................................................. 20, 21

*Sansone v. Charter Commc'ns, Inc.*,
   No. 17-cv-1880, 2023 WL 9051463 (S.D. Cal. Aug. 21, 2023) ........................................ 23

*Schmidt v. Smith & Wollensky LLC*,
   268 F.R.D. 323 (N.D. Ill. 2010) ................................................................. 18

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ................................................................. 19, 21

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ................................................................. 10

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Illinois, Inc.*,
   97 F.R.D. 668 (N.D. Ill. 1983) ................................................................. 19

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................. 19

*Yates v. Checkers Drive-In Rests., Inc.*,
   No. 17-cv-9219, 2020 WL 6447196 (N.D. Ill. Nov. 3, 2020) ........................................ 23

**Statutes, Rules & Regulations**

Federal Rules of Civil Procedure
   Fed. R. Civ. P. 23 ................................................................. *passim*
   Fed. R. Civ. P. 23(a) ................................................................. 18
   Fed. R. Civ. P. 23(a)(1) ................................................................. 18
   Fed. R. Civ. P. 23(a)(2) ................................................................. 19, 20
   Fed. R. Civ. P. 23(a)(3) ................................................................. 20
   Fed. R. Civ. P. 23(a) ................................................................. 18, 20
   Fed. R. Civ. P. 23(b) ................................................................. 18, 20
   Fed. R. Civ. P. 23(b)(3) ................................................................. 18, 20, 21
   Fed. R. Civ. P. 23(c)(2) ................................................................. 23
   Fed. R. Civ. P. 23(c)(2)(B) ................................................................. 22, 23
   Fed. R. Civ. P. 23(c)(3) ................................................................. 22
   Fed. R. Civ. P. 23(e) ................................................................. 8, 9, 12, 22
   Fed. R. Civ. P. 23(e)(1) ................................................................. 8
   Fed. R. Civ. P. 23(e)(1)(B)(i) ................................................................. 9, 18
   Fed. R. Civ. P. 23(e)(1)(B)(ii) ................................................................. 9, 18

Fed. R. Civ. P. 23(e)(2)................................................................................................*passim*

Fed. R. Civ. P.  23(e)(2)(A) .............................................................................................. 10

Fed. R. Civ. P. 23(e)(2)(B) ............................................................................................... 11

Fed. R. Civ. P.  23(e)(2)(C) .............................................................................................. 13

Fed. R. Civ. P.  23(e)(3)................................................................................................. 9, 13

## Other Authorities

2 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS, §11.40 (2d ed. 1985) ...................................... 11

3 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS §11.41 (3d ed. 1992)............................................ 9

**INTRODUCTION**

In this litigation, pending since 2019, Plaintiffs have reached a proposed $39,750,000 settlement of their claims with Defendants Surescripts LLC ("Surescripts") and Allscripts Healthcare Solutions, Inc.[1] ("Allscripts," and together with Surescripts, "Settling Defendants"), which, if approved, will resolve this litigation.[2] This Settlement is an excellent result for the Settlement Class, providing substantial monetary relief while avoiding the risks and uncertainties of continued litigation. The Settlement, along with the $10,000,000 recovery from the prior settlement with NDCHealth Corporation d/b/a RelayHealth ("RelayHealth"), will deliver meaningful compensation to class members whom Plaintiffs alleged were harmed by Defendants' alleged conduct.

Plaintiffs move the Court to preliminarily approve the Settlement Agreement, certify the proposed Settlement Class, appoint Co-Lead Counsel as Settlement Class Counsel, and approve a program to notify members of the Settlement Class of this Settlement. In addition, the Court has already appointed Angeion Group ("Angeion") as the notice and claims administrator and Huntington National Bank ("Huntington") as the escrow agent in connection with the prior settlement with RelayHealth, and Plaintiffs request that the Court authorize these entities to continue in these roles. (Wexler Decl. ¶30.)

---

[1]      Allscripts changed its name to Veradigm LLC in 2023.

[2]      Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Settlement Agreement Between Plaintiffs and Defendants Surescripts LLC & Allscripts Healthcare Solutions, Inc. ("Settlement" or "Settlement Agreement"), which is attached as Exhibit 1 to the Declaration of Kenneth A. Wexler in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement with Defendants Surescripts LLC and Allscripts Healthcare Solutions, Inc., Certification of the Proposed Settlement Class, Approval to Notify the Settlement Class, and Related Relief ("Wexler Decl.").

At the Fairness Hearing, Plaintiffs will request entry of a final order and judgment consistent with the Settlement Agreement, dismissing with prejudice all claims against Settling Defendants and retaining jurisdiction for the implementation and enforcement of the Settlement Agreement. If approved, the Settlement will provide complete and final resolution of the litigation.

## I.      BACKGROUND

Plaintiffs are eight community pharmacies and bring this action under Sections 1 and 2 of the Sherman Act and state antitrust laws to restrain alleged anticompetitive conduct by Surescripts, the nation's largest provider of e-prescribing services, along with co-defendant Allscripts and former co-defendant RelayHealth, and to remedy the harms of an alleged decade-long anticompetitive scheme. After the Federal Trade Commission ("FTC") filed a lawsuit on May 3, 2019, revealing Surescripts's alleged anticompetitive scheme to monopolize e-prescribing markets, Plaintiffs filed this class action lawsuit, seeking damages for the alleged supracompetitive overcharges that they contend they and thousands of other pharmacies were forced to pay due to Defendants' alleged anticompetitive conduct. Plaintiffs contend that Surescripts maintained its dominant status and high pricing in the e-prescription routing and eligibility markets through an anticompetitive scheme, aided by RelayHealth and Allscripts. (Wexler Decl. ¶4.)

