**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE SURESCRIPTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Class Actions | Civil Action No. 1:19-cv-06627<br><br>Honorable John J. Tharp Jr. |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND CLASS REPRESENTATIVE SERVICE AWARDS**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. PROCEDURAL BACKGROUND ..... 4

A. Complaints and Motions to Dismiss ..... 4

B. Discovery ..... 6

C. *Daubert* Motions ..... 7

D. Class Certification and Summary Judgment Motions ..... 8

E. Mediation and Settlements ..... 9

III. ARGUMENT ..... 10

A. The Court Should Use The Percentage-Of-The-Fund Method When Calculating The Appropriate Fee. ..... 10

B. Thirty-Three Percent Of The Settlement Fund Reflects The *Ex Ante* Market Rate For Class Counsel's Services. ..... 13

1. The Applicable Contingent Fee Agreements Support an Award of 33% From the Settlement Fund. ..... 14

2. The Substantial Risk of Non-Payment Weighs in Favor of Granting Counsels' Fee Request. ..... 16

a. Antitrust class actions are inherently risky. ..... 17

b. This case presented exceptional legal and factual complexity. 18

c. Defendants deployed substantial resources and mounted an aggressive defense. ..... 19

3. The Quality of Class Counsel and the Amount of Work Performed Weigh Heavily in Favor of Granting the Request. ..... 20

4. Fee Awards in Other Cases Demonstrate the Reasonableness of a 33% Market Rate. ..... 20

5. Reported Statistical Data Support a Market Rate in Antitrust Class Actions of 30% to 40%. ..... 22

6. A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request. .......... 23

C. Attorneys' Fees Calculation and Interest .......... 26

D. Counsel's Litigation Expenses Were Reasonably Incurred And Should Be Approved. .......... 27

E. The Class Representatives Should Receive Service Awards. .......... 28

IV. CONCLUSION .......... 30

# TABLE OF AUTHORITIES

**Cases**


*Abbott v. Lockheed Martin Corp.*,
No. 06–CV–701, 2015 WL 4398475 (S.D. Ill. July 17, 2015) ........................................ 27

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
No. 14-CV-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018)........................... 29

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ........................................................................ 22

*Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014)......................................................................................... 10

*Arenson v. Bd. of Trade of City of Chicago*,
372 F. Supp. 1349 (N.D. Ill. 1974) ............................................................................... 19

*Beesley v. Int'l Paper Co.*,
No. 3:06-cv- 703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014)........................... 11

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980)...................................................................................................... 10

*Burkholder v. City of Ft. Wayne*,
750 F. Supp. 2d 990 (N.D. Ind. 2010)............................................................................ 22

*Campbell v. Advantage Sales & Mktg. LLC*,
No. 1:09-cv-01430, 2012 WL 1424417 (S.D. Ind. Apr. 24, 2012) .................................... 22

*Chambers v. Together Credit Union*,
No. 19-CV-00842-SPM, 2021 WL 1948452 (S.D. Ill. May 14, 2021) ................................... 10

*Chun-Hoon v. McKee Foods Corp.*,
716 F. Supp. 2d 848 (N.D. Cal. 2010)............................................................................ 26

*City of Greenville v. Syngenta Crop Prot., Inc.*,
904 F. Supp. 2d 902 (S.D. Ill. 2012) .............................................................................. 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)........................................................................................................ 8

*Denius v. Dunlap*,
330 F.3d 919 (7th Cir. 2003).......................................................................................... 24

*Dial Corp. v. News Corp.*,
317 F.R.D. 426 (S.D.N.Y. 2016) ..................................................................................... 29

*Florin v. Nationsbank of Georgia, N.A.*,
34 F.3d 560 (7th Cir. 1994) .................................................................................... passim

*Gaskill v. Gordon* ("*Gaskill I*"),
942 F. Supp. 382 (N.D. Ill. 1996) ............................................................................ 12

*Gaskill v. Gordon* ("*Gaskill II*"),
160 F.3d 361 (7th Cir. 1998)................................................................................ 10, 11

*Gastineau v. Wright*,
592 F.3d 747 (7th Cir. 2010)...................................................................................... 24

*Goldsmith v. Tech. Sols. Co.*,
No. 1:92-cv-04374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ..................................... 21

*Gong-Chun v. Aetna Inc.*,
No. 1:09-cv-01995-SKO, 2012 WL 2872788 (E.D. Cal. July 12, 2012) ................................ 26

*Hale v. State Farm Mut. Auto. Ins. Co.*,
No. 3:12-cv-00660, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) ................................. 12, 13

*Harman v. Lyphomed, Inc.*,
945 F.2d 969 (7th Cir. 1991)................................................................................ 24, 25

*Harris v. Marhoefer,*
24 F.3d 16 (9th Cir. 1994)......................................................................................... 27

*Heekin v. Anthem, Inc.*,
No. 1:05-cv-01908, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012).................... 12, 15, 21, 23

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)................................................................................................ 12

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)....................................................................................... 4, 5, 18, 19

*In re Air Cargo Shipping Serv. Antitrust Litig.*,
MDL No. 1775, 2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015)............................................ 29

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
MDL No. 1871, 2012 WL 6923367 (E.D. Pa. Oct. 19, 2012) ........................................... 19

*In re Blech Securities Litig.*,
No. 94 Civ. 7696 (RWS), 2000 WL 661680 (S.D.N.Y. May 19, 2000) ................................ 26

*In re Broiler Chicken Antitrust Litig.*,
142 F. 4th 568 (7th Cir. 2025) ("*Broiler II*") .................................................................. 13

*In re Broiler Chicken Antitrust Litig.*,
No. 16 C 8637, 2021 WL 5578878 (N.D. Ill. Nov. 30, 2021) .......................... 14, 15, 21, 27

*In re Cabletron Sys., Inc. Secs. Litig.*,
239 F.R.D. 30 (D.N.H. 2006) ........................................................................ 22

*In re Cap. One Tel. Consumer Prot. Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015)........................................................... 14, 16

*In re Cardizem CD Antitrust Litig.*,
218 F.R.D. 508 (E.D. Mich. 2003) ................................................................ 17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
MDL No. 1917, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016)........................................... 17

*In re Comverse Tech., Inc. Sec. Litig.*,
No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y.June 24, 2010)............................ 15

*In re Dairy Farmers of Am., Inc.*,
80 F. Supp. 3d 838 (N.D. Ill. 2015)......................................................... passim

*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*,
251 F.Supp.3d 1225 (N.D. Ind. 2017)........................................................ 11

*In re GSE Bonds Antitrust Litig.*,
No. 19-CV-1704 (JSR), 2020 WL 3250593 (S.D.N.Y. June 16, 2020)............................. 29

*In re Hyundai and Kia Fuel Economy Litig.*,
926 F.3d 539 (9th Cir. 2019)...................................................................... 25

*In re Ins. Brokerage Antitrust Litig.*,
MDL No. 1663, 2009 WL 411856 (D.N.J. Feb. 17, 2009) ............................................... 22

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
733 F. Supp. 2d 997 (E.D. Wis. 2010)......................................................... 25

*In re Linerboard Antitrust Litig.*,
No. 2:98-cv-05055, 2004 WL 1221350 (E.D. Pa. June 2, 2004), *amended*, No. 2:98-cv-05055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) ......................................................... 18

*In re Lithotripsy Antitrust Litig.*,
No. 98 C 8394, 2000 WL 765086 (N.D. Ill. June 12, 2000).............................................. 21

*In re NASDAQ Mkt-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................. 17

*In re Northfield Lab., Inc. Secs. Litig.*,
No. 1:06-cv-01493, 2012 WL 2458445 (N.D. Ill. June 26, 2012) ..................................... 12

*In re Portal Software, Inc. Sec. Litig.*,
No. C-03-5138 VRW, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ................................ 26

*In re Potash Antitrust Litig.*,
No. 1:08-cv-06910 (ECF No. 589) (N.D. Ill. June 12, 2013) ....................................... 21, 29

*In re Propane Direct Purchaser Antitrust Litig.*,
No. 06–cv–3621 (ECF No. 209) (N.D. Ill. June 24, 2010) ................................................ 21

*In re Ready-Mixed Concrete Antitrust Litig.*,
No. 1:05-cv-00979, 2010 WL 3282591 (S.D. Ind. Aug. 17, 2010)............................... 14, 21