Plaintiffs filed a Consolidated Class Action Complaint on December 5, 2019. (ECF No. 52.) At a January 16, 2020 status hearing, the Court ordered Defendants to produce documents previously provided to the FTC in connection with its parallel investigation. (Jan. 16, 2020 Hr'g Tr. 6:17-24, ECF No. 87.) Discovery was otherwise stayed pending resolution of two rounds of motion to dismiss briefing.[3] (Wexler Decl. ¶5.)

---

[3]      On April 28, 2021, Plaintiffs moved to compel Surescripts to supplement its production of materials from the FTC proceedings (ECF No. 178); the Court denied the motion. (ECF No. 183.)

On January 31, 2020, Surescripts, Allscripts, and RelayHealth each moved to dismiss Plaintiffs' Consolidated Complaint. (ECF Nos. 76-77, 78-79, 80-81.) Plaintiffs opposed these motions on February 28, 2020 (ECF No. 90), and Defendants replied on June 12, 2020. (ECF Nos. 109, 110, 111.) RelayHealth's motion was held in abeyance pending approval of a settlement agreement between Plaintiffs and RelayHealth. (ECF No. 115.) The Court held a motion hearing on the other motions to dismiss on June 26, 2020. (*Id.*) On August 18, 2020, the Court granted the motions without prejudice, finding that Plaintiffs needed to clarify in their pleadings whether they purchased e-prescription services directly from Surescripts or through alleged co-conspirator intermediaries to establish standing under *Illinois Brick*. (ECF No. 135 at 13). In so ruling, the Court also denied Surescripts's motion for sanctions (ECF No. 113) against Plaintiffs and Co-Lead Counsel. (ECF No. 135 at 9, n.3.) (Wexler Decl. ¶6.)

Co-Lead Counsel conducted a comprehensive review of the materials that Defendants had produced to the FTC, which enabled Plaintiffs to incorporate substantial additional factual allegations into their Second Amended Class Action Complaint filed on October 19, 2020. (ECF No. 148). On December 4, 2020, Allscripts (ECF Nos. 161-162) and Surescripts (ECF Nos. 164-165) moved to dismiss. On January 8, 2021, Plaintiffs opposed. (ECF No. 169.) On January 29, 2021, Allscripts and Surescripts filed replies. (ECF Nos. 172-173.) (Wexler Decl., ¶7.)

On April 29, 2021, the Court granted preliminary approval of Plaintiffs' settlement with RelayHealth. (ECF No. 175.) Notice of the settlement commenced on October 6, 2021. (ECF No. 190-91.) The Court held a fairness hearing on February 24, 2022, and granted final approval the same day. (ECF Nos. 201-202.) The RelayHealth settlement obtained $10 million and included cooperation that Plaintiffs believe greatly assisted in their continuing prosecution of claims against Surescripts and Allscripts. (ECF No. 127-1.) The proceeds of the RelayHealth settlement have not

been distributed but have been earning interest for the benefit of the Settlement Class and will be distributed along with the proceeds of this Settlement, if approved. (Wexler Decl. ¶8.)

On June 21, 2022, the Court denied Surescripts's and Allscripts's motions to dismiss the Second Amended Class Action Complaint, finding that it was premature to address the *Illinois Brick* direct purchaser rule given that Plaintiffs also brought viable state law claims and that Plaintiffs' monopolization and conspiracy claims should survive because Surescripts's loyalty pricing schemes with claw back provisions and exclusive dealing agreements with RelayHealth and Allscripts plausibly constituted anticompetitive conduct that maintained its 95% market share monopoly in e-prescribing services. (ECF No. 212.) Surescripts and Allscripts filed Answers on July 5, 2022, and July 26, 2022, respectively.[4] (ECF Nos. 215, 228.) (Wexler Decl. ¶9.)

On July 12, 2022, the Court entered Case Management Order No. 2, setting deadlines for, among other things, the completion of fact discovery, expert disclosures, *Daubert* motions, class certification, and summary judgment.[5] (ECF No. 221.) In the ensuing months, the parties engaged in extensive document productions, with Defendants producing more than 3.5 million pages of documents combined and Plaintiffs producing a combined 21,623 pages. (ECF No. 264 at 1.) In addition, approximately two dozen non-parties produced over 2 million pages of documents, including non-parties that produced documents in the parallel FTC investigation. (ECF No. 264 at

---

[4]     On July 19, 2022, Allscripts filed a motion for reconsideration of the Court's order denying its motion to dismiss the Second Amended Complaint, to which Plaintiffs responded on July 29, 2022; Allscripts filed a reply on August 5, 2022. (ECF Nos. 224, 232, 234.) The Court denied Allscripts' motion on August 29, 2022. (ECF No. 235.)

[5]     In April 2023, the parties sought a 90-day extension of the case schedule due to the extensive discovery and documents produced in the case. (ECF No. 264.) The Court granted the extension. (ECF No. 265.) In September 2023, the parties sought a short extension of the case schedule to accommodate the scheduling of expert depositions, and the Court granted the extension. (ECF No. 277, 278.) In April 2024, the parties sought an extension of class certification and summary judgment briefing deadlines so that the parties could benefit from the Court's anticipated ruling on *Daubert* motions, and the Court granted the extension. (ECF Nos. 327, 331.)

2.) The parties also negotiated, and the Court entered, a Protective Order, Fact Deposition Protocol, Order Concerning the Authenticity and Admissibility of Documents and Prior Deposition Testimony (related to the FTC litigation), and an Order Concerning Expert Discovery. (ECF Nos. 68, 255, 256, 276.) (Wexler Decl. ¶10.)

During the fact discovery period, Plaintiffs took a total of 15 depositions of Surescripts' and Allscripts' current and former employees, and Surescripts and Allscripts deposed each of the eight Plaintiffs. In addition, there were four expert depositions—two Plaintiffs' experts and two Settling Defendants' experts. (Wexler Decl. ¶11.)