*In re Remeron Direct Purchaser Antitrust Litig.*,
No. 2:03-cv-00085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005).......................................... 22

*In re Schering-Plough Corp. Enhance Secs. Litig.*,
No. 2:08-cv-02177, 2013 WL 5505744 (D.N.J. Oct. 1, 2013)............................................ 19

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001)........................................................................... 13, 16, 27

*In re TFT-LCD (Flat-Panel) Antitrust Litig.*,
MDL No. 1827, 2013 WL 149692 (N.D. Cal. Apr. 3, 2013)................................................ 26

*In re Trans Union Corp. Privacy Litig.*,
629 F.3d 741 (7th Cir. 2011)...................................................................................... 14

*In re Xcel Energy, Inc., Secs., Derivative & "ERISA" Litig.*,
364 F. Supp. 2d 980 (D. Minn. 2005)........................................................................... 27

*Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*,
553 F.3d 487 (7th Cir. 2009)...................................................................................... 24

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016).................................................................................... 25

*Kirchoff v. Flynn*,
786 F.2d 320 (7th Cir. 1986).................................................................................. 14, 16

*Kitson v. Bank of Edwardsville*,
No. 3:08-cv-00507, 2010 WL 331730 (S.D. Ill. Jan. 25, 2010) .......................................... 21

*Leung v. XPO Logistics, Inc.*,
326 F.R.D. 185 (N.D. Ill. 2018)............................................................................. 23, 26

*Martin v. Caterpillar Inc.*,
No. 1:07-cv-01009, 2010 WL 11614985 (C.D. Ill. Sept. 10, 2010) .................................... 21

*Matter of Cont'l Illinois Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992)........................................................................... 13, 16, 21

*Matter of Superior Beverage/Glass Container Consol. Pretrial*,
133 F.R.D. 119 (N.D. Ill. 1990)........................................................................... 17

*Montgomery v. Aetna Plywood, Inc.*,
231 F.3d 399 (7th Cir. 2000)........................................................................... 11

*Pavlik v. FDIC*,
No. 1:10-cv-00816, 2011 WL 5184445 (N.D. Ill. Nov. 1, 2011)........................................ 21

*Paz v. Portfolio Recovery Assocs., LLC*,
924 F.3d 949 (7th Cir. 2019)........................................................................... 24

*Pearson v. NBTY, Inc.*,
772 F.3d 778 (7th Cir. 2014)........................................................................... 26

*Pierce v. Visteon Corp*,
No. 1:05-cv-01325-LJM, 2014 WL 941311 (S.D. Ind. Mar. 11, 2014) .............................. 11

*Redman v. RadioShack Corp.*,
768 F.3d 622 (7th Cir. 2014)........................................................................... 26

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
No. 1:97-cv-07694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ..................................... 21

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................................. 21, 25

*Sec. & Exch. Comm'n v. First Secs. Co. of Chicago*,
528 F.2d 449 (7th Cir. 1976)........................................................................... 12

*Silverman v. Motorola Sols.*, Inc.,
739 F.3d 956 (7th Cir. 2013)........................................................................... 13, 16

*Skelton v. Gen. Motors Corp.*,
860 F.2d 250 (7th Cir. 1988)........................................................................... 24, 25

*Spicer v. Chicago Bd. Options Exch., Inc.*,
844 F. Supp. 1226 (N.D. Ill. 1993) ................................................................... 30

*Standard Iron Works v. ArcelorMittal*,
No. 1:08-cv-05214, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) ...................................... 25

*Steele v. GE Money Bank*,
No. 1:08-civ-1880, 2011 WL 13266350 (N.D. Ill. May 17, 2011) ..................................... 11

*Sutton v. Bernard*,
504 F.3d 688 (7th Cir. 2007).......................................................................... 10, 13, 14

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002)........................................................................... 25

*Will v. Gen. Dynamics Corp.*,
No. 3:06-cv-00698, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010)....................................... 21

*Williams v. Gen. Elec. Cap. Auto Lease*,
No. 1:94-cv-07410, 1995 WL 765266 (N.D. Ill. Dec. 26, 1995) ........................................ 11

*Williams v. Rohm & Haas Pension Plan ("Rohm & Haas II")*,
658 F.3d 629 (7th Cir. 2011)........................................................................... passim

*Williams v. Rohm & Haas Pension Plan*,
No. 4:04-cv-00078, 2010 WL 4723725 (S.D. Ind. Nov. 12, 2010)..................................... 29

*Wright v. Nationstar Mortg. LLC*,
No. 1:14-cv-10457, 2016 WL 4505169 (N.D. Ill. Aug. 29, 2016)................................ 23, 24

**Statutes**

Clayton Act, 15 U.S.C. §§ 15(a)............................................................................ 4

**Other Authorities**

Joshua P. Davis, *Toward an Empirical and Theoretical Assessment of Private Antitrust Enforcement*,
36 SEATTLE U.L. REV. 1269, 1293-95 (2013)....................................................... 23

Nicholas M. Pace, Stephen J. Carroll, Ingo Vogelsang, & Laura Zakaras,
*Insurance Class Actions in the United States*, 47 tbl.3.16 (2007)............................................... 17

Robert H. Lande & Joshua P. Davis,
*Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879 (July 2008)........................................................................................................ 23

Theodore Eisenberg & Geoffrey P. Miller,
*Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIR. L. STUD. 248 (2010)............................................................................................................ 17, 25

**Rules**

Fed. R. Civ. P. 23(h) ........................................................................................ 27

## I. INTRODUCTION

After more than six years of hard-fought litigation in this complex antitrust class action with no guarantee of compensation, Interim Co-Lead Counsel for Plaintiffs ("Co-Lead Counsel")[1] have secured settlements with all Defendants: Surescripts LLC ("Surescripts"), Allscripts Healthcare Solutions, Inc. ("Allscripts"), and NDCHealth Corporation d/b/a RelayHealth ("RelayHealth"), (collectively, "Defendants"). Under these settlements, Defendants have paid into escrow a total of $49,750,000.00 ("Settlement Fund"), consisting of $10 million from the RelayHealth Settlement[2] and $39,750,00 from the Surescripts and Allscripts Settlement currently under consideration. As of November 7, 2025, with interest, the combined Settlement Fund is $50,325,957.90 ($10,466,034.64 from RelayHealth plus $39,859,923.23 from Surescripts and Allscripts) and growing.

To secure these settlements, Co-Lead Counsel dedicated substantial time, effort, and expense on behalf of the Settlement Class.[3] They did so entirely on a contingent basis, with

---

[1] The Court appointed Wexler Boley and Elgersma LLP (formerly known as Wexler Wallace LLP), Wagstaff & Cartmell, LLP, Gustafson Gluek PLLC, Kaplan Fox & Kilsheimer LLP, Lockridge Grindal Nauen PLLP, Scott+Scott Attorneys at Law LLP, DiCello Levitt LLP, and Spector Roseman & Kodroff, P.C. as Interim Co-Lead Counsel. *See* ECF Nos. 51, 155, 207, 357.

[2] This Court granted final approval to the RelayHealth Settlement on February 24, 2022. ECF No. 202. Class Counsel did not move for an award of attorneys' fees, litigation expenses, or service awards at that time. ECF No. 202, ¶13. In the notice to the Settlement Class regarding the RelayHealth Settlement, Co-Lead Counsel informed class members that they were not then seeking attorneys' fees, reimbursement of litigation expenses, or class representative incentive awards, or to distribute Settlement proceeds to qualified claimants; Co-Lead Counsel indicated that when they determined to do so, they would notify the Settlement Class and seek the Court's approval. Having now secured settlements with all Defendants and provided notice to the Settlement Class as required, Co-Lead Counsel bring this motion seeking an award of attorneys' fees, reimbursement of litigation expenses, and service awards from the total Settlement Fund.