The Court ruled on only one discovery dispute in a discovery process involving millions of pages of documents and 27 depositions. On April 12, 2024, the Court granted in part Surescripts's motion to compel "downstream discovery" of pharmacy financial data to support a pass-on defense but limited the scope to sales in Michigan after finding that Michigan was the only state whose antitrust laws clearly permit such a defense.[6] (ECF No. 323 at 20.) Because this decision came after the close of fact discovery, the Court reopened fact discovery on this one issue. (ECF No. 323 at 25.) Following the Court's ruling, Plaintiffs filed the Third Amended Class Action Complaint for the limited purpose of removing their Michigan state law claim, obviating the need for this additional discovery.[7] (ECF No. 334.) Surescripts and Allscripts answered on April 30, 2024. (ECF Nos. 343, 346.) (Wexler Decl. ¶12.)

In July 2023, Surescripts settled with the FTC. The settlement order has a 20-year term and, among other things, contains provisions precluding Surescripts from including certain types

---

[6]     The Court also denied Surescripts's request for communications between Co-Lead Counsel and the FTC, finding no relevance to credibility or bias. (ECF No. 323 at 25.)

[7]     The Third Amended Complaint also removed Jordan Drug, Inc. d/b/a Powell Prescription Center as a plaintiff because it voluntarily dismissed its claims in February 2023. (ECF No. 334.)

of provisions in its contracts for e-prescribing services. *See* Stipulated Order for Permanent Injunction and Equitable Relief, *Fed. Trade Comm'n v. Surescripts, LLC*, Case No. 1:19-cv-01080, ECF No. 187 (D.D.C. August 9, 2023).[8] While the FTC settlement addressed prospective injunctive relief, it provided for no payments to alleged victims. The settlements in this litigation will provide those payments. The FTC settlement followed a ruling by the D.C. district court on summary judgment that Surescripts possesses monopoly power in e-prescribing services with a 95% "supershare." *Fed. Trade Comm'n v. Surescripts, LLC*, 665 F. Supp. 3d 14, 48 (D.D.C. 2023).

On November 17, 2023, Surescripts and Allscripts jointly moved in this litigation to exclude the expert testimony of Daniel F. Spulber, Ph.D., Plaintiffs' economic expert, and Michele Davidson, Plaintiffs' industry expert in e-prescribing services; Allscripts also moved separately to exclude both experts. (ECF Nos. 282, 284, 287, 290.) Plaintiffs opposed these four motions on December 21, 2023. (ECF Nos. 294, 297, 300, 303.) Defendants replied on January 18, 2024. (ECF Nos. 309, 312, 315, 317.) (Wexler Decl. ¶13.)

On November 21, 2024, the Court granted in part and denied in part Defendants' *Daubert* motions, allowing Plaintiffs to proceed to class certification and summary judgment. (ECF No. 351.) The Court found that certain of Dr. Daniel Spulber's opinions, including his benchmark methodology for calculating damages and his analysis of pass-through pricing, passed the *Daubert* standard, but the Court excluded his "admission benchmark" opinion. The Court also allowed most of the opinions of Michele Davidson regarding e-prescribing standards and multihoming capabilities, while limiting her opinions about Surescripts's specific technological capabilities. The Court denied Allscripts's separate motion to exclude all of Plaintiffs' expert opinions as irrelevant, finding that under a "concurrent tortfeasor" theory, Allscripts could be held jointly

---

[8]     https://www.ftc.gov/system/files/ftc_gov/pdf/surescriptsstipulatedorder.pdf.

liable for the entire alleged market-wide harm, even though its alleged liability stems from its specific agreement with Surescripts. (Wexler Decl. ¶14.)

The Court then set a briefing schedule for class certification and summary judgment motions. (ECF No. 359.) Plaintiffs filed a motion for class certification on January 30, 2025 (ECF Nos. 368, 371), and Surescripts and Allscripts filed motions for summary judgment the same day (ECF No. 373-74, 380, 383.) (Wexler Decl. ¶15.)

On February 25, 2025, the Court extended the deadlines to respond to the pending class certification and summary judgement motions by approximately four months, while the parties engaged in settlement discussions. (ECF Nos. 389, 390.) On June 27, 2025, the parties reported to the Court that they had signed term sheets memorializing their agreements in principle and requested a stay of the class certification and summary judgment schedule while they seek approval of the Settlement; the Court granted the stay. (ECF Nos. 397, 398.) (Wexler Decl. ¶16.)

## II.    SUMMARY OF THE SETTLEMENT AGREEMENT

After extensive arm's length negotiations, with the mediation assistance of Judge Sidney I. Schenkier (Ret.), Plaintiffs agreed to settle with Surescripts and Allscripts in return for their agreement to pay a total of $39,750,000 into an Escrow Account for the benefit of the Settlement Class. (Settlement Agreement §II.A.) In consideration, Plaintiffs and the Settlement Class agree, among other things, to release claims against Settling Defendants and their affiliates, which were or could have been brought in this litigation relating to the conduct alleged in the Operative Complaint. (Settlement Agreement §II.B.) (Wexler Decl. ¶17.)

The Settlement was reached through protracted arm's-length negotiations facilitated by Judge Schenkier as mediator. As this litigation has been pending for six years, the Parties had ample opportunity to assess the merits of their claims and defenses through investigation, research, briefing of two rounds of motions to dismiss, fact and expert discovery, *Daubert* motions, and the

filing of class certification and summary judgment motions. Plaintiffs and Settling Defendants executed the Settlement Agreement on July 18, 2025. (Wexler Decl. ¶18.)

## III.    LEGAL STANDARD FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

There is an overriding public interest in settling litigation, and this is particularly true in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *See Armstrong*, 616 F.2d at 313.