[3] Settlement Class refers collectively to members of the RelayHealth Settlement Class and Surescripts and Allscripts Settlement Class.

no guarantee of compensation or reimbursement of expenses. Since the inception of this case (many months before it was actually filed in October 2019), Co-Lead Counsel and other Plaintiff Counsel (collectively, "Class Counsel")[4] invested 46,267.7 hours of attorney and other legal professional time through August 15, 2025. *See* Decl. of Joint Co-Leads in Supp. of Plfs' Mot. For Award of Attorneys' Fees, Reimbursement Expenses, and Class Representative Incentive Awards ("Joint Co-Lead Decl."). Indeed, the dollar amount of the resulting lodestar exceeds the fees requested herein. Co-Lead Counsel worked diligently to ensure that throughout the case, Class Counsel's efforts were coordinated, detailed, vigorous, and non-duplicative. In addition to the 46,267.7 hours of attorney and other legal professional time invested in this case through August 15, 2025, Class Counsel have incurred to date total litigation expenses in the amount of $3,144,250.13. These expenses, discussed in detail below, were required to carefully frame the complex issues of fact and law in the pleadings; defeat Defendants' motions to dismiss; retain and pay qualified experts; effectively manage the case; undertake well-organized discovery in a complex antitrust case against enormous and well-funded business entities; and support class certification and oppose summary judgment.

Co-Lead Counsel's efforts were highly successful, resulting in a total Settlement Fund of $50,325,957.90, including interest earned and accruing. The settlements reflect the skill, expertise, and hard work of Class Counsel. The benefit to Class members is

---

[4] At all times, Co-Lead Counsel directed and organized Class Counsel's work. *See* Joint Co-Lead Decl. As the Court directed, Co-Lead Counsel will have authority to allocate an award of attorneys' fees among Class Counsel. (ECF. No. 51, ¶10(i)). Co-Lead Counsel's good-faith determination will reflect each individual Class Counsel's contribution to the commencement, prosecution, and resolution of the litigation.

substantial, real, and concrete, compared to the significant litigation risks in this case. Plaintiffs respectfully ask the Court to award:

- Class Counsel attorneys' fees in the amount of 33% of the Settlement Fund (after subtracting administrative costs and service awards) (Sections III.A-C);
- Reimbursement for litigation expenses in the amount of $3,144,250.13 (Section III.D);
- Interest earned on the award of attorneys' fees and litigation expenses at the same rate as earned on the Settlement Fund until paid; and
- Service awards to the eight named class representatives in the total amount of $280,000 ($25,000 from the Surescripts and Allscripts Settlement and $10,000 from the RelayHealth Settlement, respectively). (Section III.E).

Class members have received notice of, and will have an opportunity to be heard on, this motion. In the Court-approved class notices, which are available on the Settlement Website, www.surescriptsantitrustlitigation.com, Class Counsel informed Settlement Class members in the notice of the Surescripts and Allscripts settlements that they would seek from the Settlement Fund an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund (plus interest),[5] up to $3.5 million in reimbursement of litigation expenses (plus interest), and service awards to the eight class representatives in the total amount of $280,000. Class Counsel further informed Settlement Class members that the Court will determine the amount of attorneys' fees, litigation expenses, and service awards.

[5] Surescripts and Allscripts Settlement Class members were advised that Class Counsel would seek as attorneys' fees up to one-third of the Settlement Fund (33.33%); RelayHealth Settlement Class members were informed in their notice that Counsels' fee request would not exceed 33% of the Settlement Fund. Counsel is seeking the lower of these two amounts, 33%, not an actual third, *i.e.* 33.33%.

Finally, Settlement Class members were told they may object to any aspect of the Settlement or this motion, and that if they object they must do so by November 28, 2025.[6] ECF. No. 403-1.

## II. PROCEDURAL BACKGROUND

As this Court well knows, the procedural background of this case is lengthy and complicated. Beginning with their investigation into this matter, Class Counsel dedicated significant time, expertise, and capital to ensure the Settlement Class would recover for Defendants' alleged wrongful conduct. The work performed since the inception of the case is described below and in the declaration submitted by Co-Lead Counsel in connection with this motion.

### A. Complaints and Motions to Dismiss

Plaintiffs brought suit in this Court seeking damages and injunctive relief pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.[7] On December 5, 2019, after numerous individual private class action complaints were filed, private plaintiffs collectively filed a Consolidated Amended Complaint. ECF No. 52.

On January 31, 2020, Surescripts, Allscripts, and RelayHealth each moved to dismiss Plaintiffs' Consolidated Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). They argued that the claims were barred by the direct purchaser rule set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and also attacked the sufficiency of the complaint on numerous other grounds. ECF Nos. 76-77, 78-79, 80-81. Plaintiffs filed their

---

[6] Class members also were informed that this motion will be posted on the Settlement Website contemporaneously with its filing.

[7] The Federal Trade Commission had filed a similar lawsuit for monopolization in the United States District for the District of Columbia.

opposition to these motions on February 28, 2020, (ECF No. 90), and Defendants replied on June 12, 2020. ECF Nos.109, 110-11. RelayHealth's motion was held in abeyance pending approval of the settlement Plaintiffs had secured in the interim.[8] ECF No. 115.

The Court held a hearing on June 26, 2020. On August 18, 2020, the Court granted the motions to dismiss without prejudice, finding that Plaintiffs needed to clarify in their pleadings whether they purchased e-prescription services directly from Surescripts or through alleged co-conspirator intermediaries to establish they had standing under *Illinois Brick*. ECF No. 135 at 13.

As discussed below, on January 16, 2020, the Court ordered Defendants to produce documents previously produced to the FTC in connection with its investigation. Co-Lead Counsel thoroughly reviewed those materials and incorporated substantial additional factual allegations into their Second Amended Class Action Complaint filed on October 19, 2020. ECF No. 148. On December 4, 2020, Allscripts (ECF Nos. 161-162) and Surescripts (ECF Nos. 164-165) again moved to dismiss. On January 8, 2021, Plaintiffs opposed. ECF No. 169. On January 29, 2021, Allscripts and Surescripts filed replies. ECF Nos. 172-173.

On June 21, 2022, the Court denied Allscripts's and Surescripts's motions to dismiss finding that it was premature to address the *Illinois Brick* direct purchaser rule, and that Plaintiffs stated a claim for monopolization and conspiracy because Surescripts's loyalty pricing schemes with claw back provisions and exclusive dealing agreements with RelayHealth and Allscripts plausibly constituted anticompetitive conduct that maintained

[8] The Court granted preliminary approval to Plaintiffs' settlement with RelayHealth on April 19, 2021 and on February 24, 2022, granted final approval of the RelayHealth Settlement. ECF Nos. 175, 202. As noted in footnote 2 above, Plaintiffs did not apply for attorneys' fees, reimbursement of expenses, or class representative service awards at that time, but are doing so now.

Surescripts' 95% market share monopoly in e-prescribing services. ECF No. 212. Surescripts and Allscripts filed answers on July 5, 2022, and July 26, 2022, respectively. ECF Nos. 215, 228.

On July 19, 2022, Allscripts moved to reconsider the Court's order denying Allscripts's motion to dismiss, to which Plaintiffs responded on July 29, 2022; Allscripts filed a reply on August 5, 2022. ECF Nos. 224, 232, 234. The Court denied Allscripts's motion on August 29, 2022. ECF No. 235.

**B. Discovery**

Discovery in this case was substantial and complex, involving millions of pages of documents, dozens of depositions, and productions from numerous parties and non-parties. This discovery consumed substantial attorney time and financial resources but was necessary to achieve results for the Settlement Class. As noted above, early on the Court ordered Defendants to produce documents previously provided to the FTC in connection with its investigation. Jan. 16, 2020 Hr'g Tr. 6:17-24, ECF No. 87. Discovery was otherwise stayed pending resolution of two rounds of motion to dismiss briefing.

On April 28, 2021, Plaintiffs moved to compel Surescripts to supplement its production of materials from the FTC proceedings (ECF No. 178); the Court denied the motion. (ECF No. 183).

On July 12, 2022, after denying Defendants' motion to dismiss the Second Amended Complaint, the Court allowed discovery to commence in full and set deadlines for, among other things, completing fact discovery, expert disclosures, *Daubert* motions, class certification, and summary judgment. ECF No. 221. In the ensuing months, the parties engaged in extensive document productions. All told, the document review effort to identify

key evidence supporting Plaintiffs' claims involved hunting for evidence in a database of approximately 6.5 million pages of documents.

During fact discovery, there were 27 depositions. Plaintiffs took fifteen depositions of Surescripts' and Allscripts' current and former employees, and Surescripts and Allscripts deposed each of the eight Plaintiffs. In addition, there were four expert depositions—two of Plaintiffs' experts and two of Defendants' experts.