Rule 23(e) requires judicial approval of class action settlements in a two-step process. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). First, under Rule 23(e)(1), a court performs a preliminary review of the terms of the proposed settlement to determine whether it is sufficient to warrant notice to the class and a hearing. *Armstrong*, 616 F.2d at 314 (the question at preliminary approval is "whether the proposed settlement is 'within the range of possible approval'"); *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 447 (N.D. Ill. 2009) (a relevant consideration is "whether [the settlement] 'has no obvious deficiencies [and] does not improperly grant preferential treatment to class representatives or segments of the class'") (second alteration in original). Second, under Rule 23(e)(2), after notice has been provided and a final approval hearing has been held, a court determines whether to grant final approval.

In determining whether to grant preliminary approval, courts must determine whether "giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the

proposal." Fed. R. Civ. P. 23(e)(1)(B)(i-ii). At the preliminary approval stage, however, the purpose of the inquiry is only "'to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing,' 'not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards.'" *In re TikTok, Inc., Consumer Priv. Litig.*, 565 F. Supp. 3d 1076, 1083 (N.D. Ill. 2021) (quoting *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) and *Am. Int'l Grp. v. ACE INA Holdings, Inc.*, No. 07-cv-2898, 2011 WL 3290302, at *6 (N.D. Ill. July 26, 2011)).

## IV.    THE COURT IS LIKELY TO APPROVE THE SETTLEMENT UNDER 23(e)(2)

To determine whether to approve a proposed class action settlement, courts look to the factors in Rule 23(e)(2).[9] Factors (A) and (B) of Rule 23(e)(2) constitute the procedural analysis factors and examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Factors (C) and (D) of Rule 23(e)(2) constitute the substantive analysis factors and examine "[t]he relief that the settlement is expected to provide to class members . . . ." *Id.*

There is a strong presumption that a class action settlement meets this standard when it is the result of arm's-length negotiations. *Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P,* 212 F.R.D. 400, 410 (E.D. Wis. 2002); *see also* Herbert B. 3 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS §11.41 (3d ed. 1992). The Settlement here

---

[9]     Rule 23(e)(2) requires courts to consider whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

is the result of lengthy arm's-length negotiations facilitated by a mediator. (Wexler Decl. ¶¶17-18.) In addition, Co-Lead Counsel and Defendant's Counsel are experienced and thoroughly familiar with the factual and legal issues presented in this Action. (Wexler Decl. ¶20.) Starting with a presumption in favor of approving the Settlement, the Court should then consider the above-mentioned factors in determining its "fairness." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006); *Isby*, 75 F.3d at 1198-99. Because the Settlement meets all factors under Rule 23(e)(2), the Settlement should be preliminarily approved.

### A. The Class Representatives and Class Counsel Have Adequately Represented the Class

Rule 23(e)(2)(A) requires that "the class representatives and class counsel have adequately represented the class." Adequacy is measured by a two-part test: (i) the named plaintiffs cannot have claims in conflict with other class members, and (ii) the named plaintiffs and proposed class counsel must demonstrate their ability to litigate the case vigorously and competently on behalf of named and absent class members alike. *See Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009).

Both requirements are satisfied here. The interests of the Settlement Class Members are aligned with those of Plaintiffs, which, like all Settlement Class Members, share an overriding interest in obtaining the largest possible monetary recovery. *See, e.g.*, *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 394 (3d Cir. 2015) (no fundamental intra-class conflict to prevent class certification where all class members pursuing damages under the same statutes and the same theories of liability). Further, Plaintiffs have actively litigated this case for six years, producing 21,623 pages of documents and each sitting for a deposition. (Wexler Decl. ¶19.) Co-Lead Counsel diligently litigated this highly complex and demanding case, vigorously and competently confronting formidable challenges, including the need to: (i) prove

monopolization in interconnected markets, (ii) analyze the anticompetitive effects of hundreds of loyalty contracts across the e-prescribing ecosystem, and (iii) demonstrate damages from a sophisticated scheme. As they demonstrated when they sought appointment as interim class counsel, Co-Lead Counsel are qualified, experienced, and thoroughly familiar with antitrust class action litigation.[10] As they respectfully submit has been demonstrated by their conduct to date, Plaintiffs and Co-Lead Counsel have diligently represented the interests of the Settlement Class in this litigation and will continue to do so.  (Wexler Decl. ¶20.)

**B.      The Settlement Is Fair and Resulted from Arm's-Length Negotiations**

Fed. R. Civ. P. 23(e)(2)(B) requires that "the proposal was negotiated at arm's length." There is usually an initial presumption that a proposed settlement is fair and reasonable when it is the result of arm's-length negotiations. *Goldsmith v. Tech. Sols. Co.*, No. 92-cv-4374, 1995 WL 17009594, at *3 n.2  (N.D. Ill. Oct. 10. 1995) ("[I]t may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's-length negotiations.").[11] The initial presumption in favor of such settlements reflects courts' understanding that vigorous

---

[10]      *See* ECF No. 47 (Plaintiffs' Unopposed Motion for CMC Reassigning & Consolidating & Appointing Interim Lead Counsel); ECF No. 51 (Court's Order of December 3, 2019, appointing same); ECF Nos. 155, 207, and 357 (Court's Orders of November 9, 2020, March 8, 2022, and December 10, 2024, respectively, updating same).

[11]      *See also* 2 Herbert B. Newberg, NEWBERG ON CLASS ACTIONS, §11.40 at 451 (2d ed. 1985); *Armstrong,* 616 F.2d at 325 (in assessing a class settlement, "the court is entitled to rely heavily on the opinion of competent counsel"); *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.,* No. 06-cv-7023, 2016 WL 772785, at *12 (N.D. Ill. Feb. 29, 2016) ("'The opinion of competent counsel is relevant to determining whether a class action settlement is fair, reasonable, and adequate under Rule 23.'"); *In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("'A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.'").

negotiations between seasoned counsel protect against collusion and advance the fairness concerns of Rule 23(e).