The discovery process proceeded efficiently and with minimal Court intervention. On April 12, 2024, the Court granted in part Surescripts's motion to compel "downstream discovery" of pharmacy financial data to support a pass-on defense but limited the scope to sales in Michigan after finding that Michigan was the only state whose antitrust laws clearly permit such a defense. ECF No. 323 at 20. Because this decision came after the close of fact discovery, the Court reopened such discovery on this one issue. ECF No. 323 at 25. Following the Court's ruling, Plaintiffs filed the Third Amended Class Action Complaint for the limited purpose of removing their Michigan state law claim, obviating the need for this additional discovery. ECF No. 334. Surescripts and Allscripts answered on April 30, 2024. ECF Nos. 343, 346.

### C. *Daubert* Motions

Class Counsel retained two experts who issued reports and were deposed, resulting in expert fees of approximately $2.3 million. (Joint Co-lead Decl. ¶¶ 23.) Co-Lead Counsel also analyzed the reports submitted by Defendants' two experts and took their depositions. These efforts required Co-Lead Counsel to both present and defend against very complex economic and industrial analyses of the impact and damages resulting from Defendants' conduct.

On November 17, 2023, Surescripts and Allscripts each moved under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the expert testimony of Daniel F. Spulber, Ph.D., Plaintiffs' economic expert, and Michele Davidson, Plaintiffs' industry expert in e-prescribing services. ECF Nos. 282, 284, 287, 290. Plaintiffs opposed these four motions on December 21, 2023. ECF Nos. 294, 297, 300, 303. Defendants replied on January 18, 2024. ECF Nos. 309, 312, 315, 317.

On November 21, 2024, in a 50-page opinion, the Court granted in part and denied in part Defendants' *Daubert* motions, allowing Plaintiffs to proceed to class certification and summary judgment. ECF No. 351. The Court found that most of Dr. Spulber's opinions, including his benchmark methodology for calculating damages and his analysis of pass-through pricing, passed the *Daubert* standard, but the Court excluded his "admission benchmark" opinion. The Court also allowed most of the opinions of Michele Davidson regarding e-prescribing standards and multihoming capabilities, while limiting her opinions about Surescripts's specific technological capabilities. The Court denied Allscripts's separate motion to exclude all of Plaintiffs' expert opinions as irrelevant, finding that under a "concurrent tortfeasor" theory, Allscripts could be held jointly liable for the entire alleged market-wide harm, even though its alleged liability stemmed from its specific agreement with Surescripts. ECF. No. 351-1.

**D. Class Certification and Summary Judgment Motions**

On December 12, 2024, the Court set a briefing schedule for class certification and summary judgment motions. ECF No. 359. Plaintiffs moved for class certification on January 30, 2025. ECF Nos. 368, 371. Surescripts and Allscripts moved for summary judgment the same day. ECF No. 373-74, 380, 383.

### E. Mediation and Settlements

As set forth above, Plaintiffs engaged in settlement discussions with RelayHealth in 2021. This required analyzing FTC transcripts and documents and numerous discussions with counsel for RelayHealth. These negotiations resulted in a $10 million settlement.

Years later, in the months preceding the motions for class certification and summary judgment, Plaintiffs had been discussing separately the possibility of settlement with both Surescripts and Allscripts. Once the class certification and summary judgment motions were filed with their supporting memoranda, the parties agreed that they were at a point in their discussions where a mediation might be productive. On February 25, 2025, at the parties' request, the Court extended the deadlines to respond to the pending class certification and summary judgment motions by approximately four months. ECF Nos. 389, 390. This allowed sufficient time for the parties to retain a mediator and engage in settlement negotiations.

The parties engaged retired Judge Sidney I. Schenkier to serve as mediator and met in person on May 15, 2025. Each of the Defendants had outside and in-house counsel present, and the parties negotiated for the entire day. The negotiations were contentious and threatened to break down more than once, only to have the parties reach an agreement on the settlement amount late in the day.

Negotiations for the term sheet were likewise protracted, arms-length, and ultimately successful. On June 27, 2025, the parties reported to the Court that they had signed a term sheet memorializing an agreement in principle and requested a stay of the class certification and summary judgment schedule while they sought approval of the settlement. The Court granted the stay. ECF Nos. 397, 398.

On August 28, 2025, the Court granted preliminary approval of the Surescripts and Allscripts Settlement. ECF No. 409. The Court scheduled a Fairness Hearing for December 18, 2025. ECF No. 411.

## III. ARGUMENT

### A. The Court Should Use The Percentage-Of-The-Fund Method When Calculating The Appropriate Fee.

When a party obtains compensation for the class's benefit in the form of a common fund, courts have long recognized that an award of attorneys' fees and costs of the litigation should be recovered from that common fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970); *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("*Gaskill II*") ("[I]t is commonplace" to award lawyers a percentage of a common fund.). This is consistent with Rule 23(h), which permits the Court to award reasonable attorneys' fees and expenses in class actions. A common-fund attorneys' fee award must reflect "the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (citation modified).

In the Seventh Circuit, courts have discretion to use the percentage-of-the-fund method or the lodestar approach. *See, e.g.*, *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243 (7th Cir. 2014) ("Both the lodestar approach and the percentage approach may be appropriate in determining attorney fee awards, depending on the circumstances."); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) (same). But the percentage method is the preferred approach in cases such as this. *See, e.g.*, *Chambers v. Together Credit Union*, No 19-CV-00842-SPM, 2021 WL 1948452, at *1 (S.D. Ill. May 14, 2021) ("[T]he percentage method is employed by the vast majority of courts in the Seventh Circuit"); *In re*

*Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) (the percentage method has "emerged as the favored method for calculating fees in common-fund cases in this district"); *Beesley v. Int'l Paper Co.*, No. 3:06-cv- 703-DRH-CJP, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("When determining a reasonable fee, the Court of Appeals for the Seventh Circuit uses the percentage basis rather than a lodestar or other basis.") (citation omitted). *See also Steele v. GE Money Bank*, No. 1:08-civ-1880, 2011 WL 13266350, at *1, *5 (N.D. Ill. May 17, 2011), *report and recommendation adopted*, 2011 WL 13266498 (N.D. Ill. June 1, 2011) ("The Seventh Circuit favors the use of the percentage of the fund method for calculating attorneys' fees in a common fund case."); *Pierce v. Visteon Corp*, No. 1:05-cv-01325-LJM, 2014 WL 941311, at *1, *11 (S.D. Ind. Mar. 11, 2014) (recognizing that "the Seventh Circuit has noted the advantages of the percentage of the fund method" over the lodestar method); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 251 F.Supp.3d 1225, 1236 (N.D. Ind. 2017) ("Our court of appeals [the Seventh Circuit] favors the percentage-of-the-fund fee in common fund cases").

The Seventh Circuit has repeatedly endorsed the percentage-of-the-fund methodology in class actions. *See Gaskill II*, 160 F.3d at 363 (collecting cases) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund, in recognition of the fact that most suits for damages in this country are handled on the plaintiffs' side on a contingent-fee basis."); *see also Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629, 635-36 (7th Cir. 2011) ("*Rohm & Haas II*"); *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000). District courts throughout the Seventh Circuit consistently apply this method. *Williams v. Gen. Elec. Cap. Auto Lease*, No. 1:94-cv-07410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995) (collecting

cases) ("The approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class."); *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 3:12-cv-00660, 2018 WL 6606079, at *7 (S.D. Ill. Dec. 16, 2018); *Heekin v. Anthem, Inc.*, No. 1:05-cv-01908, 2012 WL 5878032, at *2 (S.D. Ind. Nov. 20, 2012); *In re Northfield Lab., Inc. Secs. Litig.*, No. 1:06-cv-01493, 2012 WL 2458445, at *3 (N.D. Ill. June 26, 2012). The percentage-of-the-fund method utilizes an *ex ante* approach, awarding a fee approximating the hypothetical bargain the class and its attorneys would have negotiated at the outset of the litigation—when the risk of loss was still real and uncertain. *Americana Art China Co., Inc.*, 743 F.3d at 246-47; *Rohm & Haas II*, 658 F.3d at 635.