The Settlement embodies all the hallmarks of a procedurally fair resolution under Rule 23(e)(2). *First,* Co-Lead Counsel's settlement posture was informed by the extensive factual and legal record, developed over years-long litigation efforts that preceded the Settlement. As a result, Co-Lead Counsel had a deep understanding of the strengths and weaknesses of Plaintiffs' case when, in February 2025, the parties agreed to mediate. Throughout the mediation process, Co-Lead Counsel comprehensively vetted the factual record, analyzed Defendants' arguments and contrary facts, and thoroughly considered the costs and risks of ongoing litigation. Co-Lead Counsel—who have extensive experience litigating antitrust class actions—were well informed of the strengths and weaknesses of the claims and defenses in this Action and conducted the settlement negotiations seeking to achieve the best possible result for the Settlement Class in light of the risks, costs, and delays of continued litigation. (Wexler Decl. ¶22.) *Second,* the Parties' settlement negotiations were always at arm's length. Initially, throughout the past couple of years of the litigation, Plaintiffs discussed the possibility of settlement with both Defendants separately. Earlier this year, the parties agreed that they were at a point in their discussions at which a mediation would make sense. The parties engaged Judge Schenkier to serve as a mediator and held a mediation on May 15, 2025. Each of the Defendants had outside and in-house counsel present, and the parties engaged in settlement discussions for the entire day, only reaching an agreement late in the day. (Wexler Decl. ¶23.) The mediator's close involvement in the settlement process further supports that the Settlement is fair and that the parties achieved it free of collusion. *See McCue v. MB Fin., Inc.*, No. 15-cv-00988, 2015 WL 1020348, at *1-2 (N.D. Ill. Mar. 6, 2015) (assistance of a mediator "reinforces the non-collusive nature of the settlement").

**C.     The Terms of the Proposed Settlement Are Fair, Reasonable, and Adequate**

In assessing whether the settlement provides adequate relief for the putative class under Rule 23(e)(2)(C), the Court should consider: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C)(i-iv). All these factors weigh in favor of preliminary approval of the Settlement Agreement.

**1.     The Settlement Provides Substantial Relief in Light of the Costs, Risks, and Delay of Further Litigation**

A key factor in assessing whether to approve a class action settlement is a plaintiff's likelihood of success on the merits, balanced against the relief offered in settlement. *See* Fed. R. Civ. P. 23(e)(2)(C). Here, the Settlement provides for a $39,750,000 million cash recovery to be allocated among Settlement Class Members following deduction of Court-approved costs. This is in addition to the $10,000,000 recovery from the RelayHealth settlement. Therefore, the combined recovery totals $49,750,000, which increases to $50,000,000 when including interest earned to date on the RelayHealth settlement proceeds. (Wexler Decl. ¶25.)

While Plaintiffs largely prevailed on Settling Defendants' motions to dismiss and *Daubert* motions, there was no guarantee that Plaintiffs would prevail at class certification, summary judgment, or trial in the face of more rigorous burdens of proof. Class certification was essentially an "all or nothing" proposition—without it, there would be no meaningful avenue for relief despite Plaintiffs' claims of systematic overcharging affecting thousands of pharmacies nationwide. At summary judgment and trial, Plaintiffs would need to demonstrate through evidence, rather than allegations, that Surescripts and Allscripts possessed sufficient market power, that the exclusive

13

dealing arrangements foreclosed a substantial portion of the relevant market, and that Defendants knowingly participated in the anticompetitive scheme, among other things. The rule of reason requires comprehensive market analysis, economic evidence of anticompetitive effects, and proof of actual rather than theoretical harm to competition. These ultimately are Plaintiffs' burden, but they would have presented substantial evidentiary challenges for both sides. The trial in this matter would have been complex, and there was certainly no guarantee of a verdict in favor of Plaintiffs. Even if Plaintiffs prevailed at trial, further resources would be devoted to defending the judgment on appeal, which would result in years of delay in recovery for Settlement Class Members. (Wexler Decl. ¶26.) In sum, "[t]here can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1333 (7th Cir. 1986) ("Antitrust cases are notoriously extended.").

While the FTC's successful action against Surescripts provides some validation of Plaintiffs' theories, it did not eliminate Plaintiffs' substantial litigation risks. The FTC proceeding involved different legal standards, burdens of proof, and remedial frameworks than this private antitrust action. Notably, the FTC's enforcement action focused primarily on prospective injunctive relief to prevent any future anticompetitive conduct, whereas Plaintiffs here seek monetary damages for past alleged harm—a fundamentally different and more challenging remedy requiring proof of actual economic injury and quantifiable damages. Additionally, the FTC's settlement with Surescripts did not constitute an admission of liability or a judicial determination of antitrust violations that could be directly applied in this litigation. Therefore, Plaintiffs still faced the full burden of proving their case under the demanding standards applicable to private antitrust class actions. (Wexler Decl. ¶27.)

14

The combination of litigation risks (class certification challenges, summary judgment risks, and trial uncertainties) make the certainty of a $39,750,000 million cash recovery from the Settlement reasonable compared to the possibility of the Settlement Class recovering nothing after years of additional litigation. Plaintiffs' best-case damages estimate in this Action is approximately $294,000,000. The total settlement recovery of $50,000,000 represents 17% percent of Plaintiffs' best-case damages estimate—a recovery consistent with, or larger than, damages percentages recovered in other antitrust class action settlements that have been approved across the country.[12] While Plaintiffs estimated damages of approximately $294,000,000, Defendants contended that damages were $0. Defendants vigorously contested both liability and damages, arguing that their conduct was lawful, any exclusive dealing arrangements were procompetitive and justified by legitimate business reasons, that Plaintiffs lacked standing to pursue their claims, and Plaintiffs suffered no antitrust injury or damages at all. (Wexler Decl. ¶28.)