The percentage-of-the-fund method also conserves judicial resources by avoiding the time-consuming lodestar calculation. Percentage fees are easy to calculate, not subject to manipulation by counsel, and do not require courts to review years of timekeeping records or scrutinize each tactical decision made during the litigation. *See Florin*, 34 F.3d at 565-66 (noting "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."); *Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996) ("*Gaskill I*") (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (observing that "the percentage of the fund method saves the court the time it would have to spend reviewing eight years of billing documents."). Instead, compensation is based on the level of class counsel's success, as it would be in a similar contingency case on behalf of a private party. The percentage-of-the-fund method also allows a court to "dispose of [the] last issue in [] prolonged proceedings as expeditiously as possible." *Gaskill I*, 942 F. Supp. at 386 (quoting *Sec. & Exch. Comm'n v. First Secs. Co. of Chicago*, 528 F.2d 449, 454 (7th Cir. 1976)).

### B. Thirty-Three Percent Of The Settlement Fund Reflects The *Ex Ante* Market Rate For Class Counsel's Services.

The Seventh Circuit has been clear that, to arrive at an appropriate fee award, a district court must look to the *ex ante* bargain—the expectations of counsel and plaintiffs when the case began. *See Rohm & Haas II*, 658 F.3d at 636; *accord, e.g., Sutton*, 504 F.3d at 693; *Matter of Cont'l Illinois Sec. Litig*., 962 F.2d 566, 572–73 (7th Cir. 1992) , *as amended on denial of reh'g* (May 22, 1992). That is, to determine the reasonableness of attorneys' fees in a case such as this, "courts must do their best to award counsel the 'market price' for the legal services" they provided. *Sutton*, 504 F.3d at 692; *see also Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) ("[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services."). So long as a court follows this prescribed methodology, its decision is subject to an abuse of discretion standard. *See In re Broiler Chicken Antitrust Litig*., 142 F.4th 568, 573 (7th Cir. 2025) ("*Broiler II*") (citations omitted). As the Seventh Circuit has articulated, a district court "is closer to the case than we are," and reasonable fees "often fall within a broad range." *Id.* (citations omitted).

The Seventh Circuit permits courts to consider four factors to confirm the "market rate" in a case such as this: (1) the actual agreements between the parties, as well as fee agreements reached by entities in the market for legal services; (2) the risk of non-payment at the outset of the case; (3) the caliber of Class Counsel's performance; and (4) information from other cases, including fees awarded in comparable cases. *Id.* at 573; *see also Hale*, 2018 WL 6606079, at *1, *8 (citing *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001)). Consideration of the foregoing factors weigh heavily in favor of granting Class Counsels' attorneys' fee request.

### 1. The Applicable Contingent Fee Agreements Support an Award of 33% From the Settlement Fund.

The Seventh Circuit has directed district courts "to estimate the contingent fee that the class would have negotiated with Class Counsel at the outset of the litigation . . . ." *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 794 (N.D. Ill. 2015) (quoting *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011)). In antitrust class action litigation specifically, courts in the Seventh Circuit have recognized that "the 'market price for legal services, considering the risk of nonpayment and the normal rate of compensation in the market at the time' is a contingent fee in the amount of one-third (1/3) of the common fund recovered." *In re Ready-Mixed Concrete Antitrust Litig.*, No. 1:05-cv-00979, 2010 WL 3282591, at *3 (S.D. Ind. Aug. 17, 2010) (citing *Sutton*, 504 F.3d at 692); *see also Dairy Farmers*, 80 F. Supp. 3d at 862; *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'") (emphasis in the original).

Here, the fee agreements between Class Counsel and class representatives reflect a market rate commensurate with granting a 33% fee award. Three of the retainer agreements specified a common fund recovery for plaintiffs' counsel in the amounts of 33.33% (1/3) or 40%. For the five named plaintiff retainer agreements that did *not* include a specific number allotted for fees, the agreements still reserved counsel's right to seek contingency payment from the ultimate recovery, as was the case in *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2021 WL 5578878 (N.D. Ill. Nov. 30, 2021), where one-third of the direct purchaser plaintiff settlement fund was awarded in fees (after deducting administrative expenses and

incentive awards) as proposed here.[9] Here, the *ex ante* expectations of 33.33% to 40% support an *ex post* award of 33%. *See, e.g., In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825, 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) ("The court sees no need to impose its own ex post assessment of lead counsel's value when the retainer and fee agreements speak for themselves."); *Heekin*, 2012 WL 5878032, at *5 (awarding the request fee award of 33.3 percent, reasoning that the "named plaintiffs . . . entered into contingent fee agreements with Class Counsel agreeing to pay a fee of 33.3% and up to 45% percent of the recovery depending on the stage of the litigation"); *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 908 (S.D. Ill. 2012) ("[P]laintiffs in this matter concluded a one-third contingency fee with advanced costs was in their best financial interests in this litigation . . . Accordingly, these contracts *define* the market.") (emphasis in original). That is especially true where, as here, the requested percentage award will still result in plaintiffs' counsel recovering fees below their total lodestar.

[9] After objection and appeal, another group of plaintiffs in *Broiler*, the end-user consumers, had their requested attorneys' fee reduced to 26.6% of their $181 million settlement recovery, but that case was very different from the case here. *See Broiler II*, 142 F.4th at 575. There, the Court of Appeals found that the district court failed to properly account for plaintiffs' counsel bids at the start of the case—*ex ante* bids that ranged from 13.5% and 20%. *Id*. at 573. In contrast, here, there were no *ex ante* bids at all, much less bids that undermine *ex ante* Plaintiffs' requested 33% award. This case is similar to the direct purchaser plaintiffs' request in *Broiler*, not the end-user consumer case. *See In re Broiler Chicken Antitrust Litig*., 2021 WL 5578878, at *2 (holding that *ex ante* bidding line of cases is irrelevant where there had been no *ex ante* bidding). Here, the primary evidence of *ex ante* expectations comes from retainer agreements and, as further noted, all *ex ante* retainer agreements in this case with specific fee agreements equaled or *exceeded* 33%. Further, the settlement in this case is significantly smaller than the settlement in *Broiler II* (approximately $50 million here versus $181 million there) and thus does not raise any of the "megafund" issues addressed in *Broiler II*.

### 2. The Substantial Risk of Non-Payment Weighs in Favor of Granting Counsels' Fee Request.

A material consideration in determining an appropriate fee is the risk of nonpayment. *See Silverman*, 739 F.3d at 958; *Synthroid*, 264 F.3d at 718. "The lawyers for the class receive no fee if the suit fails." *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d at 568. "Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman*, 739 F.3d at 958 (citing *Kirchoff*, 786 F.2d 320).

In assessing the appropriate fee award in a class action settlement, a court must consider the risks as they existed "*at the outset* of the litigation." *Florin*, 34 F.3d at 565 (emphasis in original). In this regard, a court must do its best to estimate the terms of a fee contract that private plaintiffs would have negotiated with their lawyers at the outset of the case, when the risk of loss still existed, rather than at the end of a successful case:

> The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets.

*Synthroid*, 264 F.3d at 718; *see also In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 788–89 (N.D. Ill. 2015) (the probability of success at the outset of litigation helps determine the reasonableness of the fee).

At the outset of this case, the risk that Class Counsel would receive no payment was significant. Class Counsel believed in Plaintiffs' case and invested extensive time, effort, and money to investigate and prosecute it vigorously, doing so at the risk of no recovery and declining other opportunities because of the complexity, time, and expense the case demanded. Three factors substantially increased this risk: (1) the inherent difficulty of

antitrust class actions; (2) the legal and factual complexity of Plaintiffs' claims; and (3) Defendants' vast resources and aggressive defense. Each is addressed below.

**a. Antitrust class actions are inherently risky.**

Antitrust class actions are among the most difficult cases to successfully prosecute. As just one example, in a study analyzing class actions against insurers, only 12% of 564 attempted class actions led to a class settlement. Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees & Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIR. L. STUD. 248, at 24 (2010) (citing Nicholas M. Pace, Stephen J. Carroll, Ingo Vogelsang, & Laura Zakaras, *Insurance Class Actions in the United States*, 47 tbl.3.16 (2007)). Antitrust class actions are risky due in part to their unpredictable nature, as well as the tremendous amount of time and expense required to obtain a successful resolution. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 721680, at *17 (N.D. Cal. Jan. 28, 2016) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable.") (quoting *In re NASDAQ Mkt-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998)); *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (emphasizing a strong public interest in encouraging settlement of complex, class-action lawsuits because they are "notoriously difficult and unpredictable" and settlement preserves judicial resources). "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *Matter of Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990).