The next phase of litigation would have entailed enormous costs and substantial risks for Plaintiffs, including the risk of denial at the class certification stage and the possibility of adverse summary judgment rulings that could have eliminated claims entirely. The contested liability and damages issues would have required extensive expert testimony, economic analysis, and factual

---

[12] *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 315 (S.D.N.Y. 2020) (approving settlement of approximately 10% of highest damages estimate); *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 5182093, at *4 (D. Md. Sept. 12, 2013) (finding settlement that was 8% of plaintiffs' original best case damages estimate was adequate, as "a verdict in favor of the Plaintiffs was not assured by any means"); *In re N.J. Tax Sales Certificates Antitrust Litig.*, No. 12-cv-1893, 2016 WL 5844319, at *1, *9 (D.N.J. Oct. 3, 2016) (approving settlement of approximately 2.5% of the "best possible recovery"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 48 (E.D.N.Y. 2019) (stating that the Second Circuit did not take issue with original settlement recovery of "'2.5% of the largest possible estimate of actual damage to merchants'"); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 & n.5 (E.D. Pa. 2003) (gathering cases where courts approved settlements achieving single-digit percentages of potential recoveries)).

15

development that could have taken years to resolve, with no guarantee of success for Plaintiffs. Co-Lead Counsel thoroughly evaluated the relative strengths and weaknesses of the parties' respective litigation positions and determined that the Settlement brings substantial benefits to the Settlement Class and avoids the delay and uncertainty of continuing protracted litigation with Settling Defendants. (*See* Wexler Decl. ¶29.) Plaintiffs respectfully submit that the benefits of Settlement outweigh the costs and risks associated with continued litigation with Settling Defendants, and weigh in favor of granting preliminary approval.

### 2. The Effectiveness of the Proposed Form of Distributing Relief to the Class Weighs in Favor of Preliminary Approval

The proposed Plan of Distribution (attached as Exhibit 2 to the Wexler Declaration) and summarized for Settlement Class Members in the long form notice (attached as Exhibit 3 to the Wexler Declaration), provides a fair and effective means of distributing the Net Settlement Fund. The Plan of Distribution provides for a pro rata allocation of the Net Settlement Fund to eligible claimants, with each claimant's award calculated based on its proportionate share of the total number of e-prescriptions routed through the Surescripts network by all eligible claimants during the Class Period. This method is appropriate because the alleged harm constitutes a per-transaction overcharge rather than a percentage-based markup. Since each routed prescription represents the same amount of alleged harm, distributing the Settlement Fund based on transaction volume ensures that each Settlement Class Member receives compensation directly proportional to their actual alleged damages—pharmacies that processed more prescriptions through the network are alleged to have suffered proportionally greater harm and should receive proportionally larger recovery. Accordingly, the Plan of Distribution weighs in favor of preliminary approval.

### 3. Plaintiffs Have Identified All Agreements Made in Connection with the Settlement

The Parties signed a separate and confidential agreement ("Confidential Opt-Out Agreement") to address the consequences to the Settlement from potential opt-outs. The Confidential Opt-Out Agreement sets forth certain conditions under which the Settlement Agreement may be withdrawn or terminated in Settling Defendants' sole discretion if Settlement Class Members who meet certain criteria opt out of the Settlement Class. (*See* Settlement Agreement §(II)(E)(10)(b).) This type of agreement is standard in class action settlements and has no negative impact on the fairness of the Settlement. *See, e.g.*, *Hefler v. Wells Fargo & Co.,* No. 16-cv-05479, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").[13]

### D. The Proposal Treats Class Members Equitably Relative to Each Other

Consideration under this Rule 23(e)(2) factor "could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Here, in the Plan of Distribution, Plaintiffs are treated the same as all other Settlement Class Members. The release applies uniformly to putative class members and does not affect the apportionment of

---

[13] Should the Court request submission of this Confidential Opt Out Agreement, the Parties request to provide it for *in camera* review. Confidential letter agreements are routinely used in class action settlements to specify the precise opt-out threshold. *See In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248, 250, 250 n.4 (11th Cir. 2009) (noting that "the threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out").

the relief to class members. Accordingly, this factor will likely weigh in favor of granting preliminary approval.

## V. THE SETTLEMENT CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION

In order to preliminary approve the Settlement, the Court must also find that it will likely be able to certify the class for purposes of judgment on the proposal. Fed. R. Civ. P. 23(e)(1)(B)(i-ii). Under Rule 23, class actions may be certified for settlement purposes only. *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Certification of a settlement class must satisfy each requirement set forth in Rule 23(a), as well as at least one of the separate provisions of Rule 23(b). *Id.* at 613-14; *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005) ("[C]ertification of classes for settlement purposes only [is] consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry[.]").

Plaintiffs seek certification of a Settlement Class consisting of:

> All pharmacies in the United States and its territories who paid for e-prescriptions routed through the Surescripts network during the period September 21, 2010 through July 18, 2025.

(Settlement Agreement §I.A.) The Court has already certified a substantially similar settlement class in connection with the RelayHealth settlement. As detailed below, this proposed Settlement Class meets the requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3).

**Numerosity.** Rule 23(a)(1) requires that the class be so numerous as to make joinder of its members "impracticable." No magic number satisfies the numerosity requirement, however, "'a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes.'" *Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) (citations omitted). The proposed Settlement Class consists of tens of thousands of pharmacies throughout

the United States and its territories. Thus, joinder would be impracticable, and Rule 23(a)(1) is satisfied.