Here, the stakes were extremely high. Plaintiffs alleged that Defendants' violations inflated the price of e-prescription routing services to pharmacies. While Defendant RelayHealth settled prior to June 2022, Surescripts and Allscripts continued to aggressively

litigate the case, fighting Plaintiffs on the merits through extensive fact discovery, expert discovery, and initial class certification briefing and summary judgment motions. In the six years this case was litigated, the risk of nonpayment was ever-present.

**b. This case presented exceptional legal and factual complexity.**

Investigating and proving antitrust violations is difficult. *In re Linerboard Antitrust Litig.*, No. 2:98-cv-05055, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004), *amended*, No. 2:98-cv-05055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) (observing that "an antitrust class action is arguably the most complex action to prosecute."). This case was no exception.

Defendants spared no effort in challenging Plaintiffs' Second Amended Complaint, arguing that Plaintiffs' claims under the Sherman Act were barred by the direct purchaser rule set forth in *Illinois Brick*. After extensive briefing on two rounds of motions to dismiss, the Court ultimately denied Defendants' motions. ECF No. 212. This threshold victory, however, only opened the door to the substantial work required to prove Plaintiffs' claims.

Discovery in this case was extensive and complex. Over 6.5 million pages of documents were produced by Defendants and approximately two dozen non-parties, including materials from the FTC investigation. The parties conducted 27 depositions of fact witnesses and experts.

Beyond discovery, Class Counsel retained and worked extensively with economic and industry experts to demonstrate antitrust impact, damages, and class certification requirements. This work required substantial investment of time and resources with no guarantee of success, as Defendants vigorously challenged Plaintiffs' expert methodologies and opinions through *Daubert* motions and in opposition to class certification.

At the time of settlement, Plaintiffs faced significant uncertainties that class certification could be denied or summary judgment granted. Even if they made it through those gauntlets, Plaintiffs faced the expense and unpredictability of a potential interlocutory appeal of class certification, trial, and the risk that even after a trial win, the Seventh Circuit could reverse a favorable verdict on the grounds that *Illinois Brick* barred recovery for at least half the states under federal law. Class Counsel invested substantial time and resources to this case, and the risk of nonpayment remained high until settlements with Surescripts and Allscripts were secured.

**c. Defendants deployed substantial resources and mounted an aggressive defense.**

Class Counsel not only confronted the inherent uncertainties of an antitrust class action but they also litigated against large, established corporations, whose skilled and experienced legal counsel mounted a strong, united defense. The quality of opposing counsel is an important factor in analyzing the value of Class Counsel's services. *See, e.g.*, *In re Schering-Plough Corp. Enhance Secs. Litig.*, No. 2:08-cv-02177, 2013 WL 5505744, at *25 (D.N.J. Oct. 1, 2013) (emphasizing the importance of evaluating the result considering that the case was "litigated to the hilt by highly-experience [*sic*] and first-rate defense counsel to the eve of trial"); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 1871, 2012 WL 6923367, at *5 (E.D. Pa. Oct. 19, 2012) (collecting cases) (considering "the performance and quality of opposing counsel" as a factor in awarding attorneys' fees).

Here, Defendants were and are represented by leading multinational and national law firms with deep expertise in antitrust litigation. The caliber of the lawyers representing Defendants in this case is unquestionably high, and further supports the fee requested by Class Counsel. *See Arenson v. Bd. of Trade of City of Chicago*, 372 F. Supp. 1349, 1354 (N.D.

Ill. 1974) (noting that the quality, vigor, and prior success of opposing counsel is an important factor when assessing the quality of work performed by plaintiffs' counsel).

### 3. The Quality of Class Counsel and the Amount of Work Performed Weigh Heavily in Favor of Granting the Request.

The caliber of Class Counsel in this matter has been exemplary. Class Counsel are some of the country's most experienced and successful antitrust and complex litigation attorneys.

This Court is familiar with the quality of work performed by Co-Lead Counsel in this case, and they respectfully suggest that it merits the requested fee. Co-Lead Counsel conducted an extensive pre-filing investigation and filed a complaint asserting a nuanced theory of antitrust standing under federal law. After surviving Defendants' motions to dismiss, Class Counsel engaged in a robust discovery process, retained knowledgeable experts, substantially defeated *Daubert* motions, and filed what they believed would be a successful motion for class certification. In addition, Class Counsel developed a record intended to defeat summary judgment, which Defendants ultimately sought. All of these efforts led to a Settlement Fund that exceeds $50 million. The work Class Counsel performed weighs in favor of the fee award they are requesting.

### 4. Fee Awards in Other Cases Demonstrate the Reasonableness of a 33% Market Rate.

The fee award requested here is well within the acceptable range of attorneys' fee awards in protracted, complex, and expensive litigation such as this. Courts in the Seventh Circuit routinely award contingency fees of 33% or more in complex class action litigation. This is particularly true in antitrust cases, where courts have repeatedly recognized one-third as the appropriate market rate. *See, e.g.*, *Dairy Farmers*, 80 F. Supp. 3d at 862 (awarding one-

third of the common fund); *In re Potash Antitrust Litig.*, No. 1:08-cv-06910 (ECF No. 589) (N.D. Ill. June 12, 2013) ( Decl. Ex. ) (awarding fees of one-third of the $90 million fund); *In re Ready-Mixed Concrete*, 2010 WL 3282591, at *3 (one-third fee); *In re Propane Direct Purchaser Antitrust Litig.*, No. 06–cv–3621 (ECF No. 209) (N.D. Ill. June 24, 2010) (granting a request for fees in the amount of 29.5% ($15.34 million); *In re Lithotripsy Antitrust Litig.*, No. 98 C 8394, 2000 WL 765086, at *2 (N.D. Ill. June 12, 2000) ("33.3% of the fund plus expenses is well within the generally accepted range of the attorneys' fee awards").

Indeed, courts across the Seventh Circuit have approved one-third fees in diverse class action contexts. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 2021 WL 5578878 (approving interim attorneys' fees of one-third of the Settlement Fund to Class Counsel for direct purchasers); *Heekin*, 2012 WL 5878032, at *5 (awarding one-third fee of $90 million fund, plus $6,243,278.10 in expenses); *Pavlik v. FDIC*, No. 1:10-cv-00816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (one-third fee); *Goldsmith v. Tech. Sols. Co.*, No. 1:92-cv-04374, 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) (citing *Cont'l Illinois*, 962 F.2d at 572) ("Thirty three percent appears to be in line with what attorneys are able to command on the open market in arms-length negotiations with their clients."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (one-third fee); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 1:97-cv-07694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33 1/3% to 40% of the amount recovered."); *Martin v. Caterpillar Inc.*, No. 1:07-cv-01009, 2010 WL 11614985, at *4 (C.D. Ill. Sept. 10, 2010) (one-third fee); *Kitson v. Bank of Edwardsville*, No. 3:08-cv-00507, 2010 WL 331730, at *2 (S.D. Ill. Jan. 25, 2010) (one-third fee); *Will v. Gen. Dynamics Corp.*, No. 3:06-cv-00698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) (one-third fee); *Burkholder*

*v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (one-third fee); *Campbell v. Advantage Sales & Mktg. LLC*, No. 1:09-cv-01430, 2012 WL 1424417, at *2 (S.D. Ind. Apr. 24, 2012) (one-third fee).

The requested fee amount in this case is commonly granted in other jurisdictions as well. *See In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2009 WL 411856, at *56–58 (D.N.J. Feb. 17, 2009) (determining market rate for privately-negotiated contingent fees was between 30% and 40% in non-class, commercial litigation); *Allapattah Servs., Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006) (requested 31 1/3% fee was "within the range of, if not below, the market rate" using Seventh Circuit "market approach"); *In re Remeron Direct Purchaser Antitrust Litig.*, No. 2:03-cv-00085, 2005 WL 3008808, at **14, 16 (D.N.J. Nov. 9, 2005) (employing percentage-of-the-fund method to approximate a fee negotiated in the private marketplace, emphasizing risk of nonpayment, noting "the sometimes undesirable characteristics" of contingent-fee antitrust class actions, including "the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high," and determining market rate between 30% and 40%).

#### 5. Reported Statistical Data Support a Market Rate in Antitrust Class Actions of 30% to 40%.

Empirical studies of fee awards in antitrust class actions further confirm that 33% is the market rate. Courts often rely on academic and government reports to determine the "market price" for class action contingent fees. *See, e.g.*, *In re Cabletron Sys., Inc. Secs. Litig.*, 239 F.R.D. 30, 41-42 (D.N.H. 2006) (relying on "comprehensive studies evaluating fee awards in class action cases" and collecting those studies).