**Common questions.** Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Common questions "need not address every aspect of the plaintiffs' claims," but they "must 'drive the resolution of the litigation.'" *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 553 (7th Cir. 2016). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014); *Kaufman*, 264 F.R.D. at 442 (characterizing Rule 23(a)(2)'s commonality requirement as a "'low . . . hurdle'"). A central allegation in the Complaint is that Defendants illegally conspired to monopolize and to eliminate competition in the routing market, thereby increasing prices to Plaintiffs and the Class. Proof of this conspiracy will be common to all Class members. *See, e.g.*, *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Illinois, Inc.*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("The overriding common issue of law is to determine the existence of a conspiracy."). In addition to that overarching question, this case is replete with other questions of law and fact common to the Settlement Class including: (1) whether Surescripts willfully obtained and maintained market power over e-prescription routing; (2) whether Surescripts unlawfully excluded competitors and potential competitors from the markets for routing and eligibility; (3) whether Surescripts has any legally cognizable procompetitive benefit that could not have been achieved using a means with less restrictions on competition, and if so, whether the anticompetitive effect of Surescripts's misconduct nonetheless outweighs the procompetitive benefit; (4) whether

Surescripts entered into an illegal agreement with other Defendants not to compete and to allocate the routing market to Surescripts; (5) whether the unlawful scheme alleged herein has substantially affected interstate commerce; (6) whether Defendants' anticompetitive conduct caused antitrust impact to Plaintiffs and members of the class; and (7) the quantum of aggregate damages to the Class. Accordingly, the Settlement Class satisfies Rule 23(a)(2).

**Typicality.** Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. "[T]ypicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009). Typicality is a "low hurdle," requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005). When "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory," factual differences among class members do not defeat typicality. *Saltzman*, 257 F.R.D. at 479. Plaintiffs allege that Defendants illegally conspired to monopolize and eliminate competition in the routing market thereby increasing prices to Plaintiffs and the Settlement Class. Plaintiffs will have to prove the same elements that absent Settlement Class Members would have to prove, *i.e.*, the existence and impact of such conspiracy. Because Plaintiffs' claims arise out of the same alleged illegal anticompetitive conduct and are based on the same alleged theories and will require the same types of evidence to prove those theories, the typicality requirement of Rule 23(a)(3) is satisfied.

**Adequacy.** For the reasons mentioned above in §IV.A., *supra*, Plaintiffs and Co-Lead Counsel have adequately represented the class.

**Predominance.** Once Rule 23(a)'s four prerequisites are met, Plaintiffs must show the proposed Settlement Class satisfies one of the provisions of Rule 23(b). The proposed Settlement

Class satisfies Rule 23(b)(3). As to predominance, "'[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts.'" *Saltzman*, 257 F.R.D. at 484. In antitrust conspiracy cases such as this one, courts consistently find that common issues of the existence and scope of the conspiracy predominate over individual issues, which follows from the central nature of a conspiracy in such cases. *See Hughes v. Baird & Warner, Inc.*, No. 76-cv-3929, 1980 WL 1894, at *3 (N.D. Ill. Aug. 20, 1980) ("Clearly, the existence of a conspiracy is the common issue in this case. That issue predominates over issues affecting only individual sellers."); *see also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

**Superiority.** Plaintiffs must also show that a class action is superior to individual actions. Fed. R. Civ. P. 23(b)(3). Here, any Class member's interest in individually controlling the prosecution of separate claims is outweighed by the efficiency of the class mechanism. *See, e.g.*, *Suchanek*, 764 F.3d at 760 (holding that superiority demonstrated "because no rational individual plaintiff would be willing to bear the costs of this lawsuit"). Thousands of entities paid for routing services during the class period; settling these claims in the context of a class action conserves both judicial and private resources and hastens Class members' recovery. Finally, while Plaintiffs see no management difficulties in this case, Plaintiffs do not believe that this final consideration is pertinent to approving the proposed settlement class. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be

21

no trial."). Accordingly, the proposed class action is superior to other available methods (if any) for the fair and efficient adjudication of the controversy relating to Settling Defendants.

## VI.   NOTICE TO THE SETTLEMENT CLASS SHOULD BE APPROVED

As an initial matter, Plaintiffs propose that Angeion continue as claims administrator for the current Settlement. Following a competitive bidding process, Co-Lead Counsel selected Angeion to serve as claims administrator for the RelayHealth settlement. (ECF No. 127 ¶12.) Angeion has performed competently in its role, and maintaining continuity will provide efficiencies for the Class. (Wexler Decl. ¶31.)

Rule 23(e) requires that prior to final approval, notice of a proposed settlement be given in a reasonable manner to all class members who would be bound by such a settlement. The Court has already approved notice in connection with the RelayHealth settlement (ECF No. 202 ¶11 (finding that the notice "was the most effective and practicable under the circumstances")), and the proposed notice here is largely parallel to the prior notice plan. Plaintiffs propose a plan of notice that comports with due process and provides reasonable notice to all known and reasonably identifiable customers of Defendants.

The class notice documents, consisting of long form notice, email notice**,** publication notice, postcard notice, and a press release,[14] comply with the requirements of Rule 23(c)(2)(B).[15] In summary, the notice proposed here will inform Class Members of the material terms of the

---

[14]    The proposed notices are attached to the Wexler Declaration as Exhibit 3 (long form notice), Exhibit 4 (email notice), Exhibit 5 (publication notice), and Exhibit 6 (postcard notice).

[15]    Rule 23(c)(2)(B) provides, "The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."

Settlement, address frequently (or typically) asked questions about the Settlement, and inform Class Members how they can access and review the Settlement Agreement and other important documents. The proposed notice will also inform Class Members that at a date prior to Class Members' deadline to comment on or object to the Settlement, Co-Lead Counsel will move the Court to: (1) award attorneys' fees in the amount of up to one third of the Settlement Fund, including interest earned, and minus allowed administrative costs and any service awards; (2) allow reimbursement of litigation expenses from the Settlement Fund; and (3) grant service awards from the Settlement Fund to each of the eight Plaintiffs in the amount of $25,000 from the Surescripts and Allscripts Settlement, and $10,000 from the previously approved settlement with RelayHealth (totaling $280,000). This will allow Class Members to object not only to the Settlement but to the upcoming motion for attorneys' fees, litigation expenses, and service awards prior to the Fairness Hearing, should they choose to do so.