A comprehensive study of 40 antitrust class actions found courts awarded contingent fees of 30% or more in the majority of cases with recoveries up to $100 million, with a median fee of 33.3% and an average of 28.2%. Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879 (July 2008). Similarly, the majority of courts in antitrust class actions with recoveries ranging from $100 million to $500 million awarded fees in excess of 30%. *Id.* at 911, tbl.7B.

A more recent study confirmed these findings, concluding that "in the twenty newer cases counsel tended to recover approximately 30% to 33.3% in cases with recoveries below $100 million and a similar or smaller percentage in cases with recoveries between $100 and $500 million." Joshua P. Davis, *Toward an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 SEATTLE U. L. REV. 1269, 1293-95 (2013). These empirical studies demonstrate that Class Counsel's request for a 33% fee is consistent with—and indeed represents—the median fee award in antitrust class actions with comparable recoveries.

**6. A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request.**

While the percentage-of-the-fund method is favored in the Seventh Circuit for calculating fees in common fund cases, courts may use a lodestar cross-check to understand class counsel's time and effort and determine the reasonableness of a fee. *See Dairy Farmers*, 80 F. Supp. 3d at 844. Although such a cross-check is not required, *Rohm & Haas II*, 658 F.3d at 636 ("consideration of a lodestar check is not an issue of required methodology"),[10]

[10] *See also Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 204 (N.D. Ill. 2018) ("The Court is not required to check its percentage-of-fee determination against the lodestar."); *Wright v. Nationstar Mortg. LLC*, No. 1:14-cv-10457, 2016 WL 4505169, at *17 (N.D. Ill. Aug. 29, 2016) (noting that a lodestar cross-check is not required); *Heekin*, 2012 WL 5878032, at *2

Class Counsel provide this information to further demonstrate the reasonableness of the requested fee.

Lodestar is derived by multiplying the hourly rate of the attorney or legal professional by the number of hours reasonably expended. *See Wright*, 2016 WL 4505169, at *14. A reasonable hourly rate is one that is consistent with the common rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *See Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (holding that the attorney's billing rate for comparable work is generally appropriate).

The base lodestar is often augmented by a multiplier that takes into account factors that affect the amount of the fees awarded. *See Cook v. Niedert*, 142 F.3d 1004, 1015 (7th Cir. 1998); *Florin*, 34 F.3d at 565; *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 255 (7th Cir. 1988). These include the complexity of the legal issues, the degree of success, and the public interest advanced by the litigation. *See Paz v. Portfolio Recovery Assocs., LLC*, 924 F.3d 949, 954 (7th Cir. 2019); *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). Also considered is the risk of non-payment. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991).

A lodestar cross-check strongly confirms the reasonableness of the requested fee here. From case inception through the preliminary settlement approval hearing and ruling (August 15, 2025), Class Counsel invested 46,267.7 hours of attorney and legal professional time in prosecuting this case. *See* Joint Co-Lead Decl. ¶ 17 resulting in a lodestar at historical rates of $24,139,079.25. Relative to the fee Class Counsel is seeking, this lodestar

---

(criticizing a class member for "overstat[ing] the importance of the lodestar method in this Circuit.").

represents a *negative* multiplier, or deflator, of approximately .67733. In other words, if awarded the requested 33% of the Settlement Fund net of anticipated maximum settlement administration expenses ($500,000) and total service awards ($280,000), Class Counsel will receive approximately 68% of their fees—calculated by hourly rates and total hours worked—that they incurred in prosecuting this case.

The deflator demonstrates that the percentage fee method results in Class Counsel recovering less than their lodestar value and represents a particularly conservative and reasonable fee request. Courts have approved fee awards where the lodestar cross-check shows *multipliers*,[11] and here the requested fee is a *deflator* of the actual lodestar, further confirming its reasonableness. The lodestar cross-check thus provides additional support for

---

[11] Courts routinely approve lodestar multipliers between 1.0 and 4.0 in complex contingency litigation. *See Cook*, 142 F.3d at 1015 (upholding the district court's decision to "enhance[] the lodestar by a multiplier of 1.5"); *Florin*, 34 F.3d at 565 ("Because class counsel have requested a multiplier of 1.53, the district court need not worry about exceeding what we have suggested is a sensible ceiling of double the lodestar."); *Harman*, 945 F.2d at 976 (internal citations omitted) (observing that "[m]ultipliers anywhere between one and four have been approved."); *Skelton*, 860 F.2d at 258 (suggesting "that a doubling of the lodestar would provide a sensible ceiling."); *Dairy Farmers*, 80 F. Supp. 3d at 849 (awarding a fee that equated to a multiplier of 1.34 on a lodestar cross-check); *Standard Iron Works v. ArcelorMittal*, No. 1:08-cv-05214, 2014 WL 7781572, at *2 (N.D. Ill. Oct. 22, 2014) (finding that the requested lodestar multiplier of approximately 1.97 was "well within the range of reasonable multipliers awarded in similar contingent cases."); *Schulte*, 805 F. Supp. 2d at 598 (approving an award that "represent[s] a multiplier of less than 2.5, which is not an unreasonable risk multiplier."); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1015 (E.D. Wis. 2010) (awarding a fee that represented a multiplier of 2.07 on a lodestar cross-check and recognizing that "the mean risk multiplier in cases involving class settlements comparable in size to the present settlement is 2.70.") (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees & Expenses in Class Action Settlements: 1993–2008*, 7 J. OF EMPIRICAL LEGAL STUD. 248, 274 tbl.15 (2010)); *accord In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 572 (9th Cir. 2019) (affirming lodestar multipliers of 1.5521 and 1.22 as "modest or in-line with others"); *Kelly v. Wengler*, 822 F.3d 1085, 1093, 1105 (9th Cir. 2016) (affirming lodestar multipliers of 2.0 and 1.3); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (upholding a lodestar multiplier cross-check showing a multiplier of 3.65).

the conclusion that the requested one-third fee is fair, reasonable, and well within market rates. S*ee, e.g.*, *In re Blech Securities Litig.*, No. 94 Civ. 7696 (RWS), 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000) (citing evidence that award would represent a negative multiplier of the lodestar as support for a 30% award); *In re TFT-LCD (Flat-Panel) Antitrust Litig.*, MDL No. 1827, 2013 WL 149692, at *1 (N.D. Cal. Apr. 3, 2013) (negative multiplier of 0.86 confirmed amount of attorneys' fees requested was fair and reasonable); *Gong-Chun v. Aetna Inc.*, No. 1:09-cv-01995-SKO, 2012 WL 2872788, at *23 (E.D. Cal. July 12, 2012) (negative multiplier of .79 suggested that fee award was reasonable); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 853–54 (N.D. Cal. 2010) (negative multiplier of .59 indicated fee award was "reasonable and a fair valuation of the services rendered to the class by class counsel"); *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007) (negative lodestar multiplier of 0.83 or 0.74 "suggests that the requested percentage based fee is fair and reasonable").

### C. Attorneys' Fees Calculation and Interest

As required by the Seventh Circuit, if awarded by the Court, the requested attorneys' fees will be calculated as 33% of the Settlement Fund net of administration costs and service awards. *See Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) (holding that courts must deduct the costs of administering the fund and service awards from the settlement amount when determining the reasonableness of the fee); *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014); *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill. 2018). Class Counsel further request that interest awarded on the attorneys' fees and litigation expenses be calculated at the same rate as earned on the Settlement Fund until

paid.[12] The Net Settlement Fund comprises the settlements Class Counsel reached with Defendants Surescripts and Allscripts, and the earlier settlement with Defendant RelayHealth, in addition to interest accrued on these settlement proceeds that have been placed in escrow.

### D. Counsel's Litigation Expenses Were Reasonably Incurred And Should Be Approved.

Under the common fund doctrine, class counsel customarily are entitled to reimbursement of reasonable expenses incurred in the litigation. Fed. R. Civ. P. 23(h); *see also In re Broiler Chicken Antitrust Litig.*, 2021 WL 5578878, at *4. Costs should be awarded based on the types of "expenses private clients in large class actions (auctions and otherwise) pay." *Synthroid,* 264 F.3d at 722; *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir. 1994). Reimbursable expenses include "expert witness costs; computerized research; court reporters; travel expense[s]; copy, phone and facsimile expenses and mediation." *Abbott v. Lockheed Martin Corp.*, No. 06–CV–701, 2015 WL 4398475, at *4 (S.D. Ill. July 17, 2015).