Notice to class members must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem*, 521 U.S. at 617 (quoting Fed. R. Civ. P. 23(c)(2)); *see also Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013) (holding that the federal law requires only the best notice that practicable under the circumstances). Such notice may be by "United States mail, electronic means, or other appropriate means," including by publication. Fed. R. Civ. P. 23(c)(2)(B). Plaintiffs will rely predominantly on direct mail and email[16] "'to all members who

---

[16]     Courts permit notice by email. *See, e.g.*, *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 920 (N.D. Ill. 2022); *Yates v. Checkers Drive-In Rests., Inc.*, No. 17-cv-9219, 2020 WL 6447196, at *5 (N.D. Ill. Nov. 3, 2020). Courts also "regularly permit the use of postcard notices that provide information about the action and that direct class members to a website containing a long-form notice" as consistent with due process and Rule 23. *Sansone v. Charter Commc'ns, Inc.*, No. 17-cv-1880, 2023 WL 9051463, at *2 (S.D. Cal. Aug. 21, 2023); *see also Beezley v. Fenix Parts, Inc.*, No. 17-cv-07896, 2020 WL 4581733, at *2 (N.D. Ill. Aug. 7, 2020)

can be identified through reasonable effort.'" *Amchem*, 521 U.S. at 617 (quoting Fed. R. Civ. P. 23(c)(2)). Class Member contact information for purposes of notice will be compiled from multiple sources, including defendant-produced lists, a proprietary list of third-party payors, primarily consisting of drug stores and pharmacies in the United States and its territories, and claims information submitted in connection with the RelayHealth settlement. (Declaration of Stephanie Saunders, Esq. of Angeion Group, LLC Regarding the Proposed Notice Plan ("Saunders Decl.") ¶¶17-18.) Angeion will mail the notice via first-class U.S. mail to those Settlement Class Members for which it has mailing addresses. (*Id*. ¶19.) Angeion will send the email notice to all Settlement Class Members for whom email addresses were obtained. (*Id*. ¶24.) Angeion will employ best practices to increase the deliverability rate of the mailed and emailed notices. (*Id*. ¶¶20-23, 25-27.) Plaintiffs further plan to supplement the direct mail and email notice via digital publication notice, as well as a custom social media campaign, print publication, and a press release. (*Id*. ¶¶30-44.) Angeion will also continue to host an informational website (www.SurescriptsAntitrustLitigation.com), providing additional information and documents and a toll-free number for frequently asked questions and requests for mailing of further information. (*Id.* ¶¶45-46.) This notice plan satisfies the requirements of Rule 23 and due process and thus should be approved.

## VII.    APPOINTMENT OF ESCROW AGENT TO MAINTAIN SETTLEMENT FUNDS

Huntington was selected as Escrow Agent through a competitive bidding process for the RelayHealth settlement and has performed competently in that role. (ECF No. 127 ¶16.) Plaintiffs propose that Huntington continue as Escrow Agent for this Settlement to maintain the Qualified

---

(approving notice program that included postcard notice); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 968 (N.D. Ill. 2011) (same).

Settlement Fund and provide escrow services, which will create efficiencies for the Settlement Class. (*See* Settlement Agreement §II.C.; Wexler Decl. ¶32.)

## VIII. CONCLUSION

For these reasons, Co-Lead Counsel respectfully request the Court to preliminarily approve the Settlement Agreement, certify the Settlement Class, approve the notice plan to notify members of the Settlement Class of this Settlement, and grant the related relief set out in the accompanying Proposed Order.

Dated: August 14, 2025
        Respectfully submitted,

*/s/ Kenneth A. Wexler*
Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
Margaret L. Shadid
**Wexler Boley & Elgersma LLP**
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
T: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com
ms@wbe-llp.com

Karin E. Garvey (N.D. Ill. Bar No. 2997831)
Brian M. Hogan (N.D. Ill. Bar No. 6286419)
**Scott+Scott Attorneys at Law LLP**
The Helmsley Building
230 Park Ave., 24th Floor
New York, NY 10169
(212) 223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com

Daniel E. Gustafson (pro hac vice)
Karla M. Gluek (pro hac vice)
Michelle J. Looby (pro hac vice)
**Gustafson Gluek PLLC**
120 South Sixth Street, Ste. 2600
Minneapolis, MN 55402
T: (612) 333-8844

dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
mlooby@gustafsongluek.com

Tyler W. Hudson (pro hac vice)
Eric D. Barton (pro hac vice)
**Wagstaff & Cartmell, LLP**
4740 Grand Avenue, Ste. 300
Kansas City, MO 64112
T: (816) 701-1100
thudson@wcllp.com
ebarton@wcllp.com

Robert N. Kaplan (pro hac vice)
Elana Katcher (pro hac vice)
**Kaplan Fox & Kilsheimer LLP**
800Third Ave., 38th Floor
New York, NY 10022
T: (212) 687-1980
rkaplan@kaplanfox.com
ekatcher@kaplanfox.com

W. Joseph Bruckner (pro hac vice)
Robert K. Shelquist (pro hac vice)
Brian D. Clark (pro hac vice)
Jessica N. Servais (pro hac vice)
**Lockridge Grindal Nauen PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
wjbruckner@locklaw.com
rkshelquist@locklaw.com
bdclark@locklaw.com
jnservais@locklaw.com

Gregory S. Asciolla (pro hac vice)
Jonathan S. Crevier (pro hac vice)
**DiCello Levitt LLP**
485 Lexington Ave, Ste. 1001
New York, NY 10017
T: (646) 993-1000
gasciolla@dicellolevitt.com
jcrevier@dicellolevitt.com

Jeffrey L. Kodroff
John Macoretta

26

**Spector Roseman & Kodroff, P.C.**
2001 Market Street
Philadelphia PA 19103
T: (215) 496-0300
jkodroff@srkattorneys.com
jmacoretta@srkatorneys.com

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system. All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 14th day of August, 2025.


*/s/ Kenneth A. Wexler*
Kenneth A. Wexler