In notifying class members of the settlements, Class Counsel informed class members that they would seek repayment of such litigation expenses in an amount not to exceed $3.5 million. Class Counsel's actual current and ongoing expenses total $3,144,250.13, and consist of the following three categories of expenses: (1) $282,030.33 in expenses incurred

[12] Courts both within this Circuit and other Circuits commonly award interest on attorneys' fees. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637, ECF No. 5543 at 3 (N.D. Ill. April 19, 2022) (awarding interim attorneys' fees amounting to one third of the settlement fund, with a "proportional share of interest"); *In re Xcel Energy, Inc., Secs., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1004 (D. Minn. 2005) (awarding attorneys' fees "plus interest at the same rate earned by the settlement fund") (citation modified). Roughly two-thirds of the interest earned would go to the Class and 33% would be awarded to Class Counsel.

individually by each firm (primarily travel-related expenses), (2) $2,860,000 in common expenses paid by the Litigation Fund to which Class Counsel contributed, and (3) $2,219.80 in invoiced but unpaid amounts in deposition expenses. Expenses in each of these categories are described in detail in the Joint Co-Lead Decl. ¶¶ 22-32 and were reasonably necessary to advance the interests of the Class and to obtain the favorable results achieved to date. Due to the risk that they might never be recovered, Class Counsel endeavored to keep expenses to a minimum. Accordingly, Plaintiffs respectfully request that the Court approve these expenses in their total amount of $3,144,250.13.[13]

### E. The Class Representatives Should Receive Service Awards.

Plaintiffs request that the Court grant a service award of $35,000.00 to each of the eight Class Representatives: 731 Pharmacy Corp. d/b/a Ivan Pharmacy, Concord Pharmacy, Corner Pharmacy, Integrated Pharmaceutical Solutions LLC d/b/a Bartow Pharmacy Medical Supply, Jerald Whitman d/b/a Whitman Pharmacy, Kennebunk Village Pharmacy, Inc., Logan Primary Pharmacy, and Summers Pharmacy . Throughout this litigation, the Class Representatives advised Class Counsel and approved pleadings, reviewed and responded to written discovery, searched for, gathered, preserved, and produced documents, prepared for and sat for depositions, kept informed of the progress of the case, and other litigation activities. *See* Class Representative Plaintiff Declarations, enclosed in Compendium of Non-Co-Lead Class Counsel Declarations. They devoted their time and efforts to recovering their own overcharges and enabling other class members to recover theirs.

---

[13] If Plaintiffs foresee the possibility of incurring additional, relatively minimal expenses relating to administration of the Settlement, they will so advise the Court at the fairness hearing.

Courts regularly grant service awards to class representatives in recognition of the time and effort they invest in prosecuting class actions. Class representatives contribute to the successful resolution of a litigation by helping prepare pleadings, participating in discovery and depositions, continually providing information to class counsel, and participating in settlement negotiations. *See Williams v. Rohm & Haas Pension Plan*, No. 4:04-cv-00078, 2010 WL 4723725, at *2 (S.D. Ind. Nov. 12, 2010) (*Rohm & Haas II*"), *aff'd*, 658 F.3d 629 (7th Cir. 2011) ("Because a named plaintiff plays a significant role in a class action, an incentive award is appropriate as a means of inducing that individual to participate in the expanded litigation on behalf of himself and others."). Their contributions undoubtedly benefit the class as a whole, and courts in this Circuit routinely compensate class representatives for their service to the class. *See Cook*, 142 F.3d at 1016 (affirming $25,000.00 incentive award); *In re Potash Antitrust Litig.*, No. 1:08-cv-06910 (ECF No. 589) (N.D. Ill. June 12, 2013) (awarding $15,000.00 apiece in incentive awards).

Courts have approved comparable or higher service awards in complex antitrust class action litigation. *See In re Air Cargo Shipping Serv. Antitrust Litig.*, MDL No. 1775, 2015 WL 5918273, at *6 (E.D.N.Y. Oct. 9, 2015) (granting $540,000 in incentive awards, representing 0.06% of the settlement fund, to six class representatives).; *Alaska Elec. Pension Fund v. Bank of Am. Corp.,* No. 14-CV-7126 (JMF), 2018 WL 6250657, at *4 (S.D.N.Y. Nov. 29, 2018) (granting six named plaintiffs incentive awards of $50,000 each, and $100,000 to two other named plaintiffs, representing 0.09% of the settlement fund); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 438-439 (S.D.N.Y. 2016) (granting awards of $50,000 for each of the six class representatives, representing 0.12% of the settlement fund); *In re GSE Bonds Antitrust Litig.*, No. 19-CV-1704 (JSR), 2020 WL 3250593, at *6 (S.D.N.Y. June 16, 2020) (awarding

$400,000 in service awards, $50,000 each to two plaintiffs and $300,000 to one plaintiff, representing 0.10% of the settlement fund).

Courts consider various factors when determining an appropriate service award, including "the actions the [representative] has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the [representative] expended in pursuing the litigation." *Cook*, 142 F.3d at 1016 (citing *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267 (N.D. Ill. 1993)).

The requested service award of $35,000 per Class Representative is reasonable given the over six years of litigation, the substantial time and effort each Class Representative devoted to the case, and the significant benefit they secured for the Settlement Class. The total service awards of $280,000 for all eight Class Representatives represent only a small fraction—approximately 0.56%—of the Settlement Fund in this case. This amount is consistent with service awards approved in other antitrust class actions and fairly compensates the Class Representatives for their service. Their contributions have been instrumental to the success of this litigation, and the requested service awards are warranted.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion and award Class Counsel attorneys' fees of 33% of the Settlement Fund (net of administration costs and service awards) plus interest, reimbursement of litigation expenses of $3,144,250.13, and service awards of $35,000 to each of the eight Class Representatives.

Dated: November 14, 2025

Respectfully Submitted,

*/s/ Kenneth A. Wexler*

Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
Margaret L. Shadid
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
T: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
tjs@wbe-llp.com
ms@wbe-llp.com

Karin E. Garvey (N.D. Ill. Bar No. 2997831)
Brian M. Hogan (N.D. Ill. Bar No. 6286419)
**Scott+Scott Attorneys at Law LLP**
The Helmsley Building
230 Park Ave., 24th Floor
New York, NY 10169
T: (212) 223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com

Daniel E. Gustafson (pro hac vice)
Karla M. Gluek (pro hac vice)
Michelle J. Looby (pro hac vice)
**Gustafson Gluek PLLC**
120 South Sixth Street, Ste. 2600
Minneapolis, MN 55402
T: (612) 333-8844
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
mlooby@gustafsongluek.com

Tyler W. Hudson (pro hac vice)
Eric D. Barton (pro hac vice)
**Wagstaff & Cartmell, LLP**
4740 Grand Avenue, Ste. 300
Kansas City, MO 64112
T: (816) 701-1100
thudson@wcllp.com

ebarton@wcllp.com

Robert N. Kaplan (pro hac vice)
Elana Katcher (pro hac vice)
**Kaplan Fox & Kilsheimer LLP**
800 Third Ave., 38th Floor
New York, NY 10022
T: (212) 687-1980
rkaplan@kaplanfox.com
ekatcher@kaplanfox.com

W. Joseph Bruckner (pro hac vice)
Robert K. Shelquist (pro hac vice)
Brian D. Clark (pro hac vice)
Jessica N. Servais (pro hac vice)
**Lockridge Grindal Nauen PLLP**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
wjbruckner@locklaw.com
rkshelquist@locklaw.com
bdclark@locklaw.com
jnservais@locklaw.com

Gregory S. Asciolla (pro hac vice)
Jonathan S. Crevier (pro hac vice)
**DiCello Levitt LLP**
485 Lexington Ave, Ste. 1001
New York, NY 10017
T: (646) 993-1000
gasciolla@dicellolevitt.com
jcrevier@dicellolevitt.com

Jeffrey L. Kodroff
John Macoretta
**Spector Roseman & Kodroff, P.C.**
2001 Market Street
Philadelphia PA 19103
T: (215) 496-0300
jkodroff@srkattorneys.com
jmacoretta@srkatorneys.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*